THE PAYNTER LAW FIRM PLLC
Stuart M. Paynter (226147)
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Robert B. Carey (*Pro Hac Vice pending*)
Leonard W. Aragon (*Pro Hac Vice pending*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Attorneys for Plaintiff Robin Antonick E-filing

[Additional Counsel Listed on Signature Page]

EDL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ANTONICK, an Illinois Citizen,<br><br>      Plaintiff,<br><br>      v.<br><br>ELECTRONIC ARTS INC., a California<br>corporation,<br><br>      Defendant. | Case No. cv 11 1543<br><br>**COMPLAINT**<br><br>***REDACTED***<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff, by and through his attorneys, based on his individual experiences, the

2    investigation of counsel, and upon information and belief alleges as follows:

3                                    **I.    INTRODUCTION**

4    1.    Plaintiff Robin Antonick developed the first version of Electronic Arts' now-famous

5    Madden NFL Football videogame for the Commodore 64, MS DOS and Apple II platforms. The

6    first version of Madden was widely recognized as ground-breaking. At the time, it was widely

7    thought impossible to successfully simulate an actual football game with eleven players on the field

8    for each team due to the processing power limitations of then current hardware. Not only did

9    Antonick develop the first commercially successful football game to simulate 11x11 football, he

10   did it with a degree of realism that was wholly unprecedented. Antonick's ground-breaking

11   software was made possible by his programming skill and creativity combined with a practical

12   understanding of the game derived from a life of playing football, including time at the collegiate

13   level.

14   2.    Antonick developed the first Madden videogame pursuant to a series of

15   development contracts with Electronic Arts which culminated in a contract executed in 1986 (the

16   "1986 Contract"). This 1986 Contract has never been terminated and remains in force to this day.

17   It requires Electronic Arts to pay Antonick royalties on not only the versions of the Madden game

18   developed by him but also any derivative works and any works "derived" from derivative works.

19   There can be little factual dispute that Antonick was the developer of the first Madden game

20   released in 1988 and is listed on the game as such.

21   3.    For decades, Electronic Arts has avoided paying these royalties by affirmatively and

22   fraudulently misrepresenting to Antonick the derivation of the current generation of Madden

23   football games. Only recently, as a result of publicity surrounding the 20th Anniversary of the

24   Madden videogame, did Antonick become aware that Electronic Arts did not independently

25   develop subsequent versions of its Madden NFL software. Instead, according to recent statements

26   by Electronic Arts founder Trip Hawkins, the current generation of software apparently was

27   derived from software developed by Antonick. In fact, as the result of extensive interviews and

28   research triggered by Hawkins' admission, Antonick learned that the lead executive at Electronic

1

1    Arts in charge of interacting with him and who had intimate knowledge of his code then turned

2    around and spent "countless hours" working on Electronic Arts' supposedly "independently"

3    developed versions of the code.

4        4.       As a result of Electronic Arts' fraudulent behavior, Antonick has been unlawfully

5    deprived of tens of millions of dollars in royalty payments owed under the 1986 Contract and has

6    been deprived of the right to collect even more royalties going forward. Antonick brings this

7    action to recover royalty payments owed now and in the future.

8        5.       In addition, because Electronic Arts intentionally defrauded Antonick of his

9    contractual rights and valuable intellectual property, Antonick requests that Electronic Arts be

10   required to pay an amount equal to the profits that it has earned as the result of its fraudulent

11   behavior and pay punitive damages.

12                                    II.      PARTIES

13       6.       Plaintiff Robin Antonick, an individual, is an Illinois resident. A successful college

14   football player himself, Antonick has always had a passion for football. With the advent of modern

15   computing, Antonick combined his passion for football with a talent for programming by designing

16   a football videogame prototype that ultimately became the Madden NFL videogame. Antonick has

17   had a successful career in the technology industry including most recently holding the position of

18   Chief Web Officer and Chief Online Marketing Officer at The Christian Science Monitor.

19   Antonick recently received a Masters in Management from Harvard University.

20       7.       Defendant Electronic Arts Inc., a Delaware corporation, is a multi-billion dollar

21   interactive entertainment software company that produces the Madden NFL videogame franchise.

22   It describes itself as the "world's leading interactive entertainment software company." Electronic

23   Arts' principal place of business is Redwood City, California.

24       8.       As of 2010, Electronic Arts has sold more than 85 million copies of Madden

25   Football for over $4 billion in sales.

26                          III.     JURISDICTION AND VENUE

27       9.       This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332

28   because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

                                             3

1    10.    This Court has personal jurisdiction over the Plaintiff because Plaintiff submits to

2    the Court's jurisdiction. This Court has personal jurisdiction over the Defendant because

3    Electronic Arts is headquartered in the District. Furthermore, many of the actions giving rise to the

4    complaint took place in the District. Exercise of personal jurisdiction over Plaintiff and Defendant

5    is additionally appropriate because the 1986 Contract expressly provides that agreement "will be

6    deemed entered into in San Mateo County, California."

7    11.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendant, as a

8    corporation, is deemed to reside in any judicial district in which it is subject to personal

9    jurisdiction. Because Electronic Arts resides in the District, Defendant transacts business within

10   the District, and a substantial part of the events giving rise to the claims arose in this District, venue

11   is proper. Venue is additionally appropriate because the 1986 Contract contains a venue provision

12   that expressly provides that agreement "will be deemed entered into in San Mateo County,

13   California."

14   12.    Intradistrict Assignment: Assignment to the San Francisco or Oakland division of

15   this Court is appropriate because Defendant's headquarters and principal place of business is in

16   Redwood City, California. Because this action arises in the county of San Mateo, pursuant to

17   Northern District of California, Local Rule 3-2(d), assignment to either the San Francisco Division

18   or the Oakland Division is proper.

19   ### IV.    BACKGROUND

20   **A.    Antonick's Initial Collaboration With Electronic Arts**

21   13.    Early football videogames suffered from substantial limitations. A typical real life

22   football game has eleven players from each team on the field. Given the limited hardware

23   resources of the era, the complex calculations required to calculate "moves" for an eleven player

24   team meant that prior to Madden NFL no commercially successful football videogames existed that

25   actually utilized eleven man teams. Instead, most available games utilized 5x5 formations and at

26   the time, a realistic 11x11 simulation was widely thought impossible.

27   14.    Moreover, although complex for the time, the software engines underpinning these

28   early games were simplistic by modern standards. Players generally ran predetermined routes and

4

COMPLAINT

the outcome of various plays was determined by static rules. As a result, gameplay rapidly became boring and predictable for experienced players.

15.     Against this backdrop, Antonick approached Electronic Arts founder and CEO Trip Hawkins in 1983 with astonishing news: he had developed a working prototype 11x11 football videogame for the Apple II computer. Moreover, not only did the software use eleven players per team, but in addition, Antonick utterly revolutionized gameplay by utilizing sophisticated models of player behavior in place of static rules-based gameplay. The use of these player models resulted in gameplay that was adaptive and less predictable, which in turn vastly improved the gaming experience.

16.     Given the groundbreaking nature of Antonick's work, Electronic Arts immediately signed him to a development contract (the "1983 Contract") pursuant to which Antonick agreed to develop a commercial version of his software. In particular, he agreed to develop "a simulation of professional football as played in the N.F.L." To achieve "realism," the contract specified that the "main display screen will display two full eleven (11) man football teams" and that "all rules of N.F.L. football will be recreated."

17.     In addition to paying Antonick for the additional development work necessary to transform the game into a commercial version that realistically replicated an NFL game, Electronic Arts agreed to pay Antonick royalties on each sale. Specifically, Electronic Arts agreed to pay him a royalty of 15% on any works he developed and 5% on any works developed by Electronic Arts that derived from his works. 1983 Contract, § V.

18.     Following the signing of the 1983 Contract, Antonick immediately began developing a commercial version of the software. During the period 1983-1986 superseding contracts and amendments were signed as Electronic Arts insisted on the addition of new or revised features.

19.     During this period, Electronic Arts signed a deal with John Madden to utilize his name and likeness in the game. More than simply a branding deal, it required extensive technical integration of John Madden into the game itself. Specifically, Antonick translated Madden's playbook and play calling into computer algorithms and integrated them into the program,

5

including but not limited to, a feature called "Ask Madden" that permitted a user to essentially call on John Madden's playbook and Madden's situational play calling expertise for the execution of plays.

20.     Antonick's translation of Madden's plays and expertise Antonick derived from analyzing Madden's behavior as an NFL coach into computer code was extraordinarily valuable intellectual property and required literally hundreds of hours of work. In addition, it required a skilled programmer with extensive knowledge of real-life football, a rare combination of skills that only Antonick possessed. Antonick's intimate knowledge of football derived from his career as a successful college athlete as well as his experiences with several close relatives members who played professionally in the NFL.

21.     During this period, Electronic Arts founder Trip Hawkins and other Electronic Arts' employees had extensive and unfettered access to Antonick's source code, design documents and other intellectual property.

**B.     The 1986 Contract**

22.     In 1986 the parties negotiated a new contract. The new contract ("1986 Contract") remained limited to the "simulation of professional football." The main change from the 1983 Contract was that the parties mutually agreed to lower the relatively high royalty schedule in the 1983 Contract. Antonick agreed to this modification in part because Electronic Arts represented to him that they were incurring higher costs as a result of its license with John Madden. Primarily though, Antonick agreed to this modification because Electronic Arts informed him that it anticipated the product to be a long-term commercial success. Electronic Arts assured him, however, that he would remain the principal architect of the Madden product, his intellectual property would remain foundational and that he would receive royalties on all works derived from his work. In short, Antonick gave up high royalty rates for a promise that he would receive lower royalties over a longer period of time for a product that both parties believed would be commercially very successful over the long-term. Specifically, the royalty rate for works Antonick developed was slashed by more than half to 7% and the royalty on "derivative works" developed by Electronic Arts dropped eighty percent from 5% to 1%.

6

23.     The 1986 Contract defines a derivative work as "any computer software program or electronic game which either (a) constitutes a derivative work within the meaning of United States copyright law or (b) produces audiovisual effects which infringe the copyright in the audiovisual effects produced by the derivative Work." It expressly notes that the term includes "significant enhancements of the Work to add additional features or improve performance and adaptations of the Work to operate on computers or operating systems other than those described in the Specifications."

24.     The 1986 Contract also created a new royalty category termed "Remote Derivative Work." A subset of derivative works, a remote derivative work is defined as "a Derivative Work by [Electronic Arts] derived directly from another Derivative Work by [Electronic Arts] that runs on a Microprocessor Family different from that of the Work." The royalty rate on remote derivative works is defined as half of the royalty provided for Derivative Works. Because the royalty for Derivative Works was originally set at one percent, this meant that the original royalty for Remote Derivative Works was half of one percent.

25.     The creation of this new category of remote derivative work with its dramatically lower royalty rate confirms the express language in the preamble that both parties contemplated a "long-term relationship" during which Antonick would receive royalties during the entire lifespan of the Madden franchise unless and until Electronic Arts developed its own version wholly without any reference whatsoever to Antonick's intellectual property.

26.     In addition to providing Antonick with royalties, the 1986 Contract contains certain notification provisions. *First*, it obligates Electronic Arts to place a copyright notice crediting Antonick on all works he developed as well as any derivative works, including remote derivative works. *Second*, any time Electronic Arts desires to develop a derivative work, the 1986 Contract obligates Electronic Arts to provide Antonick with "written notification" and an "opportunity to develop" the derivative work.

27.     Pursuant to the 1986 Contract, Antonick continued development work on the Madden software. The first version of the software was released in 1988 for the Apple II computer

7

and 1989 on the Commodore 64 and IBM PC, which were the only versions of Madden branded football at that time.

28.     During this period, Electronic Arts founder Trip Hawkins and Electronic Arts developers, including most notably Electronic Arts employees Richard Hilleman and Bing Gordon had extensive access to and thorough knowledge of Antonick's code, design documents and other intellectual property.

29.     Hilleman in particular worked closely with Antonick for several years. By 1988, Hilleman had become Trip Hawkins' right hand man on Madden development assuming functions from Hawkins as Electronic Arts' lead producer on Antonick's Madden effort, which included a contractually mandated relocation of Antonick's team to Electronic Arts' offices in San Francisco.

30.     Hilleman's cubicle was located only a few feet from the space Electronic Arts provided and required Antonick and his team to occupy specifically for the purpose of finishing the original Madden product. Electronic Arts obligated Antonick to work hand in hand with Hilleman and his team. Hilleman's effort was intense, deep, and constant with extended hours focused on understanding Antonick's approach, designs, code and all his intellectual property.

31.     During this time it was common to have design whiteboard and detailed source code review sessions of Antonick's intellectual property with Hilleman and his team after they used the product and developed questions. This relationship would continue through the end of Antonick's relationship with EA in 1992.

## C.     The Sega Amendment

32.     After the release of Madden for the Apple II platform, Electronic Arts immediately began versions for other platforms. Most notably, Antonick was retained to do extensive work on the Commodore 64, Sega, PC, and Nintendo platforms. With respect to the Sega and Nintendo platforms, an October 1989 amendment increased the royalty rate to 3% for derivative works.

33.     The parties did not modify the provision in the 1986 Contract that calculated the royalty of remote derivative works as half the royalty for remote works. Consequently, following the Sega Amendment, the royalty for remote derivative works increased to 1.5%.

8

**D.     Antonick's Intellectual Property Is The Foundation Of The Madden Franchise**

34.     The Madden software developed by Antonick pursuant to the development agreements outlined above was truly revolutionary. Football games of the day were generally statistics based. In other words, the play selection determined the result of the play via statistical analysis, which was then animated on a 2D visual surface. Antonick developed a new revolutionary approach. Rather than relying on statistics, Antonick used complex algorithms to model the behavior of actual NFL players one player at a time using a complex system of player ratings. Play and game results were determined not through easily controlled statistical comparisons but through a complex modeling of human behavior and physics within the context of then-existing NFL rules. Antonick was uniquely able to provide this approach because not only was he a skilled programmer but he had also played college football and had close relatives who were actual NFL players. Nobody else at Electronic Arts had this unique background.

35.     On information and belief, Antonick's highly confidential and highly proprietary methods of simulating actual NFL player behavior were incorporated by Electronic Arts into subsequent versions of Madden NFL produced by Electronic Arts. Electronic Arts has paid Antonick no royalties on these subsequent versions. Antonick's methodologies are highly complex, required advance programming and required years of constant refinement to develop.

36.     Antonick's approach to simulating defensive players' interceptions of a ball carrier represents an example of the type of player modeling that was developed by Antonick and, on information and belief, copied by Electronic Arts in subsequent versions of its Madden videogame. Typical football simulations simply calculated the last position of the ball carrier and sent defensive players towards that last position. This approach did not achieve the realism that Electronic Arts and Antonick desired and which is to this day the hallmark of Electronic Arts' Madden game.

37.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT



45.     In addition to the complex algorithms by which Antonick simulated actual player

behavior, other aspects of Antonick's approach were equally revolutionary.

COMPLAINT

46.     For example, prior games presented the user with a two-dimensional visual field. Resolving logical issues in three dimensions was simply too complex for the computing power of the day because it would require a 360 degree compass and a fully integrated Z coordinate.

47.     Antonick solved this issue in a unique and revolutionary manner. ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ Thus, Antonick's code allowed users to experience the game in three dimensions even though the processing power of the day was woefully inadequate to truly operate in such an environment.

48.     On information and belief Electronic Arts utilized Antonick's 3D technologies in subsequent versions of Madden NFL in violation of Antonick's contractual and intellectual property rights.

49.     Some of Antonick's valuable intellectual property never made it into the released version of Madden but was intended by the parties to be utilized in subsequent versions, for research and development purposes or debugging or both.

████ For example, Antonick developed and presented to Electronic Arts several ways to implement an instant replay feature. ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

12

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   53.    On information and belief, Electronic Arts utilized Antonick's instant replay

24   technologies in subsequent versions of Madden NFL in violation of Antonick's contractual and

25   intellectual property rights.

26   54.    Antonick supplied other instant replay features that were not incorporated into the

27   original Madden releases.

28

13

1

2                                                                              These features were highly

3    confidential intellectual property and required advance programming skills to develop.

4          55.     On information and belief Electronic Arts utilized the above instant replay features

5    in subsequent versions of Madden NFL in violation of Antonick's contractual and intellectual

6    property rights.

7                  Another example of Antonick's groundbreaking intellectual property was his

8    development of an independent camera that could be positioned in a 3D space.  Antonick

9    developed code that allowed the user

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

57.     On information and belief, Electronic Arts utilized Antonick's 3D camera technologies in subsequent versions of Madden NFL in violation of Antonick's contractual and intellectual property rights.

58.     During the entire period described above, Trip Hawkins, Bing Gordon, Richard Hilleman and other Electronic Arts employees had extensive access to and knowledge of Antonick's code, design documents and other intellectual property, including that outlined above. Richard Hilleman in particular spent hundreds of hours playing and reviewing Antonick's code and other intellectual property and had intimate knowledge of the complex solutions developed by Antonick to model NFL behavior and physics.

**E.     EA's Assurances That It Would Safeguard Antonick's Intellectual Property**

59.     Antonick's contracts with EA had strict confidentiality provisions. Specifically, EA agreed "to hold in confidence all Confidential Information" of Antonick and "use at least the same degree of care that it uses to protect its own Confidential Information . . . ." Confidential Information was defined as "the source code developed by" Antonick, any development aides and any other information designated by Antonick as Confidential.

60.     Consistent with the contractual provisions, during the entire period in which Antonick was engaged in development work, Electronic Arts repeatedly assured Antonick that it would safeguard his intellectual property.

61.     Industry standard practice when a company wishes to develop its own version of previously licensed software is to ensure that the subsequent development occurs in a "clean room" development environment. A "clean room" is a development environment in which the relevant designers, developers, and programmers have no access to or knowledge of the prior intellectual property they are attempting to replicate. Generally, the safest and most efficient approach is to hire third party contractors, who have not had access to the prior intellectual property and are not given such access.

62.     Electronic Arts told Antonick and other developers that if it terminated a development contract but wanted to keep producing software with similar functionality, it would ensure that it developed such software in a "clean room" development environment.

15

COMPLAINT

63.     Electronic Arts went so far as to give its independent programmers and developers including Antonick extensive seminars on the "clean room" development methodology as part of conferences known as Artists Symposiums that it organized for its independent programmers and developers Electronic Arts had under contract. The presentations on independent development methodology were conducted by Electronic Arts' internal tools team in conjunction with in-house and outside counsel who represented Electronic Arts. Counsel for Electronic Arts would update the assembled programmers on the latest developments in intellectual property law as it related to infringement whether intentional or unintentional. Antonick explicitly remembers Electronic Arts' counsel telling the assembled programmers at one such Symposium that even short casual conversations in the lunch room could result in potential claims being brought and programmers were cautioned to consult with EA's legal team before integrating any suggestions by consumers or other third parties into their development work as doing so could result in intellectual property claims.

64.     EA also professed to have used a clean room methodology itself in reverse engineering Nintendo's development tools that they required Antonick to use.

65.     Thus, Antonick reasonably believed, and was specifically told by EA, that if EA sought to duplicate the functionality of his software it would, consistent with what it preached, not utilize any of his intellectual property and not allow individuals who had access to his intellectual property to work on a technical level on subsequent versions of Madden.

## V.     ELECTRONIC ARTS' FRAUDULENT FAILURE TO PAY ROYALTIES

66.     At some point in 1990, Electronic Arts realized that the Madden videogame represented software that could be easily franchised. Because of its reliance on actual NFL rosters, unlike most videogames, Madden could be sold, with minimal enhancements, on an annual basis thereby reaping enormous profits to Electronic Arts every year.

67.     Unknown to Antonick, Electronic Arts decided that it did not want to share these profits with him even though he was responsible for the development of virtually all the ground-breaking technology at the heart of the game and even though Electronic Arts had committed to a long term relationship in which it would pay him royalties over the entire life of the franchise.

16

1    68.    Without informing Antonick or providing him with his contractual first right of

2  refusal for development work, Electronic Arts quietly hired the development company Park Place

3  Productions to rush to market a Sega version of Madden for the new Sega Genesis platform.

4    69.    In the summer of 1990, Antonick first became aware of the existence of the Park

5  Place development team. On August 28, 1990, Plaintiff had a call with EA employee Richard

6  Hilleman. EA employee Bing Gordon, upon information and belief, was also on the call.

7    70.    During the call, Richard Hilleman informed Plaintiff that the reason he had not been

8  given his contractual first right of refusal was that the Sega version was going to be more of an

9  "arcade" game and that it was being developed without any reference or use of his intellectual

10  property. Indeed, Hilleman assured Plaintiff repeatedly during this conversation that none of his

11  intellectual property was being used. Plaintiff reasonably relied on these statements, and therefore

12  did not attempt to enforce his contractual rights or otherwise protect his intellectual property.

13  Further, Robin continued to fulfill his contractual obligations by contributing intellectual property

14  to Electronic Arts. Unbeknownst to Antonick, Electronic Arts was deliberately utilizing his

15  intellectual property in developing the Sega version with Park Place Productions and in developing

16  subsequent versions. Electronic Arts made zero effort to establish a clean room development

17  environment and its assurances to the contrary were false and known to Electronic Arts to be false.

18    71.    Unbeknownst to Antonick, Electronic Arts' employees who had possessed and

19  continued to possess unfettered access to his code and intellectual property, including but not

20  limited to Richard Hilleman, Trip Hawkins and Bing Gordon, continued working on subsequent

21  versions of Madden. Richard Hilleman recently acknowledged in a declaration dated November

22  17, 2009 that he "oversaw the development of the *John Madden Football* series from 1988 to

23  1993/94."

24    72.    Richard Hilleman remains at Electronic Arts as its Chief Creative Officer. On

25  information and belief, he continues to be involved in the production of Electronic Arts' Madden

26  software.

27    73.    The founder of Park Place Productions has stated on his website that Richard

28  Hilleman spent "countless hours" assisting Park Place Madden development. Among other things,

17

COMPLAINT

1    Richard Hilleman provided Park Place with technical pointers, technical solutions and even worked

2    directly on Park Place code. Given Richard Hilleman's extensive knowledge of Antonick's code, it

3    would not be possible for Hilleman to spend "countless hours" working on subsequent versions of

4    Madden without benefiting from and in fact utilizing Antonick's ground-breaking prior

5    development work.

6         74.    Significantly, the founder of Park Place Productions stated in a November 24, 2009

7    interview that Park Place was not even aware that the game produced would be an NFL game until

8    shortly before release and that player ratings were completely supplied by Electronic Arts. Thus,

9    the incorporation of player ratings among other NFL related elements necessarily derived from

10   Antonick's prior work.

11        75.    Most shocking of all, the founder of Park Place Productions stated in the same

12   interview that he only met with John Madden on a single occasion at a promotion event. He

13   affirmed that he never possessed Madden's playbook, never integrated Madden in the game and

14   never developed any algorithms based on Madden's playbook. Thus, John Madden's extensive

15   integration into the Madden franchise derives from Antonick's work, which translated his plays

16   into sophisticated computer algorithms. Prior to the November 24, 2009, interview Antonick was

17   not aware of this fact.

18        76.    The Sega version of Madden produced by Park Place was produced in a record "six

19   months." The sole assigned programmer Jim Simmons has stated under oath that he was the "only

20   programmer/developer on the [Madden] project." Mr. Simmons had never developed a

21   professional football game before and in fact had never even developed a commercial software

22   production. Additionally, he had no football experience.

23        77.    It would not be possible for Simmons to complete development in a record six

24   months, particularly given his inexperience, without the substantial input of Electronic Arts and the

25   intellectual property of Antonick. This is not speculation. In the November 24, 2009 interview,

26   Park Place founder stated that "Hilleman came down to our office and lived there for well over a

27   month with Simmons turning something that looked good into something that actually played great

28   football." Once again, it was impossible for EA to have created Madden football in a clean room

                                              18

1    development environment without access to and benefitting from Antonick's work product when

2    the developers barely knew that they were creating an NFL football videogame.

3       78.    Having already misappropriated Antonick's intellectual property, EA attempted to

4    induce Antonick to give up his contractual rights. In furtherance of its scheme, Electronic Arts

5    employee Bing Gordon called Antonick and told him that in light of potential legal issues with

6    Nintendo arising out of Electronic Arts' reverse engineering of Nintendo's development tools, it

7    would be necessary to terminate certain contractual rights for "legal reasons." Trusting Electronic

8    Arts and not questioning that such termination was necessary for legal reasons, Antonick signed an

9    amendment entitled a "Termination Amendment" in June 1991.

10      79.    Gordon's statements to Antonick were false and known to Electronic Arts to be

11   false. Had Antonick known that Electronic Arts was, in fact, stealing his technology, Antonick

12   would have taken immediate steps to protect his contractual and intellectual property rights.

13   Antonick, however, had no reason to believe that Electronic Arts' statements were false or that it

14   had misappropriated his intellectual property or breached its contractual obligations. Antonick

15   believed, and had no reason to believe otherwise, that the Sega version was developed

16   independently and without reference to his intellectual property as Electronic Arts informed him.

17      80.    The 1991 Termination Amendment terminated Antonick's contractual rights "solely

18   with respect" to the John Madden football "software program" for the "Nintendo Entertainment

19   System."

20      81.    The Termination Amendment expressly states that all other provisions of the 1986

21   Contract remained in "full force and effect." Thus, with respect to all other platforms, the 1986

22   Agreement remained in force and remains in force to this day.

23      82.    Through the Termination Amendment, Electronic Arts reiterated and incorporated

24   by reference its assurances in the 1986 Contract that it would protect Antonick's intellectual

25   property. At the time of the execution of the 1991 Termination Amendment, those assurances were

26   false and known to Electronic Arts to be false. Had Electronic Arts informed Antonick of the truth,

27   Antonick would have taken steps to protect his intellectual property and to collect the royalties to

28

19

COMPLAINT

1    which he was entitled. Instead, Antonick relied on Electronic Arts' false statements by failing to

2    enforce his contractual rights to royalties on the Madden software.

3        83.    Electronic Arts additionally intentionally and falsely represented to Antonick that

4    his intellectual property was not utilized in its Madden software by failing to place a copyright

5    notice crediting Antonick on the packaging of any version of Madden released after 1991 as

6    required by the 1986 Contract. Again, Antonick relied on EA's false statements by failing to

7    enforce his contractual rights and failing to take steps to protect his intellectual property.

8        84.    In an additional measure to conceal its unlawful conduct and contractual breaches,

9    Electronic Arts provided Antonick with regular quarterly royalty statements which affirmatively

10   and falsely represented that it owed him no royalties on software released after 1991. Electronic

11   Arts provided Antonick with these fraudulent royalty statements for many years following the

12   termination of its relationship with Antonick. Antonick relied on these false and fraudulent royalty

13   statements by failing to enforce his contractual rights and failing to take steps to protect his

14   intellectual property

15       85.    Antonick received his last royalty payment in approximately 1992.

16   **VI.    CONTINUING ROYALTY DOCTRINE AND THE TOLLING OF THE
             STATUTE OF LIMITATIONS**

17

18       86.    California has adopted the continuing royalty doctrine pursuant to which a cause of

19   action accrues each time royalties are due. Under the relevant contractual provisions, Antonick is

20   entitled to royalties each quarter. Therefore, a new cause of action accrues quarterly and

21   Antonick's claims are not barred by the statute of limitations.

22       87.    Moreover, the statute of limitations has been tolled because Electronic Arts

23   fraudulently concealed its misappropriation of Antonick's intellectual property and contractual

24   breaches. Specifically, as discussed above, Electronic Arts employee Richard Hilleman

25   affirmatively represented to Antonick that it had developed the Sega version of Madden

26   independently and without the use of or reference to his intellectual property. These assertions

27   were false and known to EA to be false. In addition, in connection with the 1991 Termination

28   Amendment, EA expressly and affirmatively represented that it would protect Antonick's

20

1   intellectual property. These assertions were false and known to be false. In fact, EA was already

2   misappropriating Antonick's intellectual property.

3       88.     Electronic Arts further concealed its fraud, misappropriation and contractual

4   breaches by failing to give Antonick "written notice and the opportunity to develop" derivative

5   works as would be required under the 1986 Contract if Electronic Arts were utilizing his

6   intellectual property in whole or in part. By failing to give this notice, Electronic Arts'

7   intentionally and falsely represented that subsequent versions of Madden were not subject to

8   royalty payments.

9       89.     Electronic Arts further concealed its fraud, misappropriation and contractual

10  breaches by sending Antonick royalty statements that were false and misleading because they

11  failed to list the Sega version of Madden and subsequent versions of Madden as derivative works,

12  even though EA had an affirmative duty to do so.

13      90.     Electronic Arts further concealed its fraud, misappropriation and contractual

14  breaches by failing to put copyright notices on the Sega version and subsequent versions of

15  Madden crediting Antonick despite affirmative contractual duties to do so.

16      91.     Antonick relied on all Electronic Arts' false and fraudulent statements above.

17  Specifically, in reliance on these statements, Antonick did not enforce his contractual and

18  intellectual property rights until this action.

19      92.     Given Electronic Arts' express misrepresentations, Antonick had no reason to

20  believe Electronic Arts owed him royalties. Only with the extensive publicity surrounding

21  Electronic Arts' Madden NFL "20th Anniversary" celebrations did Antonick become aware that

22  Electronic Arts had continued to create derivative works from his work and considered its current

23  software to have derived from Antonick's intellectual property. Specifically, in its publicity

24  materials surrounding the 20th Anniversary Electronic Arts, to Antonick's surprise traced its current

25  software back to his software *not* the version developed by Park Place.

26      93.     Similarly, in numerous recent interviews given to celebrate the 20th Anniversary of

27  Madden, Electronic Arts founder Trip Hawkins expressly traces the origin of the Madden software

28  to the 1988 version developed by Antonick and repeatedly observes that this version—as opposed

                                        21

1  to subsequent versions—took "four years" to make because many complex programming issues

2  were first solved in that version. When an acquaintance told Antonick about the Hawkins

3  interview broadcast on CNBC on July 10, 2009 it was the first time that Antonick would have been

4  put on notice that Electronic Arts might have misappropriated his intellectual property and

5  breached its contractual obligations.

6      94.    Shocked that Electronic Arts had not developed subsequent versions of the Madden

7  software independently and in fact was now tracing them all back to *his* software, Antonick

8  contacted Electronic Arts in 2009. Electronic Arts quickly entered into a tolling agreement

9  effective September 8, 2009.

10      95.    Despite extensive negotiations between Antonick and high-ranking Electronic Arts

11  executive, which included an exchange of early source code, Antonick and Electronic Arts were

12  unable to resolve their dispute.

13      96.    The parties agreed that all communications made between Antonick and Electronic

14  Arts during these settlement negotiations would be completely confidential. The parties

15  additionally agreed, subject to a few express exceptions, that the source code analysis would

16  remain confidential as well and the analysis could not be discussed by Antonick in his complaint.

17      97.    Plaintiff reserves the right to amend his complaint to add additional claims once

18  Plaintiff receives sufficient source code from Electronic Arts during discovery in this matter.

19      98.    Electronic Arts terminated the tolling agreement as of January 21, 2011.

20  **VII.    WIDESPREAD USE OF ANTONICK'S INTELLECTUAL PROPERTY**

21      99.    Electronic Arts' Sega version of Madden was derived from Antonick's works.

22      100.    Every version of Electronic Arts' Madden software is derived from prior versions

23  within the meaning of the 1986 Contract.

24      101.    Every version of Electronic Arts' Madden software is thus a "remote derivative

25  work" within the meaning of the 1986 Contract.

26      102.    Electronic Arts' use of Antonick's intellectual property likely extends far beyond

27  the Madden franchise.

28

COMPLAINT

103.   On information and belief, Electronic Arts' Bill Walsh College Football and NCAA Football franchises are derived from its Madden software and are therefore "remote derivative works" within the meaning of the 1986 Contract.

104.   In connection with the 20th Anniversary celebrations of Madden, Trip Hawkins publicly admitted that Electronic Arts had used Antonick's "engine" in its hockey game. Consistent with this, Electronic Arts provided Plaintiff with a declaration from founder Trip Hawkins stating that the Sega version "was used to develop future versions in the (Madden) franchise and EA's hockey game."

105.   On information and belief, Electronic Arts' hockey game is therefore a "remote derivative work" within the meaning of the 1986 Contract.

106.   On information and belief, other sports titles produced by Electronic Arts may utilize the intellectual property of Antonick and therefore constitute remote derivative works within the meaning of the 1986 Contract.

## VIII.   PATTERN OF INTELLECTUAL PROPERTY MISAPPROPRIATION

107.   Electronic Arts' cavalier treatment of Antonick's intellectual property and contractual rights is symptomatic of a corporate culture that has long taken a "so sue me" approach to the use of third party intellectual property that it does not own and generally devalues the importance of intellectual property. Antonick vividly recalls attending an EA function at which Larry Probst, the current chairman of EA, told the assembled programmers: "I could sell sh*t in a box. I do it every day."

108.   Symptomatic of this culture, soon after hiring Park Place Productions to assist with the production of the Madden game, Electronic Arts simply hired Park Place's lead developer and used him to develop subsequent versions of Madden, NCAA, and hockey without the involvement of Park Place. On information and belief, Electronic Arts was forced to settle with Park Place for a substantial sum.

109.   Nothing has changed in the intervening years. For example, in a situation eerily familiar to Antonick, in the late 1990s, Electronic Arts published the Motocross cycling game made by the French software company Delphine Software. Pursuant to its agreement with

23

1  Delphine, Electronic Arts had access to all its source code and other confidential information.

2  Eventually, Electronic Arts decided that it wanted to make its own game SuperCross. It did so

3  without ever establishing a clean room development environment. Delphine was forced to sue

4  Electronic Arts and the case settled after the court found that Delphine had "demonstrated a

5  cognizable non-frivolous claim."

6       110.    Similar conduct persists to this day. In the face of Activision's "Call of Duty"

7  franchise, which was generally considered far superior to EA's competing title "Medal of Honor,"

8  EA simply hired away the developers of Call of Duty. Activision has been forced to go to court in

9  order to defend its intellectual property from Electronic Arts.

10       111.    Electronic Arts has also become notorious for using the names and likenesses of

11  individuals without their permission. Most notably, EA has for years utilized actual NCAA

12  football and basketball players in its NCAA brand videogames without compensating them. EA

13  has also used the likenesses of certain retired players in its Madden software without authorization.

14  Similarly, EA recently used the likenesses and personality of an actual U.S. Special Forces soldier

15  in and on the box cover of its Medal of Honor videogame without providing compensation. In

16  each instance, the affected individuals have been forced to pursue legal against Electronic Arts to

17  vindicate their statutory publicity rights.

18                    **IX.**    **CAUSES OF ACTION**

19                    **FIRST CAUSE OF ACTION**

20                      **(Breach of Contract)**

21       112.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

22  set forth herein.

23       113.    The 1986 Contract as subsequently amended constitutes a valid and enforceable

24  contract that has never been terminated except with respect to the Nintendo platform.

25       114.    Every version of Madden produced by Electronic Arts is a derivative work or

26  remote derivative work within the meaning of the 1986 Contract.

27

28

24

115.    Electronic Arts has breached the terms of the 1986 Contract and amendments thereto by failing to pay royalties on versions of Madden other than those developed directly by Antonick.

116.    As a result of Electronic Arts' breaches, Plaintiff has been injured. Specifically, Electronic Arts owes tens of millions of dollars in back royalties and interest and a royalty of at least 1.5% going forward on all sales of Madden, NCAA Football and any other software derived from software developed by Plaintiff or derived from software that itself can be traced back to software developed by Plaintiff.

## SECOND CAUSE OF ACTION
### (Fraud)

117.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

118.    Electronic Arts had contractual and common law duties to protect the intellectual property of Antonick, to give him notice and the opportunity to develop derivative works and to place a notice of Antonick's copyright on all derivative works.

119.    Electronic Arts made numerous false representations and omissions of materials facts to Plaintiff including but not limited to the following:

> (a)    Orally and in the 1991 Termination Amendment, Electronic Arts assured Plaintiff that it would protect his intellectual property and contractual rights. Those statements were false and known to be false when made by Electronic Arts. Plaintiff relied on these statements by continuing to contribute intellectual property to Electronic Arts;

> (b)    Electronic Arts repeatedly informed Plaintiff that it was not using and did not use his intellectual property when it developed the Sega version of Madden. Specifically, and without limitation, these representations were made to Plaintiff by Electronic Arts employees Richard Hilleman and Bing Gordon multiple times. Plaintiff has a specific and contemporaneous record of one such a conversation that occurred on August 28, 1990 with Richard

25

Hilleman. During the call, Richard Hilleman told Antonick that the Sega version was being developed without any reference to or use of his intellectual property. Plaintiff relied on this and other similar statements by continuing to contribute intellectual property to Electronic Arts and by failing to enforce his contractual rights and failing to take steps to protect his intellectual property;

(c) Electronic Arts falsely informed Plaintiff that he needed to sign the 1991 Termination Amendment because of legal issues with Nintendo. In fact, the 1991 Termination Amendment was part of Electronic Arts plan to use Plaintiff's intellectual property for its own benefit while evading its responsibility to pay royalties. Plaintiff relied on these statements by continuing to contribute intellectual property to Electronic Arts. Plaintiff additionally relied on these false statements by failing to enforce his contractual rights, failing to take steps to protect his intellectual property and by signing the 1991 Termination Amendment;

(d) In developing the Sega Genesis version and subsequent versions of Madden, Electronic Arts failed to give Plaintiff "written notice and the opportunity to develop" derivative works as would be required under the 1986 Contract if Electronic Arts were creating a derivative work. By failing to give this notice, Electronic Arts' intentionally, affirmatively and falsely represented that subsequent versions of Madden were not subject to royalty. Plaintiff relied on these false statements by failing to enforce his contractual rights and failing to take steps to protect his intellectual property;

(e) Electronic Arts intentionally and falsely represented that Antonick's intellectual property was not utilized in its Madden software by failing to place a copyright notice crediting Antonick on the packaging of versions of Madden released after 1991 as required by the 1986 Contract. Plaintiff

26

relied on these false statements by failing to enforce his contractual rights and failing to take steps to protect his intellectual property.

(f) For many years following the termination of its relationship with Antonick, Electronic Arts provided Antonick with quarterly royalty statements affirmatively and falsely representing that it owed him no royalties on software released after 1991. Electronic Arts' royalty statements were false and intended to mislead Antonick into thinking that subsequent versions of Madden were not subject to royalty. Plaintiff relied on these false statements by failing to enforce his contractual rights and failing to take steps to protect his intellectual property;

(g) Electronic Arts provided Antonick with a declaration from EA founder Trip Hawkins dated November 6, 2009 which falsely and fraudulently states that EA developed the Sega Genesis version of Madden "without using anything from Robin Antonick, including any software, code, tools, engines, utilities, graphics, algorithms, libraries or technologies ... developed by Robin Antonick." These statements were false and known to Electronic Arts to be false. These statements were made to induce Plaintiff not to bring suit and, in fact, caused Plaintiff to delay suit by several months while Plaintiff completed an analysis of Electronic Arts' code. Plaintiff relied on these false statements by failing to immediately enforce his contractual rights and failing to take steps to immediately take steps to protect his intellectual property;

(h) Electronic Arts provided Antonick with a declaration from current EA Chief Creative Officer Richard Hilleman dated November 17, 2009 which falsely and fraudulently states that "the later versions of John Madden Football, Madden NFL and EA's hockey games were developed "without using any software or development work from Robin, including software, code, code structure, tools, engines, utilities, graphics, algorithms, libraries,

27

1                             technologies, or technical solutions. . . ." These statements were false and

2                             known to Electronic Arts to be false. These statements were intended to

3                             induce Plaintiff not to bring suit and, in fact, caused Plaintiff to delay suit by

4                             several months while Plaintiff completed an analysis of Electronic Arts'

5                             code. Plaintiff relied on these false statements by failing to immediately

6                             enforce his contractual rights and failing to take steps to immediately take

7                             steps to protect his intellectual property.

8         120.    All the above false statements and misleading material omissions were made for the

9 purpose of defrauding Plaintiff out of valuable trade secrets and other intellectual property and his

10 contractual royalty rights and had that effect.

11         121.   Plaintiff relied on Electronic Arts' false and fraudulent statements by continuing to

12 contribute intellectual property to Electronic Arts and by failing to enforce his contractual rights to

13 substantial royalties, continued development work and credit for prior work.

14         122.   As a result of its fraud, Electronic Arts has received substantial benefits and profits.

15         123.   As a result of its fraud, Plaintiff has been injured by, among other things, losing

16 millions in royalties.

17                             **PRAYER FOR RELIEF**

18        WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

19        A.     Actual damages, statutory damages, punitive damages, and such other relief as

20 provided by the statutes cited herein;

21        B.     Disgorgement of all profits earned by Defendant from the sale of the Madden

22 videogame franchise, NCAA Football videogame franchise and any other videogame franchise

23 utilizing the intellectual property of Plaintiff;

24        C.     Prejudgment and post-judgment interest on such monetary relief;

25        D.     The costs of bringing this suit, including reasonable attorneys' fees; and

26        E.     All other relief to which Plaintiff may be entitled at law or in equity.

27

28

28

1

## X. JURY TRIAL DEMANDED

2  124.  Plaintiff demands a trial by jury on all issues triable of right by jury.

3

4  DATED: March 30, 2011                    THE PAYNTER LAW FIRM PLLC

5

6                                           By

7                                              STUART M. PAYNTER

8                                           1200 G Street N.W., Suite 800
                                            Washington, D.C. 20005
9                                           Telephone: (202) 626-4486
                                            Facsimile: (866) 734-0622
10                                          Email: stuart@smplegal.com

11
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
12                                          Robert B. Carey (*Pro Hac Vice pending*)
                                            Leonard W. Aragon (*Pro Hac Vice pending*)
13                                          11 West Jefferson Street, Suite 1000
                                            Phoenix, Arizona 85003
14                                          Telephone: (602) 840-5900
                                            Facsimile: (602) 840-3012
15                                          Email: rob@hbsslaw.com
16                                                 leonard@hbsslaw.com

17                                          HAGENS BERMAN SOBOL SHAPIRO LLP
18                                          Shana E. Scarlett (217895)
                                            715 Hearst Avenue, Suite 202
19                                          Berkeley, California 94710
                                            Telephone: (510) 725-3000
20                                          Facsimile: (510) 725-3001
                                            Email: shanas@hbsslaw.com
21

22                                          Steve W. Berman (*Pro Hac Vice pending*)
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
23                                          1918 Eighth Avenue, Suite 3300
                                            Seattle, Washington 98101
24                                          Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594
25                                          Email: steve@hbsslaw.com

26                                          Attorneys for Plaintiff Robin Antonick

27

28
                                            29

COMPLAINT