KEKER & VAN NEST LLP
BRIAN L. FERRALL - #160847
R. ADAM LAURIDSEN - #243780
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188
E-mail: bferrall@kvn.com
        alauridsen@kvn.com

Attorneys for Defendant
ELECTRONIC ARTS INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ANTONICK, an Illinois Citizen,<br><br>                              Plaintiff,<br><br>        v.<br><br>ELECTRONIC ARTS INC., a California corporation,<br><br>                              Defendant. | Case No. 3:11-CV-01543-CRB<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:         September 9, 2011<br>Time:        10:00 a.m.<br>Ctrm:       6, 17th Floor<br>Judge:      Hon. Charles R. Breyer<br><br>Date Complaint Filed: March 30, 2011<br>Trial Date:              Not Assigned |

NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    STATEMENT OF RELEVANT FACTS ...........................................................2

III.   ARGUMENT ........................................................................................................5

    A.     Both of the Complaint's Claims are Time-Barred. .................................5

        1.     Antonick's Own Allegations Show that His Claims Are Time-Barred...........................................................................................5

        2.     The Complaint Does Not Support Equitable Tolling of the 20-Year Old Claim, or Application of the Discovery Rule..............................6

        3.     The "Continuing Royalty" Doctrine of Copyright Law Does Not Apply....................................................................................8

    B.     The Complaint Fails to State a Claim for Breach of Contract. ................9

        1.     The Court May Determine On A Motion to Dismiss Whether The Complaint Adequately Alleges Any Derivative Work Under Copyright Law. ..................................................................9

        2.     The Complaint Does Not Allege The Use of Any Protectable Expression......................................................................10

            a.     What is *not* alleged:  code copying or copying of audiovisual effects. ....................................................10

            b.     What is alleged:  the game elements identified in the Complaint are  unprotectable ideas or methods..........................10

                (i)     Simulating player behavior (Compl. ¶¶ 35-44) ...............11

                (ii)    Three-dimensional projection (Compl. ¶¶ 46-48)..............12

                (iii)   Instant replay (Compl. ¶¶ 50-55) ......................................13

                (iv)   Positionable camera (Compl. ¶¶ 56-57)............................13

    C.     The Complaint Fails to State a Claim for Fraud. ..................................14

IV.    CONCLUSION....................................................................................................15

i

NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Aliotti v. R. Dakin & Co.*
831 F.2d 898 (9th Cir. 1987) .................................................................................11

*Apple Computer, Inc. v. Microsoft Corp.*
759 F. Supp. 1444 (N.D. Cal. 1991) ..........................................................................9

*Apple Computer v. Microsoft Corp.*
35 F.3d 1435 (9th Cir. 1994) .....................................................................11, 12, 13

*Aqua Creations USA Inc. v. Hilton Hotels Corp.*
2011 WL 1239793 (S.D. N.Y. March 28, 2011) ...........................................................10

*Ashcroft v. Iqbal*
129 S. Ct. 1937 (2009)...............................................................................5, 9, 10

*Baker v. Seldon*
101 U.S. 99 (1879)......................................................................................12

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)..............................................................................2, 5, 10

*Brown Bag Software v. Symantec Corp.*
960 F.2d 1465 (9th Cir. 1992) .............................................................................11

*Capcom U.S.A., Inc. v. Data East Corp.*
1994 WL 1751482 (N.D. Cal. March 16, 1994)...................................................12, 13

*Cavalier v. Random House*
297 F.3d 815 (9th Cir. 2002) ...............................................................................11

*Cutler v. Enzymes, Inc.*
2009 WL 482291 (N.D. Cal. Feb. 25, 2009) ...............................................................10

*Data East USA, Inc. v. Epyx, Inc.*
862 F.2d 204 (9th Cir. 1988) .........................................................................11, 13

*Dodd v. Woods*
2010 WL 3747007 (M.D. Fla. Aug. 31, 2010) ............................................................10

*Federal Election Comm'n v. Williams*
104 F.3d 237 (9th Cir. 1996) .........................................................................1, 6, 7

*Frybarger v. Int'l Bus. Mach. Corp.*
812 F.2d 525, 530 (9th Cir. 1987) .........................................................................13

*Ho v. Taflove*
696 F. Supp. 2d 950 (N.D. Ill. 2010)......................................................................12

*Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*
2009 WL 330259 (N.D. Cal. Feb. 10, 2009) ...............................................................15

*Kourtis v. Cameron*
419 F.3d 989 (9th Cir. 2005) .........................................................................1, 8

*Miller v. Facebook, Inc.*
2010 WL 1292708 (N.D. Cal. March 31, 2010)............................................................10

ii

557875.01

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Mirage Eds., Inc. v. Albuquerque A.R.T. Co.*
856 F.2d 1341 (9th Cir. 1988) ............................................................................9

*Oracle USA, Inc. v. XL Global Servs., Inc.*
2009 WL 2084154 (N.D. Cal. July 13, 2009)...................................................14, 15

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*
562 F.2d 1157 (9th Cir. 1977) ..........................................................................10

*Vess v. Ciba-Geigy Corp. USA*
317 F.3d 1097 (9th Cir. 2003) ..........................................................................15

*Woods v. Resnick*
725 F. Supp. 2d 809 (W.D. Wisc. 2010) ...........................................................12

*Wyatt Tech. Crop. v. Malvern Instruments Inc.*
2009 WL 2365647 (C.D. Cal. July 29, 2009)................................................12, 13

*Zella v. E.W. Scripps Co.*
529 F. Supp. 2d 1124 (C.D. Cal. 2007) ..........................................................9, 10

## State Cases

*Foley v. Interactive Data Corp.*
47 Cal. 3d 654 (1988) ......................................................................................14

*Fox v. Ethicon Endo-Surgery, Inc.*
35 Cal. 4th 797 (2005) ..............................................................................1, 6, 7

*Freeman & Mills, Inc. v. Belcher Oil Co.*
11 Cal. 4th 85 (1995) ..........................................................................2, 3, 4, 14

*Graham v. Philip Morris USA, Inc.*
40 Cal. 4th 623 (2007) ......................................................................................7

*Hunter v. Up-Right, Inc.*
6 Cal. 4th 1174 (1993) ................................................................................14, 15

*Sagehorn v. Engle*
141 Cal. App. 4th 452 (2006) .........................................................................7, 8

## Federal Statutes

17 U.S.C. § 102(b) ...................................................................................2, 10, 11, 12

## State Statutes

Cal. Civ. Proc. Code §337(1)...............................................................................1, 5

Cal. Civ. Proc. Code §338(d) ..............................................................................1, 5, 6

## Federal Rules

Federal Rule of Civil Procedure 9(b) ..................................................................7, 14

Federal Rule of Civil Procedure 12(b)(6) ...........................................................1, 5

## Other Authorities

H.R.Rep. No. 94-1476, Section 102 (1976), *reprinted in* 1976
U.S.C.C.A.N. 5659 ..........................................................................................11

557875.01

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

Landes & Posner, *The Economic Structure of Intellectual Property Law*
  109 (2003)..................................................................................................................................9

NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE**, that on September 9, 2011, at 10:00 a.m., or on such other date and time to be set by the Court, at 450 Golden Gate Ave, San Francisco, California, Courtroom 6, 17th Floor, before the Honorable Charles R. Breyer, defendant Electronic Arts Inc. will and hereby does move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted.  The motion is based the following Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, the Declaration of Brian L. Ferrall, the pleadings and papers of record in this matter and on such other arguments as may be received by the Court at the hearing on this motion.

**SUMMARY OF ARGUMENT**

Defendant Electronic Arts Inc. ("EA") brings this motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on two independent grounds.

First, both of the asserted claims—for breach of contract and for fraud—are barred by the statute of limitations.  Cal. Civ. Proc. Code §337(1) (4-year statute of limitations for breach of written contract); *id.* §338(d) (3-year statute of limitations for fraud).  Both claims concern plaintiff Robin Antonick's and EA's relationship between 1988 and 1992 concerning the versions of the *John Madden Football* videogame that Antonick coded and EA published.  Both causes of action accrued at that time.  The Complaint's attempt to invoke principles of equitable tolling or the discovery rule to avoid the statutes of limitations is to no avail.  Both doctrines require pleading specific facts showing the plaintiff's inability to discover at least one element of the cause of action, and his diligence in investigating the claim.  *Federal Election Comm'n v. Williams*, 104 F.3d 237, 240-41 (9th Cir. 1996); *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).  Not only does the Complaint fail to allege such facts, but the Complaint, together with judicially noticeable facts, establish affirmatively that Antonick *could* have pleaded all of the Complaint's operative facts in the early 1990s.  Nor can Antonick avoid the statute of limitations on the contract claim by invoking the "continuing royalty" doctrine because that doctrine does not apply to a contract claim such as Antonick's.  *Kourtis v. Cameron*, 419 F.3d

1

557875.01

1   989, 1000 (9th Cir. 2005).

2          Second, the Complaint fails to plead facts supporting a plausible theory of recovery on

3   the merits of either cause of action.  The contract claim—which seeks royalties from sales of

4   every version in the *Madden* series since 1990 through the present—depends on evidence that

5   later versions in the *Madden* series are derivative works, under copyright law, of the early

6   versions on which Antonick worked.  Yet, the Complaint does not allege any similarity of

7   protectable expression among the works.  Each of the four allegedly common features identified

8   in the Complaint are unprotectable processes, methods or ideas.  17 U.S.C. § 102(b).  The

9   Complaint even describes them as such.  The fraud claim fails for the same reason, since it

10  depends on a finding that EA actually misused some copyrightable expression of Antonick's.

11  And it fails for the separate reason that California law does not allow a fraud claim that relies

12  upon alleged conduct that amounts to breach of contract or denial of liability under contract.

13  *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 102 (1995).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

557875.01

## I.    INTRODUCTION

Plaintiff Antonick coded three early versions of *John Madden Football* that defendant EA published in 1988 and 1989.  Beginning in 1990, EA went on to develop and publish a different football videogame under the "Madden" name each year for the past twenty-one years (collectively, the "*Madden* franchise").  Over that period, the *Madden* franchise has become the most iconic sports simulation videogame in the United States, selling over 85 million units.

Antonick played no role in developing any *Madden* franchise game released after 1989.  Yet now, for the first time in twenty-one years, Antonick claims unpaid royalties from all *Madden* games sold after 1990 on the theory that they are "derivative works" of the versions of *John Madden Football* he coded.

The Complaint comes at least fifteen years too late.  It purports to invoke "fraudulent concealment" to create an equitable tolling of the statute of limitations or to invoke the discovery rule to delay accrual of both causes of action.  But neither theory can save the Complaint, as it does not contain any operative fact that Antonick could not have alleged twenty years ago.  The Complaint's description of the four game features EA allegedly used comes from observations about publicly available features of the *Madden* games and Antonick's own recollection of his development work.  Neither equitable tolling nor the discovery rule excuses a time-barred complaint whose facts were known decades ago.

The Complaint portrays a CNBC interview in 2009 with EA's co-founder, Trip Hawkins, as the trigger that first led Antonick to realize he may have a claim against EA.  But the judicially noticeable facts do not support this unreasonable theory.  The interview is vanilla.  The only salient comment about the *Madden* franchise is a reference to the fact that the first *Madden* titles—the versions Antonick coded—took four years to develop in the 1980s.  Not only was that *not* news to Antonick, as he was there, but a 2005 *New York Times* article about the *Madden* franchise "revealed" the same facts.  Even under Antonick's implausible theory of notice, his suit was time-barred before he filed it.

Independently, the Complaint fails to state a claim on the merits.  Antonick's contract

1

NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

with EA provides for royalty payments only for derivative works under copyright law, not simply for any work that traces some idea back to, or shares a name with, the versions Antonick worked on.  In turn, to proceed, as the Complaint itself makes clear, both the contract claim and fraud claim require Antonick to plead facts showing that the 1990 version of *John Madden Football* for the Sega Genesis platform ("Sega *Madden*") contains copyright-protectable expression from the *John Madden Football* game that Antonick coded.[1]  Yet, the Complaint fails to do so.  Lacking any claim of literal code copying or similarity of visual effects, the Complaint instead identifies four game elements that Antonick purportedly developed and that EA purportedly used in subsequent *Madden* games:  player behavior, 3-dimensional projection, instant replay and a positionable camera.  None is copyright protectable expression.  The Complaint itself describes all four elements as "methods," "processes" or "algorithms."  Since copyright protects only expression, not ideas, methods of operation, or algorithms of a computer program, the Complaint's own allegations defeat the contract claim.

The fraud claim suffers from the same fatal weakness since it depends on the same allegations of misuse of Antonick's work.  Further, the fraud claim does not allege any conduct by EA that is not part and parcel of EA's performance under the contract, or denial of liability under the contract.  California does not permit such efforts to turn alleged contract liability into tort liability.

The Court should dismiss the Complaint without leave to amend.

## II.    STATEMENT OF RELEVANT FACTS[2]

In 1984, EA contracted with Antonick to develop a videogame to be called "Football."  Request for Judicial Notice ("RJN") Ex. 1, §I.[3]  During the game's development, EA negotiated with coach John Madden to help with the game and to use his name and likeness.  Compl. ¶ 19.

---

[1]     EA owned all intellectual and other proprietary rights in *John Madden Football*, subject only to any copyright interest Antonick may have.  RJN Ex. 2, Ex. A, § 8.04.

[2]     For this motion, EA accepts the truth of the Complaint's factual allegations, but not its legal conclusions.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.*

[3]     Though the Complaint refers to this as the 1983 Contract, its signature page indicates it was signed in 1984.  RJN Ex. 1.

2
NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

1   Madden's involvement led Antonick and EA to enter into a new contract in 1986 for the

2   development of a game to be called *John Madden Football* ("1986 Agreement").  RJN Ex. 2.

3   Pursuant to the 1986 Agreement, EA owned all intellectual and other proprietary rights in the

4   game, subject only to any copyright interest Antonick may have.  *Id.*, Ex. A, §§ 8.01, 8.04.

5        The 1986 Agreement entitled Antonick to $138,220 for completing three versions of the

6   game, for play on the Apple II, Commodore C64 and IBM PC platforms.  *Id.* § IV.  It also

7   entitled Antonick to royalties calculated as a percentage of sales of these games or of games that

8   were "Derivative Works" or "Remote Derivative Works" thereof.  *See* Compl. ¶¶ 114-15.  A

9   Derivative Work was defined as "any computer software program or electronic game which

10  either (a) constitutes a derivative work of the Work within the meaning of the United States

11  copyright law or (b) produces audiovisual effects which infringe the copyright in the audiovisual

12  effects produced by the Work."  RJN Ex. 2, Ex. A, § 1.03.  A "Remote Derivative Work" was

13  defined as "a Derivative Work by Publisher, derived directly from another Derivative Work by

14  Publisher, that runs on a Microprocessor Family different from that of the work."  *Id.*, § 1.05.

15  The three versions of *John Madden Football* that Antonick coded were commercially released by

16  1989.  Compl. ¶ 27.  There is no dispute that Antonick was paid for all his work on these games,

17  including any royalty payments due from their sales.  Antonick received his last royalty check in

18  1992.  *Id.* ¶ 85.

19       This was an era of revolutionary development in videogames.  The Sega Genesis

20  platform recently had been introduced, and in early 1990, EA decided to develop a new football

21  videogame for it.  EA enlisted Park Place Productions to develop the game, which became the

22  Sega version of *John Madden Football* ("Sega *Madden*").  *See id.* ¶¶ 68-70.  Antonick alleges

23  that Sega *Madden* is a Derivative Work under the 1986 Agreement.  He claims he is entitled to

24  royalties on it, the entire *Madden* franchise and other EA videogames that he speculates are

25  Remote Derivative Works.  *Id.* ¶¶ 99-101.

26       Antonick knew that EA had enlisted Park Place to develop Sega *Madden* and that the

27  game was published in 1990.  *See id.* ¶¶ 2-4, 69-70.  He also knew that EA published a new

28

3

NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

1   edition of this iconic series each year thereafter for twenty years, selling over eighty-five million

2   copies. *Id.* ¶ 8. Yet, not once before 2009 did Antonick do anything to investigate if he had a

3   claim, nor did he express a belief that he was entitled to additional compensation.

4       The Complaint asserts that Antonick could not have suspected that EA allegedly used his

5   copyrightable expression until he saw an interview with EA's co-founder, Trip Hawkins, in 2009

6   commemorating the 20th anniversary of *Madden NFL*. *Id.* ¶ 3. Quoted below is Hawkins'

7   interview:

> CNBC: Released in 1983, Dr. J and Larry Bird Go One-On-One
> was a smash. But what Hawkins really wanted was a full team
> sport, a football game featuring coach and commentator John
> Madden. But at the time having 11 players on each team like a
> real game was technically impossible. Hawkins, however,
> wouldn't give up on the idea.
>
> Hawkins: It took 4 years and it became known in the company as
> "Trip's Folly" and at one point the auditors had to come personally
> to see me to explain that "I'm sorry but we have to write this off
> because it's obviously not an asset, it's obviously just an expense
> that you are never going to recoup." (laughs)
>
> CNBC: He's laughing because "Trip's Folly" helped make EA the
> first third party software publisher to earn a billion dollars a year.
> With a new edition released annually, John Madden's NFL has
> remained at the top of the videogame best seller charts.

17   *See* RJN Exs. 3 & 4; *see also* Compl. ¶¶ 92-93. The Complaint does not explain why or how this

18   statement raised Antonick's suspicions twenty years later, or why Antonick could not have

19   learned of them earlier (for example, by reviewing the games themselves). The interview

20   contained no "new" information. In fact, a 2005 *New York Times* article reported this identical

21   information, linking the four-year development effort of which Antonick was a part to the history

22   of the *Madden* franchise. RJN Ex. 8.

23       When Antonick approached EA in 2009 demanding royalties from sales dating back to

24   1990, EA believed that a candid explanation of the facts would clear up his mistaken

25   impressions. EA provided Antonick with five sworn declarations from the relevant developers

26   and executives, all of whom explained that Sega *Madden* and subsequent editions in the *Madden*

27   franchise were developed without using Antonick's work. *See* RJN Exs. 4-8. Trip Hawkins, for

28

4

557875.01

1   example, attempted to clear up Antonick's misinterpretation of Hawkins' press statements, by

2   declaring under oath that "I do not believe (and have never believed) that anything used in any

3   other EA game—including later versions of *John Madden Football*, *Madden NFL* and EA's

4   hockey games—originates or derives from the Apple II, Commodore 64 and IBM versions of

5   *John Madden Football* developed by Robin Antonick…." RJN Ex. 6. Antonick dismissed the

6   declarations as lies. *See, e.g.,* Compl. ¶¶ 119(g) & (h). Nevertheless, so certain was EA that no

7   copying had occurred that EA took the extraordinary step of voluntarily providing Antonick with

8   code from Sega *Madden* so that he could analyze it and see the fundamental differences in the

9   games. *Id.* ¶ 95. EA even offered Antonick the opportunity to amend his complaint to add any

10  references from his code analysis (if he believed he had anything to add),[4] but Antonick declined

11  and said he had nothing else to allege. *See* Ferrall Declaration, Ex. A.

### III.   ARGUMENT

13      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

14  sufficiency of the plaintiff's claims. Dismissal is required where the plaintiff fails to plead

15  "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

16  The complaint must do more than merely raise the possibility that some set of facts might

17  support recovery; rather, it must set forth factual details that "raise a right to relief above the

18  speculative level." *Id.* at 555; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).

**A.   Both of the Complaint's Claims are Time-Barred.**

**1.   Antonick's Own Allegations Show that His Claims Are Time-Barred.**

21      On the face of the Complaint, Antonick's claims are barred by the statute of limitations.

22  Cal. Civ. Proc. Code §337(1) (4-year statute of limitations for breach of written contract); *id.*

23  §338(d) (3-year statute of limitations for fraud). Antonick alleges that EA breached the 1986

24  Agreement when it stopped paying him royalties in 1992. *See* Compl. ¶ 85. This contract claim

25  was time-barred no later than 1997. Antonick also alleges that EA made a series of false

---

26  [4]      The code-sharing agreement does not allow the parties to use their code analysis at this

27  time. But EA agreed to waive this restriction without condition, so that Antonick could make
    use of his code analysis in his Complaint. Antonick declined this offer. Dismissal of the

28  Complaint therefore should be with prejudice, not leave to amend.

557875.01

1   representations and material omissions about its non-use of his work for future *Madden* versions,

2   culminating in 1992 when EA stopped paying Antonick royalties.  *See id.* ¶¶ 78-85, 119(a)-(f).

3   This fraud claim was time barred no later than 1996.  This Complaint is therefore fifteen years

4   late, absent some tolling of the limitations periods or delayed accrual of the claims.

       **2.**       **The Complaint Does Not Support Equitable Tolling of the 20-Year Old Claim, or Application of the Discovery Rule.**

7          The Complaint seeks to skirt the statute of limitations by alleging that the statute is

8   "tolled because Electronic Arts fraudulently concealed its misappropriation of Antonick's

9   intellectual property and contractual breaches."  Compl.¶ 87.  But neither equitable tolling nor

10   the discovery rule can save Antonick's claims.  If Antonick could have known in the early 1990s

11   of any one basis that he relies upon today to claim that his "intellectual property" was used in

12   subsequent versions of *Madden* games, his claims are barred.

13          "To establish that equitable tolling applies, a plaintiff must prove the following elements:

14   [1] fraudulent conduct by the defendant resulting in concealment of the operative facts, [2]

15   failure of the plaintiff to discover the operative facts that are the basis of its cause of action

16   within the limitations period, and [3] *due diligence by the plaintiff* until discovery of those facts."

17   *Federal Election Comm'n v. Williams*, 104 F.3d 237, 240-41 (9th Cir. 1996) (rejecting equitable

18   tolling argument where public campaign finance reports provided sufficient notice of potential

19   claim) (citations omitted) (emphasis added).  Likewise, the related discovery rule only postpones

20   the accrual of a claim until the plaintiff "discovers, *or has reason to discover*, the cause of

21   action."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (emphasis added)*; see

22   also* Cal. Civ. Proc. Code §338(d).  Because of the obvious potential for abuse, the California

23   Supreme Court has placed the burden squarely on plaintiffs to establish their entitlement to the

24   discovery rule *even at the pleading stage*:  "A plaintiff whose complaint shows on its face that

25   his claim would be barred without the benefit of the discovery rule must specifically plead facts

26   to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery

27

28

6

557875.01

despite reasonable diligence." *Id*. at 808.[5] "[T]he burden [is] on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.'" *Id.* Antonick does not meet his burden.

*First*, the Complaint does not allege a single fact showing the "diligence" required by either equitable tolling or the discovery rule. Antonick does not allege that he did anything to investigate his purported claims from 1990 to 2009. This omission is all the more unreasonable, given the wide array of facts available to Antonick (as the following paragraphs points out). On this basis alone, equitable tolling cannot save Antonick's claims. *Id.*

*Second*, Antonick either already had "discovered," or could easily have discovered, in the early 1990s all the facts he now alleges to support his claims. He knew of his own alleged contributions to *John Madden Football.* Compl. ¶¶ 32-58. He knew that EA hired Park Place to develop Sega *Madden*. *Id*. ¶69. He knew that EA commercially released Sega *Madden* in 1990 and a new version of the franchise each year thereafter for the past twenty-one years, for which he never received royalties. *Id*. ¶ 85. And he knew or could have known about the readily-apparent, perceivable aspects of every *Madden NFL* game sold. These perceivable aspects include each of the four game elements now alleged in the Complaint. The way virtual players behave, including how virtual defenders intercept the ball-carrier (*Id*. ¶¶ 37-44), the 3-dimensional projection of the game (*id*. ¶¶ 46-48), instant replay (*id*. ¶¶ 50-55), and a positionable camera (*id*. ¶¶ 56-57) are features that would be plainly visible and manifest to any person playing the game. Because equitable tolling "is not available to avoid the consequences of one's own negligence," Antonick's claims are time-barred. *Sagehorn v. Engle*, 141 Cal. App. 4th 452, 460 (2006) (quoting *Lehman v. U.S*., 154 F.3d 1010, 1016 (9th Cir.1998)).[6]

*Third*, the event that Antonick says triggered his awareness of the claim is just a *post-hoc* attempt to salvage it. Antonick alleges that he could not have learned "that Electronic Arts might

---

[5]     The statutory clock begins to run once a plaintiff has mere suspicion of his claim. *Graham v. Philip Morris USA, Inc.*, 40 Cal. 4th 623, 634 (2007).

[6]     The Complaint also fails to allege, with the particularity required under Rule 9(b), the specific fraudulent conduct in which EA purportedly engaged, as required to invoke the doctrine of "equitable tolling." *Williams*, 104 F.3d at 240-41.

have misappropriated his [copyrightable expression]" until a CNBC interview with Trip Hawkins in 2009. Compl. ¶ 93. For that statement to be true, the interview would have had to reveal some detail that would not have been readily apparent earlier. But the interview barely mentions the original *John Madden Football*, other than to say that it took four years to develop. *See* RJN Ex. 3. Hawkins says nothing in the interview about Sega *Madden* (or later games), let alone suggest that those games used copyrightable code or features from the *John Madden Football* version that Antonick coded. *Id.*

But even accepting Antonick's assertion that the CNBC interview raised his suspicion, the exact same comment linking the *Madden* franchise to four years of development of the original *John Madden Football* appeared in a September 5, 2005 *New York Times* article. *See* RJN Ex. 8. Therefore, even accepting Antonick's theory of "notice," he was on constructive notice in September 2005, more than four years before he filed the Complaint.[7] *See Compl.* ¶ 94.

### 3. The "Continuing Royalty" Doctrine of Copyright Law Does Not Apply.

The Complaint also purports to rely upon "the continuing royalty doctrine" to overcome the statute of limitations. Compl. ¶ 86. But California *never* has applied the continuing royalty doctrine to a contract claim such as Antonick's. A doctrine exists under *federal copyright* law whereby a new claim for copyright royalties arises with each distinct act of infringement. But for Antonick's breach of contract claim, the claim for payment of royalties accrues *only once* – when EA allegedly first failed to pay him royalties. *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005) (reversed on other grounds). In *Kourtis*, the plaintiff sued James Cameron for copyright and state law claims stemming from the alleged unlicensed release of the movie *Terminator II*. The complaint was filed over a decade after the release of the movie. The Ninth Circuit allowed the copyright claim to proceed but held that the contract claims were time-barred, observing that no California court has extended the continuing royalty doctrine to claims for breach of contract. *Id.*

Antonick's contract claim arose once, when EA first did not pay royalties on Sega

---

[7] Antonick's fraud claim suffers the same fate because it is depends entirely upon the same conduct surrounding the alleged breach of the agreement. *See infra.*

8
NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

*Madden* in 1990.  He cannot sit on his rights for twenty years and invoke the "continuing royalty" doctrine to excuse his delay.

**B.      The Complaint Fails to State a Claim for Breach of Contract.**

> **1.      The Court May Determine On A Motion to Dismiss Whether The Complaint Adequately Alleges Any Derivative Work Under Copyright Law.**

The Complaint's breach of contract claim for unpaid royalties turns on the theory that Sega *Madden* and later versions of *Madden NFL* are Derivative Works or Remote Derivative Works of Antonick's *John Madden Football.  See* Compl. ¶¶ 114-15; *see also* RJN Ex. 2, §§V, 1.03.[8]  Under copyright law, which is incorporated into the 1986 Agreement, a derivative work is one that "incorporate[s] a portion of the copyrighted work in some form."  *Mirage Eds., Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988).  A "derivative work" does not simply "derive" from another work in the common sense of the word; it must also copy at least some of the original work's copyrightable expression.  *See, e.g.*, *Apple Computer, Inc. v. Microsoft Corp.*, 759 F. Supp. 1444, 1454 (N.D. Cal. 1991).[9]  In other words, to state a breach of contract claim, the Complaint must plead facts showing that EA used Antonick's copyright-protectable expression.

The Court can, and should, decide now whether the Complaint alleges the use of any protectable expression.  *See, e.g.*, *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133-35 (C.D. Cal. 2007) (holding as a matter of law that elements of plaintiff's work are not protectable).  It is not sufficient for Antonick simply to state, without supporting factual allegations, that Sega *Madden* is a Derivative Work.  *See Iqbal*, 129 S. Ct. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[8]      The Complaint's references to Antonick's purported "intellectual property" are a misnomer.  EA owns all intellectual and proprietary rights in *John Madden Football*, except for any copyright interest Antonick may have.  RJN, Ex. 2 §§ 8.01 & 8.04.  Therefore, references to Antonick's "intellectual property" mean merely his *copyright interest.  See also* Compl. ¶¶ 99-106 (alleging that use of his "intellectual property" makes EA games "derivative works").

[9]      "The term 'derivative work' must not be taken literally …. If there is no copying of copyrighted material, the fact that a work derived from, in the sense of being inspired by or suggested by, a prior work does not make the second work an infringement of the first."  Landes & Posner, *The Economic Structure of Intellectual Property Law* 109 (2003).

9

557875.01

suffice." *Id.* Courts routinely apply *Iqbal* and *Twombly* to dismiss copyright claims for conclusory allegations. For example, in *Dodd v. Woods*, 2010 WL 3747007 (M.D. Fla. Aug. 31, 2010), the plaintiff alleged that two works "are strikingly similar," but the court dismissed the claim, holding that it "need not accept that allegation as true because it is merely a legal conclusion." *Id.* at *5.[10] "For fifty years, courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint (and in light of all matters properly considered on a motion to dismiss)." *Zella*, 529 F. Supp. 2d at 1130.

### 2. The Complaint Does Not Allege The Use of Any Protectable Expression.

#### a. What is *not* alleged: code copying or copying of audiovisual effects.

The Complaint rightly does not allege that Sega *Madden* or any subsequent version of *Madden NFL* contains Antonick's actual source code. *See, e.g.*, Compl. ¶¶ 35, 48, 53, 57. Nor does the Complaint allege that Sega *Madden* uses protectable "audiovisual effects" from Antonick's version of *John Madden Football*. In other words, Antonick's claim depends on identifying protectable expression that is *not* in software code or in audio visual effects.

#### b. What is alleged: the game elements identified in the Complaint are unprotectable ideas or methods.

"It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977) (overruled on other grounds); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any *idea, procedure, process, system, method of operation, concept, principle, or discovery*, regardless of the form in which it is described, explained, illustrated, or embodied in such work") (emphasis added). In the context of computer software, which is inherently functional, Section 102(b) "make[s] clear that the expression adopted by the

---

[10]     *See also Aqua Creations USA Inc. v. Hilton Hotels Corp.*, 2011 WL 1239793 at *5 (S.D. N.Y. March 28, 2011) (dismissing threadbare copyright complaint for lack of copyrightability); *Miller v. Facebook, Inc.*, 2010 WL 1292708, at *3-4 (N.D. Cal. March 31, 2010) (dismissing copyright claim under *Twombly*); *Cutler v. Enzymes, Inc.*, 2009 WL 482291, at *3 (N.D. Cal. Feb. 25, 2009) (same).

10

NOTICE OF MOTION AND MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 3:11-CV-01543-CRB

557875.01

1   programmer is the copyrightable element in a computer program, and that the actual *processes or*

2   *methods embodied in the program* are not within the scope of the copyright law."  H.R.Rep.

3   No. 94-1476, Section 102 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670 (emphasis added).

4   "There is a strong public policy corollary to this axiom permitting all to use freely ideas

5   contained in a copyrightable work, so long as the protected expression itself is not appropriated."

6   *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207-08 (9th Cir. 1988) (holding that similarities

7   between computer karate games were not sufficient to support infringement).

8       Courts engage in "analytic dissection" to determine what aspects of a work constitute

9   protectable expression.  *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475-76

10  (9th Cir. 1992).  "[O]nly those elements of a work that are protectable and used without the

11  author's permission can be compared when it comes to the ultimate question of illicit copying."

12  *Apple Computer v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994); *see also Cavalier v.*

13  *Random House*, 297 F.3d 815, 822 (9th Cir. 2002).  If the plaintiff has not alleged any

14  *protectable* similarities, the claim should be dismissed without any further infringement analysis.

15  *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987).

16      Here, the Complaint identifies four game elements allegedly included in Sega *Madden* or

17  subsequent editions of *Madden NFL*:  (a) simulating player behavior, including a defensive

18  player's interceptions of a ball carrier; (b) three-dimensional projection of the field; (c) instant

19  replay; and (d) a positional camera.  *See* Compl. ¶¶ 36-57.  The Complaint itself characterizes

20  each of these as unprotectable methods, processes or algorithms.

21          **(i)       Simulating player behavior (Compl. ¶¶ 35-44)**

22      The Complaint first identifies Antonick's "methods of simulating actual NFL behavior"

23  as having been incorporated in subsequent versions of the *Madden* franchise.  Compl. ¶ 35.

24  Plainly, the mere idea of making virtual players in a videogame behave like actual NFL players

25  is not protectable expression.  17 U.S.C. § 102(b).  When videogame features "are as a practical

26  matter indispensable, or at least standard, in the treatment of a given [idea], they are treated like

27  ideas and are therefore not protected by copyright."  *Apple*, 35 F.3d at 1444 (internal quotation

28

11

and citation omitted).

The specific example the Complaint describes is no more protectable than this general idea.  The Complaint describes a "*method* for tracking the ball carrier by using a projection on ball carrier's path in 2D space with significant modifiers for the boundaries of an NFL field to determine pursuer direction."  Compl. ¶ 37 (emphasis added).  The Complaint uses the terms "method" (*id.* ¶¶ 37, 39), "an intercept *equation*" (*id.* ¶ 40), "a table driven *solution*" (*id.* ¶ 42), and "the pursuit *algorithm*," (*id.* ¶ 44).  (Emphases added).  By using these descriptors, the Complaint itself confirms that this feature is not protected by copyright.  17 U.S.C. § 102(b) ("methods" are not protectable under copyright); *see also Baker v. Seldon,* 101 U.S. 99, 102-04 (1879) (rejecting copyright protection for mathematical equations); *Woods v. Resnick*, 725 F. Supp. 2d 809, 820 (W.D. Wisc. 2010) ("The underlying finance formulas, whether categorized as business logic, algorithms, or math equations, cannot themselves be copyrighted"); *Ho v. Taflove*, 696 F. Supp. 2d 950, 954-55 (N.D. Ill. 2010) (collecting cases rejecting copyright protection for algorithms and mathematical models).[11]  Antonick's "intercept defense" method is not copyrightable expression.

### (ii)   Three-dimensional projection (Compl. ¶¶ 46-48)

The Complaint next identifies a "three-dimensional projection of the two dimensional field….us[ing] a Z coordinate generated via table lookup."  Compl. ¶ 47.  Antonick cannot hold a copyright in the mere idea of a three-dimensional projection.  17 U.S.C. §102(b).  The Complaint refers to implementing this idea using a "table lookup" and generating the projection at 30 frames per second.  Compl. ¶ 47.  But these are nothing more than functional methods or processes that do not receive copyright protection.  *Baker,* 101 U.S. at 102-04; *Wyatt Tech.*, 2009

---

[11]   *See also Wyatt Tech. Crop. v. Malvern Instruments Inc.*, 2009 WL 2365647, at *4 (C.D. Cal. July 29, 2009) ("a plaintiff is not entitled to copyright protection for features such as calculators and other methods of operation"); *Capcom U.S.A., Inc. v. Data East Corp.*, 1994 WL 1751482, at *7 (N.D. Cal. March 16, 1994) ("Here, there are no identifiable artistic features in the control sequence that are separable from their functional purpose."); Copyright Office Circular 31 ("Copyright protection is therefore not available for ideas or procedures for doing, making, or building things; scientific or technical methods or discoveries; business operations or procedures; mathematical principles; formulas, algorithms; or any concept, process or method of operation.").

557875.01

1    WL 2365647, at *7; *Capcom U.S.A.*, 1994 WL 1751482, at *7.  Antonick does not allege any

2    similarity in the actual code that could reflect the expression of these methods or processes.

### (iii)    Instant replay (Compl. ¶¶ 50-55)

4           The Complaint next claims "several ways to implement an instant replay feature."

5    Compl. ¶ 50.  The Complaint characterizes this as a "method" (*id.* ¶ 50); "the *ability* to save

6    instant replay states" (*id.* ¶ 51), "instant replay *concept*" (*id.* ¶ 52), "replay *technologies*" (*id.*

7    ¶ 53) and "*abilit[ies]*" and "features" (*id.* ¶ 54).  (Emphases added.)  Again, the Complaint's own

8    characterizations prove that they are unprotectable methods or concepts, not protectable

9    expression.  *See Capcom U.S.A.*, 1994 WL 1751482, at *7.  Certainly, Antonick does not purport

10   to claim the exclusive right to instant replay.  *See Data East*, 862 F.2d at 209.  "Similarities

11   derived from the use of common ideas cannot be protected: otherwise, the first to come up with

12   an idea will corner the market."  *Apple*, 35 F.3d at 1443; *Frybarger v. Int'l Bus. Mach. Corp.*,

13   812 F.2d 525, 530 (9th Cir. 1987) (rejecting copyright claim over videogame features that are

14   standard for a given topic).  The "instant replay" concept is not copyrightable expression.

### (iv)    Positionable camera (Compl. ¶¶ 56-57)

16          The Complaint lastly identifies "an independent camera that could be positioned in a 3D

17   space."  Compl. ¶ 56.  The concept of a positionable camera itself is no more protectable than the

18   other concepts described above.  It is also a standard part of football broadcasts.  *See Data East*,

19   862 F.2d at 209 (rejecting copyright claim over standard aspects of karate used in videogame).

20   The purported "solution" (Compl. ¶ 56)—"pre-calculat[ing] the time-consuming cpu clock cycle

21   calculations into a lookup table" (*id.*)—is similarly unprotectable because it is simply a process

22   or method of operation.  *See Wyatt Tech.*, 2009 WL 2365647, at *7; Copyright Office Circular

23   31.  The Complaint alleges no similarity of expression—as opposed to methods or concepts—

24   relating to a positionable camera.

25          In sum, all four game elements identified in the Complaint are merely unprotectable

26   ideas, processes, methods of operation, equations or algorithms.  The Complaint alleges no facts

27   showing that EA used copyrighted material to create Derivative Works as defined in the 1986

28

13

557875.01

1    Agreement, and therefore fails to state a claim for breach of contract.

2    **C.    The Complaint Fails to State a Claim for Fraud.**

3         The Complaint's fraud claim alleges in essence that EA falsely denied liability under the

4    1986 Agreement, and so fails for the same reasons that the breach of contract claim fails.  But the

5    fraud claim should be dismissed for two additional reasons:  (1) it attempts to turn mere denials

6    of breach of contract into a tort claim, which California law prohibits; and (2) it does not meet

7    the particularity requirements of Rule 9(b).

8         *First*, California law prohibits the assertion of tort claims, including fraud claims, for

9    alleged conduct that amounts to nothing more than breach of contract, or denial of breach.  *See*,

10   *e.g.*, *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 102 (1995).  Blurring the

11   distinction between contract and tort sacrifices "predictability about the cost of contractual

12   relationships," which "plays an important role in our commercial system."  *Foley v. Interactive*

13   *Data Corp.*, 47 Cal. 3d 654, 683 (1988).  Tort claims are proper only when the plaintiff's alleged

14   tort damages cannot be said to result from an alleged breach of contract.  *See Hunter v. Up-Right,*

15   *Inc.*, 6 Cal. 4th 1174, 1178 (1993); *see also Oracle USA, Inc. v. XL Global Servs., Inc.*, 2009 WL

16   2084154, at *4 (N.D. Cal. July 13, 2009) ("[T]he fundamental rule in California is that no tort

17   cause of action will lie where the breach of duty is nothing more than a violation of a promise

18   which undermines the expectations of the parties to an agreement.").

19        The Complaint's fraud claim falls squarely within the holdings of *Foley, Hunter* and

20   *Oracle*.  Each alleged misrepresentation is nothing more than a direct or indirect reference to the

21   rights and obligations of the 1986 Agreement itself.  *See* Compl. ¶¶ 119(a)–(f).[12]  Each is an

---

22   [12]       More specifically, the Complaint alleges:

23   •    EA "assured Plaintiff that it would protect his intellectual property and contractual rights
          [and] that it was not using and did not use his intellectual property when it developed the
24        Sega version of Madden." *Id.* ¶¶ 119(a) & (b);

25   •    EA "falsely informed Plaintiff that he needed to sign the 1991 Termination Amendment
          because of legal issues with Nintendo," when it was "part of Electronic Arts [sic] plan to
26        use Plaintiff's intellectual property for its own benefit while evading its responsibility to
          pay royalties." *Id.* ¶ 119(c);

27   •    EA breached the 1986 Agreement by failing to give Plaintiff written notice and the
28        opportunity to develop derivative works and by failing to place copyright notices on

14

"assurance[] that [EA] intended to meet its contractual obligations," or a representation of its understanding of the contract. *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, 2009 WL 330259, at *17 (N.D. Cal. Feb. 10, 2009) (rejecting fraud claim as a matter of law). The Complaint does not allege any injury apart from what would result from the alleged contract breach itself. *Hunter*, 6 Cal. 4th at 1178.[13] The fraud claim, therefore, fails as a matter of law.

*Second*, allegations of fraud "must be accompanied by the who, what, when, where, and how" of the misconduct charged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation and quotation marks omitted). A plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is "false or misleading about a statement, and why it is false." *Id*. Most of the allegations do not provide this requisite detail. The only allegation that identifies a specific statement, Compl. ¶ 119(b), fails to recite how the EA statement is false. That is, the Complaint never explains or identifies what *protectable* "intellectual property" in which Antonick owned an interest (*i.e.,* copyrightable material) EA allegedly used, in contrast to the statements EA allegedly made. *Vess*, 317 F. 3d at 1106. For this separate reason, the fraud claim fails as a matter of law.

## IV.   CONCLUSION

EA's motion to dismiss should be granted without leave to amend.


Dated: May 31, 2011                                    KEKER & VAN NEST LLP

                                         By:   ____/s/ Brian L. Ferrall_____
                                                       BRIAN L. FERRALL
                                                       R. ADAM LAURIDSEN
                                                       Attorneys for Defendant
                                                       ELECTRONIC ARTS INC.

---

subsequent versions of Madden. *Id*. ¶¶ 119(d) & (e);

- EA represented in royalty statements that it owed Plaintiff no royalties on software released after 1991. *Id.* ¶ 119(f); and

- EA provided Antonick with sworn declarations in 2009 which stated that EA developed Sega Madden without using Antonick's copyrightable expression. *Id.* ¶¶ (g) & (h).

[13]       The Complaint also alleges that purported misrepresentations made in 2009 caused Antonick "to delay suit by several months." Compl. ¶¶ 119(g) & (h). But the parties' tolling agreement protected Antonick against that purported concern. *See id.* ¶ 94.

557875.01