IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ANTONICK,<br><br>    Plaintiff,<br><br>  v.<br><br>ELECTRONIC ARTS INC,<br><br>    Defendant.<br>_____ / | No. C 11-01543 CRB<br><br>**ORDER DENYING MOTION TO DISMISS** |

    Plaintiff Robin Antonick is a computer programmer and former college football player who designed the earliest version of the commercially successful Madden NFL Football video game. He brings this action for breach of contract and fraud against entertainment software company Electronic Arts ("EA"), owner and producer of the Madden franchise. Defendant EA filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting two independent grounds: (1) Plaintiff's claims are barred by the applicable statutes of limitations; and (2) Plaintiff fails to state a claim for either breach of contract or fraud. See generally dkt. 22. Although, at the hearing on this Motion, the Court contemplated ordering limited discovery on the statute of limitations issue, the Court now finds that the issue can be determined at this time.

    For the reasons that follow, Defendant's Motion to Dismiss (dkt. 22) is DENIED.

## I. BACKGROUND

Plaintiff alleges as follows. In 1983, Defendant EA first contracted with Plaintiff Robin Antonick to design a computer video game that would simulate "11x11 football"[1] as played in the National Football League ("N.F.L."). Compl. (dkt. 18) ¶ 16. During the game's early development, EA negotiated with N.F.L. coach John Madden to use his name and likeness and to have the game's designers integrate his playbook into the game. Id. ¶ 19. This prompted the parties to enter a new contract in 1986 ("1986 Contract") for the development of the John Madden Football game. Mot. (dkt. 22) at 3. The 1986 Contract provided that Plaintiff would receive royalties, calculated as a percentage of sales of the games that were his works, as well as those that were "Derivative Works" and "Remote Derivative Works." Compl. ¶¶ 23-24.[2]

Plaintiff developed three versions of John Madden Football for the Apple II, Commodore C64 and IBM PC platforms that were released in 1988 and 1989. Id. ¶ 27. Plaintiff received his last royalty check for his work in 1992. Id. ¶ 85. Plaintiff alleges that EA founder Trip Hawkins and EA developers, including employees Richard Hellman and Bing Gordon, "had extensive access to and thorough knowledge of [Plaintiff]'s code, design documents and other intellectual property." Id. ¶¶ 28-31. Plaintiff further claims that it was the practice of EA to inform employees, and he was so informed, that if EA sought to terminate a development contract but wanted to continue producing similar software, it would do so independently, in a "clean room" environment.[3] Id. ¶¶ 62-64.

In 1990, EA hired Park Place Productions to develop a new version of Madden for the

---

[1] "11 x 11 football" consists of eleven players for one team playing against eleven players on the opposing team.

[2] Defendant requests judicial notice of the 1986 Contract. Defendant first submitted a copy of the contract dated May 1986, to which Plaintiff objected, claiming that the contract the Complaint was based upon was "executed in January of 1987 and made effective as of December 4, 1986." Opp'n to RJN at 6. Plaintiff noted that if Defendant were to locate a copy of the December 1986 Contract, Plaintiff would have no objection to the Court taking judicial notice of it. Opp'n to RJN at 6. Defendant subsequently filed a copy of the December 1986 contract. RJN (dkt. 43) Ex. 2. The language at issue in this case is identical in both the May 1986 and December 1986 contracts and the Court takes notice of it.

[3] Plaintiff defines a "clean room" environment as one in which "the relevant designers, developers, and programmers have no access to or knowledge of the prior intellectual property they are attempting to replicate." Id. ¶ 61.

1 Sega Genesis program. Id. ¶ 69. Plaintiff alleges that on August 28, 1990 he had a telephone
2 call with EA employees Richard Hilleman and Bing Gordon to discuss why he was not
3 approached to develop the new version of the game. Id. ¶ 69. Plaintiff claims that on this
4 call, Hilleman stated that Plaintiff had not been given his right of first refusal because "the
5 Sega version was going to be more of an 'arcade' game," and Hilleman repeatedly assured
6 him that the new game "was being developed without any reference or use of his intellectual
7 property." Id. ¶¶ 69-70. Plaintiff claims that he reasonably relied on these statements and
8 thus "did not attempt to enforce his contractual rights or otherwise protect his intellectual
9 property." Id. ¶ 70.

10 In 1991, Plaintiff was contacted by EA employee Bing Gordon and was told that, due
11 to potential legal issues with Nintendo, it would be necessary to terminate his contractual
12 rights with respect to any of his contributions to the Madden software program for the
13 Nintendo Entertainment System. Id. ¶¶ 78-79. Plaintiff signed a termination amendment
14 terminating his rights with respect to the Nintendo platform, but the 1986 Contract remained
15 in force with respect to all other platforms. Id. ¶¶ 80-81.

16 Plaintiff was aware that EA continued to release a new edition of Madden each year
17 thereafter, but claims that not until 2009, following the publicity surrounding the 20th
18 Anniversary of Madden NFL, did he begin to suspect that EA had "continued to create
19 derivative works from his work." Id. ¶ 92. Plaintiff alleges that in its 20th Anniversary
20 Madden publicity materials, EA "traced its current software back to his software[,] not the
21 version developed by Park Place." Id. Plaintiff asserts:

> [I]n numerous recent interviews given to celebrate the 20th Anniversary of Madden, Electronic Arts founder Trip Hawkins expressly traces the origin of the Madden Software to the 1988 version developed by [Plaintiff] and repeatedly observes that this version – as opposed to subsequent versions – took "four years" to make because many complex programming issues were first solved in that version. When an acquaintance told [Plaintiff] about the Hawkins interview broadcast on CNBC on July 10, 2009 it was the first time that [Plaintiff] would have been put on notice that Electronic Arts might have misappropriated his intellectual property and breached its contractual obligations.

Id. ¶ 93. Plaintiff then contacted EA in 2009 and entered negotiations over Plaintiff's claims. The parties entered into a tolling agreement effective September 8, 2009. Id. ¶ 94.

3

In November 2009, EA provided Plaintiff with sworn declarations from the relevant developers and executives which claimed that the Sega version of Madden and other subsequent versions were developed without reference to Plaintiff's work. Id. ¶ 119(g)-(h); Mot. at 4. Plaintiff relies on the declaration of Richard Hilleman to assert that unbeknownst to Plaintiff, Hilleman, who had access to Plaintiff's work, continued to oversee the development of the John Madden Football series, including the Sega version, until 1993 or 1994. Id. ¶ 71. Plaintiff also relies on the declaration of former Park Place software developer Jim Simmons, which states that Simmons was the "only programmer/developer on the [Sega Madden] project." Id. ¶ 76. According to Plaintiff, Simmons had never developed a commercial software production prior to the Sega version of Madden and "[i]t would not be possible for Simmons to complete development [of the Sega version] in a record six months, particularly given his inexperience, without the substantial input of Electronic Arts and the intellectual property of [Plaintiff]." Id. ¶¶ 76-77.

Plaintiff also refers to a November 24, 2009 interview given by the founder of Park Place Productions in which the founder stated that he was not aware that the Sega game his company had been hired to produce would be an NFL game until shortly before release, suggesting that the integration of NFL player ratings and other elements derived from Plaintiff's work. Id. ¶ 74. Plaintiff also claims that the Park Place founder stated that he "only met with John Madden on a single occasion at a promotion event" and "affirmed that he never possessed Madden's playbook, never integrated Madden in the game and . . . [t]hus John Madden's extensive integration into the Madden franchise derives from [Plaintiff]'s work, which translated his plays into sophisticated computer algorithms." Id. ¶ 75. Plaintiff claims that prior to the November 24, 2009 interview, he was not aware of this fact. Id.

The parties' negotiations prior to Plaintiff's filing this action included an exchange of early source code, although Plaintiff alleges that the parties agreed that any source code analysis would not be included in the complaint. Id. ¶ 96. Defendant, however, claims that EA offered Plaintiff the opportunity to amend his complaint and add any references from his source code analysis but that Plaintiff declined. Mot. at 5.

4

The parties terminated their tolling agreement on January 21, 2011 and Plaintiff filed this action on March 30, 2011. See generally Compl. Plaintiff claims that "[e]very version of Madden produced by Electronic Arts is a derivative work or remote derivative work within the meaning of the 1986 Contract," and thus EA has breached the terms of the contract by failing to pay Plaintiff royalties. Id. ¶¶ 113-16. Plaintiff supports this allegation by describing in detail four game elements designed by Plaintiff that EA allegedly incorporated into the Sega version of Madden and other subsequent versions. These include: (1) methods of simulating actual NFL player behavior; (2) 3D technologies and projection; (3) instant replay technologies; and (4) a 3D positional camera. Id. ¶¶ 34-58.

Plaintiff also claims that EA has made numerous false representations and omissions of material fact constituting fraud, including: (1) assuring Plaintiff that it would protect his intellectual property and contractual rights; (2) telling Plaintiff that the Sega version of Madden would be developed without any reference to his designs, specifically on the August 28, 1990 call; (3) falsely informing Plaintiff that he needed to sign the 1991 termination agreement; (4) failing to give Plaintiff written notice and the opportunity to develop derivative works; (5) failing to place a copyright notice crediting Plaintiff on the packaging of versions of Madden released after 1991; (6) providing Plaintiff with royalty statements that falsely represented that EA owed Plaintiff no royalties on software released after 1991; and (7) providing Plaintiff with declarations from EA founder Trip Hawkins and current Chief Creative Officer Richard Hilleman which falsely state that EA developed the Sega version of Madden and subsequent versions without using Plaintiff's work. Id. ¶ 119(a)-(h).[4]

Defendant moves to dismiss. See dkt. 22.

//

//

---

[4] Defendant requests judicial notice of the declarations of EA founder Trip Hawkins, EA Chief Creative Officer Richard Hilleman, and the above mentioned Park Place developer Jim Simmons not for the truth of the facts contained but "to provide the Court with the full statements quoted and referenced in [the] Complaint." Rep. in Support of EA's RJN (dkt. 42) at 2. The Court takes judicial notice of the declarations only as to their existence, and not for the truth of the statements contained within them. See Fremont Indem. Co. v. Fremont Gen. Corp., 55 Cal. Rptr. 3d 621, 633 (Cal. Ct. App. 2007).

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Id. A motion to dismiss should be granted if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This "[p]lausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 556).

"Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. Allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not, however, accept as true pleadings that are no more than legal conclusions or the "formulaic recitation of the elements" of a cause of action. Iqbal, 129 S. Ct. at 1951.

Claims for fraud must meet the particularity requirements of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).

## III. DISCUSSION

This Order first addresses Defendant's argument that the Complaint is untimely, and then its argument that the Complaint fails to state a claim for either breach of contract or fraud.

**A. Timeliness**

Barring any kind of tolling, Plaintiff's claims would be time-barred. See Cal. C. Civ. Proc. § 337(1) (California's statute of limitations for breach of a written contract is four years); Cal. C. Civ. Proc. § 338(d) (statute of limitations for fraud is three years). However, the discovery rule postpones the accrual of a claim "until the plaintiff discovers, or has reason to discover the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 110 P.3d 914, 920 (Cal. 2005). Relatedly, under the principle of fraudulent concealment, a "defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations. . . for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." Bernson v. Browning-Ferris Indus., 873 P.2d 613 (Cal. 1994).[5]

To take advantage of the discovery rule, a plaintiff has the burden to "specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." Fox, 110 P.3d at 921 (emphasis in original). The discovery rule requires plaintiffs to diligently investigate their claims once they "suspect[] that an injury has been wrongfully caused" and thus "ha[ve] reason to discover a cause of action." Fox, 110 P.3d at 919-21; Platt Elec. Supply, Inc., v. Eoff Elec., Inc., 522 F.3d 1049, 1054-55 (9th Cir. 2008). A plaintiff has "reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. . . . He has reason to suspect when he has 'notice or information of circumstances to put a reasonable person on inquiry.'" Norgart v. Upjohn, 981 P.2d 79, 88 (emphasis in original). Similarly, claims for fraud are tolled until their discovery so long as the plaintiff is "not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." Hobart v. Hobart Estate Co., 159 P.2d 958, 972 (Cal. 1945) ("The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious.").

---

[5] California courts have described the principle of fraudulent concealment as a "close cousin" of the discovery rule, motivated by similar concerns. See Bernson, 873 P.2d at 615.

7

Plaintiff here seeks to avail himself of the principle of fraudulent concealment and the discovery rule, alleging that due to Defendant's express misrepresentations, he had no reason to be aware of Defendant's contract breaches and fraudulent actions within the limitations period. Compl. ¶ 87. He claims that he only became aware of his potential causes of action in 2009 upon viewing the publicity materials surrounding Madden's 20th Anniversary, and particularly a July 2009 interview with EA founder Trip Hawkins. Id. ¶¶ 92-94. He then exercised diligence in investigating his claims by contacting EA to discuss his concerns. See id. ¶ 94. The first tolling issue is thus whether Plaintiff had "notice of information or circumstances to put a reasonable person on inquiry" that EA might have continued to use his designs in subsequent versions of Madden prior to 2009, such that he was required to make a diligent investigation sooner than he did. See Norgart, 981 P.2d at 88 (Cal. 1999). If Plaintiff can demonstrate that he did not have reason to be on notice prior to 2009, the second tolling issue is whether Plaintiff can show that a reasonable person would have been put on inquiry by information or circumstances he first became aware of in 2009.

Typically, defendants seeking to prevent the application of equitable tolling will point to specific facts that they contend the plaintiff should have been aware of within the limitations period that should have put the plaintiff on inquiry of his claims. The parties' positions here are atypical. Here, Defendant argues that Plaintiff's alleged "trigger" for discovery of his claims, the 2009 Trip Hawkins interview, was not suspicious enough to put a reasonable person on inquiry, so Plaintiff was necessarily on inquiry notice prior to viewing the interview. Rep. (dkt. 41) at 4. Defendant argues that the Complaint establishes that Plaintiff knew in the early 1990s of all the facts he now uses to support his claims, including that Plaintiff contributed to John Madden Football, that EA had hired Park Place to develop the Sega version of the game, that EA had commercially released a new Madden game each year thereafter, and that the game elements Plaintiff claims that EA misappropriated were readily perceivable in each Madden game sold since the Sega version. Mot. at 7. Defendant argues that because the interview did not reveal any additional suspicious facts, Plaintiff has

8

"failed to meet his burden of pleading facts to show that inquiry notice began with the 2009 Hawkins interview." Rep. at 4. This Court does not agree.

First, the Court takes into account Plaintiff's allegations that EA employees specifically assured Plaintiff at the time the Sega version was developed that it was not being designed with any reference to Plaintiff's work. See Compl. ¶ 70. Construing the facts in the light most favorable to Plaintiff, it is plausible that Plaintiff reasonably relied on those statements and assumed that any game elements appearing in later versions that resembled his designs were independently developed using "clean room" methodology, as EA had represented was industry practice. See id. ¶¶ 62-63. For the purposes of this Motion to Dismiss it is plausible to the Court that without access to the code, Plaintiff would have no way of knowing if such elements appearing in later versions of Madden were independently developed, or derived from his original work, simply by viewing the game.[6] As Plaintiff's counsel argued at the hearing, the notion that Plaintiff would be unable to detect whether later versions of Madden included his work without access to the software code is supported by Defendant's response of providing copies of early source code to Plaintiff when Plaintiff first confronted EA with his concerns in 2009.[7] Plaintiff appears to have had no reason to be aware of his claims prior to 2009.

Second, the Court also finds plausible Plaintiff's allegations that he discovered his claims when EA's publicity materials surrounding the 20th Anniversary of Madden traced the current Madden game back to the version Plaintiff designed. Id. ¶¶ 92-93. Plaintiff points to a particular interview given by EA founder Trip Hawkins on July 10, 2009 as "the first time that [he] would have been put on notice" that EA had continued to create derivative works from his original software. Id. ¶ 93. In relevant part, the interview transcript reads:

---

[6] If discovery reveals evidence to the contrary, the Court can revisit this issue at the summary judgment stage.

[7] Plaintiff does not describe his initial code analysis in the Complaint in accordance with the parties' agreement that any discussion of source code analysis would not appear in the Complaint. Compl. ¶ 96. Though Defendant offered to waive this restriction after the Complaint was filed, Mot.at 5 n. 4, Plaintiff claims that the code was too limited and Plaintiff did not wish to provide EA with "detailed expert analysis in the form of an amended complaint before receiving full discovery." Opp'n at 12. The Court finds that Plaintiff has pled sufficient facts to state a claim for relief without providing code analysis at this stage.

9

| | | |
|---|---|---|
| | CNBC | Released in 1983, Dr. J and Larry Bird Go One-On-One was a smash. But what Hawkins really wanted was a full team sport, a football game featuring coach and commentator John Madden. But at the time having 11 players on each team like a real game was technically impossible. Hawkins, however, wouldn't give up on the idea. |
| | Hawkins | It took four years and it became known in the company as "Trip's Folly" and at one point the auditors had to come personally to see me to explain that "I'm sorry but we have to write this off because it's obviously not an asset, it's obviously just an expense that you are never going to recoup." (laughs) |
| | CNBC | He's laughing because Trip's Folly helped make EA the first third party software publisher to earn a billion dollars a year. With a new edition released annually, John Madden's NFL has remained at the top of the video game best seller charts. |

RJN Ex. 4.[8]

In its papers and at the motion hearing, Defendant took great exception to Plaintiff's view of the July 10, 2009 Hawkins interview, asserting that the interview reveals nothing more than facts that Plaintiff already knew, and that no reasonable person in Plaintiff's position would hear the interview and suddenly suspect EA of wrongdoing. Rep. at 4. No doubt, the interview does not explicitly concede misappropriation. However, the Court finds that the interview does contain facts sufficient to make a "reasonably prudent person suspicious." See Hobart, 159 P.2d at 972. The interview links a description of the original version of Madden – which Hawkins specifically said "took four years" to make – with later versions of Madden that contributed to EA's success and included "a new edition released annually." See RJN Ex. 4. Considering that the development time described exactly matched the amount of time it took for Plaintiff to create his version, it was reasonable for Plaintiff to become suspicious that Hawkins was referring to Plaintiff's original version, and not an independently created, subsequent version, as the progenitor of the current Madden game. See id. It was thus not unreasonable for Plaintiff to draw the inference that EA had potentially derived later versions of Madden from his original version.

---

[8] The Court takes judicial notice of the July 10, 2009 Hawkins interview. At the motion hearing Plaintiff did not object to such notice.

1  Furthermore, the interview strikes the Court as precisely the kind of thing a defendant
2  would point to as sufficient for inquiry notice had it been released within the limitations
3  period. Indeed, Defendant made a similar argument by submitting for judicial notice a New
4  York Times article with similar content to the Hawkins interview, published in 2005,
5  alleging that "accepting [Plaintiff's] theory of 'notice,' he was on constructive notice . . .
6  more than four years before he filed the Complaint."[9] Mot. at 8; RJN Ex. 8.
7  Although the 2009 Hawkins interview statements linking the Madden franchise to
8  "four years" of development are by no means conclusory evidence of wrongdoing, they were
9  enough to lead a reasonable person in Plaintiff's position to investigate further. The Court
10 finds that Plaintiff has met his burden of alleging facts showing that inquiry notice began in
11 2009. Equitable tolling of Plaintiff's claims is therefore appropriate by application of either
12 the discovery rule or fraudulent concealment. See Bernson, 873 P.2d at 615.[10]

### B. Breach of Contract Claim

Defendant next argues that Plaintiff fails to state a claim for breach of contract because, although he alleges that subsequent versions of Madden are derivative, see, e.g., Compl. ¶ 3, which would require royalty payments that Defendant never paid, the elements he points to are not truly derivative. See Mot. at 9. The 1986 Contract defines these terms as follows:

> "Derivative Work" means any computer software program or electronic game which either (a) constitutes a derivative work of the Work within the meaning of the United States copyright law or (b) produces audiovisual effects which infringe the copyright in the audiovisual effects produced by the Work. Derivative Works include, for example, significant enhancements of the Work to add additional features or improve performance and adaptations of the Work

---

[9] The New York Times article does not undermine Plaintiff's allegations of first being put on notice in 2009, because, under California law, "[t]he statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only '[o]nce the plaintiff has a suspicion of wrongdoing.'" See Unruh-Haxton v. Regents of Univ. of Cal., 76 Cal. Rptr. 3d 146, 160 (Cal. Ct. App. 2008) (emphasis in original). Plaintiff claims not to have been aware of this article and any dispute as to the truth of that statement cannot be resolved at this stage in the proceedings. Id. at 366; Opp'n. at 8.

[10] Plaintiff also argues that under a theory of "continuous accrual," Defendant has repeatedly breached the 1986 Contract within the limitations period. Compl. ¶ 86. Because the Court finds that equitable tolling applies, the Court need not reach the issue of continuous accrual.

United States District Court
For the Northern District of California

> to operate on computers or operating systems other than those described in the Specifications.
>
> "Remote Derivative Work" means a Derivative Work by Publisher, derived directly from another Derivative Work by Publisher, that runs on a Microprocessor Family different from that of the Work.

RJN Ex. 2, Ex. A, §§ 1.03, 1.05.

The contract also provides that EA will be the "owner of the copyright and all other proprietary rights in the [game] . . . subject to [Plaintiff's] copyright in the [game]." Id. § 8.04. Plaintiff argues for a broad definition of "Derivative Work" that includes not only (a) the definition of a derivative work under U.S. copyright law or (b) works producing infringing audio visual effects, but also (c) works described in the contract as examples of derivative works, including significant enhancements that add additional features or improve performance, and adaptations to operate on other computers or operating systems. Opp'n at 10-11. Defendant claims that because the contract limits EA's ownership of the game only subject to Plaintiff's copyright interest, and because the additional language about "enhancements" and "adaptations" is merely "exemplary," the definition of Derivative Works must be limited to that which is defined by U.S. copyright law. Rep. at 10.

The exemplary language ("significant enhancements of the Work to add additional features or improve performance") is very broad, and the game elements Plaintiff relies on likely fall within it. But even under Defendant's more limited definition of derivative work (limiting that term to the way it is defined by U.S. copyright law), Plaintiff does not fail to state a claim. Under U.S. copyright law, "a work will be considered a derivative work only if it would be considered an infringing work if the material that it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work." 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.01 (2011); Mirage Editions, Inc. v. Albuquerque A.R.T. Co., 856 F.2d 1341, 1343 (9th Cir. 1988). Thus, for a work to be derivative, it must borrow copyrightable elements of an original work. "If what is borrowed consists merely of ideas and not of the expression of ideas, then, although the work may have in part been derived from prior works, it is not a derivative work." 1 Nimmer on Copyright § 3.01 (2011). Defendant argues that the game

elements that Plaintiff claims have been unlawfully incorporated into later versions of Madden, as described in the Complaint, are not copyrightable elements, but rather "unprotectable methods, processes, or algorithms." Mot. at 10-11.

Indeed, the Complaint describes the disputed game elements using some of the terms of art typically associated with uncopyrightable material. Compare 17 U.S.C. § 102(b) (2006) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery.") with Compl. ¶¶ 35-45 ("methods of simulating actual NFL player behavior" based on complex "equations," "algorithms" and "calculations"). However, the Complaint is not so clearly devoid of facts supporting the misappropriation of potentially copyrightable elements as to require the Court to dismiss Plaintiff's case at this early stage in the proceedings. Plaintiff's game element descriptions go beyond simply referring to each feature as a "method" or "procedure." Plaintiff offers complex and detailed explanations of various game elements that he designed and alleges have been unlawfully incorporated into later versions of EA video games. See, e.g., id. ¶¶ 34-58; cf. Johnson Controls, Inc. v. Phoenix Control Sys., Inc., 886 F.2d 1173 (9th Cir. 1989) (noting that "nonliteral components of a program, including the structure, sequence, and organization and user interface" can be protectable). Determining whether such software elements qualify as copyrightable expression versus uncopyrightable ideas requires complex analysis that seems to this Court better suited for summary judgment, when the record has been developed. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1475 (9th Cir. 1992).

Because the Complaint plausibly alleges the misappropriation of some protectable elements, the Court finds that it would be improper to dismiss the breach of contract claim at this stage. Discovery will allow the Court to determine whether any protectable elements were indeed unlawfully incorporated into Defendant's video games.

//
//
//

13

### C. Fraud Claim

Finally, Defendant argues that Plaintiff fails to state a claim for fraud by (1) turning mere denials of breach of contract into a tort claim and (2) failing to meet the particularity requirements of Rule 9(b). Mot. at 14.

The "rule in California is that no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." Oracle USA, Inc. v. XL Global Servs., Inc., C 09-00537 MHP, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009); see also Erlich v. Menezes, 981 P.2d 978, 983 (Cal. 1999). Some of Plaintiff's fraud allegations do fail to allege conduct that goes beyond breach of the 1986 Contract. See, e.g., Compl. ¶ 119(d) (failure "to give Plaintiff 'written notice and the opportunity to develop' derivative works as would be required under the 1986 Contract"). To the extent Plaintiff relies on such allegations, he has not stated a claim for fraud.

However, at least one allegation describes with particularity misconduct that is independent of Defendant's alleged breaches of the 1986 Contract. This is the August 28, 1990 call with EA employees Richard Hilleman and Bing Gordon, wherein Hilleman allegedly made repeated assurances to Plaintiff that the Sega version of Madden was being developed without reference to Plaintiff's intellectual property. See Compl. ¶¶ 70, 119(b). This allegation includes "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations" and thus, as to this one allegation, Plaintiff has met the heightened pleading requirements of Rule 9(b). See Swartz, 476 F.3d at 764. Accordingly, the Court finds it inappropriate to dismiss the fraud claim.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (dkt. 22) is DENIED.

**IT IS SO ORDERED.**

Dated: September 27, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE