THE PAYNTER LAW FIRM PLLC
Stuart M. Paynter (226147)
Jennifer L. Murray (*Pro Hac Vice*)
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
        jmurray@smplegal.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Attorneys for Plaintiff Robin Antonick

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ANTONICK, an Illinois Citizen,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS INC., a California corporation,<br><br>Defendant. | Case No. 3:11-CV-01543-CRB<br><br>**PLAINTIFF'S OPPOSITION TO ELECTRONIC ARTS' SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>**\*\*\* REDACTED VERSION – PUBLICALLY FILED \*\*\***<br><br>Date:  December 14, 2012<br>Time:  10:00 a.m.<br>Judge:  Hon. Charles R. Breyer<br>Ctrm:  6, 17th floor<br><br>Date Complaint Filed: March 30, 2011<br>Trial Date:  April 1, 2013 |

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT .......................................................1

II.   BACKGROUND ..........................................................................................................2

      A.    Factual Background ..........................................................................................2

            1.    EA and Antonick Enter into a Long-Term Relationship to Develop a
                  Revolutionary New Football Videogame. ........................................................2

            2.    EA Extends Its Long-Term Relationship with Antonick to Cover Sega and
                  Nintendo Games. ............................................................................................5

            3.    EA Cuts Short Its Long-Term Relationship with Antonick but Continues to
                  Harvest His Intellectual Property for Secret and Unauthorized Use in
                  Console Games. ..............................................................................................7

            4.    EA Fraudulently Induces Antonick to Terminate His Rights to Royalties on
                  Nintendo Games. ..........................................................................................13

III.  ARGUMENT ............................................................................................................13

      A.    Plaintiff Is Entitled to Damages for EA's Fraudulent Denial of Royalties Owed Him
            Under the Contract. ........................................................................................14

            1.    Even Under EA's Flawed Interpretation of the Contract, Plaintiff Is Entitled
                  to Royalties on the Sale of Super Nintendo and TurboGrafx Games..............14

            2.    A Jury Could Reasonably Conclude that the 1990 Sega Genesis Game and
                  Subsequent Games Constitute "Derivative Works By Artist" in Light of
                  Antonick's Substantial Contributions............................................................15

            3.    Plaintiff Is Entitled to Royalties under Amendment VIII. .............................19

      B.    Plaintiff Is Entitled to Damages for EA's Other Contractual Breaches and Fraud. .....23

            1.    Right of First Refusal ....................................................................................23

            2.    Confidentiality Obligations ...........................................................................24

            3.    Proprietary and Copyright Protection.............................................................25

IV.   CONCLUSION .........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adobe Sys. Inc. v. Hoops Enter. LLC*,
    2012 WL 2237283 (N.D. Cal. June 15, 2012)................................................. 14, 19

*City of Hope Nat. Med. Ctr. v. Genentech, Inc.*,
    43 Cal. 4th 375 (Cal. 2008) ........................................................................ 16, 19

*City Solutions, Inc. v. Clear Channel Comm.*,
    365 F.3d 835 (9th Cir. 2004) ............................................................................ 15

*Crestview Cemetery Ass'n v. Dieden*,
    54 Cal. 2d 744 (Cal. 1960) ......................................................................... 16, 17

*F.B.T. Productions, LLC v. Aftermath Records*,
    621 F.3d 958 (9th Cir. 2010) ............................................................................ 19

*First Nat. Mortg. Co. v. Fed. Realty Inv. Trust*,
    631 F.3d 1058 (9th Cir. 2011) ................................................................. 1, 16, 19

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ........................................................................................ 13

*Lazar v. Superior Court*,
    12 Cal. 4th 631 (Cal. 1996) ............................................................................. 15

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
    69 Cal.2d 33 (Cal. 1968) ........................................................................... 16, 17

*Richardson v. Reliance Nat. Indem. Co.*,
    2000 WL 284211 (N.D. Cal. Mar. 9, 2000) (Breyer, J.) ...................................... 15

*Wilson v. Nobell*,
    119 Cal. App. 2d 341 (Cal Ct. App. 1953) ....................................................... 19

STATUTES

California Civil Code § 1641 .................................................................................. 24

California Civil Code §1654 ............................................................................. 14, 20

OTHER AUTHORITIES

Federal Rule of Civil Procedure 56 ......................................................................... 13

1

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Following this Court's summary denial of its first motion for summary judgment, Defendant Electronic Arts Inc. ("EA") now makes a second, equally futile attempt. Like EA's first motion, material issues of fact abound. Thus, as demonstrated below, EA cannot satisfy its burden to establish no genuine issue of material fact regarding the only issue raised by its motion—whether Antonick is entitled to damages for EA's fraud and contractual breaches.[1]

*First*, even if EA were correct in its flawed interpretation of Amendment VIII—which it is not—Plaintiff would still have a claim for royalties on **six** pre-1996 *Madden* Super Nintendo and TurboGrafx games under Amendment 1's unambiguous definition of "Microprocessor Family." EA submits no admissible evidence to refute Plaintiff's categorization of these games as belonging to the same "Microprocessor Family" as Antonick's Apple II game and even if it did, this would merely raise an issue of material fact not suitable for resolution on summary judgment. Moreover, EA cannot claim that the 1991 Termination Amendment absolves it of the obligation to pay royalties on Nintendo games because EA fraudulently induced Antonick to sign it.

*Second*, a reasonable jury could conclude that Antonick is entitled to additional royalties because the 1990 Sega Genesis *Madden* game and subsequent versions constitute "Derivative Works By Artist." EA asserts that, to constitute a "Derivative Work By Artist," Antonick must have coded the game himself. However, the term is undefined in the 1986 Contract and the evidence suggests otherwise. Antonick's contract was not limited to coding, but also encompassed significant design work. Moreover, he was paid "Derivative Work By Artist" royalties on the 1992 *Madden* Amiga game, which he did not code himself. This post-contract conduct raises an issue of material fact concerning ambiguous contractual language and provides another basis on which to deny summary judgment.

---

[1] During the August 24, 2012 Case Management Conference, this Court agreed to the parties' joint request to bifurcate the trial between EA "games released before 1996" and "games released in 1996 and after." Dkt. 164 at 9; Dkt. 165. Although Plaintiff believes he entitled to damages for EA's misappropriation of his intellectual property in *all Madden* games, as well as EA's college football and hockey games, this opposition brief will concentrate on evidence relating to damages for pre-1996 *Madden* games.

***Third***, in spite of EA's efforts to complicate matters by reading into Amendment VIII terms that are just not there, the amendment is simple and clear. It unambiguously grants Antonick 3% royalties on any Sega or Nintendo "Derivative Work," without qualification as to whether it is a "Derivative Work By Artist" or "Derivative Work By Publisher"—indeed, these terms are never mentioned in the amendment. According to Plaintiff's expert, Amendment VIII's promise of royalties whether or not Antonick actually coded the Sega and Nintendo games would have represented fair compensation for the use of his intellectual property and would have been within industry norms. To the extent that the Court finds the term "Derivative Work" as used in Amendment VIII is ambiguous, ample extrinsic evidence exists to support Plaintiff's interpretation.

**Fourth,** EA also breached its contractual obligations to offer Antonick a right of first refusal to develop Derivative Works, to keep Antonick's intellectual property confidential, and to obtain and maintain proprietary and copyright protection for all Works and Derivative Works. EA's failure to address these breaches at all—let alone establish the absence of any genuine issue of material fact—is yet another reason to deny this motion.

## II.     BACKGROUND

### A.     Factual Background

As described below, there is ample evidence to support Plaintiff's claims for damages resulting from EA's breach of contract and fraud. EA therefore cannot satisfy its heavy burden on summary judgment of demonstrating that no genuine issue of material fact exists and no reasonable jury could find in Plaintiff's favor.

#### 1.     EA and Antonick Enter into a Long-Term Relationship to Develop a Revolutionary New Football Videogame.

In December 1986, EA and Antonick negotiated a Software Development and Publishing Agreement to develop the *John Madden Football* videogame (the "1986 Contract"), which provided that Antonick would receive royalties in three ways: on (i) "Works," (ii) "Derivative Works," and (iii) "Remote Derivative Works." Ex. 1 § V.[2] The royalty rates for "Derivative Works" were further subdivided into "Derivative Works By Artist" and "Derivative Works By

---

[2] All exhibits cited herein are attached to the accompanying Declaration of Jennifer L. Murray, dated November 21, 2012 ("Murray Decl.").

2

Publisher," but neither term was expressly defined. *Id*. According to the contract, Antonick was entitled to a 7% royalty rate on sales of Works, 7% on Derivative Works By Artist, 1% on Derivative Works By Publisher and ½% on Remote Derivative Works.[3] *Id*. In addition, EA promised to (i) keep Antonick's intellectual property confidential, (ii) offer him a right of first refusal to develop Derivative Works utilizing his intellectual property, (iii) obtain and maintain "proprietary protection" for all Works and Derivative Works, and (iv) credit Antonick in copyright notices placed on all Works and Derivative Works. *Id*. at Ex. A §§ 5.02, 8.01, 8.03, 9.04.

Based on his conversations with EA, Antonick understood that the intent of the 1986 Contract was to create "a long-term relationship with me." Ex. 2, Antonick Dep. at 162. Consistent with this understanding, the preamble to the 1986 Contract expressly refers to the parties' intention to create a "long-term relationship." Ex. 1 at "Recitals"; *see also id*. § 13.01 ("Publisher is interested in establishing a long term relationship with Artist and hopes to promote Artist's name as a recognized Artist in the field of computer software.").[4]

In February 1987, Antonick and EA executed Amendment 1 to the 1986 Contract pursuant to which, among other things, Antonick agreed to a higher royalty rate on sales of Works and Derivative Works By Artist (7% on the first 100,000 units sold and 10% thereafter) and a lower or higher royalty rate on Derivative Works By Publisher depending on the microprocessor used (2% on those in the same "Microprocessor Family" and 0% on those in a different "Microprocessor Family").[5] Ex. 3 at 2. The royalty rates for "Remote Derivative Works" were not modified. In addition, Amendment 1 limited Antonick's right of first refusal to develop Derivative Works to certain Microprocessor Families—the 6502, 6800, Z-80 and 8080 families. *Id*. at 2. EA also

---

[3] The 1986 Contract and its amendments set forth separate rates for royalties on licenses. For the sake of simplicity, this brief will focus on royalties on sales.

[4] ███████████████████████████████████████████████████████████ Ex. 54, Hawkins Dep. at 16. ████████████████████████████████████████████ *Id*. at 18-19.

[5] After repeatedly assuring Plaintiff that it had done a thorough search and produced all relevant documents, EA recently produced Amendment 1 along with more than 4,100 pages of other documents. Prior to this time, neither EA nor Plaintiff recalled the existence of the document now known to be Amendment 1.

promised "not to use or otherwise provide" Antonick's "Development Aids"[6] to employees or third

parties. *Id.* at 3. Contrary to EA's claims, Antonick did not agree to change his compensation in

Amendment 1 "in exchange for an additional $10,000." Br. at 1. As the Amendment clearly states,

the $10,000 was an "advance," not a bonus, and the money was applied against Antonick's

royalties. Ex. 3 at 3; Ex. 66 to 10/5/12 Lauridsen Decl.

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Ex. 54, Hawkins Dep. at 34-38; Antonick

Decl. ¶ 22. Antonick also met separately with Mr. Madden again. 11/21/12 Declaration of Robin

Antonick ("Antonick Decl.") ¶ 22.[7] ████████████████████████████████

██████████████████████████████████████████ Ex. 54,

Hawkins Dep. at 38; Ex. 2. Antonick Dep. at 277-78.

        Antonick also worked closely with EA producer Richard Hilleman, who made active efforts

to familiarize himself with Antonick's code and trade secrets and became "more and more

interested in Madden football as time went on." Ex. 4, Kawahara Dep. at 28. During the three-

month period in 1987 that Antonick spent working from EA's offices, he and Hilleman would

often stay late "discussing the source code and making changes to it." Ex. 2, Antonick Dep. at 185-

87; *see also* Ex. 4, Kawahara Dep. at 28-29, 71-74. Among other conversations, Mike Kawahara—

then an EA assistant producer on *Madden*—remembers Hilleman asking Antonick about his

algorithms for "player behaviors." *Id.* at 6, 69. Along with his algorithms for player behaviors,

Antonick also recalls discussing with Hilleman (i) the method for player ratings embodied in the

game, (ii) his methodology for instant reply, (iii) data flow and data flow design, and (iv) memory

management techniques. Ex. 5, Plaintiff's Am. Response to Rog. 20 at 4.

        By 1988, Hilleman was in charge of development of the *John Madden Football* series.

Ex.6, 11/17/09 Hilleman Decl. ¶ 1. As part of his duties, he made "design decisions" about

---

[6] ████████████████████████████████████

███████████████████████████████ Ex. 55, Kaiser Dep. at 28-29.

        [7] The transcripts of these conversations are 228 and 80 pages long respectively. *See id.*

4

1   Antonick's work. Ex. 7, 11/28/90 Email. As such, he was copied on emails discussing technical

2   aspects of Antonick's work, including the "football field display code" and the "AI" (artificial

3   intelligence) used for game play. Ex. 8, 11/21/90 Email; *see also* Ex. 7, 11/28/90 Email; Ex. 9,

4   7/19/91 Email. In addition, Hilleman had physical access to Antonick's code because he was in

5   charge of archiving it. Ex. 4, Kawahara Dep. at 67, 72-74. Hilleman required Antonick to deposit

6   his code with EA "almost every day." *Id.* at 28; *see also* Ex. 2, Antonick Dep. at 187-89.

7        Antonick also underwent rigorous technical design reviews ("TDRs"). EA performed at

8   least four TDRs of Antonick's work during the period from October 1989 through the end of 1990.

9   Murray Decl. ¶ 59. These TDRs were deliberately intended to harvest Antonick's intellectual

10  property.[8] In addition to oral conversations, Antonick provided TDR documents to Hilleman and

11  technical director Scott Cronce, among others.[9] *See, e.g.,* Ex. 8, 11/21/90 Email.

12      **2.     EA Extends Its Long-Term Relationship with Antonick to Cover Sega and
                Nintendo Games.**

13      Antonick's Apple II version of *Madden* was released in 1988. According to EA, the game

14  was an "overnight success" that "exceeded its high expectations" and "went on to sell more copies

15  than any other sports game of its time." Ex. 11 "It's In The Game," at 4; Ex. 12, 20th Anniversary

16  Publication. The following year, Antonick's versions of the game for the Commodore 64 and IBM

17  were released. Ex. 13, EA's Fifth Am. Response to Rog. 1.

18      In keeping with its intent to foster a long-term relationship with Antonick and its respect for

19  the high quality of his work, EA also asked Antonick to develop *Madden* games for the Sega

20  Genesis and Nintendo platforms. Antonick had begun work on the Nintendo version by early

21  _____

22      [8] EA's counsel has represented to this Court that the "purpose of the TDR was to set forth a
    timeline; it had nothing to do with having Antonick explain his technology or code related to player
23  behavior," Dkt. 97 at 12-13. However, the original TDR memorandum that EA provided Antonick
    blatantly contradicts these representations. The first line states: "The purpose of a TDR is to give
    you an opportunity to **explain your product's design** to members of the Technical Staff at
24  Electronic Arts."  Ex. 10, "An Artist's View of a Technical Review" at 1 (emphasis added). It
    continues: "The Technical Design Review also provides you with a forum for sounding out **new
25  and innovative concepts** among a group of friendly comrades." *Id.* (emphasis added). Among
    other things, EA required Antonick in the TDR to devote the "main" part of his presentation to
26  explaining "the form and function of the **major data structures**" of his code as well as the
    "**program modules**." *Id.* at 3-4 (emphasis added).
27      [9] As technical director, Cronce would have been responsible for "being in touch with the state
    of the code" and for helping the "artist (i.e., Antonick) get the code done to excellence." Ex. 57,
28  Gordon Dep. at 64-65.

September 1989. *See* Ex. 14, Page from Antonick's Notebook. In October 1989, Antonick and EA entered into Amendment VIII to the 1986 Contract, which required Antonick to develop a "script" and a "TDR" (Technical Design Review) for the Sega and Nintendo versions. Ex. 15 at 1. The Amendment also provided that Antonick would receive "additional compensation" in the form of 3% royalties on sales of any "Nintendo Derivative Work" or "Sega Genesis Derivative Work." *Id*. at 2. Contrary to EA's representations, nowhere does Amendment VIII specify that Antonick was only entitled to these royalties "if he coded those games." *See* Br. at 8. Indeed, Amendment VIII does not mention Antonick coding the games at all; the only "Deliverable Items" specified are the script and TDR. *Id*. at 1. Nor, as EA claims, did the Amendment grant "Antonick an additional 0.5% royalty rate increase on the Nintendo Derivative Work if he finished the game ahead of schedule." *See* Br. at 5. Instead, Amendment VIII mentions a 0.5% increase "[i]f final software is achieved on or ahead of schedule." Ex. 15 at 2. It does not specify that Antonick would only receive the increased royalties if he actually coded the final software himself, as opposed to providing design or technical assistance. *See id*.

The Nintendo version of *Madden* was to implement "the play execution code from the Apple II version" developed by Antonick. Ex. 16, Script and TDR at RA 1003. By the end of October 1989, Antonick and his team were working hard to accomplish this objective, including the design of running and passing screens and "translat[ion]" and "assembl[y]" of the "Play Calling Screen" from Antonick's IBM game. Ex. 17, 10/30/89 Email. By mid-November, the script and TDR that Antonick had been contracted to develop under Amendment VIII had been accepted by EA. *See* Ex. 18, Amendment X at 1. It was only at this point that EA and Antonick entered into a separate amendment to the 1986 Contract—Amendment X—pursuant to which Antonick was to develop "game play code" for the Nintendo version. *Id*.

On December 30, 1989, Antonick signed a "Decline Letter" acknowledging that he had received written notice of his contractual right to develop a "Derivative Work" for the Sega Genesis platform and declined to do so. Ex. 19, Sega Decline Letter ¶ 2. Although Antonick does

not remember signing this letter,[10] it explicitly acknowledges his continued right to "Derivative

Work" royalties on the Sega Genesis game:

> "I [Antonick] further acknowledge that I must provide Publisher [EA] or the appropriate third party aid in such development as Publisher shall reasonably request as a condition to receiving any compensation with respect to Net Receipts from such Derivative Works."

*Id.* The signatory to Amendment VIII, EA's ex-CFO William Kaiser, admits in his declaration that

the Decline Letter reflects EA's "practice" of "determin[ing] whether the declining artist was

entitled to any compensation for a publisher's or third party's derivative work by consulting the

Derivative Work by Publisher provision of the declining artist's publishing agreement." Dkt. 196,

Kaiser Decl. ¶ 10. Thus, according to EA's own witness, the Decline Letter's mention of

Antonick's right to "compensation" for "Derivative Works" necessarily means that EA had

"consult[ed]" the royalty provisions of Antonick's contract and "determine[d]" that it would owe

Antonick royalties in the event the Sega Genesis version were a "Derivative Work" within the

meaning of the contract.

### 3. EA Cuts Short Its Long-Term Relationship with Antonick but Continues to Harvest His Intellectual Property for Secret and Unauthorized Use in Console Games.

Antonick continued working on the Nintendo version through much of 1990. Murray Decl.

¶ 60. Then, on August 28, 1990, after Antonick had devoted over six years of hard work and

creative technological innovation to developing *Madden*, Richard Hilleman told him that EA had

decided not to work with him any longer on the Nintendo or Sega Genesis versions. Hilleman said

that the Sega Genesis game was going to have "more of an arcade feel to it," and EA "had

contracted with another company, Park Place," which was going to develop the game "independent

of my work, completely developed independently, not using any of my source code or methods and

such." Ex. 2, Antonick Dep. at 19, 125. Hilleman explained that there was going to be a

---

[10] EA makes much of the fact that Antonick does not recall signing the Decline Letter, but EA also had no memory of this document until discovering it two months ago. *Supra* note 5. In any event, EA is incorrect that the discovery of the Decline Letter undermines "material allegations" of the Complaint. *See* Br. at 7-8. As discussed *infra* Section III.B.1, while Antonick gave up his contractual right of first refusal as to the Sega Genesis game, he still retained the contractual right to develop other games. Because EA never extended him the opportunity to develop these other games, Antonick is owed damages as a result of EA's breach and fraud.

7

1   "separation between my work and what was going on for the Sega"; thus, Antonick would not be

2   entitled to any royalties. *Id*. at 125. This was a complete surprise to Antonick and was the first time

3   he heard that the Sega game was going to be developed without using any of his work. *Id*. at 18,

4   125. Indeed, only six months previously, when Antonick had declined the right to develop the Sega

5   Genesis game himself, EA had reconfirmed in the "Decline Letter" that he would receive

6   "Derivative Work" royalties on the game. Ex. 19, Sega Decline Letter ¶ 2. As for the Nintendo

7   game, Hilleman told Antonick that the "market was dissolving" and EA would not be producing a

8   game that year at all. Ex. 20, Page from Antonick's Notebook; Ex. 2, Antonick Dep. at 119-20.

9   Instead of continuing work on Nintendo, Hilleman told Antonick he should concentrate on the

10  development of a second game for the IBM platform ("*Madden II*"). Ex. 2, Antonick Dep. at 123.

11  Thereafter, Antonick focused his work on *Madden II*, communicating regularly with Hilleman,

12  Scott Cronce and Bing Gordon, among others, on the technical details of the game during 1990 and

13  1991. *See, e.g.*, Ex. 8, 11/21/90 Email; Ex. 7, 11/28/90 Email; Ex. 9, 7/19/91 Email.

14          Although it was a "business jolt and emotionally difficult" for Antonick to be pulled of the

15  Nintendo project he'd been working on for nearly a year and to learn he would not be receiving

16  "Derivative Work" royalties on the Sega Genesis game, he had no suspicions that his contractual

17  rights were being violated. This was because EA continued to assure Antonick that it was not using

18  and did not use his intellectual property in subsequent versions of *Madden*. Ex. 2, Antonick Dep. at

19  25. In late summer/early fall of 1990, Bing Gordon called Antonick and expressly assured him

20  again that the Sega team was independently developing a different interface for passing and was

21  not duplicating Antonick's approach. Ex. 21, Plaintiff's Am. Responses to EA's Rogs at 15. EA's

22  specific assurances with respect to the *Madden* game were consistent with its assurances to its

23  "Artists" during this period that if it terminated a development contract but wanted to keep

24  producing software with similar functionality, it would ensure that it developed such software in a

25  "clean room" development environment. *Id*; Ex. 2, Antonick Dep. at 79-81. Antonick relied on

26

27

28

8

these statements and believed that EA was using a clean room to develop subsequent versions of *Madden*. Ex. 2, Antonick Dep. at 24.[11]

In fact, as EA now finally admits, it never used a clean room to develop the Park Place version or any subsequent version of *Madden*. Ex. 22, EA's Am. Responses to Plaintiff's Second Set of Rogs at 5-6. The associate producer of the Sega Genesis version, Michael Brook, has testified that nobody at EA ever gave him or his team any instruction not to use design documents, algorithms or development materials from Antonick's games. Ex. 24, Brook Dep. at 55-56. Instead, unbeknownst to Antonick at the time, EA employees who had extensive access to and knowledge of Antonick's code and other intellectual property also worked on the Park Place version and subsequent *Madden* games. In particular, Richard Hilleman was a designer and producer of the version released for the Sega Genesis in 1990, and a designer of the version released for Sega Genesis in 1991. Ex. 25, Sega/SNES Game Credits.[12] Hilleman spent "countless hours" assisting Jim Simmons, the only Park Place programmer on the title (who had never worked on a football video game before), to develop the game in a record six months. Ex. 26, Troy Lyndon Website at 2; *see also* Ex. 27, EA's Third Am. Response to Rog. 14 (admitting Hilleman discussed player ratings and the "play-selection process" with Simmons).[13] ██████████████████████████████ ████████████████████████████████████████████ Ex. 56, Simmons Dep. at 35-36. Since Antonick did not cease work with EA until after finishing *Madden II* in late 1991, the

_____

[11] EA claims that it was not its "practice or policy to establish 'clean rooms' for the development and/or coding of software for new games." Ex. 22, EA's Am. Responses to Plaintiff's Second Set of Rogs at 4-5. But this is contradicted by, among other things, the statements of then-CEO Trip Hawkins. In an email to an ESPN reporter, Hawkins wrote that if Park Place had wanted to begin "an entirely new game from scratch" for one of EA's competitors, "they would have had to use a clean room and not use anything they learned from Madden." Ex. 23, 3/19/10 Email at 1; *see also* Ex. 54, Hawkins Dep. at 71. ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ *Id.* at 73.

[12] Hilleman is also listed as a designer on the game credits for *John Madden Football* for the SNES (1991); *John Madden Football '93* for the Sega Genesis (1992), and *John Madden Football '93: Championship Edition* for the Sega Genesis (1992). *Id.*

[13] EA claims that the "countless hours" Hilleman spent assisting Simmons was spent on bug-testing, not technical pointers or solutons. *See* Ex. 27. ████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 54, Hawkins Dep. at 88-89.

period of Hilleman's growing interest and responsibilities with respect to Antonick's intellectual property, *supra* Part II.A.1, would have coincided with the period during which Hilleman was designing these Sega Genesis games, which were released in December 1990 and 1991.[14]

EA has vastly misrepresented the development history of the Sega Genesis game, claiming in sworn interrogatory responses that Simmons was provided with nothing more than a "**two to three page description** of the game containing overarching concepts" and that "Hilleman only became involved in James Simmons' work on the Genesis game when it moved closer to a complete product." Ex. 28, EA's Fourth Am. Response to Rog. No. 3 at 3 (emphasis added); Ex. 22, EA's Am. Responses to Plaintiff's Second Set of Rogs. at 7. The evidence directly contradicts these claims. ███████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████ Ex. 29, Sega Genesis Design Script at SIMMONS 2, 12-13, 32, 34-35, 38-42 (emphasis added). ████████████████
█████████████████████████████████████████████████████ *Id.* at SIMMONS 26 (emphasis added). ██████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████ *Id.* at SIMMONS 36 (emphasis added). █████████████
███████████████████████████████ Ex. 56, Simmons Dep. at 33-34.

EA's assistance to Simmons intensified when it decided—mere months before release—to convert the Sega version from an arcade-like game to one that realistically simulated professional football like the games Antonick was coding.[15] According to Brook, in July 1990 Simmons' game

---

[14] In addition, Scott Cronce—who, as discussed *supra* Part II.A.1, led EA's analysis of drafts of Antonick's Technical Design Reviews and was responsible for managing Antonick's work on the code—also worked on subsequent versions of *Madden*. ███████████████████████
██████████████████████████ Ex. 56, Simmons Dep. at 21-23. He was also a "technical director" for *John Madden Football '92* for the SNES (1991), *John Madden Football '92* for the Sega Genesis (1991), and *John Madden Football '93* for the Sega Genesis (1992). Ex. 25, Sega/SNES Game Credits.

[15] As explained by Brook, at the time "two distinct types of sports games" existed: (1) "simulation sports games that were meant to [] accurately reflect the statistics and abilities of [] real life players" and (2) "arcade sports games" which were a "parody of the sport itself" and featured

10

1    still had "[n]o plays, nothing. No play calling." Ex. 24, Brook Dep. at 47. Brook testified that when

2    the game was booted up, "there were 11 guys on each side running around without any logic, so it

3    was like seeing a football field with 11 guys just running circles." In fact, he didn't "even know if

4    there was a football in there yet." *Id.* at 46-47. Then Hilleman and designer Scott Orr decided, at

5    the last minute, that the game could "work as a Madden product." Ex. 30, Scott Orr Interview at 7;

6    Ex. 31, 12/12/11 Simmons Decl ¶ 7; Ex. 24, Brook Dep. at 66, 70. Despite the radical redesign and

7    obviously incomplete state of Simmons' game, ████████████████████████████████████████

8    ████████████████████████████████████████████ so that the product would

9    instead be available for the 1990 Christmas rush.[16] This meant the game would need to have been

10   ready for final testing by mid to late September 1990. *See* 11/21/12 Declaration of Garry Kitchen

11   ("Kitchen Decl.") ¶¶ 12-14; *see also* Ex. 24, Brook Dep. at 57. Thus, Simmons and EA would have

12   had less than two months to transform the game from "11 guys just running circles" to a

13   realistically simulated football videogame with a full playbook, realistic play calling AI and fully

14   rated rosters of players. ████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████ Ex. 56, Simmons Dep. at 46-47; Ex. 54, Hawkins Dep. at 38.

18          According to videogame development expert Garry Kitchen, Brook's testimony and the

19   involvement of several EA employees with the development of both games, along with the lack of

20   any documentation related to methods for ensuring independent development of the Sega Genesis

21   game,[17] "confirm[] that Electronic Arts did not institute any procedures to prevent the intentional

22   or inadvertent use of Mr. Antonick's intellectual property." Kitchen Decl. ¶ 18. Rigorously

23   documented clean room procedures are essential, in Mr. Kitchen's view, because the transfer of

24   intellectual property can even occur unintentionally. For example, Hilleman, in conversing with

---

athletes with surrealistic physical abilities, such as the ability to shoot flames or jump extreme
distances. Ex. 24, Brook Dep. at 39.

[16] *Compare* Ex. 32 (expected completion date of 3/1/91) *with* Ex. 6, 11/17/09 Hilleman
Declaration ¶ 6 (Sega game released in December 1990).

[17] *See* Ex. 33, 2/12/12 Sherringham Ltr.

Simmons or Brook, would have found it virtually impossible to separate out knowledge gained from Antonick's work from knowledge gained independently. *Id.* ¶ 19. In Mr. Kitchen's opinion, the "fact that Electronic Arts radically transformed its Sega Genesis version from an arcade version to a realistic simulation in an extremely short amount of time, makes it very likely that Electronic Arts utilized and benefited from Mr. Antonick's intellectual property." *Id.* ¶ 20.

Mr. Kitchen's opinion is confirmed by Plaintiff's videogame source code analysis expert, Michael Barr. Among the similarities between EA's subsequent games and protectable elements of Antonick's work that Mr. Barr has identified are the unique system for tracking the movements of players and the ball, the player ratings, and the angle of pursuit. Ex. 34, Barr Report at 38-46. Mr. Barr also found that the Sega and Nintendo versions of *Madden* duplicated the same mistake Antonick made with respect to the width of the football field.[18] *Id.* at 35. Despite having been in possession of much of Mr. Barr's analysis for the past six months, EA has made no effort to rebut his findings. Instead, EA has submitted an expert report consisting of no actual analysis of Antonick's source code or design materials, only an opinion that it would have "made no practical or economic sense" to "copy, port, or translate" Antonick's code to the Sega Genesis platform.[19] *See* Ex. 35, Lerner Report at 3.

Both Mr. Kitchen and Mr. Barr's expert opinions are further confirmed by EA's former CEO, Trip Hawkins, who, in a recent interview, admitted that when EA transitioned from "read-write floppy discs" (*i.e.*, Antonick's games) to "smaller read-only cartridges" (*i.e.*, Sega Genesis), it **"used the same underlying gameplay mechanics, camera angle, playbooks, and player stats**." Ex 37, Trip Hawkins Interview (emphasis added). Hawkins' statement directly contradicts his prior sworn declaration—on which EA relied in its first motion for summary judgment[20]—that

---

[18] Although Brook claims that the only material EA used of Antonick's were pages from his game manual, this does not explain why the binary play data, like Antonick's, reflects the incorrectly sized football field.

[19] EA also claimed, in opposing a discovery motion, that it would a provide an explanation regarding the "differences" in the player ratings in its subsequent games versus Antonick's in an expert report, but its sole expert had no mention of any supposed differences. Ex. 36, EA's Second Am. Response to Rog 15.

[20] Dkt. 134, EA Reply Br. in Support of Summary Judgment at 12.

1   EA used none of the intellectual property from Antonick's games in subsequent versions of

2   *Madden*. Ex. 38, 11/6/09 Hawkins Decl. ¶ 3.[21]

### 4. EA Fraudulently Induces Antonick to Terminate His Rights to Royalties on Nintendo Games.

4   In the late spring/early summer of 1991, Bing Gordon told Antonick that it was necessary to

5   terminate his contractual right to royalties on Nintendo games because of "legal reasons" arising

6   out of EA's reverse engineering of Nintendo's development aids. Ex. 39, Plaintiff's Am. Response

7   to Rog. 21 at 6. Gordon explained that he could not provide more details because EA's

8   conversations with its attorneys were privileged. *Id*. Antonick accepted these statements because he

9   knew and trusted Gordon and because he had previously been assured that EA would not use his

10  intellectual property if it subsequently developed a version of *Madden* for the Nintendo platform.

11  *Id*. These assurances were memorialized in paragraph 3 of the Termination Amendment, in which

12  EA reiterated the promises it had made in the 1986 Contract to protect Antonick's confidential and

13  proprietary information. Ex. 40, 1991 Nintendo Termination Amendment. EA, however, had no

14  intention of honoring the contractual promises it made in the Termination Amendment. In fact, it

15  had already breached the promises it had made in the 1986 Contract and reiterated in the 1991

16  Termination Amendment and would continue to do so with regard to the development of

17  subsequent games. *See infra* Part III.A.1.

### III. ARGUMENT

19  Federal Rule of Civil Procedure 56(c) provides for summary judgment when "there is no

20  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

21  of law." "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be

22  believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie,*

---

[21] ███████████████████████████████████████████████████████████ Ex. 54,
Hawkins Dep. at 50, 53-54. Not only is this nonsensical—if this is what Hawkins meant, it would
apply to every football simulation game on the market—but it is undermined by his other
testimony. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ *Id*. at 42, 62.

526 U.S. 541, 552 (1999).[22] Because EA drafted the contract at issue,[23] California Civil Code section 1654 requires that it be strictly construed against EA. "If conflicting extrinsic evidence supports different interpretations of ambiguous contractual language, this poses a question of fact not amenable to summary judgment." *Adobe Sys. Inc. v. Hoops Enter. LLC*, 2012 WL 2237283, at *6 (N.D. Cal. June 15, 2012). Here, EA has utterly failed to satisfy its burden of demonstrating no genuine issue of material fact regarding the only issue raised by its motion—whether Antonick is entitled to damages for EA's fraud and contractual breaches.

**A.    Plaintiff Is Entitled to Damages for EA's Fraudulent Denial of Royalties Owed Him Under the Contract.**

    **1.    Even Under EA's Flawed Interpretation of the Contract, Plaintiff Is Entitled to Royalties on the Sale of Super Nintendo and TurboGrafx Games.**

As EA acknowledges, even under Amendment 1 Antonick was entitled to 2% royalties on sales of "Derivative Works By Publisher" in the same "Microprocessor Family"[24] as the Apple II game he coded. *See* Br. at 4. Thus, EA's entire motion depends on its assertion that "[n]one of the accused *Madden* games are designed for the Apple II microprocessor family" and are therefore covered instead by Amendment 1's "0%" royalty for "Derivative Works By Publisher" on "Different Microprocessor Families." *See* Br. at 1, 7. The only support EA provides for its factual assertion that none of the games at issue are in the same "Microprocessor Family" as Antonick's games is a citation to its *own* interrogatory response—presumably drafted by the primary tortfeasor Richard Hilleman. *See id* at 1 n.1. Unfortunately for EA, this assertion is simply untrue. According to videogame development expert Garry Kitchen, **five** *Madden* games released on the Super Nintendo and **one** game released on the TurboGrafx platform prior to 1996 were all in the same "Microprocessor Family" as the Apple II (the 6502 family) because they used the "same instruction set" and had the "same instruction and data word size." Kitchen Decl. ¶¶ 21-28 & Ex. A. Thus,

---

[22] Internal quotations and citations omitted unless otherwise indicated.

[23] Ex. 54, Hawkins Dep. at 23; Antonick Decl. ¶ 23.

[24] "Microprocessor Family" had been defined previously in the 1986 Contract as "a single microprocessor and all related microprocessors that utilize the same instruction set and have the same instruction and data word size." Ex. 1 at Ex. A § 1.04.

14

1   even putting aside the applicability of Amendment VIII, Antonick would still be entitled to 2%

2   royalties on sales of these **six** games pursuant to Amendment 1.

3          Nor can EA rely on the 1991 Termination Amendment that purports to terminate Plaintiff's

4   rights on "Nintendo" platforms because it expressly reaffirms the confidentiality provisions of the

5   1986 Contract, which, as discussed *infra* Part III.B.2, prevent EA from using Antonick's

6   intellectual property without paying him royalties. A reasonable jury could conclude that EA

7   obtained Antonick's consent to the Termination Amendment by fraud by falsely promising that it

8   would continue to protect his intellectual property and not use it in subsequent Nintendo versions.

9   *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (Cal. 1996) (an action for fraud may lie where

10  the defendant fraudulently induces the plaintiff to enter into a contract); *accord Richardson v.*

11  *Reliance Nat. Indem. Co.*, 2000 WL 284211, at *4 (N.D. Cal. Mar. 9, 2000) (Breyer, J.). Antonick

12  clearly relied on these misrepresentations because he executed the Termination Amendment

13  pursuant to which his right to royalties for Nintendo "Derivative Works" were purportedly

14  terminated—royalties to which he was entitled under the unambiguous definition of

15  "Microprocessor Family" in Amendment 1 (let alone Amendment VIII) and which he would have

16  never given up if he had been aware of EA's fraud. Antonick was also injured by EA's continued

17  misappropriation of his intellectual property. EA's assertion that it is entitled to summary judgment

18  on the fraud claim because of a lack of "reliance and resulting damage," Br. at 2, is therefore

19  meritless. *See, e.g., City Solutions, Inc. v. Clear Channel Comm.*, 365 F.3d 835, 840 (9th Cir. 2004)

20  ("Except in the *rare case* where the undisputed facts leave no room for a reasonable difference of

21  opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.").

22          **2.     A Jury Could Reasonably Conclude that the 1990 Sega Genesis Game and**
             **Subsequent Games Constitute "Derivative Works By Artist" in Light of**
23           **Antonick's Substantial Contributions.**

24          In addition to Plaintiff's unambiguous right to royalties for Super Nintendo and TurboGrafx

25  games in the same "Microprocessor Family," there is a second reason to deny the current motion

26  without even addressing the parties' dispute over the proper interpretation of Amendment VIII: A

27  reasonable jury could conclude that Antonick is entitled to additional royalties because the 1990

28  Sega Genesis *Madden* game and subsequent versions constitute "Derivative Works By Artist."

15

1    Although the term is undefined in the 1986 Contract, EA asserts that, to constitute a "Derivative

2    Work By Artist," Antonick must have coded the game himself. *See* Br. at 8. However, as discussed

3    below, Antonick's contract was not limited to coding, but was a broad "Software Development"

4    contract that also included significant design work. Moreover, Antonick was paid "Derivative

5    Work By Artist" royalties on one game he did not code himself—the 1992 *Madden* Amiga game.

6    This post-contract conduct raises an issue of material fact concerning ambiguous contractual

7    language and provides another basis on which to deny summary judgment.

8                    a.    **The Term "Derivative Work by Artist" Is Ambiguous.**

9              "California has long abandoned a rule that would limit the interpretation of a written

10   instrument to its four corners." *First Nat. Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1066

11   (9th Cir. 2011). Instead, a court may consider extrinsic evidence if it "is relevant to prove a

12   meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec.*

13   *Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (Cal. 1968). Because "a party's

14   conduct occurring between execution of the contract and a dispute about the meaning of the

15   contract's terms may reveal what the parties understood and intended those terms to mean . . . . [it]

16   is admissible to resolve ambiguities in the contract's language." *City of Hope Nat. Med. Ctr. v.*

17   *Genentech, Inc.*, 43 Cal. 4th 375, 393 (Cal. 2008). "[E]ven if it be assumed that the words standing

18   alone might mean one thing to the members of this court, where the parties have demonstrated by

19   their actions and performance that to them the contract meant something quite different . . . the

20   parties by their actions have created the 'ambiguity' required." *Crestview Cemetery Ass'n v.*

21   *Dieden*, 54 Cal. 2d 744, 754 (Cal. 1960).

22             The 1986 Contract does not define the terms "Derivative Work By Artist" and "Derivative

23   Work By Publisher." The closest the contract comes to a definition is to state that the Artist

24   "develop[s]" a "Derivative Work By Artist," whereas the "Publisher develops or has a third party

25   develop" a "Derivative Work By Publisher." Ex. 1, 1986 Contract at Ex. A §§ 5.02(a), (b). EA

26   assumes, without support, that a "Derivative Work By Artist" must have been coded by Antonick.

27   *See* Br. at 8. However, the contract does not say that; it only says that a "Derivative Work By

28   Artist" is "develop[ed]" by Antonick. Although EA reads the term "develop" as synonymous with

                                                   16

1    "code," nothing in the 1986 Contract compels this conclusion. To the contrary, the contract itself,

2    which is entitled a "Software Development" agreement, expressly requires Antonick to do far more

3    than simply code the game, including design work ranging from development of "graphics, game

4    sounds and music," to playbook editors, internal documentation and user instructions. Ex. 1, 1986

5    Contract at Exs. B, B1 & B2. Subsequent amendments to the contract also required Antonick to

6    provide "consultant services." Ex. 41, Amendment 4; Ex. 42, Amendment 7. In keeping with the

7    broad scope of these responsibilities, EA itself credited Antonick as both a "designer" and

8    "programmer" on the original game.[25] Ex. 43, Apple II Packaging; Ex. 57, Gordon Dep. at 96.

9        Moreover, as discussed below, EA, by its own conduct, has shown that it interpreted

10   *developing* a "Derivative Work by Artist" to mean something other than merely *coding* a game

11   because it paid Antonick "Derivative Work By Artist" royalties on a game he did *not* code—the

12   1992 *Madden* Amiga game. Although EA argues that in order for Antonick to be paid "Derivative

13   Work By Artist" royalties, there must have been a separate addendum executed setting forth a

14   schedule of deliverables and development prepayments (Br. at 8-9), no such addendum was

15   executed with regard to the Amiga game. This post-contract conduct is more than sufficient to

16   demonstrate that the term "Derivative Work By Artist" is "reasonably susceptible" to more than

17   one meaning and is, thus, ambiguous. *Pacific Gas & Elec. Co.*, 69 Cal.2d at 37; *Crestview*

18   *Cemetery Ass'n*, 54 Cal. 2d at 754.

19           **b.      EA's Post-Contract Conduct Demonstrates that the Term Encompasses
                      More than Simply Games Coded by Antonick.**

20       In April 1987, EA contracted with a third party, Bethesda Softworks, to develop *Madden*

21   for the Amiga and several other platforms. Ex. 44, 4/1/87 Bethesda Contract. The Bethesda

22   contract specifically provided that the game would incorporate "many of the specifications" of

23   Antonick's game. *Id*. § I. In particular, Bethesda was going to use Antonick's *Madden* "playbook,"

24   "as well as his "player editor mechanic," which allowed players to arrange their own football plays.

25   Ex. 45, 9/11/87 Email. EA claims that the Amiga version of *Madden* was ultimately designed "in-

26   _____

27       [25] According to EA's expert, a "designer" is someone "responsible for making high-level
     choices regarding a game's objective, plot, interface, style, appearance and other content," whereas
28   a "programmer [is] responsible for writing the underlying code that makes the game work." Ex. 35,
     Lerner Report at 18-19.

17

house" using the Sega Genesis code, not Antonick's code. Ex. 28, EA's Fourth Am. Response to Rog. No. 3 at 4. Nevertheless, after the game was released, EA paid Antonick 7% royalties—the royalty rate provided under Amendment 1 for "Derivative Works By Artist." *See, e.g.*, Ex. 46; *see also* Murray Decl. ¶ 61. The 7% royalty rate was approved by the producers of the title, Kevin Shrapnell and Jack Falk. Ex. 47, Bastel Dep. at 36-37; Ex. 48, Amiga Game Credits.

EA was unable to locate the source code for the Amiga game, so Plaintiff cannot say definitively whether EA used any of the technical information Antonick prepared for Bethesda's use, or whether the game was, in fact, exclusively adapted from the Sega Genesis code as EA claims. The answer is, however, ultimately irrelevant to the issue of the proper interpretation of the term "Derivative Work By Artist." Even if the Amiga game was derived solely from the Sega Genesis code, EA still believed at the time that Antonick was entitled to 7% royalties on it. This contradicts its post-litigation stance that Antonick must have coded a game in order to receive the higher "Derivative Work By Artist" royalty rate.

EA will likely argue that its payment of 7% royalties for a game Antonick didn't code is a mistake, but the evidence suggests otherwise. As discussed *supra* Part II.A.3, Plaintiff's expert Michael Barr has found numerous additional similarities between Antonick's games and the Sega version, including duplication of the same mistake Antonick made with respect to the width of the football field—"smoking gun" evidence of copying that EA has made no effort to rebut despite having knowledge of Mr. Barr's finding since April. Moreover, Trip Hawkins has admitted that, among other elements, Antonick's "playbooks" were used in the Sega and Nintendo console games. If, as EA claims, the Amiga version was programmed from the Sega Genesis code, then Antonick's work was undoubtedly used in the Amiga game also—in fact, the games are in the same microprocessor family, making it easy to "port" information from one to the other. *See* Kitchen Decl. ¶ 24.

It is therefore plausible, if not likely, that the Amiga producers believed Antonick was entitled to "Derivative Work By Artist" royalties as a result of these substantial contributions. Indeed, given that the 7% Amiga royalties were approved by different producers who were not involved in EA's scheme to defraud Antonick, this post-contract conduct is arguably more

18

revealing as to the true nature of "what the parties understood and intended [the contract] terms to mean." *City of Hope Nat. Med. Ctr.*, 43 Cal. 4th at 393. By contrast, Richard Hilleman, the producer of the early Sega and SNES games and the primary tortfeasor here, made sure that Antonick was not paid 7% royalties on those games, going so far as to overrule personnel in EA's accounting department who believed otherwise. Ex. 47, Bastel Dep. at 41, 44-46. *See also Wilson v. Nobell*, 119 Cal. App. 2d 341, 346 (Cal Ct. App. 1953) ("The explanation was offered that the invoices had been sent through error. The court, however, was not required to accept this explanation in view of Nobell's obvious interest in reducing plaintiff's royalty.").[26]

In any event, to the extent that EA argues it made a mistake, this only reinforces the conclusion that summary judgment is inappropriate here. *See Adobe Sys. Inc.*, 2012 WL 2237283, at *6. The conflict between EA's payment of 7% royalties on the Amiga game and its refusal to pay royalties on other games it admits share the same development history raises an issue of material fact that can only be resolved by a jury. *First Nat. Mortg. Co.*, 631 F.3d at 1067.

### 3.    Plaintiff Is Entitled to Royalties under Amendment VIII.

A third reason to deny summary judgment is that Plaintiff is also entitled to royalties under Amendment VIII. As discussed below, Amendment VIII unambiguously grants Antonick 3% royalties on any Sega or Nintendo "Derivative Work," without qualification as to whether it is a "Derivative Work By Artist" or "Derivative Work By Publisher"—indeed, these terms are never mentioned in the amendment. To the extent that the Court finds the term is ambiguous, ample extrinsic evidence exists to support Plaintiff's interpretation.

#### a.    Amendment VIII Unambiguously Entitles Plaintiff to Royalties on Sega and Nintendo "Derivative Works."

EA claims that Amendment VIII is "unambiguous" and parol evidence need not be considered. Br. at 6. Plaintiff agrees. Amendment VIII unambiguously grants Antonick 3% royalties on any "Sega Derivative Work" or "Nintendo Derivative Work." Ex. 15 at 2. EA points out that the term "Derivative Work By Publisher" appears nowhere in Amendment VIII. Br. at 11.

---

[26] Nor can EA point to Antonick's lack of objection to the failure to pay him royalties on the Sega and SNES games as evidence of how he interpreted the term "Derivative Work By Artist" because Antonick was unaware that his work had been used in these games. *See F.B.T. Productions, LLC v. Aftermath Records*, 621 F.3d 958, 966-67 (9th Cir. 2010).

19

1    But neither does the term "Derivative Work By Artist." Instead, Amendment VIII merely refers to

2    "Derivative Works." EA certainly knew how to differentiate between "Derivative Works By

3    Artist" and "Derivative Works By Publisher" when it wanted to—both the 1986 Contract and

4    Amendment 1 make this distinction. *See* Ex. 1, 1986 Contract § V; Ex. 3, Amendment 1 at 2.

5    Amendment VIII, which is the only other amendment to the 1986 Contract that modifies royalty

6    rates, does not. The only logical conclusion is that, by referring to a 3% royalty on "Derivative

7    Works," EA meant *both* "Derivative Works By Artist" *and* "Derivative Works By Publisher." To

8    the extent there is conceivably any doubt, it should be resolved against the drafter—in this case,

9    EA. *See* Cal. Civ. Code § 1654. Thus, pursuant to Amendment VIII, Antonick is entitled to 3%

10   royalties on all Sega and Nintendo "Derivative Works," regardless of whether they were ultimately

11   coded by him, EA, or a third party.

12        The language of Amendment VIII is consistent with this interpretation. Contrary to EA's

13   assertions, the amendment never says that Antonick will be the person coding the Sega and

14   Nintendo games. The only "Deliverable Items" specified are the script and Technical Design

15   Review (TDR). *Id*. at 1. Nor, as EA claims, did the amendment grant "Antonick an additional 0.5%

16   royalty rate increase on the Nintendo Derivative Work if he finished the game ahead of schedule."

17   Br. at 5. Instead, Amendment VIII mentions a 0.5% increase "[i]f final software is achieved on or

18   ahead of schedule." It does not specify that Antonick would only receive the increased royalties if

19   he actually coded the final software himself. *See id*. at 2. This is also consistent with the language

20   of the original 1986 Contract, pursuant to which, as discussed *supra* Part II.B.1, Antonick provided

21   a broad range of design work.

22        Nor, as EA claims, would it be "unreasonable" to award Antonick the same royalties if he

23   did not do all of the underlying programming work himself. *See* Br. at 10. In the opinion of

24   videogame development expert Garry Kitchen, because much of the prior work Antonick had done

25   would have been transferrable to the Sega and Nintendo versions—for example, his player ratings

26   and playbook editor—3% would have represented fair compensation for the use of his intellectual

27   property, as well as development of a script and TDR, and would have been within industry norms.

28   Kitchen Decl. ¶¶ 29-30. EA's assertion that it received "no consideration" for the increase, Br. at 2,

20

1   is nonsense. Amendment VIII clearly spells out the services that Antonick was required to perform

2   and later amendments required additional deliverables.[27] Moreover, by agreeing to compensate

3   Antonick with additional royalties, EA gained the ability to utilize his Development Aids, which

4   under Amendment 1 it could not otherwise use. *See infra* Part III.B.2.

5                   **b.      Extrinsic Evidence Further Supports This Interpretation.**

6          If the Court, nonetheless, finds that the term "Derivative Work" as used in Amendment VIII

7   is ambiguous, ample extrinsic evidence supports Plaintiff's interpretation and refutes EA's.

8   Amendment VIII's promise of royalties whether or not Antonick actually coded the Sega and

9   Nintendo games is consistent with EA's explicit placement of a "designer" credit to Antonick on

10  the box cover of the original game. *See* Ex. 43, Apple II Packaging. In addition, EA's own

11  practices confirm that it often compensated artists for design work apart from coding. For example,

12  the contract between EA and D.C. True (a company belonging to Antonick) regarding the

13  development of the *Madden II* game for the IBM platform provided that, in certain circumstances,

14  Antonick would receive 3% royalties for development of a script alone. Ex. 49, 1991 Contract §

15  V(b)(3). Similarly, Scott Orr was compensated at a rate of 3% for consulting on *Madden II* for the

16  Sega Genesis without doing all of the underlying development work. Ex. 50, Orr Contract at Ex. B.

17  Furthermore, at his deposition, the associate producer of the 1990 Sega Genesis game admitted—

18  over vigorous speaking objections by EA's counsel—that EA agreed to pay Simmons a

19  "Derivative Work" royalty on another game in return for a promise to provide "technical

20  assistance" and fix a few bugs, tasks that Brook admitted did not necessarily require Simmons to

21  actually code the game. Ex. 24, Brook Dep. at 127-28.

22         In addition, the Sega "Decline Letter" (Ex. 19) supports Plaintiff's position. The letter—

23  which was executed two months after Amendment VIII—confirms that Antonick was to receive

24  "compensation with respect to Net Receipts" (i.e., royalties) for "Derivative Works." According to

25  EA's purported witness as to its contractual practices at the time, William Kaiser, before sending

26

27         [27] If anyone did not receive what he bargained for, it is Antonick. After a year of hard work on
    the Nintendo game, all of the compensation he received was applied against his royalties for the
28  *Madden II* game on the IBM platform. *See* Ex. 40, Termination Agreement ¶ 5.

                                                21

such a letter it was EA's "practice" to first "determine whether the declining artist was entitled to any compensation . . . by consulting" the artist's contract. Dkt. 196, Kaiser Decl. ¶ 10. If EA had believed at the time that Antonick had no possibility for additional compensation because Amendment 1's 0% "Derivative Work By Publisher" rate applied, it presumably would not have explicitly assured Antonick in the "Decline Letter' of his right to royalties in the event the Sega Genesis version were a "Derivative Work."

By contrast, the extrinsic evidence does not support EA's interpretation of Amendment VIII. Contrary to EA's claim, the parties did not always execute an "addendum" pursuant to Section 5.02(a) of the contract when Antonick was to be compensated at the "Derivative Work By Artist" royalty rate. *See* Br. at 8-9. As discussed *supra* Part II.B.1, the parties did not do so when Antonick received the higher royalty rate for the Amiga game. Nor does the Sega "Decline Letter" support EA's position merely because it mentions the term "Derivative Work By Publisher," while Amendment VIII does not. *See id.* at 10-11. As discussed above, Amendment VIII doesn't mention the term "Derivative Work By Artist" either, despite EA's explicit differentiation between the two types of derivative works in every other royalty provision in the parties' contract.

Furthermore, William Kaiser—EA's only witness on the topic—concedes he has no personal recollection of Amendment VIII, ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Dkt. 196, Kaiser Decl. ¶ 4; Ex. 55, Kaiser Dep. at 22, 24, 28, 33-35. Given Kaiser's lack of personal knowledge and involvement in Antonick's contract, his interpretation of Amendment VIII should be entitled to no weight here.

Finally, EA is incorrect that the "only logical reading" of the 1991 Termination Amendment is that it "terminated Amendment VIII only with respect to the Nintendo Derivative Work because Antonick previously had declined to work on the Sega Genesis Derivative Work." *See* Br. at 11. In fact, there is nothing "logical" about EA's reading. If, as EA claims, Amendment VIII was limited to royalties on games Antonick coded, then there would have been no reason to terminate Antonick's rights because he never coded a game that was released on the Nintendo

platform. And if EA had wanted Antonick to decline his contractual right of first refusal to develop a Nintendo game, it would have simply asked him to sign a "Decline Letter," as it did with the Sega Genesis—which, according to William Kaiser, was EA's "practice" at the time. Kaiser Decl. ¶¶ 9-10. Instead, EA took the extraordinary step of asking Antonick to terminate his rights with respect to all *Madden* games developed for the Nintendo platform. Ex. 46, Termination Amendment §§ 1-2. An eminently more "logical reading" is that EA did so because it knew it was vulnerable to a claim for royalties, if its fraud was discovered, on the basis that Super Nintendo games are in the same "Microprocessor Family" as Antonick's Apple II game. *See supra* Part III.A.

**B.      Plaintiff Is Entitled to Damages for EA's Other Contractual Breaches and Fraud.**

As discussed below, EA also breached its contractual obligations to offer Antonick a right of first refusal to develop Derivative Works, to keep Antonick's intellectual property confidential, and to obtain and maintain proprietary and copyright protection for all Works and Derivative Works. EA's failure to address these breaches at all—let alone establish the absence of any genuine issue of material fact—is yet another reason to deny its motion for summary judgment.

**1.      Right of First Refusal**

Under the terms of the 1986 Contract, EA promised to offer Antonick "written notice and the opportunity to develop" Derivative Works. Ex. 1 at Ex. A § 5.02. In Amendment 1, Antonick's right of first refusal was limited to the 6502, 6800, Z-80 and 8080 Microprocessor Families (as well as any Derivative Works developed for a "New Microprocessor Family"). Ex. 3 at 2. EA claims—inexplicably—that Antonick's right of first refusal to develop these games is "not at issue here." *See* Br. at 7. This is incorrect. As discussed *supra* Part III.A.1, **six** pre-1996 *Madden* games belong to the 6502 family under the 1986 Contract's unambiguous definition of "Microprocessor Family." Kitchen Decl. ¶¶ 21-28, Ex. A. In addition, **four** pre-1996 *Madden* games belong to the Z-80 "Microprocessor Family." *Id*. According to William Kaiser, EA used a form letter, such as the one Antonick signed for the Sega Genesis (Ex. 19), "whenever an artist waived his or her contractual right to develop a derivative work." Kaiser Decl. ¶ 9. EA has produced no such letters with regard to the games in the 6505 and Z-80 families. EA's failure to give Antonick "written notice and an opportunity to develop" these **ten** Derivative Works is a clear breach.

23

1

### 2.      Confidentiality Obligations

2      The 1986 Contract also required EA to "hold in confidence all Confidential Information" of

3 Antonick with "at least the same degree of care that it uses to protect its own Confidential

4 Information" and to "prevent the unauthorized disclosure of [Antonick's] Confidential Information,

5 both during and after the term" of the contract. Ex. 1, 1986 Contract at Ex. A § 9.04. "Confidential

6 Information" is defined to include Antonick's source code. *Id*. at Ex. § 9.02. EA breached its

7 confidentiality obligations by failing to use a clean room and by implementing no other methods to

8 prevent the unauthorized disclosure of Antonick's source code and other intellectual property. *See*

9 *supra* Part II.A.3; *see also* Kitchen Decl. ¶ 31 (opining that the design elements discussed in the

10 Barr report are "proprietary and confidential information").

11      EA has previously argued that, because all Works and Derivative Works are defined as

12 EA's "Confidential Information" during the term of the contract, EA could do anything it wanted

13 with Antonick's source code and had no obligation to safeguard it. *See* Dkt. 102, EA Reply Br. in

14 Support of Motion for Protective Order at 5. But this would lead to an absurd result, which, as EA

15 acknowledges, should be avoided when interpreting a contract. *See* Br. at 6 (citing *Flagship W.,*

16 *LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1012-13 (E.D. Cal. 2010)). Reading the

17 1986 Contract as a whole—as this Court is required to do, Cal. Civ. Code § 1641—it is clear that

18 EA could *not* do anything it wanted with Antonick's intellectual property. To the contrary, the

19 contract requires that, in return for use of his intellectual property including his source code, EA

20 must compensate Antonick for all Works and Derivative Works. Ex. 1, 1986 Contract § V.

21 Logically, if EA wanted to avoid paying Antonick these royalties, then it would have had to

22 safeguard his source code and other intellectual property and independently develop its own game.

23 Consonant with this understanding, in a section entitled "Exceptions," the contract states that

24 neither party's "Confidential Information" includes information that "is independently derived

25 from other sources." *Id*. at Ex. A § 9.03. Moreover, in falsely assuring Antonick that the 1990 Sega

26 Genesis game and all subsequent *Madden* games were being independently developed without use

27

28

of his work,[28] EA certainly possessed this same understanding of the contract. In sum, EA was obligated under the contract to *either* pay Antonick royalties for the use of his work *or* safeguard his intellectual property and independently develop future games. It did neither; thus, it is liable for breaching the confidentiality obligations of the contract.

In addition, EA is liable for providing Antonick's "Development Aids" to its employees and third parties for use in developing subsequent *Madden* games in violation of the 1986 Contract and Amendment 1. *Id.* at Ex. A §§ 5.05, 9.04; Ex. 3, Amendment 1 at 3. Among other things, EA used Antonick's debugging utility as an instant reply feature in subsequent *Madden* games—a use of the debugging utility that had specifically been explained to EA by Antonick. Ex. 51, Plaintiff's Responses to EA's Rogs, Set Three at 5-6.

### 3.    Proprietary and Copyright Protection

Finally, EA failed to protect Antonick's proprietary rights as required under the 1986 Contract. EA promised to "use reasonable efforts to obtain and maintain proprietary protection" (defined to include protection under "patent, trademark, trade secrecy or copyright" laws) for all Works and Derivative Works. Ex. 1, 1986 Contract at Ex. A § 8.01. It also promised to place Antonick's name on copyrights notices on all Works and Derivative Works. *Id.* at Ex. A § 8.03. It did neither. As EA has already acknowledged, it failed to secure copyright protection for the games Antonick coded. *See* Dkt. 107, 4/10/12 Tr. at 26.[29] Indeed, EA failed to secure any protection whatsoever for Antonick's work because it did not even preserve his source code. *See* Ex. 52, 1/27/12 Lauridsen Ltr. EA also admits it did not place Antonick's name on copyright notices on the *Madden* games that used his intellectual property and thus constitute Derivative Works. Ex. 53, EA's Responses to Plaintiff's RFA No. 4.

### IV.    CONCLUSION

EA's second motion for summary judgment is equally as meritless as its first and should be summarily denied.

---

[28] *E.g.*, Ex. 2, Antonick Dep. at 19, 125; Ex. 21, Plaintiff's Am. Responses to EA's Rogs at 15.
[29] Counsel for EA claims that Antonick could have registered the copyright for the games himself. *Id.* However, the contract required EA to secure this protection, not Antonick, and he was entitled to rely on EA's promise to do so.

DATED: November 21, 2012

HAGENS BERMAN SOBOL SHAPIRO LLP


By    /s/ Leonard W. Aragon
     LEONARD W. ARAGON

Robert B. Carey (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Stuart M. Paynter (226147)
Jennifer L. Murray (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
        jmurray@smplegal.com

Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Attorneys for Plaintiff Robin Antonick