1 | KEKER & VAN NEST LLP
SUSAN J. HARRIMAN - #111703
2 | sharriman@kvn.com
ERIC H. MACMICHAEL - #231697
3 | emacmichael@kvn.com
R. ADAM LAURIDSEN - #243780
4 | alauridsen@kvn.com
TIA A. SHERRINGHAM - #258507
5 | tsherringham@kvn.com
633 Battery Street
6 | San Francisco, CA 94111-1809
Telephone:     (415) 391-5400
7 | Facsimile:     (415) 397-7188

8 | Attorneys for Defendant
ELECTRONIC ARTS INC.
9

10 |              UNITED STATES DISTRICT COURT

11 |              NORTHERN DISTRICT OF CALIFORNIA

12

13 | ROBIN ANTONICK, an Illinois citizen,     Case No. 3:11-CV-01543-CRB (EDL)

14 |              Plaintiff,

15 |     v.                                   **DEFENDANT ELECTRONIC ARTS
                                              INC.'S THIRD MOTION FOR SUMMARY
16 | ELECTRONIC ARTS INC., a California       JUDGMENT**
corporation,
17 |                                          Date:       March 8, 2013
              Defendants.                    Time:       10:00 a.m.
18 |                                          Judge:      Hon. Charles R. Breyer
                                             Ctrm:       6, 17th Floor
19
                                             Date Comp. Filed:     March 30, 2011
20
                                             Trial Date:  April 1, 2013
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................2

  A.   EA Hired Antonick to Write Code for *John Madden Football* for the Apple II, Commodore 64, and IBM PC.................................................................2

  B.   EA Hired Park Place to Develop a Football Game for the New Sega Genesis.............................................................................................................4

III. ARGUMENT ..........................................................................................................7

  A.   Antonick's Contract Claim for Unpaid Royalties Fails Because None of the Games Are Derivative Works of Those He Coded.....................................7

    1.   Antonick's Unpaid Royalties Claim Turns on Copyright..................7

    2.   EA Did Not Copy Any Element of Antonick's Code.........................8

    3.   The Alleged "Similarities" Are Not Protectable By Copyright.................9

      a.   The field-width rule. ...........................................................11

      b.   The player ratings system. ..................................................12

      c.   "Decision Points" using the player rating system.............14

      d.   Ball carrier pursuit method. ...............................................15

      e.   The order of offensive players listed in rosters.............17

      f.   The direction tracking system.............................................18

      g.   The method for "flipping" the field. ..................................19

      h.   Football plays' names and formations. ...............................20

      i.   The names of variables, subroutines and plays.............22

      j.   The instant replay concept. ................................................22

  B.   Antonick's Other Breach of Contract Claims Fail as a Matter of Law. ...............23

  C.   Antonick's Fraud Claim Fails as a Matter of Law.......................................24

    1.   EA did not make an actionable misstatement. .................................25

    2.   Antonick cannot show justifiable reliance..................................27

    3.   Antonick has no fraud damages. .......................................................29

i

1

IV.    CONCLUSION ................................................................................................30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

723585.02

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Allen v. Academic Games League of Am., Inc.*
    89 F.3d 614 (9th Cir. 1996) ............................................................. 11, 19, 20

*Apple Computer, Inc. v. Microsoft Corp.*
    759 F. Supp. 1444 (N.D. Cal. 1991) ............................................................. 8

*Apple Computer, Inc. v. Microsoft Corporation*
    35 F.3d 1435 (9th Cir. 1994) ............................................................. *passim*

*Atari v. North American Philips Consumer Electronics Corp.*
    672 F.2d 607 (7th Cir. 1982) ............................................................. 11

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*
    226 F.3d 1138 (10th Cir. 2000) ............................................................. 28

*Aurora World, Inc. v. Ty Inc.*
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) ............................................................. 10

*Averbach v. Vnescheconombank*
    280 F. Supp. 2d 945 (N.D. Cal. 2003) ............................................................. 28, 29

*Baker v. Selden*
    101 U.S. 99 (1879) ............................................................. 12

*Baystate Techs. v. Bentley Sys.*
    946 F. Supp. 1079 (D. Mass. 1996) ............................................................. 18, 19

*Bikram's Yoga College of India v. Evolation Yoga*
    2012 WL 6548505 (C.D. Cal. Dec. 14, 2012) ............................................................. 21

*Brown Bag Software v. Symantec Corp.*
    960 F.2d 1465 (9th Cir. 1992) ............................................................. 10

*Cavalier v. Random House*
    297 F.3d 815 (9th Cir. 2002) ............................................................. 10

*City Solutions, Inc. v. Clear Channel Communications*
    365 F.3d 835 (9th Cir. 2004) ............................................................. 27

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*
    982 F.2d 693 (2d Cir. 1992) ............................................................. 18

*Data East USA, Inc. v. Epyx, Inc.*
    862 F.2d 204 (9th Cir. 1988) ............................................................. 11, 13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*
    499 U.S. 340 (1991) ............................................................. 10, 17

*Frybarger v. IBM Corp*
    812 F.2d 525 (9th Cir. 1987) ............................................................. 14, 16, 21

iii

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*
   9 F.3d 823 (10th Cir. 1993) ........................................................................ 18

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*
   446 F.2d 738 (9th Cir. 1971) ...................................................................... 17

*Hexcel Corp. v. Ineos Polymers, Inc.*
   681 F.3d 1055 (9th Cir. 2012) .................................................................... 26

*Ho v. Traflove*
   696 F. Supp. 2d 950 (N.D. Ill. 2010) ........................................................ 16

*Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*
   2009 WL 330259 (N.D. Cal. Feb. 10, 2009) ............................................. 25

*Jada Toys, Inc. v. Mattel, Inc.*
   518 F.3d 628 (9th Cir. 2008) ................................................................. 8, 9

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*
   No. C-07-03983 JSW, 2009 U.S. Dist. LEXIS 57525 (N.D. Cal. June 18, 2009) ................. 10

*Kamel v. Kenco/The Oaks at Boca Raton, LP*
   2008 WL 2245831 (S.D. Fla. May 29, 2008) ............................................... 8

*Lamke v. Sunstate Equipment Co.*
   387 F. Supp. 2d 1044 (N.D. Cal. 2004) .................................................... 28

*Landsberg v. Scrabble Crossword Game Players, Inc.*
   736 F.2d 485 (9th Cir. 1984) ...................................................................... 16

*Legal Additions LLC v. Kowalski*
   2010 U.S. Dist. LEXIS 25996 (N.D. Cal. Mar. 19, 2010) .......................... 29

*Mattel, Inc. v. MGA Entertainment, Inc.*
   782 F. Supp. 2d 911 (C.D. Cal. 2011) ...................................................... 27

*Matthew Bender & Co. v. West Pub. Co.*
   158 F.3d 674 (2d Cir. 1998) ....................................................................... 17

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*
   426 F. Supp. 2d 1101 (E.D. Cal. 2006) .................................................... 11

*Mirage Editions v. Albuquerque A.R.T. Co.*
   856 F.2d 1341 (9th Cir. 1988) ..................................................................... 8

*Oracle Am., Inc. v. Google Inc.*
   872 F. Supp. 2d 974 (N.D. Cal. 2012) ............................................. *passim*

*Oracle USA, Inc. v. XL Global Servs., Inc.*
   2009 WL 2084154 (N.D. Cal. July 13, 2009) ............................................ 25

*Swirsky v. Carey*
   376 F.3d 841 (9th Cir. 2004) .......................................................... 13, 14, 16

*Woods v. Resnick*
   725 F. Supp. 2d 809 (W.D. Wisc. 2010) ................................................... 16

iv

**State Cases**

*Beckwith v. Dahl*
 205 Cal. App. 4th 1039 (2012) ................................................................................ 27

*Foley v. Interactive Data Corp.*
 47 Cal. 3d 654 (1988) ............................................................................................. 25

*Freeman & Mills, Inc. v. Belcher Oil Co.*
 11 Cal. 4th 85 (1995) ...................................................................................... 2, 3, 4, 5, 25

*Hinesley v. Oakshade Town Ctr.*
 135 Cal. App. 4th 289 (2005) ................................................................................ 24

*Hunter v. Up-Right, Inc.*
 6 Cal. 4th 1174 (1993) ........................................................................................... 29

*K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*
 171 Cal. App. 4th 939 (2009) ................................................................................ 26

*OCM Principal Opp. Fund v. CIBC World Markets Corp.*
 157 Cal. App. 4th 835 (2007) ................................................................................ 29

*Silvaco Data Sys. v. Intel Corp.*
 184 Cal. App. 4th 210 (2010) ........................................................................... 26, 27

*Smith & Hawken, Ltd. v. Gardendance, Inc.,*
 2005 WL 1806369, at *2 (N.D. Cal. July 28, 2005) ............................................. 10

**Federal Statutes**

17 U.S.C. § 101 .......................................................................................................... 8

17 U.S.C. § 102(a) ................................................................................................... 20

17 U.S.C. § 102(b) ............................................................................................ *passim*

**State Statutes**

Cal. Civil Code § 3426 ......................................................................................... 26, 27

**Federal Regulations**

37 C.F.R. § 202.1(a) ................................................................................................ 22

37 Fed. Reg. 37605 ................................................................................................. 21

37 Fed. Reg. 37607 ................................................................................................. 21

DEFENDANT ELECTRONIC ARTS INC.'S THIRD MOTION FOR SUMMARY JUDGMENT
Case No. 3:11-CV-01543-CRB (EDL)

723585.02

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE**, that on March 8, 2013, at 10:00 a.m., or on such other date and time to be set by the Court, at 450 Golden Gate Avenue, Courtroom 6, 17th Floor, San Francisco, California, before the Honorable Charles R. Breyer, Defendant Electronic Arts Inc. ("EA") will and hereby does move the Court for an Order granting summary judgment to EA on all causes of action in Plaintiff Robin Antonick's Complaint or, in the alternative, partial summary judgment on the fraud claim for relief and on each of the copyright issues that require determination as a matter of law.

This motion is brought pursuant to Federal Rule of Civil Procedure 56 and relevant case law, on the basis that there is no genuine issue of material fact and summary judgment is appropriate as a matter of law. This motion is based on the this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the declaration of Tia A. Sherringham, filed herewith, and such other and further papers, evidence, and argument as may be submitted to the Court in connection with the hearing on this motion.

DEFENDANT ELECTRONIC ARTS INC.'S THIRD MOTION FOR SUMMARY JUDGMENT
Case No. 3:11-CV-01543-CRB (EDL)

723585.02

1

## I.   INTRODUCTION

2          In 2011, Plaintiff Robin Antonick filed a quixotic complaint claiming that all of Electronic

3   Arts Inc.'s ("EA") *John Madden Football* ("*JMF*") and *Madden NFL* videogames for the past

4   twenty-plus years are derivative works of the 1988 source code he wrote for the very first *JMF*

5   game.  After eighteen months of discovery, Antonick has not a shred of percipient witness

6   testimony or a single concurrent document showing that EA copied **any** of his code.  To the

7   contrary, all evidence demonstrates that EA's *JMF* for the Sega Genesis platform was

8   independently developed by Jim Simmons—an independent software developer, who never saw

9   Antonick's source code, never talked with anyone about Antonick's source code, and did not

10  know that the Antonick-coded games even existed.  Declaration of Tia A. Sherringham

11  ("Sherringham Decl."), Ex. 129 (Simmons Decl., ¶¶4-6).[1]

12         It should come as no surprise then that the **only** supporting evidence Antonick offers is the

13  testimony of his expert, Michael Barr.  But Barr's opinion cannot forestall summary judgment, as

14  even he concedes that there is no evidence of literal source code copying.  *See* Ex. B (Barr Depo.,

15  157:20-158:3).  Faced with the undisputed fact that not a single line of code from Antonick-coded

16  games appears in any EA game, Barr devotes his entire report to purported conceptual and high-

17  level "similarities" between Antonick's code and EA's *Madden* games.  But as a matter of law,

18  none of these purported "similarities" constitute expression protected by copyright law.  The

19  game elements at issue are ideas, methods and systems—expressly excluded from copyright

20  protection—and elements inherent in the game of football and dictated by the videogame

21  technology of the era—unprotectable under various copyright doctrines.  Because the only

22  alleged similarities are excluded from copyright protection, Antonick's claim for breach of his

23  1986 Contract fails.

24         Antonick's fraud claim fares no better.  Antonick has no evidence of actionable

25  misrepresentation, justifiable reliance, or resulting damages—each of which is required to prove

26  fraud.  His fraud allegations simply parrot EA's assurances that it did not breach the 1986

27  Contract and that Antonick was not entitled to unpaid contractual royalties.  California does not

28

---

[1]       All subsequent exhibits referenced herein are attached to the Sherringham Decl.

DEFENDANT ELECTRONIC ARTS INC.'S THIRD MOTION FOR SUMMARY JUDGMENT
Case No. 3:11-CV-01543-CRB (EDL)

723585.02

1  permit efforts to turn alleged contract liability into tort liability.  *See, e.g., Freeman & Mills, Inc.*

2  *v. Belcher Oil Co.*, 11 Cal. 4th 85, 102 (1995).  Antonick also cannot establish detrimental

3  reliance because he took no actions in reliance on any of EA's assurances, other than those he

4  was contractually obligated to do under the 1986 Contract.  Finally, Antonick has no evidence of

5  damages separate and apart from those stemming from his contract claim for allegedly unpaid

6  royalties—as even his damages expert admits.

7      The Court should grant EA's motion for summary judgment in its entirety.

8  **II.  STATEMENT OF FACTS**

9      **A.  EA Hired Antonick to Write Code for *John Madden Football* for the Apple II, Commodore 64, and IBM PC.**

10      EA founder Trip Hawkins had a "long-time interest in football stimulation [games]."

11  Ex. C (Hawkins Depo., 19:7-20:6).  Hawkins grew up playing Strat-o-Matic Football, a

12  statistically-based sports simulation game played with cards and dice.  *Id.* at 19:22-23.  As an

13  undergraduate at Harvard, Hawkins developed his first computer football simulation game.  *Id.* at

14  20:1-4.  Hawkins sought to bring the Strat-O-Matic features—such as "player ratings, accurate

15  rosters, accurate strategy, accurate simulation of correct outcomes based on play calling and the

16  players' strengths and weaknesses"—to the computer.  *Id.* at 26:8-20.

17      To implement Hawkins' vision, EA hired Antonick in 1984 to write the source code for a

18  videogame to be called "Football."  Ex. 14 (1984 Contract, 1).  Antonick's only experience in

19  videogames was as part of a team writing code for a single educational videogame; he had never

20  developed a sports videogame.  Ex. D (Antonick Depo., 10:4-11:3).[2]  During the game's

21  development, EA negotiated with John Madden to use his name and likeness on the game.

22  Madden's involvement led EA to enter into a new contract with Antonick in 1986 ("1986

23  Contract") for the development of a game for the Apple II platform to be called *John Madden*

24  *Football*.  Ex. 15 (1986 Contract).  The 1986 Contract also allowed Antonick to adapt his code

25  from Apple II *Madden* for two additional platforms, the Commodore 64 and IBM PC.  *Id.* at IV,

26  

27  ――――――――――
[2]  After *JMF*, Antonick worked on only one other videogame in the mid-1990s, which was
so unsuccessful that its sales never recouped the advances paid to Antonick.  Ex. D (Antonick

28  Depo., 48:5-12; 48:24-49:4; 51:11-17; 52:15-24).  Thereafter, Antonick left the videogame
industry.

723585.02

3-4.  The 1986 Contract provided payment schedules tied to Antonick's completion of deliverable items for those three games.  *Id.*  Under the 1986 Contract, EA owned all intellectual and other proprietary rights in the game (including all trade secrets), subject only to any copyright interest Antonick may have.  *Id.* at Ex. A, §§8.01, 8.04.

Hawkins was the lead designer of the *JMF* games that Antonick coded.  Ex. C (Hawkins Depo., 90:9-12).  Antonick acknowledges that Hawkins played a "substantial part" in designing the games he coded, testifying that he and Hawkins "beg[an] an in-depth engagement" and "collaborat[ed]" on the design of *JMF*.  Ex. D (Antonick Depo., 87:15-88:9).  For example, Antonick testified that he and Hawkins chose the individual player ratings for those games.  *Id.* at 212:12-15.  As evidence of Hawkins' lead role in designing the game, Hawkins generated most of the design documents that Antonick produced in discovery.  *See, e.g.,* Ex. 29 (Hawkins' "design input memo"); Exs. 33, 37, 41 (Hawkins' player ratings documents).

In 1988, during the final development stages of Apple II *Madden*, Richard Hilleman joined the project as a producer.  Ex. E (Hilleman Depo., 15:14-16; 26:25-27:3).  As producer of Apple II *Madden*, his primary role was to "try and ship what we had been working on for . . . years."  *Id.* at 15:22-16:16.  Hilleman played the game to isolate "bugs," and "ma[de] sure materials, like marketing materials and manuals, were ready to go when the product was ready to ship and to give the company some visibility as to when that would be."  *Id.*

It took four years for Antonick to complete writing the source code for *JMF*.  Ex. D (Antonick Depo., 41:23-42:4).  Hilleman explained that "Antonick was struggling to achieve the vision that [Hawkins] had for what that game should be" and that "[i]t was hard to get there for both of them."  Ex. E (Hilleman Depo., 53:12-16).  Antonick's failure to meet deadline after deadline forced EA and Antonick to amend his contract repeatedly.  From 1987 to 1990, the parties entered into fifteen amendments to the 1986 Contract, each of which required Antonick to produce deliverables on specific dates in exchange for specified compensation.  *See* Ex. 15 (1986 Contract and Amendments II-XV); Ex. 65 (Amendment 1).

Ultimately, Antonick wrote code for *JMF* games released on the Apple II in 1988 and the Commodore 64 and the IBM PC in 1989.  After completing this work, Antonick's role with EA

3

was very limited.  In December 1989, Antonick declined in writing to develop a *JMF* game for the recently-introduced Sega Genesis platform.  Ex. 69 (Decline Letter).  In June 1991, Antonick executed an agreement terminating his work on the *JMF* game for the Nintendo platform.  Ex. 70 (Termination Agreement).  In fact, after August 1990, Antonick acknowledged that he worked only on *JMF* II for the IBM, which he completed in 1992.  *See* Ex. D (Antonick Depo., 180:19-181:8; 183:20-23; 245:17-246:21).

**B.      EA Hired Park Place to Develop a Football Game for the New Sega Genesis.**

In early 1990, EA decided to develop a new "arcade-style" football videogame for the new Sega Genesis.  Ex. D (Antonick Depo., 152:8-11, 153:19-154:3); Ex. E (Hilleman Depo., 31:13-32:9).  EA intended to design a different football game that focused on fun and ease of play for the more sophisticated Sega that used a faster processor.  Ex. F (Hilleman Decl., ¶7).  To develop that game, EA contracted with an independent company, Park Place Productions ("Park Place"), whose co-founder had developed *Monday Night Football* for the PC[3]—a game that was a commercial success and outperformed the Antonick-coded *JMF* for the PC.[4]

Park Place enlisted software engineer James Simmons to develop this game, which became the Sega Genesis version of *JMF* published in 1990 ("*Sega Madden*").  Ex. 129 (Simmons Decl., ¶3).  At the end of the development process, EA decided to put the *JMF* title on Simmons' game.  *Id*.; Ex. A (Simmons Depo., 45:16-21).

EA provided Simmons with a design script (a loose "guideline for something [EA] would like to see in the product"[5]), allowing Simmons to implement his own vision of the game and design the game from the ground up.  Ex. A (Simmons Depo., 19:16-23, 21:17-20); Ex. L (Cronce Depo., 63:20-23); Ex. E (Hilleman Depo., 30:15-25) ("Simmons made the day-to-day decisions that turned in the product that we played.").  Simmons was responsible for writing the game code for *Sega* Madden; no one at EA had any role in writing the game code.  Ex. 129 (Simmons Decl., ¶5).  Simmons worked in San Diego, not EA's Redwood City headquarters.  *Id*.,

---

[3]      *See* http://www.mobygames.com/developer/sheet/view/developerId,31916/.

[4]      *Compare* Ex. G (Life to Date Statements for *Madden* IBM PC) with Ex. H (RA0002756) (Monday Night Football sold "over a hundred thousand copies").

[5]      Ex. 130 (Orr Design Script); Ex. A (Simmons Depo., 25:2-19, 27:10-13, 27:21-28:13).

¶6; Ex. A (Simmons Depo., 32:16-18).  No one from EA ever provided Antonick's source code or any other game-related source code to Simmons or to anyone else at Park Place.  Ex. 129 (Simmons Decl., ¶5); Ex. F (Hilleman Decl., ¶7).  Nor did anyone at EA ever speak to Simmons about any aspect of the Antonick-coded games[6]—in fact, Simmons was unaware that any other *JMF* videogames existed.  Ex. 129 (Simmons Decl., ¶4).  Moreover, it would have made no sense for EA to discuss Antonick's game with Simmons, because Antonick had taken four years to develop a game that was both critically and financially unsuccessful.  Ex. F (Hilleman Decl., ¶7).

Simmons wrote *Sega Madden* for a 68000 processor—a much more powerful processor than the 6502 processor for which the Antonick-coded games were written.  Ex. 129 (Simmons Decl., ¶ 8); Ex. I (Lerner Report, 5-6).  It would have been impractical to use code that was written in assembly language for a 6502 processor to develop a game for a 68000 processor, in part because it would have taken twice as long to translate and port old code than it would to write fresh code.  Ex. 129 (Simmons Decl., ¶8); Ex. I (Lerner Report, 5-6).

After providing Simmons with an initial design script, EA's involvement in the development of Simmons' game was limited to: (1) providing "player ratings" data, (2) selecting plays to be featured in the game, and (3) testing a near-final game for feature functions and bugs.  Ex. 125 (EA's 2nd Am. Rog. Resp. Nos. 14-15).

"Player ratings" are numerical values corresponding to football skills and physical attributes of the virtual players within the game.  Ratings are commonplace and have been used in games, including videogames, for forty years.  *See* Ex. I (Lerner Report, 25-27).  For *Sega Madden*, EA employee Michael Brook created the player ratings from scratch.[7]  He used a 0-15 scale to rate virtual players on different attributes such as "speed," "pass accuracy" (for

---

[6]     Ex. E (Hilleman Depo., 36:10-13) ("I don't remember discussing source code specifically with Mr. Simmons for [*Sega Madden*]"); Ex. J (Brook Depo., 50:1-17) (Brook never had any conversations with anyone about Antonick); *id.* at 55:4-20 (there was "no desire on anybody's part to . . . use [design documents from the Antonick-coded games].  I never requested any of those documents and—and nobody ever mentioned them to me one way or the other"); Ex. A (Simmons Depo., 91:22-25) (Hawkins had no involvement in *Sega Madden*).

[7]     Ex. J (Brook Depo., 41:23-42:5) ("[M]y assignment was [to] create the ratings for each of the players for . . . five or six different skill categories—like speed was one of them."); 43:11-14 ("I provided [Simmons] with a whole set of player ratings"); 72:20-73:5) ("I rated them."); Ex. E (Hilleman Depo., 46:17:-23) ("Michael Brook's job was to produce those ratings.").

quarterbacks), "catching" (for receivers) and "tackling" (for defensive line).  Ex. K (Sega manual).  Simmons wrote a data file, and Brook inputted his ratings into that data file and sent the completed file back to Simmons.  Ex. 125 (EA's 2nd Am. Resp. to Rog. No. 15); Ex. A (Simmons Depo., 73:20-74:6).

EA also provided Simmons with drawings of the football plays for the virtual teams to run.  Brook selected the plays for *Sega Madden* from two sources: a generic football reference book and the hard-copy playbook included with the packaging for the Apple II, C64 and IBM versions of *JMF*.  Ex. J (Brook Depo., 48:18-49:17).  Hawkins used John Madden's Raiders playbook to "create every single one of those plays."  Ex. C (Hawkins Depo., 57:3-18).  Once Brook selected plays for *Sega Madden*, he sent Simmons hard-copy play diagrams—similar to ones football coaches or commentators draw.  Ex. J (Brook Depo., 47:18-48:15).  Simmons consulted the diagrams for specific formations, but wrote the code for the plays included in *Sega Madden* from scratch.  Ex. A (Simmons Depo., 50:22-54:2)

At the "end of the development cycle,"[8] EA employees played the game to check it for realism, feature functions, and bugs.  Ex. F (Hilleman Decl., ¶ 5); Ex. A (Simmons Depo., 35:4-36:22).  Hilleman and Simmons discussed how to ensure that the player ratings made the game fun and realistic, the user-interface and process by which a user selects plays, and how to visually refine the depiction of one-on-one player confrontations.  *See* Ex. 125 (EA's 2nd Am. Resp. to Rog. No. 14); Ex. A (Simmons Depo., 34:25-36:8).  None of these discussions involved game code.  Hilleman ***never*** reviewed, edited, or wrote any of the *Sega Madden* source code.[9]

Simmons, one of the "best programmers" of his day,[10] spent 50 to 60 hours per week working on *Sega Madden*, which he described as "not very complicated."  Ex. 129 (Simmons Decl., ¶8).  In December 1990, roughly eight months after he began coding the game, *Sega Madden* was commercially released.

---

[8]      Ex. A (Simmons Depo., 30:3-14).

[9]      *See* Ex. 125 (EA's 2nd Am. Resp. to Rog. No. 14).  No one at EA ever reviewed the source code until Scott Cronce did one or two weeks before the game was finalized.  Ex. 129 (Simmons Decl., ¶6); Ex. A (Simmons Depo., 22:24-23:9); Ex. L (Cronce Depo., 66:6-68:6).

[10]      Ex. N (Orr Depo., 85:9-20).

723585.02

Each year since 1990, EA has released a new *JMF* game by many different software developers for play on over 20 different platforms.

## III.   ARGUMENT

### A.   Antonick's Contract Claim for Unpaid Royalties Fails Because None of the Games Are Derivative Works of Those He Coded.

#### 1.   Antonick's Unpaid Royalties Claim Turns on Copyright.

Antonick complains that EA breached the 1986 Contract by failing to pay him royalties on sales of "Derivative Works" of the games he coded.  Compl. ¶¶ 2-4, 114-15; Ex. M (Pl.'s 3rd Am. Resp. to Rog. No. 1); Ex. 15 (1986 Contract §V, 5).  Under the 1986 Contract, EA owns all intellectual and other proprietary rights in Antonick's work, except for any copyright interest Antonick may have.  Ex. 15 (1986 Contract, Ex. A §8.04).  Therefore, when Antonick refers to his "intellectual property," he can only mean a *copyright* interest in the games he coded.

Antonick does not contend that EA literally copied any of his source code—meaning not a single line of code from Antonick-coded games appears in any other EA game.  *See* Ex. B (Barr Depo., 157:11-158:3).  Instead, Antonick's entire claim rests on the testimony of his expert, Michael Barr, who offers an "opinion[] regarding the *similarities* between EA source code for [EA's versions of *JMF*] and Mr. Antonick's intellectual property."  Ex.166 (Barr Report, 9) (emphasis added).[11]  And the only similarities Barr identifies are ***conceptual*** similarities dealing with "organizational systems and logical sequences."  Ex. B (Barr Depo., 69:4-20); Ex. 166 (Barr Report, Figure 7).

The 1986 Contract defined a Derivative Work as "any computer software program or electronic game which either (a) constitutes a derivative work of the Work within the meaning of United States copyright law or (b) produces audiovisual effects which infringe the copyright in

---

[11]   Although EA's arguments herein do not turn on the quantity of code Barr claims is similar, it is nonetheless worth noting that out of more than fifty thousand lines of code from the Antonick-coded games, Barr's report focuses on purported similarities in less than 1% of Antonick's code.

723585.02

the audiovisual effects produced by the Work." Ex. 15 (1986 Contract, Ex. A §1.03).[12]  Barr's

expert reports—the only evidence Antonick offers—are expressly limited to source code analysis

and do not discuss any audiovisual effects.  *See* Ex. 166 (Barr Report, 9); Ex. B (Barr Depo.,

191:14-192:2).  Thus, Antonick must prove that the EA games are derivative works of the games

he coded "within the meaning of United States copyright law."

"[A] work will be considered a derivative work only if it would be considered an

infringing work if the material which it has derived from a preexisting work had been taken

without the consent of a copyright proprietor of such preexisting work."  *Mirage Editions v.*

*Albuquerque A.R.T. Co.,* 856 F.2d 1341, 1343 (9th Cir. 1988) (quotation marks and citation

omitted).  A "derivative work" does not simply "derive" from another work in the common sense

of the word; it must copy at least some of the work's copyrightable expression.  *See*, *e.g.*, *Apple*

*Computer, Inc. v. Microsoft Corp.*, 759 F. Supp. 1444, 1454 (N.D. Cal. 1991).  In turn,

Antonick's breach of contract claim for unpaid royalties fails as a matter of law unless he proves,

first, that EA ***copied*** elements of the games he coded and, second, that the copied elements are

***protected by copyright***.  *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 636 (9th Cir. 2008).

## 2.    EA Did Not Copy Any Element of Antonick's Code.

All evidence shows that EA copied nothing from Antonick's source code.  No witness

testimony or concurrent documents evidence code copying.  Antonick asserted in his Complaint

that three EA employees, Bing Gordon, Trip Hawkins, and Rich Hilleman, had "access to and

thorough knowledge of Antonick's code, design documents, and other intellectual property"

---

[12]    The 1986 Contract offers two examples of "Derivative Works": "Derivative Works
include, *for example*, significant enhancements of the Work to add additional features or improve
performance and adaptations of the Work to operate on computers or operating systems other
than described in the Specifications."  Ex. 15 (1986 Contract, Ex. A §1.03) (emphasis added).
This explanatory text highlights that only those "significant enhancements" or "adaptations" that
are a "derivative work of the Work" under copyright law are "Derivative Works" under the 1986
Contract.  This is consistent with the Copyright Act's definition of a derivative work, which
provides that derivative works can be "elaborations" or "adaptations."  *See* 17 U.S.C. § 101.

These examples do not expand the 1986 Contract's definition of "Derivative Works"
beyond copyright.  *Cf. Kamel v. Kenco/The Oaks at Boca Raton, LP*, 2008 WL 2245831, at *4
(S.D. Fla. May 29, 2008) ("By listing specific items, like labor and material shortages, the
contract is not expanding the definition of impossibility of performance …. Including specific
factual situations in the contractual language does not expand or contract any remedy that
Defendant would not otherwise have at law").

723585.02

1    during the time he coded the *Madden* games.  Compl., ¶28.  That allegation is false.  Neither

2    Gordon nor Hawkins ever saw Antonick's source code. Ex. O (Gordon Depo., 66:16-17); Ex. D

3    (Antonick Depo., 278:24-279:15).  As producer, Hilleman never wrote code for any EA game,

4    and writing or reviewing code was not his responsibility.  Ex. E (Hilleman Depo., 29:13-30:7).

5    Hilleman likewise does not remember seeing Antonick's source code.  Ex. F (Hilleman Decl.,

6    ¶¶6-7); Ex. E (Hilleman Depo., 36:10-13).  Simmons confirmed that he did not have access to

7    Antonick's source code, never reviewed it, never spoke with anyone about it, and—in fact—

8    never knew that prior *JMF* games existed.  Ex. 129 (Simmons Decl., ¶¶4-6).  These statements

9    remain uncontroverted.[13]

10       With no supporting testimony or concurrent documents, Antonick rests his claim entirely

11   on the testimony of his expert, Michael Barr.[14]  Barr makes three noteworthy concessions:

12   (1) There is no evidence of literal source-code copying.  *See* Ex. B (Barr Depo., 157:20-158:3).

13   (2) His opinion is limited only to whether certain code looks "similar;" he has no opinion whether

14   EA actually used Antonick's code to develop other *Madden* games.  *Id.* at 187:11-188:11; *id.* at

15   191:14-192:2.  (3) He has no opinion whether any "similar" element is protected by copyright.

16   *Id.* at 50:8-13.  At the end of the day, Barr is left with only high-level purported "similarities"

17   between Antonick's code and other *Madden* games.

18           **3.      The Alleged "Similarities" Are Not Protectable By Copyright.**

19       Copyright infringement requires proof that the defendant copied protected elements of the

20   allegedly infringed work.  *Jada Toys,* 518 F.3d at 636.  Whether the allegedly-copied elements of

21   the Antonick-coded *Madden* games are protected by copyright is a ***purely legal*** issue that this

---

[13]      Antonick also asserted that he "spent a considerable amount of time explaining his
intellectual property" to EA employees David Maynard and Scott Cronce.  *See* Ex. 72 (Pl.'s Am.
Resp. to Rog. No. 20).  Whatever "explaining intellectual property means," it is undisputed that
neither of them copied his code.  Antonick offered no evidence that Maynard worked on any *JMF*
game.  Cronce's only interaction with Antonick was for a "couple hours" as part of a technical
design review ("TDR") for *JMF II, after Sega Madden* was completed.  *See* Ex. L (Cronce Depo.,
11:6-12:25; 79:19-80:20); *see also* Ex. P (EA's 5th Am. Resp. to Rog. No. 1).  Cronce never saw
any of Antonick's *JMF II* code.  Ex. L (Cronce Depo., 41:11-25) ("I don't ever remember seeing
any code.  I don't remember Antonick ever delivering source code to EA.").

[14]      *See* Ex. M (Pl.'s 3rd Am. Resp. to Rog. No. 1, ¶i) (requesting that Antonick identify "all
facts" in support of his royalties claim); Ex. AA (Pl.'s 2nd Am. Resp. to Rog. Nos. 2-4) (relying
entirely on Barr reports to identify allegedly copied elements).

9

1   Court should decide.  *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, No. C-07-03983

2   JSW, 2009 U.S. Dist. LEXIS 57525, at *2 (N.D. Cal. June 18, 2009); *Smith & Hawken*, *Ltd. v.*

3   *Gardendance, Inc.*, 2005 WL 1806369, at *2 (N.D. Cal. July 28, 2005); *Oracle Am., Inc. v.*

4   *Google Inc.* 872 F. Supp. 2d 974, 975 (N.D. Cal. 2012).

5       "The mere fact that a work is copyrighted does not mean that every element of the work

6   may be protected."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348 (1991).  Courts

7   engage in "analytic dissection" to determine what aspects of a work constitute protectable

8   expression.  *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475-76 (9th Cir. 1992).

9   "[O]nly those elements of a work that are protectable and used without the author's permission

10  can be compared when it comes to the ultimate question of illicit copying."  *Apple Computer, Inc.*

11  *v. Microsoft Corporation,* 35 F.3d 1435, 1443 (9th Cir. 1994); *see also Cavalier v. Random*

12  *House*, 297 F.3d 815, 822 (9th Cir. 2002).

13      The Supreme Court has made clear that "sweat of the brow" does not confer copyright

14  protection.  That "much of the fruit of the compiler's labor may be used by others without

15  compensation" is "not some unforeseen byproduct of a statutory scheme.  [Instead, it is] the

16  essence of copyright, and a constitutional requirement."  *Feist*, 499 U.S. at 349 (quotation marks

17  and citation omitted).  Copyright "encourages others to build freely upon the ideas and

18  information conveyed by a work. […] This result is neither unfair nor unfortunate.  It is the means

19  by which copyright advances the progress of science and art."  *Id.* at 350.  *Accord Oracle Am.*,

20  872 F. Supp. 2d at 992.

21      EA did not copy any of Antonick's source code.  Barr opines that certain game elements

22  look "similar," but these game elements are not protectable by copyright because they are ideas,

23  systems, or methods, and/or fall within the merger doctrine, the *scenes a faire* doctrine and other

24  limits on the scope of copyright protection.

25      Moreover, even if the Court remains undecided as to whether some of the allegedly-

26  similar elements were copied, where, as here, "the range of protectable and unauthorized

27  expression is [at most] narrow, the appropriate standard for illicit copying is *virtual identity*."

28  *Apple Computer,* 35 F.3d at 1439 (emphasis added); *see Aurora World, Inc. v. Ty Inc.*, 719 F.

723585.02

Supp. 2d 1115, 1137 (C.D. Cal. 2009) (applying "virtual identity" standard); *Meridian Project Sys., Inc. v. Hardin Const. Co.*, *LLC*, 426 F. Supp. 2d 1101, 1113 (E.D. Cal. 2006) (requiring "verbatim reproduction or very close paraphrasing before a work will be deemed infringed").

### a.    The field-width rule.

Barr claims that *Sega Madden* is similar to the Antonick-coded games because the virtual playing fields in both measure 80 virtual "yards." *See* Ex. 166 (Barr Report, 33-37). This argument fails for two independent reasons.

First, copyright protection does not extend to a game's ideas or to methods of playing the game.[15] The width of a playing field in a videogame is an idea or abstract rule, not protected by copyright. *See Allen v. Academic Games League of Am., Inc.*, 89 F.3d 614, 617-18 (9th Cir. 1996). For example, the NFL could publish a rule book stating that a regulation field is 53.33 yards wide. Ex. B (Barr Depo., 36:19-21). The NFL might own a copyright in the printed rule book, but not in the rule itself. The Canadian Football League could freely implement the NFL's 53.33 yard field-width rule. The same logic applies here. Barr claims only that both the Antonick-coded games and *Sega Madden* used the idea or rule of an 80 yard field-width. *Id.* at 82:14-83:1; 89:20-90:5. That is not protectable by copyright. *See Allen,* 89 F.3d at 617-18. To hold otherwise would grant "a monopoly on such commonplace ideas as a simple rule on how youngsters should play their games." *Id.*

Second, Antonick cannot satisfy the "virtual identity" requirement. *Apple Computer,* 35 F.3d at 1439. Barr initially claimed that both Antonick's and EA's games use an 80-yard wide field. Ex. 166 (Barr Report, 34 (Figure 9), 37). But at deposition, Barr admitted that the field widths are different, and now contends only that the widths are "approximately" the same. Ex. B

---

[15]    *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any *idea, procedure, process, system, method of operation, concept, principle, or discovery,* regardless of the form in which it is described, explained, illustrated, or embodied in such work" (emphasis added)); *Atari v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 615 (7th Cir. 1982). With computer software, which is inherently functional, Section 102(b) "make[s] clear that the expression adopted by the programmer is the copyrightable element in the computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law." H.R. Rep. No. 94-1476, Section 102 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670; *see also Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207-08 (9th Cir. 1988); *Oracle Am.*, 872 F. Supp. 2d at 997 (holding that the structure and organization of code did not qualify for copyright protection).

1  (Barr Depo., 91:2-8).  In fact, Barr never settled on the field widths of the Antonick-code games

2  and the EA games.  *See*, *e.g.*, Ex. 166 (Barr Report, 37); Ex. 167 (Barr. Supp. Report, 6-7); Ex. B

3  (Barr. Depo., 82:5-10, 90:1-5).

4        Third, the respective codes giving expression to the "approximately" 80-yard field width

5  are different both literally and conceptually.  For example, Antonick used only non-negative

6  numbers, with the sidelines represented by 0 and 127, and with 5 yards represented by every 8

7  units.  Ex. B (Barr Depo., 83:13-84:1).  In contrast, Barr observes that the EA games used 0 as the

8  field midpoint, with the sidelines represented by approximately negative and positive 320, and

9  with 1 yard represented by every 8 units.  *Id.* at 87:13-88:6, 92:1-17.

10                       **b.      The player ratings system.**

11        Like other videogames, the virtual players in both the Antonick-coded games and *Sega*

12  *Madden* have numerical ratings in categories based on the "actual skills, attributes and abilities of

13  actual NFL players."  *See* Ex. 166 (Barr Report, 54).  Barr contends that there are similarities

14  between the 36 player attributes used in Antonick's code and the 16 player attributes used in *Sega*

15  *Madden*.  *Id.* at 56-59.  Barr's analysis fails to support Antonick's claim for multiple reasons.

16        First, virtual player attributes are functional parts of a system, and therefore unprotectable

17  under copyright.  *See* 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99 (1879) (holding that

18  accounting system was not copyrightable).  Both Antonick and Barr uniformly describe

19  Antonick's player rating system as exactly that—a "system."  Ex. 166 (Barr Report, 54)

20  ("Antonick's game utilized a detailed system of player ratings . . .");  *see also* Compl. ¶ 34 ("a

21  complex system of player ratings.").  Barr even describes these attributes as "concepts" used by

22  the game.  Ex. B (Barr Depo., 115:17-20).[16]

23        Second, the names of individual attributes (*e.g.*, "speed" or "hands") are not

24  copyrightable.  *See Oracle Am.*, 872 F. Supp. 2d at 997 ("short phrases are not copyrightable").

25        Third, Antonick's player ratings system is based on inherent elements of football, and

26  ─────────────────────
[16]      Barr also contends that Antonick's code and *Sega Madden* used a similar "data flow
27  architecture."  Ex. 166 (Barr Report, 70-73).  The Court need not wade into Barr's unnecessarily
   complex explanation of "data flow architecture", because Barr concedes it is a "technical
28  process," and a technical process is not protectable by copyright.  *Id.* at 70; *see* 17 U.S.C.
   § 102(b).

723585.02

1    therefore not copyrightable under the *scenes a faire* doctrine. "Under the *scenes a faire* doctrine,

2    when certain commonplace expressions are indispensable and naturally associated with the

3    treatment of a given idea, those expressions are treated like ideas and therefore not protected by

4    copyright." *Swirsky v. Carey,* 376 F.3d 841, 850 (9th Cir. 2004)); *see also Data East,* 862 F.2d at

5    208-10 (videogame elements that naturally flowed from the idea of a martial arts karate game

6    were unprotectable *scenes a faire*). "Similarities derived from the use of common ideas cannot be

7    protected; otherwise, the first to come up with an idea will corner the market." *Apple,* 35 F.3d at

8    1443. The attributes at issue are "traits of football players and aspects of football familiar to

9    those involved in the game, such as coaches, players, scouts and journalists." *See* Ex. Q (Cooney

10   Decl., ¶16). To punctuate the point, player ratings have been used in games and videogames for

11   many years **before** the Antonick-coded game, including in several earlier football videogames.

12   Ex. R (Lerner Rebuttal, 15-18). Antonick does not gain, through his code, the right to bar other

13   football videogames from using these commonplace attributes.

14          Fourth, the player ratings in the respective games are fundamentally different, and the few

15   similarities exist simply because they both rate the attributes of football players. *See Apple*

16   *Computer,* 35 F.3d at 1439 (describing "virtual identity" requirement for code copyright

17   infringement). Antonick's game utilized a system with 36 total ratings with a maximum of 11

18   rated attributes of each player. Ex. 166 (Barr Report, 56). In contrast, the *Sega Madden* had only

19   16 player attributes and used a maximum of 6 rated attributes per player, rather than 11. *Id*. at 57-

20   58. The ratings used different, incompatible scales—0-9 for Antonick's code and 0-15 in *Sega*

21   *Madden*. *Compare* Ex. S (Apple II manual) *with* Ex. K (*Sega Madden* manual). In addition to

22   these different approaches, Barr identified **only three** overlaps—"speed," "hands" and "tackling."

23   Ex. 166 (Barr Report, 58). That's the extent of the similarities. The player ratings systems are

24   not remotely "virtually identical."

25          Fifth, the *Sega Madden* player rating system was independently developed without any

26   reference to the Antonick-coded *Madden* games. Simmons' uncontroverted testimony is that he

27   created from scratch the *Sega Madden* player ratings template (listing the attributes) and the

28   videogame source code that would use the player ratings. *See* Ex. 129 (Simmons Decl. at ¶ 5).

723585.02

1    Brook testified that he created from scratch the *Sega Madden* numerical player rating and

2    inputted them into Simmons' template.  Ex. J (Brook Depo., 72:20-73:5, 85:3-22).  Barr, of

3    course, does not challenge their testimony.  Ex. B (Barr Depo., 146:15-20, 187:21-188:4).

4                        c.        **"Decision Points" using the player rating system.**

5            Barr opines that Antonick's code and *Sega Madden* use similar "decision points" to decide

6    the outcome of each play.  *See* Ex. 166 (Barr Report, 67-69).  To simulate a football game, both

7    games repeatedly update the position of the virtual players many times per second, and at certain

8    points player ratings and random numbers are used to decide the outcome of an event in the game

9    —for example, whether a virtual wide-receiver catches a pass.  *See* Ex. B (Barr Depo., 138:13-

10   139:10, 154:15-22); *see also* Ex. 166 (Barr Report, 80-82).  Barr used his own nomenclature to

11   call these "decision points," a term that does not exist elsewhere.  Ex B (Barr Depo., 139:11-13).

12   Any "decision point" similarities do not support Antonick's claim for three independent reasons.

13           First, the use of "decision points" is an uncopyrightable concept or method.  *See* 17 U.S.C.

14   § 102(b).  Barr and Antonick use both terms to describe the use of "decision points."  *See* Ex. B

15   (Barr Depo, 139:21-140:2) ("I'm using [the term] 'decision points' not as a line of code that

16   refers to it but rather, as a larger concept, a football concept like a kick or like a collision between

17   two players."); *see also* Compl. ¶35 ("methods of simulating actual NFL player behavior").  Put

18   another way, the use of "decision points" that simulate football is nothing more than granular

19   rules for a computer-mediated, turn-based game.  The use of such rules for sports simulations is

20   neither new nor copyrightable.  Barr conceded that Strat-O-Matic, a 1960s' board game, used

21   random numbers and player ratings to simulate football, but with decisions being made on a play-

22   by-play basis, rather than a frame-by-frame basis.  Ex. B (Barr Depo., 154:1-155:16); *see also*

23   Ex. I (Lerner Report, 25:15-26:1).[17]

24           Second, the decision points Barr identifies are inherent in football, and not copyrightable

25   under the *scenes a faire* doctrine.  *See Swirsky,* 376 F.3d at 850; *Frybarger v. IBM Corp* 812 F.2d

26   525, 530 (9th Cir. 1987) (rejecting copyright claim over videogame features that are standard for

27   _____

[17]        Using a dice roll—*i.e.*, a random number generator—to resolve a "decision point" is a
28   process or method unprotectable by copyright.  In addition, adding randomness was widely used
     in the game industry long before Antonick wrote his code.  *See* Ex. R (Lerner Rebuttal, 22-25).

723585.02

1    a given topic).  Some of the purported "decision points" that Barr lists are "catch," "fumble,"

2    "passing range," "running speed" and "tackling."  Copyright does not allow someone to "corner

3    the market" on an idea that is an inherent part of football.  *Apple Computer*, 35 F.3d at 1443.

4        Third, Barr does not contend that the expression of decision points (*i.e.*, the code) is the

5    same (because it is different), only that two games simulating football will encounter similar

6    "decision points" to determine the outcome.  *See* Ex. B (Barr Depo., 138:13-139:10) ("[A]n

7    example of a decision point would be when the kicker kicks the ball, a first decision point is how

8    strong and how accurately he has kicked it.").  These so-called "decision points" do *not* exist

9    outside of Barr's report.  They are Barr's construct.  Ex. 166 (Barr Report at 68).  The chart he

10   created, however, actually shows how remarkably different the games are.  *See id.*[18]  Ultimately,

11   the purported "similarities" of "decision points" that Barr points out exist only at a high level of

12   abstraction, and are therefore insufficient to show that the "decision point" methods are virtually

13   identical.  *Apple Computer*, 35 F.3d at 1439.

14                    **d.    Ball carrier pursuit method.**

15       Barr opines that Antonick and EA use similar "methods" to decide how to pursue the

16   virtual ball carrier.  Barr identifies three specific behaviors he argues are similar:  (1) defenders

17   "leading" the ball carrier so as to intercept them, (2) computer controlled defenders moving

18   laterally when the ball carrier is still behind the line of scrimmage, and (3) defenders heading

19   straight for the ball carrier when the distance to cover is small.  Ex. 166 (Barr Report, 74-75).

20   None of these elements are copyrightable for three independent reasons.

21       First, these elements are "methods" or "behaviors" governing how defenders move within

22   the game, and therefore uncopyrightable.  Barr describes the three elements collectively as

23   "Antonick's ***method*** of ball carrier pursuit" and concludes that "[k]ey ***behaviors*** of

24

25

26   _____

     [18]     Antonick's code and *Sega Madden* use ***different*** player ratings for the "decision points."
27   For example, for the decision point for "sack avoidance," Antonick's code uses ratings
     "durability," "speed," "rushing" and "pressure," while *Sega Madden* uses the "intelligence"
28   rating.  For the decision point "agility," Antonick's code purportedly uses ratings for "pressure"
     and "big play," while *Sega Madden* purportedly uses "weight."  Ex. 166 (Barr Report, 68).

1   Mr. Antonick's angle of pursuit are present" in EA's games.[19]  Ex. 166 (Barr Report, 74-75).

2   (emphasis added).  That is, Barr contends that Antonick and EA implemented similar *strategies*

3   that the computer-controlled players followed.  But the Ninth Circuit has explicitly rejected the

4   theory that one can copyright a game strategy.  *See Landsberg v. Scrabble Crossword Game*

5   *Players, Inc.*, 736 F.2d 485, 486-87 (9th Cir. 1984).  Landsberg had developed and described a

6   "systematic strategy for playing Scrabble," which he contended the defendants copied for their

7   Scrabble players' handbook.  *Id.* at 486-87.  The Ninth Circuit rejected Landsberg's copyright

8   claim:

9           While we find similarities between the two works, we think there is no more than
10          the similarity that must unavoidably be produced by anyone who wishes to use and
            restate the unprotectable ideas contained in Landsberg's work.  If we were to hold
            S & R's work to be an infringement, we do not see how anyone could state
11          Landsberg's ideas without also being held to have infringed.  Landsberg would in
            effect have obtained a copyright on the ideas contained in his work.
12

13  *Id.* at 489.

14          Second, the algorithms Barr says (but never identifies) that Antonick used to implement

15  his methods, behavior and concepts are not copyrightable.  17 U.S.C. § 102(b); *see also Woods v.*

16  *Resnick*, 725 F. Supp. 2d 809, 820 (W.D. Wisc. 2010); *Ho v. Traflove*, 696 F. Supp. 2d 950, 954-

17  55 (N.D. Ill. 2010) (collecting cases rejecting copyright protection for algorithms and

18  mathematical models).[20]  Antonick describes the ball carrier pursuit elements as "an intercept

19  equation," "a table driven solution," and a "pursuit algorithm."  Compl., ¶¶40, 42, 44.  Barr

20  confirms that the elements at issue are "algorithms and subroutines."  Ex. 166 (Barr Report, 74).

21          Third, the "ball pursuit" methods, behaviors and concepts are inherent in the game of

22  football, and therefore not copyrightable under the *scenes a faire* doctrine.  *See Swirsky*, 376 F.3d

23  at 850; *Frybarger*, 812 F.2d 525, 530.  Barr acknowledges that "leading the ball carrier" is merely

24  an attempt to replicate what happens in real football.  Ex. B (Barr Depo., 149:17-150:7).

25  Tackling ball carriers when they are within reach is behavior that is necessary to model a realistic

26  ───────────────
    [19]     *See also* Compl. ¶37 ("a *method* for tracking the ball carrier. . .");  ¶39 ("*methods*
27  developed by Antonick"); ¶43 ("the *concept* was used once the defensive player committed to
    pursuing the ball carrier") (emphasis added).

28  [20]     *See also* Copyright Office Circular 31 (excluding from copyright "mathematical
    principles; formulas; algorithms; or any concepts, process or method of operation.").

723585.02

1    football simulation.  Ex. R (Lerner Rebuttal, 21-22).

2                    **e.      The order of offensive players listed in rosters.**

3            Barr claims that the order of the positions in the virtual player rosters (*e.g.*, listing QB

4    first, then RB, etc.) contained in Antonick's code is similar to—but not the same as—the roster

5    order used in EA's games.  This purported similarity fails for two independent reasons.

6            First, there are only a limited number of logical ways to order players in a football roster,

7    and thus the merger doctrine bars protection for Antonick's order.  *See Herbert Rosenthal Jewelry*

8    *Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir. 1971) ("When the 'idea' and its 'expression' are

9    thus inseparable, copying the 'expression' will not be barred, since protecting the 'expression' in

10   such circumstances would confer a monopoly of the 'idea' upon the copyright owner free of the

11   conditions and limitations imposed by the patent law.").  Copyright does not protect "obvious,

12   garden-variety, or routine selections."  *Matthew Bender & Co. v. West Pub. Co.,* 158 F.3d 674,

13   682 (2d Cir. 1998).  Instead, an author must make "non-obvious choices from among more than a

14   few options."  *Id.; see also Feist,* 499 U.S. at 362.  Here, as a practical matter, there are

15   significant constraints on how one might order the player positions.  *See* Ex. 205 (Zeidman

16   Rebuttal, ¶¶125-131).  Even Barr admits so, and further concedes that programmers likely would

17   order positions in a roster in a logical fashion.  *See* Ex. B (Barr Depo., 132:14-133:5; 134:20-

18   135:5).  Neither Barr nor Antonick offers anything non-obvious or illogical about the choice of

19   position order in the rosters for the Antonick-coded games.

20           Second, the offensive player order used by EA was *not* the same as the order used in

21   Antonick's code.  The order of the left and right guards was reversed, as was the order of the left

22   and right tackles, and Antonick included two fullbacks while EA had only one.[21]  Ex. B (Barr

23   Depo., 130:12-132:7).  The ordering systems therefore fail to meet the "virtual identity" burden

24   required to demonstrate copyright infringement where, as here, only a limited range of expression

25   is available.  *See Apple Computer,* 35 F.3d at 1439.

26

27

28   ────────────────────
     [21]      Because the order is different, the only similarity is in the names of *some* of the positions.
     But names and short phrases are not copyrightable.  *Oracle Am.*, 872 F. Supp. 2d at 997.

723585.02

### f.    The direction tracking system.

Barr contends that both EA-coded and Antonick-coded games used a similar direction tracking system.  Ex. 166 (Barr Report, 38).  A direction tracking system maps the direction that a virtual player moves on the virtual field.  According to Barr, the two systems are similar because they both use numbers 0-7 to represent the eight cardinal directions and the number 8 to represent no movement.  Ex. 166 (Barr Report, 40-46).  This theory fails for three independent reasons.

First, the system Antonick used to track direction is simply that—a system, which copyright law does not protect.  *See* 17 U.S.C. § 102(b).  Barr repeatedly describes it as a system.  *See*, *e.g.*, Ex. 166 (Barr Report, 38-51) ("Antonick's 0-7+8 directional tracking system.").

Second, copyright protection does not extend to elements of a computer program that are "dictated by external factors, such as hardware standards and mechanical specifications."  *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 838 (10th Cir. 1993); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 709-10 (2d Cir. 1992); *Baystate Techs. v. Bentley Sys.,* 946 F. Supp. 1079, 1087-90 (D. Mass. 1996).  Barr neglected to consider the hardware factors that constrained Simmons' choices in choosing a direction tracking system for the Sega and Super Nintendo versions of *JMF*.  The digital "d-pad" controllers used by these gaming consoles could only convert the game-player's movements into eight directions.  Ex. B (Barr Depo., 104:4-15).  With this limitation, it was natural to create a direction tracking system with eight possible directions.  *Id.* at 105:15-20.  In fact, the alternatives Barr suggested were *poor* fits.  For example, a clock-inspired system, with twelve directions, made no sense given the eight-direction controllers used by these consoles.  *Id.* at 105:6-13.

Moreover, the numbering scheme Simmons used naturally followed from another aspect of his game code.  Simmons' code used different graphical depictions for players running in each of the eight directions, and for players standing still and facing in those directions.  Ex. 205 (Zeidman Rebuttal, ¶ 107).  Simmons used the numbers 0 through 15 to label these animation depictions, with the eight numbers from 0-7 used to represent "running" directions and 8-15 used to represent "standing" directions.  *Id.*  Had Simmons instead used a different numbering scheme suggested by Barr (using 0 to represent standing still, and 1-8 for movement), there would have

723585.02

1    been no room in the numbering scheme for the other seven "standing still" animation options.

2        Barr was unaware that Simmons used this animation system when he submitted his report.

3    Ex. B (Barr Depo., 108:5-14).  At deposition, however, he conceded that Simmons' animation

4    system was logical and would explain Simmons' numbering scheme.  *See id.* at 109:3-16.

5        Third, the two directional tracking systems are different.  The directional system in *Sega*

6    *Madden* and other EA games differs from the one in the Antonick-coded games in that, among

7    other reasons, it has eight different "no movement" values at numbers 8-15, not simply one, at

8    number 8.  Ex. 205 (Zeidman Rebuttal, ¶107).  In his rebuttal report, Barr concedes that this 0-7 +

9    8-15 system is not the same as Antonick's system, labeling it instead a "clever *extension*."

10   Ex. 207 (Barr Rebuttal, 29).  Whatever that means, it is undisputed that the directional system in

11   EA's games is not "virtually identical" and therefore cannot be used to support Antonick's

12   derivative work claim.  *See Apple Computer,* 35 F.3d at 1439.

13                          **g.      The method for "flipping" the field.**

14       Barr opines that EA copied Antonick's process for "flipping" the field at a change of

15   possession.  At his deposition, Barr limited his opinion to the abstract "mechanics" of the flip—

16   "how it's done"—not the code that executes the flip.  Ex. B (Barr Depo., 179:14-21).  This

17   purported similarity does not support Antonick's claim for three independent reasons.

18       First, the flip mechanic is an unprotectable process or method, 17 USC § 102(b).  Barr

19   repeatedly describes this element as the "field reorientation ***process***" and "flipping ***process***."

20   Ex. 166 (Barr Report, 88); Ex. B (Barr Depo., 183:3) (emphasis added).

21       Second, the flip mechanic is unprotectable under the merger doctrine.  "Under the merger

22   doctrine, when there is only one (or only a few) ways to express something, then no one can

23   claim ownership of such expression by copyright."  *Oracle Am.*, 872 F. Supp. at 997; *see also*

24   *Allen*, 89 F.3d at 617 ("the notions of idea and expression may merge from such 'stock' concepts

25   that even verbatim reproduction of a factual work may not constitute infringement.").  A software

26   programmer has two choices to implement a field "flip" upon a change in possession.  First, the

27   programmer can switch x-y coordinate numbering, so that x-values now increase to the left rather

28   than the right, and y-values increase as players travel down the screen rather than up.  Barr

723585.02

1  admitted that this method requires a variable indicating which of the two coordinate systems is

2  being used at the moment.  Ex. B (Barr Depo., 181:4-11).  Second, the programmer can use the

3  same x-y coordinate numbering before and after the "flip," in which case upon a change of

4  possession the programmer must recalculate each player's x-y coordinates, as well as the

5  coordinates for the line of scrimmage, before continuing with the game.  *Id*. at 181:12-16.  Barr

6  conceded that both options exist.  Ex. B (Barr Depo., 182:19-183:7).  With two such options, any

7  expression representing them merges with the underlying idea, and thus is not copyrightable.

8        Third, the flip mechanic used by *Sega Madden* and later games is not virtually identical to

9  the mechanics used by Antonick in the games he coded.  The respective games flip the field

10  differently.  While Antonick's process flips the field once the player catches a kick, *Sega Madden*

11  and later games flips the field while the kicked ball is in the air.  *See* Ex. 205 (Zeidman Rebuttal,

12  ¶¶189-194).  Barr was unaware of this difference and did not consider it in reaching his

13  conclusion.  Ex. B (Barr Depo., 184:1-9).  When questioned on the two flipping mechanics, Barr

14  conceded that they would result in differences in the respective games' code.  *Id*. at 184:13-19.

15               **h.    Football plays' names and formations.**

16        Although Barr is not an expert in football or videogame development, he opines that the

17  visual representation[22] of certain football play names and formations that appear in the Antonick-

18  code games are similar to the play names and formations in other *JMF* games.  Ex. 166 (Barr

19  Report, 113).  Putting aside whether Barr is qualified to render such an opinion, his assertion does

20  not support Antonick's derivative work claim for two reasons.

21        First, football plays are not copyrightable.  The Copyright Act identifies eight subject

22  matter categories in which copyright protection can subsist.  *See* 17 U.S.C. § 102(a).  Only one of

23  those—"pantomimes and choreographic works"—even arguably could include football plays and

24  formations.  But the Copyright Office has clarified that "a selection, coordination, or arrangement

25  of functional physical movements *such as sports movements,* exercises, and other ordinary motor

26  activities alone do not represent the type of authorship intended to be protected under the

27

28  ───────────────
   [22]    It is undisputed that the expression of the plays in code is different between the Antonick-
   coded games and *Sega Madden*.  Ex. 166 (Barr Report, 106).

723585.02

copyright law as a choreographic work."  37 Fed. Reg. 37605, 37607 (June 22, 2012) (emphasis added).  *See also* H.R. Rep. 94-1476 at 54 (1976) ("social dance steps and simple routines" are outside the scope of copyrightable categories); *Bikram's Yoga College of India v. Evolation Yoga*, 2012 WL 6548505, at *3-4 (C.D. Cal. Dec. 14, 2012) (yoga sequences are not copyrightable).[23]

Second, the football plays that Barr identifies *are not Antonick's work*.  John Madden provided EA with the Oakland Raiders' playbook so that EA could incorporate the plays into the videogames that bore his name.  *See* Ex. 180 (Madden Contract, Ex. C at § (c)); Ex C (Hawkins Depo., 38:3-18).  Madden "grant[ed] to [EA] an irrevocable, perpetual, nonexclusive license to use, copy, distribute, create derivatives of and display publicly the Plays in all media now known or hereafter developed."  Ex. 180 (Madden Contract, Ex. C at § (c)).  Hawkins spent countless hours using the Raiders' playbook to create hand-drawn plays that then could be represented in the Antonick-code game.[24]  Ex. C (Hawkins Depo., 54:12-24, 56:5-57:18).  Antonick admits that his only role was to translate those visual representations of plays—already selected, named and organized by EA—by writing the necessary code.  Ex. D (Antonick Depo., 258:12-17).  EA included hard-copied playbooks created by Hawkins as part of the Apple II, IBM PC and Commodore 64 game packaging.  *See* Exs. 182, 183 (*JMF* playbooks).

Barr ignores this evidence.  Instead, he incorrectly assumes that the plays (including their names and numbers) are Antonick's work, and then compares the two sets of plays.  Ex. B (Barr Depo., 190:1-3).  Yet during his deposition, he admitted that he does not know whether Antonick wrote the plays in the playbook.  *Id.* at 206:19-207:4.  He admitted that he does not know who set the numbering of the plays.  *Id.* at 214:19-215:1.  He admitted that he does not know whether the playbooks were in the public domain at the time Simmons wrote the *Sega Madden* code.  *Id.* at 224:21-225:7.  And he admitted that he cannot render an opinion as to whether the data structure of the plays is similar because he has not reviewed Antonick's source code for the plays.  *Id.* at

---

[23]    Numerous other videogames included plays before the Antonick-coded *Madden* games. *See* Ex. I (Lerner Report, 28-36).

[24]    To the extent Antonick claims similarities in the football plays, the claim fails under the scenes a faire doctrine.  *Frybarger*, 812 F.2d at 530 (rejecting copyright claim over videogame features that are standard for a given topic).  There is no evidence that any play at issue is anything but a standard play, known within the sport that the *Madden* games simulate.

723585.02

1  219:7-220:2.[25]

2  ### i.    The names of variables, subroutines and plays.

3      Barr also points to similarities in the *names*—and nothing else—of certain variables,

4  subroutines, and plays.  These purported similarities fail to support Antonick's claim for

5  numerous reasons.  First, names and short phrases are not copyrightable.  37 C.F.R. § 202.1(a);

6  *see also Oracle Am., Inc.*, 872 F. Supp. 2d at 997.  Second, the names are unprotectable due to the

7  limited range of available expression under both the *scenes a faire* and merger doctrines.  All are

8  common football terms, such as "kickoff" and "firstdown," or videogame programming terms,

9  such as "drawfield" (draw the field on the screen) or "ballx" (the x-axis location of the ball).  *See*

10  Ex. 205 (Zeidman Rebuttal, ¶¶169-186).  Third, the purported similarities do not show that the

11  Antonick-coded games and other *JMF* games are "virtually identical."  Out of tens of thousands

12  of lines of code, including hundreds of subroutines, variables and labels, Barr identifies only two

13  subroutines, five variables and two labels with the same name and purpose.[26]  Ex. 166 (Barr

14  Report, 83-84).  Barr also does not dispute that the code associated with these subroutines,

15  variables and labels is different.  Nor does he explain why, under his analysis, anyone would

16  bother to copy the *name* of a subroutine without copying the actual subroutine code.

17  ### j.    The instant replay concept.

18      Barr claims that EA used Antonick's instant replay "design"—not code—to implement an

19  instant replay feature in much-later *JMF* games.  Ex. 166 (Barr Report, 118).  Barr bases his

20  argument on a single TDR (technical design review) document for *JMF II* that Antonick provided

21  EA in November 1990.  Barr claims that "several specific concepts from this document were

22  implemented in the Sega and SNES games."  *Id*. at 119.  The instant replay concept purportedly

23  in the TDR cannot serve as a basis of Antonick's claim for two reasons.

24      First, as Barr himself states, the allegedly similar elements are "concepts," unprotectable

25  by copyright.  17 U.S.C. § 102(b); Ex. 166 (Barr Report, 119); *see also* Compl. ¶50 ("method [of

---

26  [25]    Barr's code comparison of the plays showed that "the binary from Mr. Antonick is a different data structure than the source code from Sega."  Ex. B (Barr Depo., 220:3-8).

27  [26]    The allegedly common subroutine names are "drawfield" and "passmove."  The allegedly

28  common variable names are "down," "offplay," "defplay," "ballx" and "bally."  The allegedly common labels are "kickoff," "firstdown" and "gameloop."  *See* Ex. 166 (Barr Report, 83-84).

723585.02

1    instant replay]”); *id.* at ¶52 (“instant replay concept”).

2        Second, Barr has no proof that there are similarities between the code for *JMF II* (which

3    allegedly implemented Antonick’s instant replay method) and other *Madden* games because he

4    never reviewed Antonick’s code for *JMF II*. Ex. B (Barr Depo., 236:21-237:20) (“Q. But you

5    have no idea how Antonick actually implemented the instant replay feature in his *John Madden 2*

6    game, do you? A. Not without the source code, no.”).

7        In sum, each of the alleged similarities that Barr identifies fails, as a matter of copyright

8    law, to show copying. Since these issues are only for the Court to decide, it should enter

9    summary judgment for EA on Antonick’s breach of contract claim or, alternatively, enter partial

10   summary judgment as to any of the following alleged similarities: field width, the player rating

11   system, decision points using the player rating system, the data flow process, ball carrier pursuit

12   methods, the order of offensive players listed in the roster, the direction tracking system, the

13   method for flipping the field, football plays’ name and formations, the names of variables and

14   subroutines, and the instant replay concept.

15       **B.    Antonick’s Other Breach of Contract Claims Fail as a Matter of Law.**

16       In addition to the alleged breach of the 1986 Contract’s derivative work provision,

17   Antonick alleges four other tag-along breaches of the contract. Antonick claims EA breached the

18   1986 Contract by (1) failing to put copyright notices on other *Madden* games that are allegedly

19   “Derivative Works” under the contract; (2) not giving Antonick a right of first refusal to develop

20   other *Madden* games that would have been “Derivative Works” under the contract; (3) failing to

21   keep confidential Antonick’s “confidential” information regarding instant replay by allegedly

22   using it in other *Madden* games, and (4) failing to register Antonick’s copyrights in the Antonick-

23   coded games. *See* Ex. M (Pl.’s 3rd Am. Resp. to Rog. No. 1); Ex. T (Pl.’s Resp. to Rog. No. 25).

24   These alleged breaches are meritless.

25       First, Antonick offered no evidence that he was damaged by any of these alleged

26   breaches. Antonick stated under oath that his damages expert would set forth his *entire* damages

27   theory and identify *all* alleged damages evidence in a written damages expert report. Ex. U (Pl.’s

28   Am. Resp. to Rog. No. 20). The damages report does not offer any damage calculation for these

1    alleged breaches or identify any evidence regarding how Antonick was damaged by them. *See*

2    Ex. 191 (Lloyd Am. Report, ¶¶2; 17-19). To the contrary, the expert report does not even contend

3    that Antonick seeks damages for these alleged breaches. *Id.* Without evidence of damage,

4    Antonick's additional make-weight contract claims must be dismissed.

5           The alleged breaches also fail for breach-specific reasons. The first two alleged breaches

6    rise and fall with Antonick's derivative work claim. If EA did not copy Antonick's protectable

7    expression, then it had no obligation to put copyright notices in his name on other *Madden* games

8    and owed him no right of first refusal to develop the other *Madden* games. *See* Ex. 15 (1986

9    Contract at Ex. A § 8.03 (copyright notices)); Ex. 65 (Amendment 1, 2 (right of first refusal)).

10   The third alleged breach regarding the alleged use of Antonick's "confidential" instant replay

11   information fails because EA did not base any instant replay feature on Antonick's purportedly

12   confidential "concepts." It is undisputed that instant replay was well-known in the videogame

13   design field at the time, and had been implemented by other games for years. Ex. I (Lerner

14   Report, 39 n.50). Antonick's instant replay concepts also differ significantly from the instant

15   replay features in other *Madden* games. Ex. 205 (Zeidman Rebuttal, ¶¶204-212). Barr did not

16   consider these differences in his analysis. Ex. B (Barr Depo., 240:2-242:10). The fourth alleged

17   breach—that EA failed to register Antonick's copyrights in the games he coded—has no legal

18   basis in the 1986 Contract. The only provision of the 1986 Contract that Antonick cites, Section

19   8.01, contains no such requirement and Antonick presents no evidence suggesting that such a

20   requirement should be read into it.

21          **C.    Antonick's Fraud Claim Fails as a Matter of Law.**

22          A fraud claim requires proof of five elements: "(1) misrepresentation, (2) scienter or

23   knowledge of its falsity, (3) intent to induce reliance (intent to defraud), (4) actual, detrimental,

24   and justifiable reliance, and (5) resulting damage." *Hinesley v. Oakshade Town Ctr.*, 135 Cal.

25   App. 4th 289, 294 (2005). Antonick offers no evidence of three required elements: actionable

26   misrepresentation, justifiable reliance, or resulting damages. Accordingly, the Court should grant

27   summary judgment on his fraud claim.

28

723585.02

1    **1.      EA did not make an actionable misstatement.**

2        California law prohibits the assertion of tort claims, including fraud claims, for alleged

3    conduct that amounts to nothing more than breach of contract, or denial of breach.  *See, e.g.,*

4    *Freeman & Mills, Inc. v. Belcher Oil Co*., 11 Cal. 4th 85, 102 (1995).  Blurring the distinction

5    between contract and tort sacrifices "predictability about the cost of contractual relationships,"

6    which "plays an important role in our commercial system."  *Foley v. Interactive Data Corp*., 47

7    Cal. 3d 654, 683 (1988); *see also Oracle USA, Inc. v. XL Global Servs., Inc*., 2009 WL 2084154,

8    at *4 (N.D. Cal. July 13, 2009).

9        Antonick's fraud allegations are nothing more than a direct or indirect reference to the

10   rights and obligations of the 1986 Contract—assurances that EA did not breach the contract and

11   that Antonick was not entitled to unpaid contractual royalties.  *See* Ex. V (Pl.'s 2nd Am. Resp. to

12   Rog. No. 8).  The ten alleged false statements—all grounded on the purported breach of the 1986

13   Contract—collapse into three general categories:

14   •      Assurances that EA had not breached the 1986 Contract.  Ex. V (Pl.'s 2nd Am. Resp. to
            Rog. No. 8) at ¶ i ("EA falsely informed Antonick that it was not using and did not use his
15          intellectual property when it developed the Sega line of *Madden* games or any other
            works.");¶ ii ("EA falsely assured Antonick that it would protect his intellectual property
16          and contractual rights."); ¶ iv (1991 Termination Agreement "reiterated and incorporated"
            contractual assurances that EA "would protect Antonick's intellectual property"; and ¶ vi
17          (copyright notices "failed to credit Antonick … as required by the 1986 Contract.").

18
     •      Assurances that Antonick was not owed unpaid royalties under the 1986 Contract.  Ex. V
19          (Pl.'s 2nd Am. Resp. to Rog. No. 8) at ¶ iii (Termination Agreement allowed EA "to use
            Antonick's intellectual property for its own benefit while evading its responsibility to pay
20          royalties."); ¶ v ("EA intentionally, affirmatively and falsely represented that subsequent
            versions of *Madden* were not subject to royalty."); ¶ vii (statements "falsely representing
21          that it owed him no royalties"); and ¶ x (decline letter "falsely promising … that he would
            receive royalties on the Sega version in the event it constituted a derivative work within
22          the meaning of the 1986 Contract.").

23
     •      Declarations (provided in 2009) stating that EA did not use Antonick's code.  Ex. V (Pl.'s
24          2nd Am. Resp. to Rog. No. 8) at ¶ viii (Hawkins declaration); ¶ ix (Hilleman declaration).

25
26   These alleged misrepresentations are nothing more than "assurances that [EA] intended to meet

27   [or had met] its contractual obligations."  *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*,

28   2009 WL 330259, at *17 (N.D. Cal. Feb. 10, 2009).  Indeed, all of them depend on the outcome

723585.02

1    of Antonick's breach of contract claim—if EA did not breach its contract, none of them is false.

2    In ruling on the motion to dismiss, the Court agreed that "Plaintiff's fraud allegations do

3    fail to allege conduct that goes beyond breach of the 1986 Contract," with only one apparent

4    exception—"the August 28, 1990 call with EA employees Richard Hilleman and Bing Gordon,

5    wherein Hilleman allegedly made repeated assurances to Plaintiff that the Sega version of

6    Madden was being developed without reference to Plaintiff's intellectual property."  Order

7    Denying Motion to Dismiss at 14 (Dkt. No. 47).  But Antonick subsequently produced his notes

8    of that phone call, and they reveal no such assurances.  *See* Ex. 13 (RA0001712).  When asked

9    whether he recalled anything about the conversation not reflected in his notes, Antonick said

10   only:  "[Hilleman] assured me that the . . . work . . .was being done independently, was not using

11   any of my work, that I wouldn't be needed on the Sega."  Ex. D (Antonick Depo., 125:1-11).

12   This testimony falls far short of an actionable misrepresentation for four reasons.  *First*,

13   the notes simply don't say anything about the alleged assurances Antonick now claims, and an

14   unsupported *post hoc* "recollection" cannot forestall summary judgment.  *Cf. Hexcel Corp. v.*

15   *Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012).  *Second*, Antonick's elaboration of the

16   call with alleged details not reflected in his notes has proven false—his assertion that Hilleman

17   told him that "he won't be needed on Sega" cannot be squared with the fact that Antonick had

18   declined in writing to work on a Sega game almost a year **before** the August 1990 call.[27]  *Third*,

19   even if Hilleman had told Antonick that the work was being done independently and was not

20   using Antonick's code, that statement is simply another way of saying that Antonick's code was

21   not being used to develop other games—in other words, a denial of a breach of contract.

22   *Fourth*, even if such an assurance were different from a denial of a breach of contract,

23   Antonick's fraud claim would be preempted by California Uniform Trade Secrets Act, Cal. Civil

24   Code § 3426 *et seq.* ("CUTSA").  CUTSA preempts *all* common law claims, including fraud

25   claims that involve the unauthorized use of confidential information, irrespective of whether the

26   information qualifies as a "trade secret" under CUTSA.  *See Silvaco Data Sys. v. Intel Corp.*, 184

27   Cal. App. 4th 210, 232-40 (2010); *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*,

28   _____
     [27]     *See* Ex. 69 (Decline Letter).

171 Cal. App. 4th 939 (2009); *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011).  Of course, Antonick did not assert a claim under CUTSA, because it would not survive.  He cannot make an end-run around CUTSA's strict pleading and proof requirements by re-fashioning his claim as a common law fraud claim.  *See Silvaco*, 184 Cal. App. 4th at 238.

### 2.  Antonick cannot show justifiable reliance.

"An essential element in recovery for deceit is proof of the plaintiff's justifiable reliance on the defendant's fraudulent representations."  *City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 840 (9th Cir. 2004).  "Actual reliance occurs when a misrepresentation is an ***immediate cause*** of a plaintiff's conduct, which alters his legal relations and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the contract or other transaction."  *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062-63 (2012) (emphasis added); *City Solutions, Inc.*, 365 F.3d at 840 (same).

The Complaint's single allegation of detrimental reliance states that "[Antonick] relied on [EA's] false and fraudulent statements by [1] ***continuing to contribute intellectual property to Electronic Arts*** and by [2] ***failing to enforce his contractual rights*** to substantial royalties, continued development work and credit for prior work."  Compl. ¶ 121 (emphasis added).  In discovery, Antonick added little meat, stating only that he relied on EA's statements by (1) "continu[ing] to provide the deliverables outlined in Amendment VIII and other amendments to the 1986 Contract," (2) "provid[ing] technical documents to EA personnel," and (3) "spen[ding] a considerable amount of time explaining his intellectual property to individuals at EA."  Ex. 72 (Pl.'s Am. Resp. to Rog. No. 20).  Antonick theory of detrimental reliance fails as a matter of law.

*First*, Antonick's contractual obligations with EA—not EA's alleged statements—were the "immediate cause" of Antonick's "continuing to contribute intellectual property to Electronic Arts."  The 1986 Contract and its amendments governed Antonick and EA's relationship, and it required Antonick to provide deliverables, technical documents and other work product for the games he coded.  Ex. 15 (1986 Contract and Amendments II-XV); Ex. 65 (Amendment 1).  Significantly, he was compensated under the contract for doing so.  *Id.*

723585.02

1    Antonick admits that he provided "deliverables" that were specified in the 1986 Contract

2    and its amendments.  *See* Ex. 72 (Pl.'s Am. Resp. to Rog. No. 20).  Amendment VIII, for

3    example, explicitly required Antonick to provide certain deliverable items, such as a script, on

4    specified dates, in exchange for specified compensation.  *See* Ex. 15 (Amendment VIII).

5    Similarly, technical design reviews ("TDRs") were contractually-required milestones.[28]  Had

6    Antonick failed to provide TDRs, he would have breached the contract.  Likewise, to the extent

7    that Antonick spent time "explaining his intellectual property to individuals at EA," he did so

8    because he was contractually required to explain the game he coded.[29]  In short, Antonick was

9    obligated to provide deliverables, furnish technical documents, and explain his work under the

10   1986 Contract, thereby defeating his assertion that he did so in reliance on EA's statements.[30]

11   Antonick's assertion that he "continu[ed] to contribute intellectual property to Electronic

12   Arts," therefore, does not constitute detrimental reliance.  *See, e.g., Lamke v. Sunstate Equipment*

13   *Co.*, 387 F. Supp. 2d 1044, 1049 (N.D. Cal. 2004) (rejecting plaintiff's argument that continuing

14   to work for defendant constituted detrimental reliance).

15   *Second*, Antonick's claim that EA's alleged misstatements caused him to "fail to enforce

16   his contractual rights" until he sued in 2011 fails because delay in filing suit does not establish

17   detrimental reliance as a matter of law.  *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*,

18   226 F.3d 1138, 1160 (10th Cir. 2000) ("Delay in filing suit, without more, does not satisfy the

19   fifth element of a claim for fraudulent concealment—"action on the concealment resulting in

20   damages.");  *Averbach v. Vnescheconombank*, 280 F. Supp. 2d 945, 957 (N.D. Cal. 2003) (no

21

22

---

23   [28]    *See, e.g.,* Ex. 15 (Amendment VIII) (requiring Antonick to provide a TDR on 10/13/89 in
       exchange for $5,000); Ex. 15 (Amendment XV) (requiring Antonick to provide a TDR on
24     11/30/90 in exchange for $500).

25   [29]    *See* Ex. 15 (1986 Contract, Ex. B, 37) (requiring Antonick to provide a "Program
       Overview," which included "an overall program description," "a narrative of the flow of control,"
26     "a complete list of subroutines with a short description of each," "an explanation of key data
       structures in the program," and "a description of the specifications provided by the Publisher
27     [and] *any other measures implemented by Artist*") (emphasis added).

     [30]    After the Termination Agreement in 1991, the only work he did for EA was for *JMF II*.
28     Antonick admitted that he was contractually required to perform this work and was compensated
       for it.  *See* Ex. D (Antonick Depo., 245:17-246:21).

723585.02

1   reliance where "[t]he only thing Plaintiff did in reliance was to defer bringing suit").[31]

2   With no detrimental reliance, Antonick's fraud claim fails as a matter of law.

3   **3.      Antonick has no fraud damages.**

4   To recover for fraud, a plaintiff must prove "detriment proximately caused by the

5   defendant's tortious conduct.  Deception without resulting loss is not actionable fraud." *OCM*

6   *Principal Opp. Fund v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 870 (2007).  Tort

7   claims are proper only when the plaintiff's alleged tort damages cannot be said to result from an

8   alleged breach of contract.  *See Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1178 (1993).

9   The only damages that Antonick seeks are allegedly unpaid royalties under the 1986

10   Contract.  Ex. U (Pl.'s Resp. to Rog. No. 20) (stating under oath that all damages would be

11   specified in the report of his damages expert); *id.*, Ex. 191 (Lloyd Am. Report, ¶2) (stating that he

12   was retained only to "calculate the amounts due Plaintiff from the sales and licensing by

13   Defendant of "Madden" game products using or derived from Antonick's intellectual property.");

14   Ex. W (Lloyd Depo., 26:10-22) (confirming that the damages calculations in his expert report

15   were limited to unpaid royalties under the 1986 Contract).  Indeed, the only injury Antonick

16   alleges in the Complaint to have suffered is unpaid royalties—*i.e.*, that EA breached its obligation

17   to pay him royalties under the 1986 Contract.  *See* Compl. ¶¶116, 123.  Without damages separate

18   and apart from those stemming from his contract claim for allegedly unpaid royalties, Antonick's

19   fraud claim fails.  *See, e.g.*, *Legal Additions LLC v. Kowalski*, 2010 U.S. Dist. LEXIS 25996, at

20   *12 (N.D. Cal. Mar. 19, 2010) (dismissing fraud claim because plaintiff "failed to point to any

21   harm above and beyond Defendants' broken contractual promise").

22   ////

23   ////

24   ////

---

[31]      Antonick did not detrimentally rely on the declarations EA voluntarily provided him in 2009 because he received them *after* he sent his first threat letter alleging breach.  *Compare* Compl. ¶94 *with* ¶119 (g), (h).  Moreover, Antonick never believed them, calling them "false" and "fraudulent."  *Id.* ¶119 (g), (h).

723585.02

1

IV.     **CONCLUSION**

2          EA respectfully requests that the Court grant its motion for summary judgment or,

3   alternatively, partial summary judgment.

4

Dated:  January 29, 2013                          KEKER & VAN NEST LLP

5

6                                        By:    */s/ Susan J. Harriman*

7                                               SUSAN J. HARRIMAN
                                                ERIC H. MACMICHAEL
8                                               R. ADAM LAURIDSEN
                                                TIA A. SHERRINGHAM
9
                                                Attorneys for Defendant
10                                              ELECTRONIC ARTS INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

723585.02