KEKER & VAN NEST LLP
SUSAN J. HARRIMAN - #111703
sharriman@kvn.com
ERIC H. MACMICHAEL - # 231697
emacmichael@kvn.com
R. ADAM LAURIDSEN - #243780
alauridsen@kvn.com
TIA A. SHERRINGHAM - #258507
tsherringham@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ANTONICK, an Illinois citizen,<br><br>    Plaintiff,<br><br>  v.<br><br>ELECTRONIC ARTS INC., a California corporation,<br><br>    Defendants. | Case No. 3:11-CV-01543-CRB (EDL)<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF EXPERT REPORT BY GARRY KITCHEN; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: March 8, 2013<br>Time: 10:00 a.m.<br>Dept: 6, 17th Floor<br>Judge: Charles R. Breyer<br><br>Date Filed: March 30, 2011<br><br>Trial Date: April 1, 2013 |

DEFENDANT'S MOTION TO STRIKE OPINIONS OF GARRY KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

725958.01

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE**, that on March 8, 2013 at 10:00 a.m., or on such other date and time set by the Court, at 450 Golden Gate Avenue, San Francisco, California, in Courtroom 6, 17th Floor, before the Honorable Charles R. Breyer, Defendant Electronic Arts Inc. ("EA") hereby moves to exclude portions of the opinions and testimony of Plaintiff Robin Antonick's expert Garry Kitchen.  This motion is brought pursuant to Federal Rule of Evidence 702 and relevant case law, on the basis that the opinions at issue do not meet the standard for admissibility under Rule 702.

This Motion is based on this Notice of Motion and Motion, following Memorandum of Points and Authorities, the Declaration of Tia A. Sherringham, filed herewith, and such further papers, evidence, and argument as may be submitted to the Court in connection with the hearing on this Motion.

## I. INTRODUCTION

Plaintiff Robin Antonick has no percipient witness testimony and no contemporaneous document to support his claim that all of Electronic Arts Inc.'s ("EA") *John Madden Football* ("*JMF*") and *Madden NFL* videogames derived from his 1988 source code. Similarly, extensive discovery has failed to unearth any parole evidence that supports Antonick's interpretations of the 1986 Contract.

Antonick tries to fill this evidentiary vacuum with testimony from his multi-purpose expert, Garry Kitchen. As several courts have recognized, "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." *Therasense, Inc. v. Becton, Dickinson and Co.*, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008). Kitchen's proposed testimony epitomizes this abuse.

The Court should prevent Kitchen from offering the following opinions, which under *Daubert* are irrelevant, unreliable, and inadmissible:

*First*, Kitchen's opinion that the microprocessor found in the Super Nintendo Entertainment System ("SNES") is in the same "Microprocessor Family" as the Apple II should be excluded, because "Microprocessor Family" is a defined term in the 1986 Contract and Kitchen admitted that he ignored that definition in offering his opinion. Kitchen cannot offer an opinion on contract interpretation when that opinion is admittedly divorced from the language in the parties' agreement.

*Second,* Kitchen should not be permitted to tell the jury that the absence of a formal clean room means that it would have been "almost impossible [for EA] to develop *Sega Madden* without incorporating and benefitting from Mr. Antonick's intellectual property." This opinion attempts to usurp the jury's role as fact-finder; is based on a fundamental misunderstanding of what is Antonick's intellectual property; and is unreliable for a host of undisputed reasons.

*Third*, Kitchen's opinion that EA developed *Sega Madden* in an "extremely short amount of time," making it "very likely that EA utilized and benefited from Mr. Antonick's intellectual

1

MOTION TO STRIKE PORTIONS OF EXPERT REPORT OF GARRY KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

725958.01

property," is nothing more than Antonick's arguments and interpretations of record evidence dressed up as an expert opinion. This opinion admittedly is not based on any scientific analysis, verifiable data, or relevant experience, and should not be presented to the jury.

*Fourth*, Kitchen readily conceded during his deposition that he has no basis to say that EA's ability to release *Sega Madden* in December of 1990—ahead of the March 1, 1991 release date originally contemplated in the initial Park Place contract—was a "substantial contributor" to EA's overall success of *all* the subsequent games that EA has developed or produced for the Sega platform for the past 20 years, for all subject matters. This opinion does not come close to satisfying Fed. R. Evid. 702, and must be excluded.

*Fifth,* Kitchen's attempt to come up with a "reasonable royalty rate" for Antonick should be excluded as irrelevant and unreliable. Evidence about a "hypothetical negotiation" is not relevant because the 1986 Contract and its amendments specify the applicable rates, which the Court must interpret as a matter of law. Separately, Kitchen's opinion is inherently unreliable because he admittedly disregarded the terms of the contract; did not examine the contracting practices of either party; and did not look at a single, relevant outside contract.

*Finally,* Kitchen should not be permitted to instruct the jury on copyright and trade secret law, which is the sole province of the Court.

## II.  LEGAL STANDARD

The Supreme Court has charged trial judges with the responsibility of acting as gatekeepers to ensure that expert testimony is relevant, does not usurp the role of the judge or the jury, and is based on a proper factual and methodological foundation. *Daubert v. Merrell Dow Pharmas, Inc.*, 509 U.S. 579 (1993). The Court has explained that "this basic gatekeeping obligation" applies not only to "scientific" testimony, but "to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael* 526 U.S. 137, 147 (1999). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering expert testimony must establish its admissibility by

1 a preponderance of the evidence.  *See DSU Med. Corp. v. JMS Co., Ltd.,* 296 F. Supp. 2d 1140, 1146-1147 (N.D. Cal. 2003).

As the Ninth Circuit has repeatedly instructed, "admission or exclusion under *Daubert* rests on the ***scientific reliability*** and ***relevance*** of the expert testimony." *Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 431 (9th Cir. 2012) (emphasis added).

### 1. The relevance requirement.

To satisfy the relevance requirement, an expert's opinion must not only be pertinent to an issue in the case, it must assist "the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  An expert cannot be presented solely for the purpose of constructing a factual narrative based upon record evidence.  *Highland Capital Mgmt., L.P. v. Schneider,* 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005).  It is manifestly improper for a party to put forward an expert "to weave a story," selecting "those portions of the available material which support his client's position, and . . . deliberately ignor[ing] other portions that do not support his client's claim."  *De Jager Const., Inc. v. Schleininger*, 938 F. Supp. 446, 449 (W.D. Mich. 1996).

In addition, legal opinions are not a proper subject of expert testimony because they do not assist the trier of fact in understanding the evidence, but instead attempt to tell the trier of fact what result to reach.  "Each courtroom comes equipped with a legal expert . . . called a judge." *Burkhart v. Washington Metro. Area Transit Auth.* 112 F.3d 1207, 1213 (D.C. Cir.1997) (quotations omitted).  The Ninth Circuit (and every other circuit) bars experts from interpreting the law or stating ultimate legal conclusions.  *See, e.g., Aguilar v. Int'l Longshoreman's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (excluding expert's legal conclusions).

### 2. The reliability requirement.

The court "must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis,* 657 F.3d at 982.  Federal Rule of Evidence 702 limits proper expert evidence only to that which is based upon sufficient facts/data and is the result of reliable principles and methods applied reliably.  *See* Fed. R. Evid. 702.  The reliability

requirement "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).  Expert testimony is inadmissible, for example, where in place of an unbiased and accepted methodology, the purported expert employs "litigation driven speculation." *Burleson v. Tex. Dep't. of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).  Courts must be on guard against purported expertise that is "carefully tailored to support plaintiff's position but devoid of analysis." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).

### III.   ARGUMENT

#### A.   Kitchen's Untethered Opinion that the SNES is in the Same "Microprocessor Family" as the Apple II is Irrelevant and Unreliable.

For Antonick to recover any royalties from games developed for the SNES, he must first prove that the SNES is in the same "Microprocessor Family" as the Apple II, as that term is defined within the 1986 Contract.  The *only* evidence Antonick offers to support his claim that the SNES is in the same "Microprocessor Family" as the Apple II is a conclusory opinion from Kitchen.  That opinion should be excluded for two independent reasons.

*First*, Kitchen's testimony cannot assist the Court or the jury in interpreting the Contract. The term "Microprocessor Family" is specifically defined in the 1986 Contract, yet Kitchen readily admitted that his opinion is not based on the language of the Contract, and, in fact, is directly at odds with the language in the Contract.  Ex. A (Kitchen Depo., 223:22-225:25). Kitchen admitted that the SNES microprocessor is "essentially identical" to the Apple IIgs microprocessor.  Ex. A (Kitchen Depo., 217:5-20.)  That admission should foreclose his claim that the parties intended for the SNES to be in the same family as the Apple II, since the parties specifically agreed to exclude the Apple IIgs from the Apple II family.  Ex. 15 (Amendment III) ("[t]he Apple II family of computers shall mean all Apple II computers based on the 6502 ***8-bit*** microprocessor including the Apple II, Apple II +, Apple II e and Apple II c, ***but excludes . . . the Apple IIgs***.") (emphasis added).  Kitchen had no explanation for how the SNES microprocessor

4
MOTION TO STRIKE PORTIONS OF EXPERT REPORT OF GARRY KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

725958.01

could logically be placed in the same Microprocessor Family as the Apple II when the parties agreed to exclude the Apple IIgs from that family. Faced with clear contractual language showing that the parties excluded an "essentially identical" microprocessor from the Apple II family, Mr. Kitchen simply "disagree(d)" with the parties agreement, stating "I'm not saying it's not in the contract; I'm saying I disagree with their characterization." Ex. A (Kitchen Depo., 223:22-225:2). While Kitchen may feel free to disregard the language of the Contract, the Court cannot, rendering Kitchen's opinion irrelevant and unhelpful. *See iGames Entm't, Inc. v. Chex Servs., Inc.*, 2005 WL 3657156, at *3 (D. Del. June 9, 2005) ("An expert giving his view of what contract language means, without linking it to what the parties understood, is not giving relevant evidence.").

Kitchen concluded that his opinion would not change even if the Contract clearly stated that the SNES microprocessor was *not* in the same Microprocessor Family as the Apple II:

> Q.   Even if the parties in this agreement specifically stated that the 65816 did not fall within the 6502 family, you would still contend that it does?
>
> A:   Yes, because of the emulation mode in the 65816.[1]

Accordingly, because Kitchen's opinion is admittedly untethered to the language of the Contract, it cannot assist the Court in interpreting the meaning of the parties' agreement. *See Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 78 (2d Cir. 1995) (party cannot use expert testimony in "an effort to persuade the jury to ignore the contract.").

*Second*, Kitchen's opinion should be excluded as irrelevant because it is based on a false comparison between, on the one hand, the Apple II *microprocessor*, and, on the other, a single backwards compatibility *mode* within the SNES microprocessor. Ex. A (Kitchen Depo., 210:14-23.) The 1986 Contract does not say anything about comparing the full capabilities of one microprocessor against an isolated backwards compatibility mode of another in order to determine whether they are part of the same family. Instead, the Contract states that, to be considered in the same family, two microprocessors must actually "*utilize* the *same* instruction

---

[1]   Ex. A (Kitchen Depo., 225:4-25).

set and have the *same* instruction and data word size." *See* Ex. 15 (1986 Contract, Section 1.04) (emphasis added). Kitchen admitted that the actual *JMF* video game that was designed and released for the SNES utilized data word sizes of 16 bits, whereas the maximum word size utilized by the Apple II game was 8 bits. Kitchen also admitted that the *JMF* game released for the SNES utilized different and longer instructions as compared to the Apple II. Ex. A (Kitchen Depo., 221:5-9; 222:9-223:1).

Consequently, Kitchen's testimony confirmed that the actual *JMF* game designed and released for the *SNES* was *different* in every material way from the Apple II game. Kitchen's admissions confirm that under the 1986 Contract, the SNES cannot be in the same Microprocessor Family as the Apple II. Kitchen should not be permitted to tell the jury otherwise simply because he chooses to ignore or "disagree" with the language in the Contract.

### B. Kitchen's Opinions Regarding EA's Failure to Implement Clean Room Procedures Are Irrelevant and Unreliable.

Lifting allegations from the Complaint almost verbatim, Kitchen opines that EA "should have, but did not, institute clean room development procedures when it developed the 1990 Sega Genesis and subsequent versions of *John Madden Football*," and, as a result of its failure to institute clean room development procedures, it would have been "almost impossible to develop the Sega Genesis version without incorporating and benefitting from Mr. Antonick's intellectual property." Ex. 166 (Kitchen Report, Summary of Opinions, p. 27). This "closing argument" style opinion should be excluded for at least five reasons.

*First*, Kitchen does not explain how the absence of a clean room means that it would have been "almost impossible" to develop the Sega game without utilizing "Antonick's IP," rendering this opinion speculative and unsupported. Kitchen acknowledged that his opinion was based solely on the fact that one of the producers of Antonick-coded games (Richard Hilleman) was also a producer on *Sega Madden*. Ex. A (Kitchen Depo., 112:25-113:15). In Kitchen's view, that fact alone means that EA must have incorporated Antonick's "intellectual property" into the Sega game, because (so the theory goes) Kitchen can "pretty accurately *guess*" what any producer

would do on any game. Ex. A (Kitchen Depo., 251:14-25). But setting aside for the moment his guesswork, Kitchen confirmed that he: (i) has "no knowledge" of any Antonick IP that Hilleman allegedly disclosed to the developers of *Sega Madden*; (ii) has never worked with or spoken to anyone involved in this case; (iii) does not know the substance of any of the conversations between Hilleman and Antonick, or between Hilleman and Jim Simmons, regarding the development of their respective games; (iv) has never developed a football simulation game in his career; (v) did not look at any source code for any game in this case; (vi) did not play any of the video games at issue (or any other football simulation games); and, (vii) has not, beyond reading the report of Antonick's other expert, Michael Barr, done anything to identify any "actual in-fact similarity between these games."[2] Accordingly, his opinion about the likelihood of copying is nothing but a guess, which does not substitute for actual evidence.

*Second,* Kitchen admitted that he is ***not*** an expert in clean room procedures, has never before offered any expert opinion regarding clean rooms, and has never actually set up or implemented a clean room as described in his report. Ex. A (Kitchen Depo., 226:3-5; 226:20-227:1; 238:3-6). His opinion must be excluded because he is not qualified by knowledge, skill, experience, training or education to act as an expert on clean room procedures. *See U.S. v. Chang*, 207 F.3d 1169, 1172-1173 (9th Cir. 2000) (district court did not abuse its discretion in precluding expert from testifying regarding matters beyond scope of expertise).

*Third*, Kitchen's opinion is irrelevant and unreliable because it is predicated on a fundamental misreading of the 1986 Contract regarding what constitutes "Antonick's IP." In rendering his opinion that the absence of a clean room makes it "likely" that EA utilized "Antonick's IP," Kitchen mistakenly assumed that "Antonick's IP" goes well beyond the contract to include any knowledge or insight acquired during the development of the game, including what makes the game "fun." Ex. A (Kitchen Depo., 86:8-17; 253:24-254:12; 260:23-261:13). According to Kitchen, all of the "learnings of what makes the games fun," as well as any

---

[2] (i) Ex. A (112:25-113:15); (ii) Ex. A (10:8-16; 247:5-8); (iii) Ex. A (111:9-23); (iv) Ex. A (31:5-15); (v) Ex. A (41:1-8); (vi) Ex. A (46:18-47:2); and (vii) Ex. A (42:8-19; 45:21-46:3).

"knowledge [that] led to a certain play or personal feature or a certain polish point on the Apple game that made it better … became part of the intellectual property of the Apple game," and was therefore owned by Antonick. Ex. A (Kitchen Depo., 262:14-24). The 1986 Contract makes clear, however, that EA owns all "proprietary interests in the game" (including trade secrets), except for any copyright interest that Antonick may own. Ex. 15 (1986 Contract, Section 8.04). Kitchen's assumption about the exceedingly broad scope of Antonick's intellectual property rights has no basis in the facts of this case, rendering his entire analysis irrelevant and unhelpful to the jury. *See Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216, 1221 (N.D. Cal. 2003) (expert's testimony inadmissible when based on premise directly contradicted by the evidence); *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1181, 1184 (N.D. Cal. 2007) (same).

*Fourth,* Kitchen's opinions about clean rooms are an irrelevant sideshow, as EA has never claimed that it set up a formal clean room during the development of *Sega Madden*. In *Daubert*, the Supreme Court noted that the question of relevance is whether the evidence is sufficiently tied to the facts of the case that it will assist the jury in resolving the issues before them. *Daubert*, 509 U.S. at 591. The Court should exclude scientific expert testimony under the second prong of the *Daubert* standard unless it is "convinced that it speaks clearly and directly to an issue in dispute in the case." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (citation and quotation marks omitted). Because EA will not offer evidence that it set up a formal clean room, Kitchen's opinions are not relevant.

*Finally*, Kitchen's opinions should be excluded under Rule 403 because they are far more prejudicial than probative. *See Rogers v. Raymark Indus.,* 922 F.2d 1426, 1430 (9th Cir. 1991). If Kitchen were permitted to testify that EA must have utilized "Antonick's IP," the jury would be unduly prejudiced by the credence commonly afforded by juries to perceived experts. Whether EA's later *Madden* games are derivative works of Antonick's code is for the jury to decide based on the evidence. Kitchen should not be permitted to put his thumb on the scale.

### C. Kitchen's Opinion That the Development Schedule for *Sega Madden* Makes it "Very Likely" That EA Used Antonick's IP is Unreliable and Improper.

Similar to his discussion regarding clean rooms, Kitchen borrows heavily from the Complaint in opining that the development schedule for *Sega Madden* "makes it very likely that [EA] utilized and benefited from Mr. Antonick's intellectual property." Ex. 166 (Kitchen Report, ¶ 57). Here again, Kitchen relies solely on his hunch about copying, instead of actual evidence. This opinion should be excluded for many of the same reasons discussed in section IV.B., above.

*First*, the jury must decide whether EA's later games are derivative works of *JMF* for the Apple II. Kitchen's opinion about the "likelihood" that Antonick's IP was utilized—which he arrived at ***without*** looking at any source code, talking to a single witness, or even playing the games in question – does not assist the jury in that regard, as it amounts to nothing more than an attempt to tell the jury what result to reach. *GST Telecomms., Inc. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000) ("Court[s] should not shift to such witnesses the responsibility to give conclusory opinions and characterizations of the business conduct portrayed and to essentially decide the case."). Kitchen's opinion boils down to a closing argument masquerading as an expert opinion, which does not assist the trier of fact and fails to satisfy the requirements of Rule 702. *Rogers*, 922 F.2d at 1431 ("a party is not entitled to have an expert testify solely because that witness can eloquently summarize the evidence. That job belongs to counsel.")

*Second,* the danger of the jury being misled is only magnified considering that Kitchen has no relevant expertise or experience qualifying him to opine on the schedule for *Sega Madden*, let alone to draw an inference of copying from that schedule. Kitchen has never designed or developed a football simulation game, and has not played any of the games in question or reviewed any of the source code for those games. Ex. A (Kitchen Depo., 41:1-8; 46:18-47:2; 47:18-22). Further, Kitchen did not analyze the development schedule for ***any*** other football games for a comparative sense of how long they take to develop. Ex. A (Kitchen Depo., 31:5-15; 281:9-19.) Kitchen also made no effort to control for the skill and speed of the lead programmer on *Sega Madden*, Jim Simmons, admitting he has not looked at the schedule for any of Simmons'

9

other games. Ex. A (Kitchen Depo., 281:16-282:4). Consequently, Kitchen's claim that *Sega Madden* "likely" copied from the Apple II is based not on any evidence, data, or verifiable methodology, but solely on his kneejerk reaction to the development schedule for *Sega Madden*. This would not assist, but will surely mislead, the jury. The trial court, acting as gatekeeper, should not allow a jury to hear this sort of expert "ipse dixit," especially when it is targeted at the ultimate issue to be decided by the jury. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Kitchen does not dispute that he did nothing to test this opinion, but claims that his general "experience" in the video game industry qualifies him to draw an inference of copying based on the amount of time it took to develop *Sega Madden*. Ex. A (Kitchen Depo., 281:5-19). Relying on "intuition" is not a methodology, however, and "is neither normal among social scientists nor testable—and conclusions that are not falsifiable aren't worth much to either science or the judiciary." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (quotation marks omitted). Further, a party must show more than that its witness has special expertise; it must also demonstrate that, in forming the proffered opinions, the witness has actually applied that expertise properly to the facts of the case, and in a manner that would be helpful to the finder of fact. *See Daubert v. Merrell Dow Pharmas,* 43 F.3d 1311, 1315-16 (9th Cir. 1995) (remand decision). Because Kitchen's opinion is based solely on his say-so, rather than any objectively verifiable data, it must be excluded.

*Third,* Kitchen's opinion contains the same embedded (and incorrect) legal conclusion about what constitutes "Antonick's IP." This Court must ultimately decide the scope of Antonick's protected expression in his code, and Kitchen cannot usurp that role by offering an opinion that hinges on the erroneous assumption that Antonick owns something more or different.

**D. Kitchen's Opinion That EA's Release of *Sega Madden* in December of 1990 Was A "Substantial Contributor" to its Success is Admittedly Unsupported.**

Bootstrapping on his unsupported inferences about the development schedule for *Sega Madden*, Kitchen opines that EA's ability to release that game in December of 1990—ahead of the March 1, 1991 release date contemplated in the initial Park Place contract—was a "substantial

contributor" to EA's overall success of *all* the subsequent games that EA has developed or produced for the Sega platform. Ex. 166 (Kitchen Report, Summary of Opinions, p. 27). In other words, Kitchen opines that EA's ability to release *Sega Madden* three months ahead of an earlier schedule is "substantially" responsible for the commercial success of all of the subsequent games that EA has developed or produced for the Sega system for the past 20 years, across all subject matters. This opinion goes way beyond speculation and lands squarely in the absurd.

Moreover, Kitchen's opinion is devoid of any reliable foundation or dependable methodology. Kitchen did not conduct *any* analysis to support this conclusion, including any type of econometric, regression or comparative analysis. Ex. A (Kitchen Depo., 266:7-23). In fact, Kitchen did not even attempt to determine what EA's overall success on the Sega platform would have been if *Sega Madden* was released on March 1, 1991, which (one would think) would be the starting point for any comparison. Ex. A (Kitchen Depo., 267:25-268:4). Kitchen also conceded that he did not examine any sales data for any video game in connection with this opinion, and he made no attempt to quantify the economic impact to EA from the December 1990 release of *Sega Madden*. Ex. A (Kitchen Depo., 268:11-269:3). Rather, Kitchen admitted that he was "just relying on [his] experience in the industry" in opining that EA's 20 years of success on the Sega platform—which spans hundreds of different video games across a variety of subject matters—is somehow attributable in "substantial part" to its ability to release *Sega Madden* in December of 1990. Ex. A (Kitchen Depo., 268:16-17).

Kitchen's opinion does not pass muster under Rule 702. *See Robinson*, 286 F. Supp. 2d at 1221 ("Rule 702 . . . requires, for expert opinion testimony to be admissible, that the testimony be based on sufficient facts or data.") (quotation marks omitted). Not only must the expert employ a reliable methodology, he must apply that methodology to data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Daubert*, 509 U.S. at 595 (citing Fed. R. Evid. 703). Any expert who was attempting to estimate the relationship among variables, as Kitchen purportedly is, would necessarily need to analyze *some* facts or data, and not just rely on his or her general impressions. Because it is undisputed that

11
MOTION TO STRIKE PORTIONS OF EXPERT REPORT OF GARRY KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

725958.01

Kitchen did nothing to test his subjective belief about the relationship between the release date for *Sega Madden* and EA's 20-years of success on the Sega platform, his opinion should be excluded.

Separately, Kitchen's opinion should be excluded because EA's overall success on the Sega platform is not relevant to any issue in this case. The only issue it could conceivably relate to is Antonick's claim for damages, but Antonick's damages expert did not rely on this opinion in any way, and Kitchen conceded he was not trying to quantify any economic benefit to EA from the December 1990 release. Ex. A (Kitchen Depo., 266:24-267:3). Kitchen's opinion about some un-quantified and unverified benefit of a December 1990 release is irrelevant.

### E. Kitchen's Opinion About a "Reasonable Royalty Rate" for Derivative Works is Irrelevant and Lacks Foundation.

Kitchen dedicates two paragraphs of his report to his opinion that a 3% royalty rate for Antonick for *Sega Madden* and *JMF* for the SNES would have been reasonable and within industry norms "regardless of whether [Mr. Antonick] did all or even any of the actual development work" on these games. Ex. 166 (Kitchen Report, ¶¶65-66). But this opinion is inadmissible for the following reasons:

*First*, a "reasonable royalty" analysis is inapplicable here. A reasonable royalty analysis is undertaken where the parties do ***not*** have an established royalty and where the court is attempting to understand the result of a "***hypothetical*** negotiation." *See, e.g., Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) ("'reasonable royalty' contemplates a hypothetical negotiation") (emphasis added). Here, the 1986 Contract and its amendments specify the applicable rates, which the Court must interpret as a matter of law. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1125 (2008) ("The interpretation of a contract is a judicial function"). Kitchen's musings about what would have been "fair compensation" are simply irrelevant.[3]

---

[3] Even if a reasonable royalty analysis were helpful here, Kitchen does not purport to use any of the well-known and generally accepted methods to determine a reasonable royalty, such as an analysis of the fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir. 1971). Instead, Kitchen's "analysis" is entirely subjective, and based solely on what he thinks is fair. That methodology assuredly does not meet the requirements under Fed. R. Evid. 702.

*Second*, if the Court admits extrinsic evidence to assist in contract interpretation, the evidence must be relevant to interpret the ambiguous provision, and not an effort to persuade the jury to **ignore the contract**. *Travelers Indem. Co.,* 62 F.3d at 78; *Gelb v. Auto. Ins. Co.,* 168 F.2d 774, 775 (2d Cir. 1948) ("There is, of course, a distinction between using extrinsic evidence to interpret the contract and using it to alter the meaning of the contract."). But Kitchen's opinion that a 3% royalty is reasonable does just that—it ignores the explicit terms of the contract and is based solely on what Kitchen thinks Antonick "deserved," which is not relevant to any issue in this breach of contract case. Ex. A (Kitchen Depo., 64:6-17). Kitchen admitted that his "opinion was rendered **regardless of what [Antonick] agreed to**," and that he "didn't analyze the contracts to determine what is actually in the contracts." Ex. A (Kitchen Depo., 62:1-3; 62:13-15) (emphasis added). Expert evidence that is intended to assist in contract interpretation but then disregards the terms of a contract should be excluded. *See, e.g., Hutton Contracting Co., Inc. v. City of Coffeyville*, 2004 WL 2203449, at *15 (D. Kan. Sept. 24, 2004) (excluding expert opinion that "ignores the clear provisions of the Contract").

*Third*, even if relevant, Kitchen's conclusion that a 3% royalty rate would have been "fair compensation" is unsupported. Kitchen admitted that he has no understanding of Antonick's or EA's contracting practices, and he did not review a single contract from any outside source that sets forth specific royalty rates for derivative works by publisher and derivative works by artist. Ex. A (Kitchen Depo., 67:11-69:8; 99:7-100:10). That admission alone compels the exclusion of this opinion. *See, e.g., GPF Waikiki Galleria, LLC v. DFS Grp., L.P*, 2007 WL 3195089, at *6 (D. Haw. Oct. 30, 2007) (excluding expert because his "conclusions are not based on his assessment of other similar agreements to clarify or define terms of art.").

The evidence Kitchen relies on to bolster his emaciated claim does not withstand scrutiny: Kitchen attempts to rely on Scott Orr's contract with EA to demonstrate that a 3% royalty is reasonable, yet he admitted at deposition that he misread that contract, and that Orr's agreement is inapposite because it is a fixed rate contract for $35,000, not a running royalty of 3%. Ex. A (Kitchen Depo., 116:20-24; 118:25-119:3). Kitchen also tries to claim that a 3% royalty is

13

supported by the amount of work that Antonick contributed to the Sega and SNES games, but conceded at deposition that, in fact, he has no idea how much work Antonick performed on those games. Ex. A (Kitchen Depo., 55:13-16; 128:15-20). Finally, Kitchen tries to rely on EA's contract with D.C. True, which he never connects to the facts of this case. Ex. 166 (Kitchen Report, ¶66). This single contract for a *different* game does not provide an adequate foundation for Kitchen's conclusion that a 3% royalty rate would be "within industry norms."

### F. Kitchen Impermissibly Opines on Copyright and Trade Secret Law.

An expert witness cannot give an opinion as to any *legal conclusions* drawn from applying law to facts; instructing the jury as to the applicable law is the distinct and exclusive province of the court. *See Nationwide Transp. Fin. v. Cass Info. Syst. Inc.*, 523 F.3d 1051, 1057-59, (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*."); *Aguilar*, 966 F.2d at 447 (holding that matters of law are "inappropriate subjects for expert testimony."). Kitchen's testimony that certain "design elements, methods and processes" in the Antonick-coded games "would have been protectable under trade secret and copyright"[4] falls squarely within the category of inadmissible and excludable legal opinion testimony.

Determinations of copyrightability are questions of law reserved for the judge, and not the jury. *Oracle Am., Inc. v. Google Inc.* 872 F. Supp. 2d 974, 975 (N.D. Cal. 2012). Relying on this principle, courts have rejected attempts to offer "experts" on the scope of copyright protection. *See, e.g., Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 2009 U.S. Dist. LEXIS 57665, at *3-4 (N.D. Cal. June 18, 2009) (precluding expert from testifying regarding copyrightability of allegedly infringing light fixtures); *Religious Tech. Cent. v. Netcom On-Line Commc'n Servs., Inc.*, 1997 WL 34605244, at *8 (N.D. Cal. Jan. 6, 1997) (striking declarations of copyright "experts," as it is "well-established" that explanations of the law are improper expert testimony.)

Kitchen's opinion that elements of the Antonick-coded games are protected under trade secret law fails for the additional reason that Antonick has not brought a trade secret claim.

---

[4] Ex. 166 (Kitchen Report, ¶67).

14

1  Because trade secret simply is not part of this case, Kitchen's opinions as to whether game
2  elements are protected under trade secret law are irrelevant and would only confuse a jury.
3        In addition to being outside the province of proper expert testimony, Kitchen's opinions as
4  to legal conclusions are unreliable. Kitchen admitted that he has had ***no training*** in either trade
5  secret or copyright law, and is not capable of drawing the line between what is and is not
6  protectable under the law. Ex. A (Kitchen Depo., 95:11-16; 144:9-11; 154:14-19; 155:22-23).
7  Kitchen's unfamiliarity with the law is evident from his testimony; in defining the boundaries of
8  trade secret protection, Kitchen testified that "anything that I would keep confidential for business
9  reasons I would consider it a trade secret." Ex. A (Kitchen Depo., 169:21-23). He further
10 explained that "[i]t wouldn't have to be unique in my shop for it to be trade secret. I just don't
11 want people knowing how I'm doing it. So it would be a trade secret." Ex. A (Kitchen Depo.,
12 176:8-16). Kitchen went on to testify that anything that is potentially copyrightable is "by
13 default" also a trade secret. Ex. A (Kitchen Depo., 164:10-165:2). Kitchen's hopelessly
14 overbroad definition of what qualifies as a trade secret is inadmissible. *See, e.g., Hebert v. Lisle*
15 *Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible
16 through 'experts' than are falsifiable scientific theories.").

### IV.  CONCLUSION

The Court should exclude those opinions and testimony of Antonick's expert Garry Kitchen discussed herein.

Dated:  February 1, 2013                                    KEKER & VAN NEST LLP

                                                    By:  */s/ Susan J. Harriman*
                                                         SUSAN J. HARRIMAN
                                                         ERIC H. MACMICHAEL
                                                         R. ADAM LAURIDSEN
                                                         TIA A. SHERRINGHAM

                                                         Attorneys for Defendant
                                                         ELECTRONIC ARTS INC.

725958.01