THE PAYNTER LAW FIRM PLLC
Stuart M. Paynter (226147)
Jennifer L. Murray (*Pro Hac Vice*)
Sara Willingham (*Pro Hac Vice*)
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
        jmurray@smplegal.com
        swillingham@smplegal.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Attorneys for Plaintiff Robin Antonick

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBIN ANTONICK, an Illinois Citizen,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS INC., a California corporation,<br><br>Defendant. | Case No. 3:11-CV-01543-CRB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT ELECTRONIC ARTS INC.'S THIRD MOTION FOR SUMMARY JUDGMENT**<br><br>**\*\*\*REDACTED VERSION – PUBLICALLY FILED\*\*\***<br><br>Date:   March 22, 2013<br>Time:   10:00 a.m.<br>Judge:  Hon. Charles R. Breyer<br>Ctrm:   6, 17th floor<br><br>Date Complaint Filed: March 30, 2011<br>Trial Date:  April 1, 2013 |

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................................... 1

 A.   EA And Antonick Enter Into A Long-Term Relationship. ........................................ 1

 B.   Antonick And Hawkins Collaborate To Refine The Preexisting Player Ratings And
  Play Calling For The *Madden* Game. ..................................................................... 2

 C.   EA Harvests Antonick's IP. ...................................................................................... 3

 D.   EA Provides Antonick's IP To Third Party Developer, Bethesda Softworks. ............. 4

 E.   Antonick's Apple II Game Is An "Overnight Success." ............................................ 5

 F.   EA Extends Its Long-Term Relationship With Antonick To Cover Sega And
  Nintendo. ................................................................................................................. 5

 G.   EA Cuts Short Its Relationship While Falsely Promising To Safeguard Antonick's
  IP. ........................................................................................................................... 5

 H.   EA Continues To Secretly Harvest Antonick's IP For Use In Console Games. ........... 6

 I.   EA Fraudulently Induces Antonick To Terminate His Right To Nintendo Royalties. 10

III. ARGUMENT ................................................................................................................. 10

 A.   The Parties Intended The Term Derivative Work To Be Applied Broadly To
  Compensate Antonick For Any Game In Which His IP Was Used. ........................... 10

  1.   Contractual Language. ...................................................................................... 11

  2.   Post-Contract Conduct. .................................................................................... 14

 B.   Plaintiff Is Owed Royalties Even If The Term Derivative Work Is Limited To
  Copyright. ................................................................................................................ 15

  1.   Both EA and Simmons had "Access" to Antonick's Work. ............................... 15

  2.   EA's Subsequent *Madden* Games are "Substantially Similar" to Antonick's
   Apple II Game. ................................................................................................ 16

   a.   Overall Data Flow Architecture. ....................................................... 19

   b.   Internal Representation of the Football Field. .................................... 20

   c.   Football Plays/Formations and Initial Player Movements. ................. 22

   d.   Player Ratings Structure and Data Templates. ................................... 24

   e.   Decision Points. ............................................................................... 26

  3.   EA Cannot Demonstrate Independent Creation. ............................................... 27

 C.   EA Breached The Contract's Confidentiality Provisions By Using Antonick's
  Development Aids And Other IP To Develop Subsequent Games. ............................ 28

 D.   EA's Attacks On Plaintiff's Non-Royalty Contract Claims Fail. ............................... 32

 E.   Material Issues Of Fact Prevent Dismissal Of Antonick's Fraud Claim. .................... 33

IV.  CONCLUSION .............................................................................................................. 35

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adobe Sys. Inc. v. Hoops Enter. LLC*,
2012 WL 2237283 (N.D. Cal. June 15, 2012)........................................................14

*Apple, Inc. v. Psyster Corp.*,
673 F. Supp. 2d 931 (N.D. Cal. 2009)..................................................................17

*Atari Games Corp. v. Nintendo of Am. Inc.*,
975 F.2d 832 (Fed. Cir. 1992) ("*Atari I*") ......................................................19, 20, 23

*Atari Games Corp. v. Nintendo of Am. Inc.*
1993 WL 207548 (N.D. Cal May 18, 1993) ("*Atari II*") ........................................24, 25

*Brawner v. Wilson*,
126 Cal. App. 2d 381 (Cal. Ct. App. 1954)..........................................................13

*c.f. Positive Software Solutions, Inc. v. New Century Mortgage Corp.*,
259 F. Supp. 2d 531 (N.D. Tex. 2003)..................................................................25

*Cadence Design Sys., Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997)...............................................................................28

*Castro v. Terhune*,
2010 WL 724683 (N.D. Cal. Mar. 1, 2010) ...........................................................32

*City of Hope Nat. Med. Ctr. v. Genentech, Inc.*,
43 Cal. 4th 375 (Cal. 2008) ...........................................................................14, 15

*Computer Assoc. Int'l, Inc. v. Altai*,
982 F.2d 693 (2d Cir. 1992) ...............................................................................13

*Crestview Cemetery Ass'n v. Dieden*,
54 Cal. 2d 744 (Cal. 1960) .................................................................................14

*CyberMedia, Inc. v. Symantec Corp.*,
19 F. Supp. 2d 1070 (N.D. Cal. 1998)..................................................................16

*Engalla v. Permanente Med. Group, Inc.*,
15 Cal. 4th 951 (Cal. 1997) ...........................................................................34, 35

*eScholar LLC v. Otis Educ. Sys.*,
2005 WL 2977569 (S.D.N.Y. Nov. 3, 2005) ..........................................................18

*Ets-Hokin v. Skyy Spirits Inc.*,
225 F.3d 1069 (9th Cir. 2000) .............................................................................17

ii

*Gabriel Technologies Corp. v. Qualcomm Inc.*,
    2009 WL 3326631 (S.D. Cal. Sep. 3, 2009) ..................................................... 34

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
    9 F.3d 823 (10th Cir. 1993) ........................................................................... 18

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ...................................................................................... 10

*In re Quantification Settlement Agreement Cases*,
    201 Cal.App.4th 758 (Cal. Ct. App. 2011) ..................................................... 11

*In re Toyota Motor Corp.*,
    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ......................................................... 35

*Jarvis v. K2 Inc.*,
    486 F.3d 526 (9th Cir. 2007) ......................................................................... 17

*Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*,
    886 F.2d 1173 (9th Cir. 1989) ......................................................... 12, 16, 20, 21

*Kamar Int'l Inc v. Russ Berrie and Co.*,
    657 F.2d 1059 (9th Cir. 1981) ....................................................................... 16

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) ....................................................................... 16

*M. Kramer Mfg. Co., Inc. v. Andrews*,
    783 F.2d 421 (4th Cir. 1986) .................................................................... 17, 20

*Martone v. Burgess*,
    2008 WL 3916022 (N.D. Cal. Aug. 25, 2008) ................................................ 34

*Merc. Transaction Sys. Inc. v. Nelcela, Inc.*,
    2009 WL 723001 (D. Ariz. Mar. 18, 2009).......................................... 17, 22, 23

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*,
    426 F. Supp. 2d 1101 (E.D. Cal. 2006) .......................................................... 15

*Meta-Film Assoc., Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984) .............................................................. 16

*Morey v. Vannucci*,
    64 Cal.App.4th 904 (Cal. Ct. App. 1998)....................................................... 10

*Nordstrom Consulting, Inc. v. M & S Technologies, Inc.*,
    2008 WL 623660 (N.D. Ill. Mar. 4, 2008) ..................................................... 28

*Portney v. CIBA Vision Corp.*,
    2008 WL 5505517 (C.D. Cal. July 17, 2008) ................................................. 33

iii

*Religious Tech. Center v. Wollersheim,*
   796 F.2d 1076 (9th Cir.1986) ............................................................................29

*Saks v. Franklin Covey Co.,*
   316 F.3d 337 (2d Cir. 2003) ............................................................................34

*Satava v. Lowry,*
   323 F.3d 805 (9th Cir. 2003) ...........................................................................18

*Streamcast Networks, Inc. v. Ibis LLC,*
   2006 WL 5720345 (C.D. Cal. May 2, 2006) ....................................................34

*Swirsky v. Carey,*
   376 F.3d 841 (9th Cir. 2004) ...........................................................16, 17, 18, 27

*Taylor Corp. v. Four Seasons Greetings, LLC,*
   403 F.3d 958 (8th Cir. 2005) ...........................................................................28

*Three Boys Music Corp. v. Bolton,*
   212 F.3d 477 (9th Cir. 2000) ......................................................................15, 27

*Veritas Operating Corp. v. Microsoft,*
   2008 WL 474248 (W.D. Wash. Feb 4, 2008) ...........................................17, 20, 23

*Williams Electronics, Inc. v. Artic Int'l, Inc.,*
   685 F.2d 870 (3d Cir. 1982) ............................................................................17

*Wilson v. Nobell,*
   119 Cal. App. 2d 341 (Cal Ct. App. 1953) .......................................................14

**STATUTES**

17 U.S.C. § 101 .................................................................................................13

California Civil Code § 1641 ..............................................................................11

California Civil Code § 1643 ..............................................................................13

California Civil Code § 3300 ..............................................................................32

California Civil Code § 1654 ..............................................................................12

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 8 ......................................................................34

Federal Rule of Civil Procedure 56 ....................................................................10

1

## I.   INTRODUCTION

2    As with its first two motions, material issues of facts prevent summary judgment on EA's

3    third try. *First*, both the text of the 1986 Contract and EA's subsequent conduct demonstrates that

4    the parties interpreted the term Derivative Work broadly to compensate Antonick when his

5    intellectual property ("IP") was used in subsequent EA games. The parties did *not* intend to engage

6    in the type of backward-looking minute parsing of supposedly unprotectable elements that EA now

7    advocates. *Second*, even if the term Derivative Work were limited in the untenable way EA

8    suggests, EA breached the contract by using copyrightable elements of Antonick's work. The

9    evidence shows that midway through development of the 1990 Sega game, EA decided to

10   transform an "arcade" football game into a realistic *Madden* branded NFL simulation. With barely

11   two months to make the change and a programmer lacking football game experience, EA simply

12   copied all the platform independent elements of Antonick's game—its plays, its carefully crafted

13   system of player ratings and its AI. *Third*, to the extent any of the elements of Antonick's games

14   used by EA are not copyrightable, EA nevertheless breached the 1986 Contract's confidentiality

15   and proprietary protection provisions by using his IP in subsequent *Madden* games. *Finally*, EA's

16   arguments concerning Plaintiff's non-royalty contract claims and fraud claim improperly re-argue

17   issues already decided by this Court and are otherwise meritless.

18    Unfortunately for EA, the third time is not the charm. Its motion must be denied.

## II.   FACTUAL BACKGROUND

19

20   **A.   EA And Antonick Enter Into A Long-Term Relationship.**

21    In 1983, Antonick developed a prototype of an 11x11 football videogame, which he

22   presented to EA. Ex. 1, Antonick Dep. at 11-13; Ex. 2, Hawkins Dep. at 20-21.[1] At the time, this

23   feat was thought impossible due to computing limitations, but Antonick was able to "do some

24   things with the Apple II" that "were just not obvious." Ex. 3, Kawahara Dep. at 11. Trip Hawkins,

25   then EA's CEO, was "very pleased," *id.*, and engaged Antonick to develop a commercial version in

26   exchange for royalties on versions he developed or that derived from his work. Ex. 4. In 1985, EA

27

28    [1] Exhibits are attached to the Declaration of Jennifer L. Murray ("Murray Decl."). Internal quotation marks omitted and citations and emphasis added unless otherwise stated.

1

1    contracted with John Madden to lend his name to the game. Ex. 5. In December 1986, EA and

2    Antonick negotiated a revised agreement (the "1986 Contract"), pursuant to which Antonick would

3    develop the newly titled *John Madden Football* videogame for the Apple II, Commodore 64 and

4    IBM platforms, as well as "consult" on the development of additional games. Ex. 6 § IV. The

5    contract gave Antonick royalties on (i) "Works," (ii) "Derivative Works," and (iii) "Remote

6    Derivative Works." *Id*. § V. In addition, EA promised to (i) keep Antonick's IP confidential, (ii)

7    offer him a right of first refusal to develop Derivative Works, (iii) obtain and maintain "proprietary

8    protection" for all Works and Derivative Works, and (iv) credit him with copyright notices on all

9    Works and Derivative Works. *Id*. §§ 5.02, 8.01, 8.03, 9.04. As memorialized in the preamble,

10   Antonick understood that the intent of the 1986 Contract was to create "a long-term relationship"

11   with him. Ex. 1, Antonick Dep. at 162. Ex. 6 at "Recitals"; *see also id.* § 13.01.

**B.      Antonick And Hawkins Collaborate To Refine The Preexisting Player Ratings And Play Calling For The *Madden* Game.**

13            A realistic model of an actual NFL game must mimic the physics of NFL players and the

14   ball in motion, while approximating NFL players' decision-making processes. Ex. 7, Barr Rep. at

15   52. To accomplish this, Antonick embodied in the code his proprietary "model" of an NFL player.

16   *Id*. Though a virtually infinite number of attributes exist that could be modeled, given the era's

17   limited computing resource, Antonick's model ultimately selected less than a dozen. *Id.* This was

18   not a trivial task. Hawkins confirmed that it took "years" to "develop" the player rating "structure"

19   embodied in the game. Ex. 2, Hawkins Dep. at 62-63. Although Hawkins also claimed sole credit

20   for this ratings "structure" based on a 1987 design document he authored, the evidence shows that

21   the document was merely one exchange in a long process of design collaboration between

22   Antonick and Hawkins and represented a "summary" of what had already been "discussed and

23   agreed to" between them. Ex. 1, Antonick Dep. at 271; Antonick Decl. ¶ 11; *see, e.g.,* Ex. 8. As the

24   ratings structure was finalized, Antonick (and later EA employee Mike Kawahara) populated it

25   with individualized ratings for each NFL player. Ex. 3, Kawahara Dep. at 23, 61-62.

26            Drawing on his own knowledge of football, Antonick married the player ratings structure

27   with an elaborate system of plays. Ex. 1, Antonick Dep. at 362-64. Long before Madden's

28   involvement, his game included a careful selection of offensive and defensive plays, which were

2

"fairly similar" to the plays in the final game. *Id.* After signing Madden, Hawkins became more

involved, collaborating with Antonick to refine the existing plays and play calling to incorporate

Madden's ideas. *Id.* at 88, 90. As well as reviewing his playbook, they met with Madden during a

long train trip in which they spent 12-15 hours per day discussing, among other things, play-

calling. Ex. 2, Hawkins Dep. at 34-38; Ex. 75; Antonick Decl. ¶ 2. Antonick later met separately

with Madden again for several hours. *Id.* ¶ 3; Ex. 9. These conversations became a "major part" of

the game's design. Ex. 2, Hawkins Dep. at 38. The transcripts show that Antonick, not Hawkins,

took the leading role in refining the existing plays based on Madden's input. *See* Ex. 9, 88 & 89;

Antonick Decl. ¶12. Consistent with this, Antonick to this day has Madden's original playbook.

Ex. 10; Antonick Decl. ¶ 4.

## C.     EA Harvests Antonick's IP.

        EA harvested Antonick's IP in a variety of ways, both through producer Richard Hilleman

and technical director Scott Cronce, and through contractual provisions requiring Antonick to

provide detailed explanations of his code and design work. Contrary to EA's claims, Br. at 8-9, the

evidence demonstrates that Hilleman—***who was conversant in the 6502 Assembly language in***

***which Antonick programmed***, Ex. 13, Hilleman Dep. at 7—had access to and thorough knowledge

of Antonick's code, design documents and other IP. Most obviously, Hilleman archived Antonick's

code on an "almost" daily basis. Ex. 3, Kawahara Dep. at 28, 67, 72-74; *see also* Ex. 1, Antonick

Dep. at 187-89; Ex. 2, Hilleman Dep. at 10-11; Ex. 87. Hilleman actively familiarized himself with

Antonick's code and trade secrets and became "more and more interested in Madden football as

time went on." Ex. 3, Kawahara Dep. at 28. During the three months in 1987 that Antonick spent in

EA's offices, he and Hilleman often stayed late "discussing the source code and making changes to

it." Ex. 1, Antonick Dep. at 185-87; *see also* Ex. 3, Kawahara Dep. at 67-69. Among other

conversations, Kawahara remembers Hilleman asking Antonick about his algorithms for "player

behaviors." *Id.* at 69. Antonick also recalls discussing with Hilleman (i) the player ratings structure,

(ii) his instant replay methodology, (iii) data flow and design, and (iv) memory management

techniques. Ex. 12 at 4. By 1988, Hilleman was in charge of *John Madden Football* series

development. Ex. 14 ¶ 1; Ex. 13, Hilleman Dep. at 15. As part of his duties, he made "design

3

decisions" about Antonick's work and was copied on emails discussing technical aspects, including the "football field display code," "play editors," and the "AI" (artificial intelligence). Exs. 15, 16, 17. He also helped finalize the plays used in Antonick's game. Ex. 18.

Antonick underwent rigorous technical design reviews ("TDRs"), which were deliberately intended to harvest his IP.[2] *See, e.g.,* Exs. 15, 16. These TDRs were led by technical director Cronce, who was responsible for "being in touch with the state of the code" and for helping the Antonick "get the code done to excellence." Ex. 20, Gordon Dep. at 64-65; Ex. 21, Cronce Dep. at 11. In addition to conversations, Antonick provided TDR documents to EA. *See, e.g.,* Ex. 16.

Finally, EA required Antonick to deliver detailed explanations of his code and other IP. Among the documentation he was required to—and did—provide was (i) "complete assembled source code with sufficient comments to allow the **easy understanding** of each routine, subroutine and table by an individual [like Hilleman] conversant with 6502 assembly language," (ii) "an overall program description, including the file name of each module of code," "a narrative of the flow of control," "a complete list of subroutines with a short description of each," and "an explanation of key data structures," and (iii) a description of "any firmware or software utilities used." Ex. 6 at RA 5977, 5983, 5989; Ex. 22; Ex. 23; Antonick Decl. ¶ 5.

## D. EA Provides Antonick's IP To Third Party Developer, Bethesda Softworks.

In 1987, EA contracted with a third party, Bethesda Softworks, to develop *Madden* for the Amiga. Ex. 85. The Bethesda contract provided that the game would incorporate "many of the specifications" of Antonick's game. *Id.* § I. EA intended for the Amiga version to use Antonick's "playbook" and "player editor mechanic," but other elements, such as the AI, would be different. *See* Exs. 25, 26. Hawkins also asked Antonick to "write up" for Bethesda "how he . . . coded" his game. Ex. 27. Ultimately, EA developed the game in-house. Ex. 28 at 4. After it was released, EA paid Antonick the royalty rate provided under the contract for "Derivative Works By Artist." Ex.

---

[2] EA's TDR memorandum states: "The purpose of a TDR is to give you an opportunity to explain your product's design to members of the Technical Staff at [EA]." Ex. 19 at 1. It continues: "The [TDR] also provides you with a forum for sounding out new and innovative concepts . . . ." *Id.* It required Antonick to explain "the form and function of the major data structures," as well as the "program modules." *Id.* at 3-4.

29. These payments were approved by the producers of the Amiga game—the only version not produced by Hilleman or Orr in the early 1990s. *See* Ex. 30, Bastel Dep. at 36-37; Ex. 31.

**E.     Antonick's Apple II Game Is An "Overnight Success."**

EA released the Apple II game in 1988 and credited Antonick as both a "designer" and "programmer." Ex. 32. Contrary to EA's current stance that Antonick's game was "critically and financially unsuccessful," Br. at 5, EA itself called it an "***overnight success***" that "***exceeded its high expectations***" and "went on to ***sell more copies*** than any other sports game of its time." Ex. 33 at 4; Ex. 34 at 14. EA was so pleased that in 1989 it gave Antonick its "President's Award," as well as a gold disk for over 100,000 units sold. Exs. 35, 36; Antonick Decl. ¶ 6.[3]

**F.     EA Extends Its Long-Term Relationship With Antonick To Cover Sega And Nintendo.**

Consistent with its respect for his work, EA asked Antonick to develop *Madden* games for the Sega and Nintendo platforms. Antonick had begun work on the Nintendo version by September 1989. *See* Ex. 37. In October, the parties agreed Antonick would develop a "script" and a "TDR" for which he would receive 3% royalties on sales of any "Nintendo Derivative Work" or "Sega Genesis Derivative Work" as "Additional Compensation." Ex. 38. Although Antonick worked hard on the Nintendo version for nearly a year, Antonick Decl. ¶ 7., he ultimately received nothing because his advances were applied against royalties received for other games. *See* Ex. 39 ¶ 5.

**G.     EA Cuts Short Its Relationship While Falsely Promising To Safeguard Antonick's IP.**

On August 28, 1990, Hilleman told Antonick that EA had decided not to publish Derivative Works on the Nintendo or Sega Genesis platforms. Instead, Hilleman said the Sega game would have "more of an arcade feel," and EA "had contracted with another company, Park Place," to develop it "independent of [his] work" not "using any of [his] source code or methods and such." Ex. 1, Antonick Dep. at 19, 125. Hilleman explained that because there would be a "separation between [Antonick's] work and what was going on for the Sega," he would not receive royalties. *Id*. at 125. This surprised Antonick because it was the first he'd heard that the Sega game would not use his IP. *Id*. at 18, 125. Indeed, only six months previously, when he had declined the right to

---

[3] Although development took longer than expected, this was due to the Apple II's limitations, not Antonick's lack of skill. *See* Ex. 2, Hawkins Dep. at 27.

1  code the Sega game himself, EA had confirmed that he would receive "Derivative Work" royalties.

2  Ex. 40 ¶ 2. As for the Nintendo game, Hilleman told Antonick that the "market was dissolving"

3  and EA would not develop a Nintendo version. Ex. 41; Ex. 1, Antonick Dep. at 119-20. He told

4  Antonick to concentrate on the development of a second game for the IBM platform ("*Madden*

5  *Football 2.0"*). *Id.* at 123. Antonick did just that, communicating regularly with Hilleman and

6  others on the technical details of the game during 1990 and 1991. *See, e.g.*, Ex. 15, 16, 17.

7       Though it was a "emotionally difficult" to learn he would not receive Derivative Work

8  royalties on the Sega game and that EA would not publish a Nintendo version, Antonick did not

9  suspect that EA was violating his rights as EA continued to assure him that it was not using his IP

10  in the Sega version. Ex. 1, Antonick Dep. at 25. In late summer/early fall of 1990, Gordon called

11  Antonick and told him that the Sega team was independently developing a different passing

12  interface and was not duplicating his approach. Ex. 42. This is consistent with EA's general

13  assurances to its "Artists" at the time that it would use a "clean room" to develop software with

14  similar functionality to that covered in terminated development contracts. Ex. 1, Antonick Dep. at

15  79-81. Antonick relied on these assurances. *Id.* at 24.

16  **H.     EA Continues To Secretly Harvest Antonick's IP For Use In Console Games.**

17       Although EA waited until August 1990 to tell Antonick that the Sega version was being

18  developed "independently," it had hired Park Place six months earlier. Ex. 43. As EA now admits,

19  it ***never used a clean room*** to develop the Park Place or any subsequent version of *Madden*. Ex. 44

20  at 5-6.[4] Nor did EA ever give anyone working on the Sega game instructions not to use design

21  documents, algorithms or development materials from Antonick's games. Ex. 46, Brook Dep. at

22  55-56; *see also* Ex. 21, Cronce Dep. at 52. Instead, unbeknownst to Antonick, EA employees who

23  had extensive access to and knowledge of his code and other IP also worked on the Park Place

24  version and subsequent *Madden* games. These include Hilleman, a designer and producer of the

25  ─────────

26       [4] EA's claim that it had no "policy to establish 'clean rooms' for the development and/or coding of software for new games" *id.* at 4-5, is contradicted by its ex-CEO Hawkins. According to Hawkins, if Park Place had wanted to begin "an entirely new game from scratch" for an EA competitor, it "would have had to use a clean room and not use anything they learned from Madden." Ex. 45 at 1; *see also* Ex. 2, Hawkins Dep. at 71. Hilleman also admitted that EA discussed clean rooms for software development. Ex. 13, Hilleman Dep. at 76.

27

28

1   1990 Sega game, and Cronce, its technical director. Ex. 47.[5]

2          EA misrepresents the Sega Genesis game's development history, originally claiming that

3   Simmons was provided with only a "***two to three page description*** of the game containing

4   overarching concepts" and that "Hilleman only became involved" with "when it moved closer to a

5   complete product." Ex. 48 at 3; Ex. 44 at 7. The evidence contradicts these claims. The Park Place

6   development contract contemplated the transfer of IP, including code, from EA to Park Place. Ex.

7   43 at 3583. Moreover, EA provided a ***forty page*** set of instructions ███████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ███[6] Ex. 49 at SIMMONS 2, 12-13, 32, 34-35, 38-42. ████████████████████████

10  ████████████████████████████████████████████   *Id.* at SIMMONS 26. It

11  further provides █████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████

13  ██████████████████████████████████   *Id.* at SIMMONS 36.

14          From the early stages of development, ████████████████████████████████

15  ██████████████████████, who had never developed a football videogame before. Ex. 13,

16  Hilleman Dep. at 48-49; Ex. 51 at SIMMONS 44. Hilleman had bi-weekly conversations with

17  Simmons and others at Park Place. Ex. 13, Hilleman Dep. at 34. Cronce "audit[ed]" Simmons'

18  TDR document and participated in an in-person TDR meeting with Simmons, Hilleman and

19  designer Scott Orr. Ex. 21, Cronce Dep. at 49-50; Ex. 13, Hilleman Dep. at 35. Since Antonick did

20  not cease work with EA until he finished *Madden 2.0* in late 1991, Antonick Decl. ¶ 8, the period

21  of Hilleman and Cronce's growing interest and responsibilities with respect to Antonick's IP, *supra*

22  Part II.C, coincided with the period when they were developing the first two Sega games, which

23  were released in December 1990 and 1991 respectively. Ex. 14 ¶ 6; Ex. 7, Barr Rep. at 122.

---

[5] Hilleman and Cronce are also listed as "designer" and "technical director" respectively on several other subsequent *Madden* games. *Id.*

[6] Although the author of the design document, Scott Orr, claims that the credit he gave Hilleman was merely a courtesy, he also admits that (1) Hilleman provided feedback on multiple "drafts," (2) he had "regular communications" with Hilleman during the game's design, and (3) he gave all of his design documents to Hilleman. Ex. 50, Orr Dep. at 22-23, 31-32, 42.

7

1    EA's assistance to Simmons intensified when it decided to convert the Sega version from

2    an arcade game to one that realistically simulated NFL football. According to assistant producer

3    Michael Brook, in July 1990 Simmons' game had "[n]o plays, nothing. No play calling." Ex. 46,

4    Brook Dep. at 47. When booted up, "there were 11 guys on each side running around without any

5    logic, so it was like seeing a football field with 11 guys just running circles;" in fact, Brook didn't

6    "even know if there was a football in there yet." *Id.* at 46-47. Then Hilleman and Orr decided "very

7    late in the process" to convert the game to a *Madden* product. Ex. 50, Orr Dep. at 35; Ex. 46, Brook

8    Dep. at 66, 70. Despite the radical redesign and the game's obviously incomplete state, EA

9    advanced the release date, originally set at March 1991, to December 1990 so that the product

10   would be available for the Christmas rush.[7] Completing the game for holiday season was "highly

11   desirable," given the growth of the Sega Genesis market and the seasonality of videogame sales.[8]

12   Ex. 24, Kitchen Rep. ¶ 61. This meant the game needed to be ready for final testing by mid to late

13   September 1990. *Id.* ¶ 25; *see also* Ex. 46, Brook Dep. at 57. Thus, Simmons and EA had ***less than***

14   ***two months*** to transform the game from "11 guys just running circles" to a realistic NFL football

15   videogame with a full playbook, realistic play calling AI and fully rated rosters.

16   Also in July 1990, just as the decision to revamp the Sega game was being made, Hilleman

17   flew to Park Place's offices to meet with Simmons. Ex. 46, Brook Dep. at 6, 60-61; Ex. 53,

18   Simmons Dep. at 33-34. The pair then began weekly phone calls. *Id.* at 35-36. To complete the

19   game in such a tight timeframe, Simmons received play diagrams, play calling tables, and player

20   rating information from EA. Ex. 53, Simmons Dep. at 27, 49-51, 73-74, 85-86. Hilleman then

21   helped Simmons refine these elements to make the game more realistic. *See* Ex. 54; Ex. 13,

22   Hilleman Dep. at 36-38.[9] This platform independent data used was at the heart of Antonick's game

---

[7] *Compare* release date in Ex. 52 *with* release date in Ex. 14 ¶ 6.

[8] EA also rushed the Sega *Madden* release to stay ahead of its major competitor, Sega, who "had way more marketing power" and was developing a *Joe Montana* football game. Ex. 2, Hawkins Dep. at 67-68; Ex. 24, Kitchen Rep. ¶ 63. Hawkins admitted that after Sega encountered development delays and was forced to contract with EA to finish *Montana*, EA stripped out important features to intentionally "cripple" *Montana* and make it "notably inferior to Madden." Ex. 2, Hawkins Dep. at 67-69; *see also* Ex. 45; Ex. 13, Hilleman Dep. at 54-55.

[9] EA claims that Hilleman spent "countless hours" with Simmons on bug-testing, not technical design. *See* Ex. 54. However, bug-testing often involved identifying design flaws. Ex. 2, Hawkins

8

and resulted from years of development, testing and refining, in which Hilleman was deeply involved. *Supra* Parts II.B, C. Given that Simmons never met with Madden, the integration of Madden's insights into the 1990 Sega game necessarily came from Hawkins and Antonick's previous embodiment of these insights into the Apple II version. Ex. 53, Simmons Dep. at 46-47; Ex. 2, Hawkins Dep. at 38; *see also* Ex. 50, Orr Dep. at 35 (admitting that he listened to transcripts of conversations between Madden, Hawkins and Antonick when designing the Sega game).[10]

EA's use of Antonick's platform-independent *Madden* work is confirmed by EA's former CEO, Hawkins, who admitted to recently telling a reporter that when EA transitioned from read-write floppy discs (*i.e.*, Antonick's games) to read-only cartridges (*i.e.*, Sega Genesis), it ***"used the same underlying gameplay mechanics, camera angle, playbooks, and player stats."*** Ex 2, Hawkins Dep. at 50. The jury will not find credible his attempt to explain that statement as merely meaning that both games "obey[ed] the rules of football" and therefore had a "certain amount of similarity." *Id.* at 50, 53-54. Not only is this nonsensical—if this is what he meant, it would apply to every football simulation game—but it is undermined by his other testimony. For example, he later admitted that the design of the play-calling AI for Antonick's games was used in the 1990 Sega game and that it would have been "just silly to dump it overboard and forget it." *Id.* at 54-61. Similarly, he testified that the player ratings structure was not "platform specific" and once "you've figured that out once, there is no reason to throw it away and reinvent it every year." *Id.* at 42, 62. Consistent with what, is in essence an admission by Hawkins that the Sega game derived from Antonick's game, EA's *internal* Royal Payable Report listed the Sega version as a Derivative Work but a handwritten note crosses it out and states "delete." Ex. 30, Bastel Dep. at 37-42; Ex. 76. EA's accounting supervisor recognized the note as her handwriting and stated that she would have been instructed to do so by Hilleman, after his review of the report. *Id* at 40.[11]

---

Dep. at 88-89. In Kitchen's expert opinion, "the testing and tuning process often resulted in technical design changes that made the game more realistic." Ex. 56, Kitchen Rebuttal ¶ 8.

[10] Orr mistakenly believed the conversations were between Hawkins only and Madden. *Compare* Ex. 50, Orr Dep. at 35, *with* Exs. 9, 75 and Antonick Decl. ¶¶ 2-3.

[11] Undermining any contention that the internal royalty report was a mistake, EA continued to classify the Sega games as a Derivative Work through at least August 1991. Ex. 30, Bastel Dep. at 42-56; Ex. 77.

1    **I.      EA Fraudulently Induces Antonick To Terminate His Right To Nintendo Royalties.**

2            In the summer of 1991, Gordon told Antonick that EA had to terminate his contractual right

3    to royalties on Nintendo games because of "legal reasons" arising out of EA's reverse engineering

4    of Nintendo's development aids. Ex. 55 at 6. Gordon explained that he could not provide more

5    details because EA's conversations with its attorneys were privileged. *Id*. Antonick accepted this

6    because he trusted Gordon and because EA had assured him that it would not use his IP if it

7    subsequently developed a Nintendo version of *Madden*. *Id*. These assurances were memorialized in

8    paragraph 3 of the Termination Amendment, in which EA reiterated the promises it had made in

9    the 1986 Contract to protect Antonick's IP. Ex. 39. EA, however, had no intention of honoring

10   those obligations. In fact, as discussed *supra* Part II.H, it had already breached the promises it had

11   made in the 1986 Contract and reiterated in the Termination Amendment and would continue to do

12   so with regard to the development of subsequent games.

13                                  **III.     ARGUMENT**

14           Summary judgment issues only when "there is no genuine issue as to any material fact and

15   that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling

16   on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all

17   justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie,* 526 U.S. 541, 552

18   (1999). Here, EA fails to satisfy its burden of demonstrating no genuine issue of material fact.

19   **A.      The Parties Intended The Term Derivative Work To Be Applied Broadly To
             Compensate Antonick For Any Game In Which His IP Was Used.**

20           Although EA's motion turns on the definition of a contractual term, it ignores the evidence

21   concerning the "mutual intention" of the parties—the "fundamental goal of contract interpretation."

22   *Morey v. Vannucci*, 64 Cal.App.4th 904, 912 (Cal. Ct. App. 1998). Contrary to EA's constricted

23   interpretation of Derivative Work, both the language of the 1986 Contract and EA's subsequent

24   conduct demonstrates that the parties intended to compensate Antonick with royalties when his

25   work was used.[12] Moreover, as discussed *infra* Parts III.B and C, Antonick's IP was, in fact,

26   _____

27          [12] EA argues that references to Antonick's "IP" mean the "copyright interest in the games he
     coded." Br. at 7. Wrong. By "IP," Antonick means all proprietary and confidential information he
     disclosed to EA. Ex. 24, Kitchen Rep. ¶ 62. This is consistent with the 1986 Contract, which
28   provided that he retained ownership of his Development Aids and that if EA committed a material

                                            10

misappropriated by EA to develop subsequent *Madden* games. Since EA's entire motion is predicated on its interpretation of the term Derivative Work, if the Court disagrees with EA's interpretation that alone provides ground for denying its motion.

### 1.     Contractual Language.

The 1986 Contract defines "Derivative Work" as:

> Any computer software program or electronic game which either (a) constitutes a derivative work of the Work within the meaning of the United States copyright law or (b) produces audiovisual effects which infringe the copyright in the audiovisual effects produced by the Work. Derivative Works include, for example, significant enhancements of the Work to additional features or improve performance and adaptations of the work to operate on computers or operating systems other than those described in the Specifications.

Ex. 6 § 1.03. This Court has already held that this definition is "very broad, and the game elements Plaintiff relies on likely fall within it." Dkt. 47 at 12. Nothing compels a different conclusion now. Instead, reading the contract as a whole further supports a broad interpretation of Derivative Work in which the parties intended that Antonick would be compensated when subsequent games used his IP or themselves derived from a game that used his IP.[13]

*First*, the 1986 Contract contemplates that Antonick would be paid royalties on subsequent games even if his source code was not copied verbatim. The definition of Derivative Work encompasses "adaptations of the Work to operate on computers or operating systems other than described in the Specifications." Ex. 6 § 1.03. In addition, the royalty structure provides for royalties on Derivative Works belonging to "Different Microprocessor Famil[ies]," for which, because of the different programming language involved, code *could not* be copied verbatim from

---

breach—such as the illicit use of his work described here—all "proprietary" rights would revert to him, along with his source code and Development Aids. *See* Ex. 6 §§ 8.04, 9.02, 12.02, 12.04.

[13] *See* Cal. Civ. Code § 1641; *In re Quantification Settlement Agreement Cases*, 201 Cal.App.4th 758, 799 (Cal. Ct. App. 2011) ("Even if one provision of a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part [and] any interpretation which renders part of the instrument to be surplusage should be avoided.").

1    Antonick's game. *Id.* § V; *see* Ex. 7, Barr Rep. at 28-29. Thus, EA's oft-repeated contention that no

2    "literal" code copying occurred here, *see e.g.,* Br. at 1, 7, 9, 20, 22, is simply irrelevant.[14]

3           *Second*, as Amendment VIII (Ex. 38) establishes, the parties anticipated that Antonick

4    would be compensated for the Sega version of *Madden* as a "Derivative Work." As such, even if

5    EA were correct that it was "impractical" to use Antonick's Apple II code to develop the Sega

6    game because "it would have taken twice as long to translate and port old code than it would to

7    write fresh code," Br. at 5,[15] the parties clearly viewed the Sega game as constituting a Derivative

8    Work irrespective of the need to write "fresh code." Nor was Antonick only to be paid royalties

9    pursuant to Amendment VIII if he wrote the "fresh code" himself. Instead, as this Court has

10   already held, there is a factual issue as to whether Amendment VIII entitles Antonick to royalties

11   even if he did not code the game. *See* Dkt. 288. Because EA's ex-CEO Hawkins admitted that

12   much of the prior work Antonick did was transferrable to the Sega game—for example, his player

13   ratings and plays—it would have been consonant with industry norms to compensate Antonick

14   with 3% Derivative Work royalties for the use of this IP. Ex. 2, Hawkins Dep. at 62-63; Ex. 24,

15   Kitchen Rep. ¶ 66. Thus, EA's argument that Antonick is not entitled to royalties for his player

16   ratings, plays and other IP under copyright law's definition of derivative work is inconsistent with

17   the parties' intentions as expressed in the 1986 Contract. Furthermore, because EA drafted the

18   contract,[16] California Civil Code § 1654 requires that it be strictly construed against EA.

19          *Third*, under the contract's confidentiality provisions, EA was required to "hold in

20   confidence all Confidential Information" of Antonick with "at least the same degree of care that it

21   uses to protect its own Confidential Information" and to "prevent" its "unauthorized disclosure."

22   Ex. 6 § 9.04. "Confidential Information" included Antonick's source code and Development Aids,

23

24   ———————————————————

          [14] While EA uses the phrase "literal source code copying," it actually means is that it did not
25   copy Antonick's code verbatim. Its misuse of the word "literal" should not be confused with
     copyright law's reference to copying the "literal elements" of software, which simply means
26   copying non-structural elements. *See, e.g., Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*,
     886 F.2d 1173, 1175 (9th Cir. 1989). As discussed *infra* Section III.B.2, EA did copy literal
27   elements of Antonick's source code even though it did not do so verbatim because the different
     programming languages used by the Apple II and Sega games made verbatim copying impossible.
          [15] In any event, Kitchen disagrees. *See* Ex. 56, Kitchen Rebuttal ¶¶ 15-20.
28        [16] Ex. 2, Hawkins Dep. at 23; Antonick Decl. ¶ 9.

among other things, unless the information was "independently derived from other sources." *Id*. §§

9.02, 9.04. Amendment 1 further prohibited EA from "us[ing] or otherwise [provid[ing]"

Antonick's Development Aids to its employees or third parties. Ex. 57 at 3. Reading these

provisions together with the definition of Derivative Work makes clear that the parties intended to

compensate Antonick for subsequent games unless those games were exclusively "independently

derived." As the confidentiality provisions also make clear, the parties did *not* envision a situation

in which a subsequent game would be "based upon" Antonick's game, *see* 17 U.S.C. § 101, but

Antonick would not be owed royalties unless he proved EA used particular and copyrightable

elements. The parties simply did not intend to engage in the backward-looking and entirely

unwieldy minute parsing of "copyright protectable" elements that EA now advocates with regard to

each subsequent *Madden* game developed.[17] *See* Br. at 9-23. Rather, EA's use of a clean room to

develop subsequent games would demonstrate the independent development required under the

contract; this was certainly how Antonick understood the contract to operate. *See supra* Part II.G.

In fact, analytic dissection did not even exist as a concept at the time the parties entered into the

contract in 1986.[18] Put simply, it is obvious from a reading of the contract as a whole that the

possibility of a game that was *based on* Antonick's work but nonetheless *not* a Derivative Work

and thus *not* compensable was wholly foreign to the intention of the contracting parties.

    *Fourth*, EA was also required to "maintain proprietary protection," including trade secret

protection, for Antonick's work. Ex. 6 § 8.01. As with its obligations to keep Antonick's IP

confidential, a definition of Derivative Work that would allow EA to use Antonick's Development

Aids and trade secrets without compensating him simply because they may not be copyrightable

would be inconsistent with Section 8.01.[19]

---

[17] As further evidence that the parties did not intend to parse Antonick's work, in the Apple II manual EA declared Antonick's "software" as a whole to be "copyrighted" and prohibited "copy[ing], reproduc[tion], [or] translat[ion]" of any "part" of the it without EA's consent. Ex. 84.

[18] *See Computer Assoc. Int'l, Inc. v. Altai*, 982 F.2d 693, 706 (2d Cir. 1992) (adopting, for the first time, "abstract-filtration-comparison" test which breaks a computer program down into "constituent structural parts").

[19] Cal. Civ. Code § 1643; *Brawner v. Wilson*, 126 Cal. App. 2d 381, 385 (Cal. Ct. App. 1954) ("Where a contract admits of two constructions, the court ought to adopt that which is most equitable and which will not give an unconscionable advantage to one party over the other.")

13

1    *Fifth*, the contract repeatedly refers to Antonick as the "Artist," which as then-CEO and

2    contract negotiator Hawkins explained, was meant to denote that he believed "the development of

3    software ought to be thought of as having creative value." Ex. 6; Ex. 2, Hawkins Dep. at 16. This is

4    also consistent with an expansive definition of Derivative Work in which Antonick is compensated

5    for the "value" he contributed to the *Madden* franchise and inconsistent with the notion that the

6    parties would engage in a minute parsing of copyrightable elements to determine royalties owed.

7    **2.    Post-Contract Conduct.**

8    EA's post-contract conduct also sheds light on the definition of Derivative Work in the

9    1986 Contract.[20] EA paid Antonick royalties on the Amiga version of *Madden*, even though EA

10   admits that the Amiga source code was based on the *Madden* Sega Genesis source code.[21] The

11   Amiga, like the Sega, uses a Motorola 68000 microprocessor so verbatim copying of Antonick's

12   source code was not possible. However, it was possible to use Antonick's platform independent IP

13   like his playbook and player ratings—indeed, EA requested Antonick's assistance in developing

14   the Amiga version and the contract with the original third party developer referenced incorporating

15   "specifications" from Antonick's game. *Supra* Part II.D. EA's payment of royalties on the Amiga

16   game is therefore further evidence that, in spite of its argument that platform independent elements

17   such as these are not copyrightable, EA nevertheless believed their use in a game made it a

18   Derivative Work. At the very least, this post-contract conduct raises an issue of fact precluding

19   summary judgment. *Adobe Sys. Inc. v. Hoops Enter. LLC*, 2012 WL 2237283, at *6 (N.D. Cal.

20   June 15, 2012). At best, given that the Amiga Derivative Work royalties were approved by

21   different producers who, unlike Hilleman, were not involved in EA's scheme to defraud Antonick,

22   ───────────

23   [20] *See, e.g., City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 393 (Cal. 2008)
     ("A party's conduct occurring between execution of the contract and a dispute about the meaning of

24   the contract's terms may reveal what the parties understood and intended those terms to mean.");
     *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (Cal. 1960) ("[E]ven if it be assumed that

25   the words standing alone might mean one thing" to the court, "where the parties have demonstrated
     by their actions and performance that to them the contract meant something quite different . . . the
     parties by their actions have created the 'ambiguity' required.").

26   [21] EA has previously claimed that its payment of Amiga royalties was "aberrant," Dkt. 232 at

27   11 n.10, but as the evidence shows, EA consistently paid Antonick Derivative Work royalties on
     the Amiga game over a period of several years. *See* Ex. 29. This is hardly aberrant. Moreover,
     EA's claims of "error" are highly suspect given its "obvious interest in reducing plaintiff's

28   royalty." *Wilson v. Nobell*, 119 Cal. App. 2d 341, 346 (Cal Ct. App. 1953).

*supra* Part II.D, it is more revealing as to the true nature of "what the parties understood and intended [the contract] terms to mean." *City of Hope*, 43 Cal. 4th at 393.

**B.      Plaintiff Is Owed Royalties Even If The Term Derivative Work Is Limited To Copyright.**

Copyright infringement is shown by evidence that the defendant had "access" to the plaintiff's work and that the two works are "substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." *Id.* at 486. Here, material issues of fact regarding all three issues preclude summary judgment.

**1.      Both EA and Simmons had "Access" to Antonick's Work.**

Contrary to EA's claims, Plaintiff is not required to present definitive evidence of copying, only that it had "access" to his work. "Proof of access requires an ***opportunity*** to view or to copy plaintiff's work." *Id.* at 482. Here, both EA and Park Simmons had multiple opportunities to view and copy Antonick's IP. As discussed, *supra* Part II.C, the 1986 Contract required Antonick to provide EA with fully documented source code and Development Aids and participate in detailed TDRs. This alone establishes the access required. *See, e.g., Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 426 F. Supp. 2d 1101, 1111 (E.D. Cal. 2006).

Moreover, EA employees who had access to Antonick's work also worked on the 1990 Sega game. Hilleman had detailed conversations with Antonick regarding his source code (which he could read) and design. Ex. 1, Antonick Dep. at 185-87; Ex. 3, Kawahara Dep. at 28-29, 69, 71-74; Ex. 12 at 4; Ex. 13, Hilleman Dep. at 7. By 1988, when Hilleman was charged with development of the *Madden* games, he was privy to discussions concerning the technical aspects of Antonick's work, including the "football field display code," "play editors," and the "AI" used for game play, and also helped finalize the plays. Exs. 15, 16, 17, 18. Hilleman then went on to produce several of EA's Sega and SNES *Madden* games, including the 1990 Park Place version, for which he was responsible for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Simmons. Ex. 47; Ex. 49; Ex. 50, Orr Dep. at 22-23, 31-32, 42; Ex. 13, Hilleman Dep. at 48-49. After EA decided to radically redesign the game to integrate

15

1    realistic simulation and Madden's plays, Hilleman met with Simmons in person and then had

2    weekly phone calls with him to refine the play diagrams, play calling tables, and player rating

3    information Simmons received from EA. Ex. 53, Simmons Dep. at 27, 34-36, 49-51, 73-74, 85-86;

4    Ex. 54; Ex. 13, Hilleman Dep. at 36-38. Cronce led the TDRs of Antonick's work and had

5    thorough knowledge of Antonick's code. *See* Ex. 20, Gordon Dep. at 64-65; Ex. 21, Cronce Dep. at

6    13, 26-27; Ex. 16. He went on to become the technical director for several of EA's Sega and

7    SNES games including the 1990 Park Place version, for which he "audit[ed]" Simmons' TDR

8    document and participated in an in-person TDRs with Simmons. Ex. 47; Ex. 21, Cronce Dep. at

9    49-50; Ex. 13, Hilleman Dep. at 35. The fact that Hilleman and Cronce worked substantively on

10   both games is also definitive evidence of access. *See Johnson Controls*, 886 F.2d at 1176 (finding

11   access where several former employees of defendant previously worked on plaintiff's version);

12   *CyberMedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1077 (N.D. Cal. 1998) (same).

13            Because Hilleman and Cronce had knowledge of and supervisory responsibilities with

14   respect to both Antonick's game and the 1990 Sega version, access can be presumed as to

15   Simmons also. *See Kamar Int'l Inc v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981)

16   (access established where defendant did business with same stuffed animal manufacturer that made

17   plaintiff's stuffed animals); *Meta-Film Assoc., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355-58 (C.D.

18   Cal. 1984) (discussing cases in which access found because intermediary had opportunity to view

19   plaintiff's work and could transmit it to the copier). Indeed, the presumption of access is virtually

20   incontrovertible given that EA did not use a clean room to develop the Sega game and "did not

21   institute any [other] procedures to prevent the intentional or inadvertent use of Mr. Antonick's

22   [IP]." Ex. 24, Kitchen Rep. ¶ 54; Ex. 44 at 5-6; Ex. 58 (confirming EA has no documentation

23   related to methods for ensuring independent development of any subsequent *Madden* games).

24            **2.    EA's Subsequent *Madden* Games are "Substantially Similar" to Antonick's
                      Apple II Game.**

25            "Substantial similarity is usually an extremely close issue of fact and summary judgment

26   has been disfavored" in IP cases. *Litchfield v. Spielberg*, 736 F.2d 1352, 1355 (9th Cir. 1984).

27   Where a plaintiff provides "indicia of a sufficient disagreement concerning the substantial

28   similarity of two works," the issue should be tried to a jury. *Swirsky v. Carey*, 376 F.3d 841, 853

                                             16

1   (9th Cir. 2004).[22] Even a "quantitatively small amount of copied material may be sufficiently

2   important to the operation of plaintiff's program to justify a finding of substantial similarity"

3   because it may "give it distinctive features or may make [it] especially creative or desirable."

4   *Veritas Operating Corp. v. Microsoft*, 2008 WL 474248, at *7 (W.D. Wash. Feb 4, 2008).[23] Courts

5   have "consistently viewed evidence of 'common errors' as the strongest evidence of copying." *M.*

6   *Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 446 (4th Cir. 1986); *see also e.g., Williams*

7   *Electronics, Inc. v. Artic Int'l, Inc.*, 685 F.2d 870, 876 n.6 (3d Cir. 1982).

8          Contrary to EA's claim, "virtual identity" is not required here. *See* Br. at 11. Instead, where

9   a "high degree of access" to a plaintiff's work is shown, the degree of substantially similarity is

10  "commensurately lowered." *Swirsky*, 376 F.3d at 844-45. Given the incontrovertible evidence that

11  EA and Park Place had unfettered access to Antonick's work, *supra* Part III.A, the degree of

12  similarity should be significantly less. Allowing a greater latitude in the "substantial similarity"

13  required is particularly logical here, given that the comparison is to derivative works which, by

14  their very nature, "recast, transform[] or adapt[]" the original work. *Jarvis v. K2 Inc.*, 486 F.3d 526,

15  531 (9th Cir. 2007); *see also Apple, Inc. v. Psyster Corp.*, 673 F. Supp. 2d 931, 938 (N.D. Cal.

16  2009) (finding infringement even where derivative work was "substantial variation from the

17  underlying" work); *Veritas*, 2008 WL 474248, at *7, 10 (plaintiff satisfied extrinsic test even

18  though code compared was written in different programming languages).[24]

19         The doctrines of "merger and scenes-a-faire" are "defenses to infringement" for which EA

20  has the burden of proof. *Ets-Hokin v. Skyy Spirits Inc.*, 225 F.3d 1069, 1082 (9th Cir. 2000); *Merc.*

21  *Transaction Sys. Inc. v. Nelcela, Inc.*, 2009 WL 723001, at *7 (D. Ariz. Mar. 18, 2009). "Under the

22  merger doctrine, courts will not protect a copyrighted work from infringement if the idea

23         [22] Even in EA's favorite case, *Oracle Am., Inc. v. Google Inc.*, the court refused to grant
24  summary judgment, finding that plaintiff's expert report provided "multiple examples" of
    similarity and if "Google disputes the basis for the opinion" then it "should raise its critiques
25  during cross-examination at trial." 810 F. Supp. 2d 1002, 1012 (N.D. Cal. 2011).

26         [23] In his book, EA's expert agrees that it is not "the percentage of code that determines whether
    the [copying] is substantial" because "code can be critical" to a program's operation but "consist of
    a relatively small percentage of the total lines of code." Ex. 78 at 331.

27         [24] Moreover, EA cannot invoke the "virtual identity" standard because, as discussed *infra*, it
28  has failed to prove that a "substantial portion" of Antonick's work is "unprotected." *Oracle Am.*,
    810 F. Supp. 2d at 1012.

17

underlying the copyrighted work can be expressed in only one way." *Satava v. Lowry,* 323 F.3d 805, 812 n. 5 (9th Cir. 2003). The defense of *scenes a faire* requires a showing that the similarities identified are "commonplace expressions [that] are indispensable and naturally associated with the treatment of a given idea" within the "relevant field." *Swirsky,* 376 F.3d at 850. EA faces a heavy burden with regard to both defenses. To show *scene a faire*, it must prove that external factors such as mechanical specifications, compatibility requirements, manufacturer design standards, or industry practices dictate the elements involved. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993). Nor may EA rely on its cross of Plaintiff's experts; it must present "independent evidence." *Swirsky,* 376 F.3d at 850. That evidence must be specific and may not argue that "entire categories of elements" are unprotectable. *Oracle Am.*, 810 F. Supp. 2d at 1010. If the elements cited by the plaintiff are "sufficiently creative to be original," then challenges based on merger and *scenes a faire* are "generally unsuccessful." *eScholar LLC v. Otis Educ. Sys.*, 2005 WL 2977569, at *24-25 (S.D.N.Y. Nov. 3, 2005).

Here, as discussed below, Plaintiff easily meets his burden. A reasonable jury could conclude that midway through development, EA decided to transform an "arcade" football game into a realistic *Madden* branded NFL simulation. With barely two months to make the change and a programmer lacking football game experience, EA simply copied all the platform independent elements of Antonick's game—its plays, its carefully crafted system of player ratings and its AI. This is more than enough to demonstrate the "indicia of a sufficient disagreement" required to defeat summary judgment on substantial similarity. *See Swirsky,* 376 F.3d at 853.

Nor can EA meet its burden of proving that the copied elements are *scenes a faire* or barred by merger. With respect to many elements, the ***only*** "evidence" EA offers are the words of Plaintiff's expert taken out of context, bolstered with arguments that entire categories of elements are unprotectable. This does not constitute "specified" and "independent evidence." *Oracle Am.*, 810 F. Supp. 2d at 1010; *Swirsky,* 376 F.3d at 850. Even where EA does rely on its own experts, its arguments fail. It offers ***no*** affirmative evidence that any element was dictated by external factors. *Gates Rubber Co.*, 9 F.3d at 838. In fact, its industry expert admitted that he never even reviewed ***any*** source code from ***any*** other competing contemporaneous games. Ex. 79, Lerner Dep. at 27-28.

18

1    Instead, he formed his opinions about the originality of Antonick's source code by watching

2    "minute or two" YouTube videos posted by unknown individuals in unknown resolutions of other

3    unknown individuals playing other games. Ex. 79, Lerner Dep. at 51-53, 88. His unreliable

4    methodology will be the subject of a motion to exclude.

5                    **a.    Overall Data Flow Architecture.**

6            Most games pre-dating Antonick's decided "the outcome of the whole play" based on a

7    "dice roll" modified by historical statistics. Ex. 7, Barr Rep. at 52. The avatars then moved "down

8    the field over time even though" the game "had already pre-decided the outcome." Ex. 80, Barr

9    Dep. at 138; *see also* Ex. 3, Kawahara Dep. at 93 (noting that it was a "common practice at the

10   time" to "pre-calculate the outcomes"). Antonick took a different approach and designed a game

11   with 11x11 players on a fully realized field of play with outcomes calculated in real time based on

12   individual player ratings and a computer AI that drew upon those ratings at discrete points. Ex. 7,

13   Barr Rep. at 52-53. He achieved this by making numerous "highly technical" but "creative"

14   decisions about what data to use, the format of the data, how the data would move through the

15   program and where the data would be used. *Id.* at 70. Together, these decisions form the data flow

16   architecture of his source code. *Id.* In Barr's opinion, while there are "differences in some details,"

17   the "overall architecture" of the "data flow" in Simmons' game is the "same" as Antonick's. Barr

18   details these similarities and identifies alternatives in section V(c)(4) of his initial report (Ex. 7).[25]

19          EA does not address—and therefore concedes—the substantial similarity in data flow

20   architecture. Instead, it argues only that the Court "need not wade into Barr's unnecessarily

21   complex explanation of 'data flow architecture'" because he purportedly "concedes it is a

22   'technical process'" not protected by copyright. *See* Br. at 12 n.16. EA simply takes Barr's words

23   out of context. Barr was describing the "process" of designing a program's "data flow architecture"

24   as both "technical" and "creative"—not opining that data flow architecture itself is an

25   uncopyrightable "process." *See* Ex. 7, Barr Rep. at 70. Even if he had, it would not be an accurate

26

27          [25] *Cf. Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 840 (Fed. Cir. 1992) ("*Atari
     I*") ("unique arrangement of computer program expression which generates [a] data stream does

28   not merge with the process [if] alternate expressions" exist).

                                                    19

1    legal opinion since a program's architecture is copyrightable. *See, e.g., Johnson Controls*, 886 F.2d

2    at 1175; *Atari I*, 975 F.2d at 840; *Veritas*, 2008 WL 474248, at *10.

        **b.    Internal Representation of the Football Field.**

4          A football videogame must express in the code a representation of the football field.

5    Obviously, a programmer does not "draw" a rectangle in the code; rather, the field is expressed by

6    inbound/outbound values embedded in the code. Ex. 81, Barr Rebuttal at 24. Significantly, the

7    inbound/outbound values expressed in Antonick's code led to a coded field that is mistakenly

8    approximately twice as wide as a real NFL field, resulting in unrealistic lateral running times. Ex.

9    7, Barr Rep. at 33-38. Incredibly, EA's 1990 Sega Genesis game ***replicates this mistake***. *Id.* at 35.

10   In Barr's opinion, this is "strong evidence that [EA's] versions derived from Antonick's *John*

11   *Madden Football* game." *Id.* at 37; *c.f.* Ex. 78 (conceding that a "mistake" that "appears in both

12   programs" is "a sign that the code was copied"); *see also M. Kramer Mfg.*, 783 F.2d at 446.

13   Significantly, three years later when re-designing the game for the 3DO console, EA's own

14   designers recognized this mistake and suggested a more accurate field size of "55 yards (for nice

15   round numbers)." Ex. 7, Barr Rep. at 37 (discussing Ex. 83). Contrary to EA's claims, Br. at 11,

16   Plaintiff is not claiming a "copyright" in the "idea" of a mistaken field width. Instead, the

17   inbound/outbound values *expressed* in EA's code are substantially similar to the inbound/outbound

18   values *expressed* in Antonick's code, which—when combined with Barr's other findings below—

19   indicates that the *expression* of the internal field in Simmons' source code is substantially similar

20   to Antonick's *expression*.[26]

21         Antonick's field also has the unusual feature that upon a change of possession, the code (i)

22   pauses the onscreen action, (ii) transposes the coordinates of the objects on the field, (iii) flips the

23   field so that the defensive team (now with the ball) runs away from the camera position, and (iv)

24   resumes play. Ex. 7, Barr Rep. at 88. This is an unusual approach because it would be easier to

25   reorient the screen for the viewer (*e.g.* achieve the same visual effect) by flipping "one variable"

26   _____

27        [26] In some instances there are minor field width differences of one to two yards, but in Barr's
     opinions these trivial differences are less important than the fact that both fields are far too wide.
28   Ex. 81, Barr Rebuttal at 25. EA's own expert could not identify an example where the differences
     he cited affected the code's functionality. *See* Ex. 82, Zeidman Dep. at 129-31.

                                                   20

1    transposing every object on the field. Ex. 80, Barr Dep. at 181; *see Johnson Controls*, 886 F.2d at

2    1176 ("unusual" implementation of common feature is protectable). Barr never admitted that *only*

3    two options existed for programming a change in possession; instead, in the portions quoted in

4    EA's brief, he simply notes that Antonick did not adopt the most logical approach. *See* Ex. 80, Barr

5    Dep. 181-82. Barr also considered and rejected as insignificant the minor difference identified by

6    EA in the implementation of a change of possession, Ex. 81, Barr Rebuttal at 33—a difference

7    which, in any event undermines EA's claim that only two alternatives for implementation exist.

8         Another unique feature of Antonick's field is its utilization of a clockwise direction and

9    tracking system in which object movements were limited to eight compass-like directions (0-7):

10   "0" for forward movement, "1" for 45 degrees forward and right, and so on. Ex. 7, Barr Rep. at 40.

11   In Barr's opinion the use of "8" for a rest state instead of "0" is unusual since most programmers

12   would chose "0." *Id.* Antonick's system had the significant limitation of allowing only object

13   movement at 45-degree angles. *Id.* Despite better alternatives, EA's field uses the same direction

14   and tracking system. Ex. 7, Barr Rep. at 43-47. In Barr's opinion, EA likely copied this feature to

15   facilitate its copying of Antonick's plays, discussed *infra* Part III.B.2.c. Contrary to EA's claim,

16   Br. at 18, Barr did not "neglect[] to consider" whether "hardware" dictated this unusual direction

17   and tracking system; he devotes an entire section to explaining why hardware standards cannot

18   explain the similarity. Ex. 7, Barr Rep. at 47-50. That opinion is supported by an EA document that

19   references using a *different* direction and tracking system that will not have the limitations of

20   Antonick's system. *Id*. at 51 (discussing Ex. 83). Fatal to EA's "dictated by hardware" argument,

21   its videogame expert could not point to a single other contemporaneous game that used the same

22   system direction and tracking system as Antonick. Ex. 79, Lerner Dep. at 119-20.[27]

23        Finally, both Antonick's game and the 1990 Sega game expressed the field width using

24   inbound/outbound values that varied slightly depending on the algorithm. Ex. 81, Barr Rebuttal at

25

26   _____
     [27] EA's argument, Br. at 19, that the direction system in the Sega *Madden* game is "different"
     because it uses the values 8-15 to indicate the direction that the avatar is facing grasps at straws. In
27   Barr's opinion this simply represents an "extension" of Antonick's system, not a substantially
     different system. Ex. 81, Barr Rebuttal at 29. Critically, this extension had no impact on EA's
28   ability to copy Antonick's play coordinates. *See* Ex. 82, Zeidman Dep. at 148-49.

24-25. For example, both sets of code calculate the field width slightly "differently when the ball is in the air" than "when the ball is in a player's hands." *Id.* at 24-25. Both games contain this same variation even though an internal EA design document for a later 3DO version acknowledges the alternative of setting constant values. Ex. 83.

### c.    Football Plays/Formations and Initial Player Movements.

In Barr's opinion, EA's Sega Genesis game copied Antonick's "expression of offensive and defensive plays." Ex. 7, Barr Rep. at 94. The evidence of this is overwhelming. Most directly, Barr extracted play coordinates—that is, the avatar starting positions and initial movements—from Antonick's binary files. *Id.* at 106-13. His report displays the results in a graphical format and the similarities are visible even to a layperson. *Id.* at 109-113. Critically, Barr found that certain copied play coordinates ***will not fit*** on a correctly sized football field, making clear that EA either copied the coordinates directly from Antonick's data files or, alternatively, used Antonick's play editor—a protected development aid, *see infra* Part III.C—to generate the coordinates. *Id.* at 113; Ex. 81, Barr Rebuttal at 32. Both sets of source code use identical naming conventions—"offXX" for offensive plays and "defXX" for defensive plays—and matching plays generally have matching names in the code. Ex. 7, Barr Rep. at 99-104.[28] Finally, both sets of source code associate four unusual strings with specific plays: "double fl" "double se" "short zone" and "2 deep zone." Ex. 81, Barr Rebuttal at 22. EA's own expert's automated program identified these strings as among the top eight rarest. *Id.*[29] In short, Barr's analysis confirms Hawkins' testimony that the Sega game copied Antonick's "playbooks." Ex 2, Hawkins Dep. at 50.

Faced with incontrovertible evidence of copying, EA again distorts Barr's findings. It asserts without any basis that it "is undisputed that the expression of the plays in the code is different between the Antonick-coded games and Sega *Madden*" and that Barr identifies only

---

[28] *See Merch. Transaction Sys.,* 2009 WL 723001 at *13 (holding that while "individual field names may be limited in their expression . . . when incorporated into lines of code, they may become numerous enough and their selection and arrangement original enough that their combination constitutes and original work").

[29] Zeidman dismissed the matching strings as "common football terms" based on Google searches. When confronted with fact that ***none*** of the top search results for "double fl" related to football, he confessed that he searched for the terms plus the Boolean modifier "AND football," a process that inevitably results in at least some football related hits. Ex. 82, Zeidman Dep. at 187.

OPPOSITION TO EA'S THIRD MOTION FOR SUMMARY JUDGMENT                3:11-CV-01543-CRB

similarities in their "visual representation." *See* Br. at 20. In fact, the portion of Barr's report cited refers to a "review" of "source code." Ex. 7, Barr Rep. at 106.[30] Relying on its own misrepresentation, EA then simply ignores the evidence that it copied the *expression* of the plays in the code and associated data files. Nothing else explains the substantial similarity between the play coordinates embedded in the Sega Genesis source code and those in Antonick's data files.[31] Nothing else explains why certain common plays only fit on a mistakenly sized field, or why the source code of both games associates certain plays with unique strings, like "double fl."

Next, EA defends its copying by invoking the Copyright Office's rule that "functional physical movements *such as sports movements*" cannot be protected under the Copyright Act's provision for "pantomimes and choreographic works." Br. at 20. But the "work" here is a software program, not a football-themed ballet. Antonick is not trying to copyright "functional physical movements." What *is* protected under even the most cramped view of copyright is the selection of plays and the expression of those plays in the original game. *See e.g., Atari I*, 975 F.2d at 840; *Merch. Transaction Sys.,* 2009 WL 723001 at *8, 13; *Veritas*, 2008 WL 474248, at *10. Indeed, EA itself implicitly recognized the irrelevancy of the copyright rule when it licensed Madden's Raiders playbook to create "derivative" works. *See* Br. at 21 (quoting Sherringham Ex. 180).

Finally, EA argues that the plays "are not Antonick's work." *Id*. There are two flaws in this argument. First, the 1986 Contract gives Antonick a royalty in ***any*** Derivative Work. Ex. 6 § V. Once the jury concludes that EA's game constitutes a Derivative Work for which a royalty is specified, Antonick is entitled to that royalty. He is not required to parse the code element by element and prove that the copied elements are "[his] work." Antonick freely admits that Madden and Hawkins influenced the play selection and design. Madden received a royalty for his work while EA received the majority of profits. In any case, EA cannot show that the plays are not Antonick's work. As discussed, *supra* Part II.B, the game had plays long before Madden became

---

[30] Barr devotes a section to explaining why the "copying of Antonick's play data" is visible only by examining code and data files, "not by playing the game." Ex. 81, Barr Rebuttal at 115.

[31] Antonick's source code stored play coordinates in data files because the Apple II, unlike the Sega machine, was a "general purpose computer" with a read/write drive that allowed the user to create and save plays. Ex. 81, Barr Rebuttal at 31-32. This difference likely facilitated EA's copying because it could use the play editor to generate Antonick's play coordinates. *Id.*

23

involved. Moreover, while Madden provided his playbook to EA, incorporating it into the game was not "as simple as just thumbing through it and just circling the ones you want." Ex. 2, Hawkins Dep. at 57. As Hawkins testified: "There are no plays in [Madden's] play book. It's a construction kit [that] describes blocking; it describes formations. . . So it's basically got the dialect and the vocabulary, but then you have to create your own sentence structure." *Id*. Although Hawkins then went on to testify that he personally "create[d] every single one of the plays," this is an exaggeration by an individual whose ego is such that he also compared his involvement to "brain surgery." *See id.* at 58. The recordings of Antonick's meetings with Madden exist and show Antonick's critical role in the design and selection of plays. *See* Exs. 9, 75.

### d.      Player Ratings Structure and Data Templates.

As discussed *supra* Part II.B, Antonick and Hawkins collaborated to design a player rating structure for the game, which took the virtually infinite number of attributes that could be modeled and narrowed them to less than a dozen ratings per player. Hawkins confirmed that it took "years" to "develop" the player rating "structure" embodied in the game and that "once you've figured [it] out" there "is no reason to throw it away and reinvent it every year" because it was not platform specific but "universal." Ex. 2, Hawkins Dep. at 62-63; *see also* Ex. 3, Kawahara Dep. at 19. He further testified that the Sega Genesis game would have "honor[ed]" Antonick's ratings structure, although it might have "changed it" or "subsetted it." *Id.* at 62.

Barr's source code analysis confirms that EA "drew heavily" on the player rating structure of Antonick's game. Specifically, Barr concluded that EA's rating structure "subsetted" Antonick's by condensing a number of his ratings under two new variables called "abilitya" and "abilityb." Ex. 7, Barr. Rep. at 53-57. That is not a matter of speculation because Barr found non-functional comments in Simmons' code. *Id.* at 58; *see Atari Games Corp. v. Nintendo of Am. Inc.* 1993 WL 207548, at *5 (N.D. Cal May 18, 1993) ("*Atari II*") (copying "non-functional features" is "strong evidence of copying"). Also, Simmons' data templates are so similar to Antonick's that Barr concluded "the mathematical odds are strongly against such a similar outcome if Simmons had independently ordered the player types himself." Ex. 7, Barr Rep. at 62-63.

1          EA asserts that its ratings structure is "fundamentally different" because Antonick's system

2    used a total of 36 ratings with a maximum of 11 rated attributes per player while the Sega *Madden*

3    had only 16 with a maximum of 6. *See* Br. at 13. But as Barr explains, that is because Simmons

4    condensed certain of Antonick's position specific ratings under the generic variables "abilitya" and

5    "abilityb"—a fact confirmed by the non-functional comments in Simmons' code that reference

6    Antonick's ratings structure. Ex. 7, Barr. Rep. at 53-58. EA's only other alleged difference is the

7    use of supposedly "incompatible" scales. *See* Br. at 13. Here, EA simply misunderstands how the

8    ratings work. The scaled ratings in the code were drawn from "raw" ratings that ranged from 0-99.

9    Ex. 3, Kawahara Dep. at 57. Translating these raw ratings to a scale of 0-15 versus 0-9 is basic

10   algebra. Moreover, because, as EA concedes, each game manual revealed the rating scale, Br. at

11   13, the difference in scaling is the type of "trivial variation" that "just as strongly suggests an

12   inference that [EA] deliberately altered" the scaling "to hide evidence of copying" as it suggests

13   "independent creation." *Atari II*, 1993 WL 207548, at *6.

14         Similarly meritless is EA's argument that the player ratings structure is an uncopyrightable

15   "functional" system. Br. at 12. That Barr used the word "system" in describing aspects of the

16   player rating structure does not magically make it an uncopyrightable element. As Barr made clear,

17   Antonick picked certain attributes to embody in his source code from a "very large" list of

18   attributes. Ex. 7, Barr Rep. at 54. Antonick's ratings structure therefore is not a "functional system"

19   as that term is used in copyright law, but one of many possible data structures. This distinguishes

20   Antonick's player ratings from the accounting system at issue in the 100+ year old Supreme Court

21   precedent relied upon by EA. Br. at 12 *(citing Baker v. Selden*, 101 U.S. 99 (1879)); *c.f. Positive*

22   *Software Solutions, Inc. v. New Century Mortgage Corp.*, 259 F. Supp. 2d 531, 536 (N.D. Tex.

23   2003) (data structures not dictated by external factors are protectable expression).[32]

24         Finally, EA cannot meet its burden of showing that Antonick's ratings system is "based on

25   inherent elements of football and therefore not copyrightable under the *scenes a faire* doctrine." Br.

26   _____

27   [32] That the parties viewed the player ratings structure as copyrightable is clear from the fact that both Antonick and EA placed copyright notices on documents that describe player ratings systems—documents that under EA's post-litigation interpretation of copyright law would not be

28   copyrightable. *See e.g.,* Exs. 8, 11.

at 13. EA's own ex-CEO confirmed that it took "years" to develop the player ratings "structure" and evidence confirms Antonick and Hawkins spent several years exchanging and discarding various alternatives, culminating in a final 1987 design memo. Ex. 2, Hawkins Dep at 63; Ex. 1, Antonick Dep. at 270-72. Significantly, and fatal to EA's argument, even though EA's experts possessed source code for the rival games *Touchdown Football* and *Monday Night Football* (developed by Park Place), EA presents no evidence that either game had a similar player rating structure. To the contrary, Lerner opines that *Monday Night Football* had only a "simple" rating structure (although the basis for this opinion is unclear since he admits that he never reviewed that game's source code). *See* Ex. 63, Lerner Rep. at 35; Ex. 79, Lerner Dep. at 27-28.

**e.   Decision Points.**

A "decision point" is "a place in the code where something is being decided." Ex. 80, Barr Dep. at 138. Unlike most contemporaneous games that pre-determined play outcomes, the Antonick and Simmons games had "specific subroutines" that made "decisions every frame," *e.g.,* in real time. Ex. 7, Barr Rep. at 67; Ex. 80, Barr. Dep at 139. An "example of a decision point would be when the kicker kicks the ball." *Id.* A "first decision point is how strong and how accurately has he kicked it. And then a later decision point is . . . which defensive player is closest to the ball[,] whether they're good at catching and whether they catch it." *Id.* Both Antonick's and EA's code utilize individual player ratings only at specific decision points and contain numerous decision points that do not utilize player ratings data. Ex. 7, Barr Rep. at 67. The choice of decision points and the choice of which decision points will utilize player ratings are key creative elements of source code design. *Id.* at 69. Significantly, Simmons' source code draws upon player ratings data in 20 specific decision points copied from Antonick's game and contains only a *single* decision point not copied directly from Antonick's game—the trivial use of the rating "ability b" to vary an avatar's touchdown dance. *Id.* at 67-69. In Barr's opinion this level of similarity is "highly remarkable" and confirms that the Sega Genesis game "derived from Antonick's design." *Id.*

EA has only two weak responses. *First*, it takes a snippet of Barr's testimony out of context to argue that these remarkable similarities are merely "concept[]s." *See* Br. at 14. In context, it is clear that Barr was merely defining the term "decision point" in the abstract in response to the

26

1    question "What is a decision point?" Ex. 80, Barr. Dep. at 138. The actual identified similarities are

2    not abstract, but based on Barr's painstaking manual source code analysis during which he

3    identified the decision points by "looking for the places where these [ratings] variables . . . are

4    used." *Id.* at 140. Such analysis was never performed by EA's expert, who relied on automated

5    tools and whose understanding of Antonick's code was so rudimentary that he accidentally

6    included in his analysis source code from utility programs that were written in a ***completely***

7    ***different programming language***. *See* Ex. 82, Zeidman Dep. at 88-89.

8         *Second,* EA argues that the overlapping decision points are "inherent in football, and not

9    copyrightable." Br. at 14. Again, EA misrepresents Barr's analysis. Plaintiff does not claim a

10   copyright in football concepts such as a "fumble." But, while including a "fumble" feature may not

11   be creative, nothing inherent in football requires that source code draw upon individual player

12   ratings to determine when a fumble occurs. As EA's own videogame expert admitted, numerous

13   other ways exist for the code to make this determination: the code could (i) associate fumble

14   percentages with particular plays; (ii) randomly fumble fixed percentages of plays, or (iii) assign

15   fumble percentages to quarterback/receiver combinations. Ex. 79, Lerner Dep. at 126. Instead,

16   Simmons structured his code to draw upon individual player ratings to determine a fumble, and at

17   19 other decision points culled from Antonick's code—a "highly remarkable" similarity. Ex. 7,

18   Barr Rep. at 69. Significantly, EA's experts admitted that they had no idea whether the code of

19   either *Touchdown Football* or *Monday Night Football* draws upon player ratings at the same

20   decision points as Antonick's. Ex. 82, Zeidman Dep. at 173; Ex. 79, Lerner Dep. at 125.[33] This

21   failure to present "independent" evidence that Antonick's structure was "commonplace" dooms

22   EA's invocation of *scene a faire. See Swirsky,* 376 F.3d at 850.

23        **3.    EA Cannot Demonstrate Independent Creation.**

24        Having established a presumption of copying, the burden shifts to EA to show that it

25   independently created the subsequent *Madden* games. *Three Boys Music Corp.*, 212 F.3d at 486.

26   EA cannot satisfy this burden. It admits that it did not use a clean room to develop the Park Place

27   ────────────────────────

28        [33] Both of EA's experts had access to *Monday Night Football* and *Touchdown Football* source
     code. EA produced this code to Plaintiff only after Barr's initial report. Murray Decl. ¶ 84.

game, and that it lacks any other documentation showing independent creation. Ex. 44 at 5-6; Ex.

58. Moreover, as discussed *supra* Part III.A, EA allowed its employees with prior substantive

knowledge of and access to Antonick's source code and IP to also work with Simmons on the Sega

version. Rigorously documented clean room procedures are essential because the transfer of IP can

even occur unintentionally; without a clean room, Hilleman, in conversing with Simmons or Brook

would have found it virtually impossible to separate out knowledge gained from Antonick's work

from knowledge gained independently. Ex. 24, Kitchen Rep. ¶ 56. Indeed, even where clean rooms

have been used, courts have found them inadequate if they failed to prevent the developer from

taking advantage of its prior knowledge.[34] In the face of this evidence, EA merely proffers stale

declarations from Simmons and Hilleman stating that they didn't use Antonick's IP. This cannot

suffice to show an absence of material fact since the jury is entitled to judge their credibility. *See*

*e.g., Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967 (8th Cir. 2005).

**C.    EA Breached The Contract's Confidentiality Provisions By Using Antonick's Development Aids And Other IP To Develop Subsequent Games.**

The 1986 Contract had strict confidentiality provisions, which acknowledged that

Antonick's "Works" were "of a character which are or may be protectable by patent, trademark,

trade secrecy or copyright" and required EA to use "reasonable efforts to obtain and maintain

proprietary protection." Ex. 6 § 8.01. EA was also required to safeguard all Antonick's

"Confidential Information," defined to include Antonick's "source code" and "Development Aids"

unless the information was (i) "known to the general public"; (ii) "customarily disclosed" to others,

(iii) obtained from a "third party"; (iv) "independently derived from other sources" or (v) "required

to be disclosed" in litigation. *Id*. §§ 9.02-9.04. In Amendment 1 (Ex. 57), EA further agreed not to

"use" or even "provide" Antonick's "Development Aids" to "employees" or "third parties." EA's

own proffered witness on contract interpretation, William Kaiser, testified that the term

Development Aids should be interpreted broadly as referring to a "wide range of things" including

---

[34] *See, e.g., Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (criticizing clean room procedures because "Avant! was able to take advantage of its knowledge of the functions and the basic structure of the Cadence code"); *Nordstrom Consulting, Inc. v. M & S Technologies, Inc.*, 2008 WL 623660, at *7 (N.D. Ill. Mar. 4, 2008) (criticizing clean room procedures because defendant's employee "may have suggested solutions to difficulties encountered by the independent programmers in writing the new code").

28

"other software programs" and "schematic[s]" that could be "used" by an "artist" to assist in development. Ex. 59, Kaiser Dep. at 29. Kaiser's definition is consistent with the contract, which refers broadly to "all equipment, firmware and software utilities and any other development aids used or developed by the Artist." Ex. 6 § 5.05.[35] A reasonable jury could easily find that EA breached the above confidentiality provisions of the 1986 Contract.

To begin with, even if the elements of Antonick's source code discussed *supra* Part III.B.2 were not copyrightable, in Kitchen's opinion they would have been considered by industry participants at the time to be "proprietary and confidential information that would not have been shared with third parties absent the execution of non-disclosure agreements or other assurances of confidentiality." Ex. 24, Kitchen Rep. ¶ 26;[36] *cf., Religious Tech. Center v. Wollersheim*, 796 F.2d 1076, 1089-91 (9th Cir.1986). As such, EA violated the contract by using those elements.

EA also used other protected IP in violation of the confidentiality provisions of section 8 and 9 and Amendment 1 of the 1986 Contract. *First*, in Barr's opinion, EA's subsequent games used Antonick's methodology for instant replay. Though his original game lacked such a feature, Ex. 7, Barr Rep. at 118, 122, Antonick developed a utility program that allowed him to "replay" plays to debug the code. Antonick Decl. ¶ 10. He told Hilleman that this program could form the basis for an instant replay feature, and in a November 20, 1990 TDR document for the *John Madden Football 2.0* game he outlined his methodology. Ex. 7, Barr Rep. at 119; Ex. 61; Antonick Decl. ¶ 10. After comparing this TDR document to EA's instant replay source code, Barr concluded that EA used Antonick's methodology. Ex. 7, Barr Rep. at 119-22; *see also* Ex. 62 at 3-4, 6.[37]

In response, EA first argues that Antonick's instant replay methodology is not copyrightable. This argument simply ignores the contract's broad confidentiality provisions

---

[35] Antonick retained ownership of his Development Aids. *Id.* § 8.04.

[36] Kitchen bases his opinion on his "30 plus years" of game development experience, during which he developed numerous games, ran game development, negotiated numerous non-disclosure agreements and himself signed non-disclosure agreements. Ex. 60, Kitchen Dep. at 141-46.

[37] Barr could not review Antonick's source code because EA failed to preserve *John Madden Football 2.0* source code. If it matters, Antonick will testify that the instant replay methodology outlined in his TDR was the methodology he implemented in that game. Antonick Decl. ¶ 10.

29

1    intended to protect Antonick from the unauthorized use of any aspect of his work that is "of a

2    character" which "are or may be protectable" by "trade secrecy *or* copyright" and designated his

3    source code—not simply its copyrightable elements—as "Confidential Information." Ex. 6 §§ 8.01

4    & 9.02-9.04. In addition, EA's argument ignores that its use of Antonick's instant replay feature

5    breached its promise not to use his Development Aids. Because the instant replay feature was

6    originally developed as a debugging program to aid in development of the Apple II game and was

7    subsequently outlined in a TDR document, it clearly qualifies as "software" and as a "schematic"

8    that could be used to aid game development—both categories of "Development Aids" in the

9    opinion of EA's own witness Kaiser. Ex. 59, Kaiser Dep. at 29.

10           Similarly meritless is EA's argument that "instant replay was well-known in videogame

11    design at the time." Br. at 22, 24. EA bases this argument on a footnote in Lerner's report in which

12    he merely notes that (i) EA's *Earl Weaver Baseball* game, the source code of which he never

13    analyzed, had an instant replay feature, and (ii) his own flight simulation game had "one of the first

14    commercial implementations of replay." Ex. 63, Lerner Rep. at 39 n.50. But Antonick does not

15    claim that the idea of "instant replay" is proprietary. Instead, he claims that EA copied his

16    *methodology* for implementing it, which in Barr's opinion was one of many possible

17    methodologies. Ex. 7, Barr Rep. at 119-125.[38] Notably, while the design specs for the 1990 Sega

18    game called for an instant replay feature, the game as published lacked instant replay,

19    demonstrating it was not a feature easily implemented in a football game with 22 avatars constantly

20    in motion, regardless of how "well known" the idea was in the abstract. Ex.49 at Simmons0025;

21    Ex. 7, Barr Rep. at 122. The next version, *Madden '92*, released in 1991 and developed in-house by

22    Hilleman, was the first EA version to include an instant replay feature.[39]

23           As for EA's assertion that "Antonick's instant replay concepts differ significantly from the

24    instant replay features in other *Madden* games," the expert cited, Zeidman, admitted that he

25

26    _____

       [38] That Lerner's own games used two different methods of instant replay contradicts EA's
       suggestion that only one way exists to implement it. Ex. 63, Lerner Rep. at 39 n. 50.

27     [39] EA provided the *Madden '92* code in a corrupted format. Ex. 7, Barr Rep. at 122; Dkt 87 ¶
       27. Therefore, Barr analyzed code from *Madden '93*, released in 1991, and a jury could infer that

28     that game used the instant replay methodology of its immediate predecessor.

OPPOSITION TO EA'S THIRD MOTION FOR SUMMARY JUDGMENT                    3:11-CV-01543-CRB

1    reached this conclusion by "looking at a video game in operation" because "looking at the source

2    code to determine that the functionality occurs and how it occurs is a very difficult, very time-

3    consuming prospect." Ex. 64, Zeidman Dep. at 193-94. But the implementation—not the

4    appearance to the viewer—is the IP protected under the contract, and Zeidman's slapdash opinion

5    is therefore irrelevant. In any case, at best, it creates an issue of fact for the jury to resolve,

6    particularly since under the contract EA has the burden to demonstrate that it "independently

7    derived" its instant replay feature. Ex. 6 § 9.03.

8         *Second*, a reasonable jury could conclude that EA utilized Antonick's play editor, a

9    protected Development Aid, to copy Antonick's plays. As explained, *supra* Part III.B, Barr's

10   opinion is that EA either copied the play coordinates directly from Antonick's binary files or

11   copied them using Antonick's play editor. Ex. 80, Barr Dep. at 97; Ex. 62.

12        *Third*, in Barr's opinion, EA's games duplicate Antonick's game engine or the computer AI

13   which controlled the non-user controlled avatars. A core aspect of this IP was "the development of

14   a complex and innovative set of algorithms and subroutines" that Antonick "collectively termed

15   'angle of pursuit.'" Ex. 7, Barr Rep. at 74. The evidence demonstrates that Antonick and EA spent

16   considerable effort trying and discarding different solutions that played well and looked realistic.

17   *Id.*; *see also* Exs. 9 at 673; 65, 66, 67, 86. Antonick's code had several features that are not

18   "inherent in the game of football." *See* Br. at 16. For example, while a pursuer usually led the ball

19   carrier (*e.g.* plotted an intercept course), at small distances he would "head straight for the ball

20   carrier." Ex. 7, Barr Rep. at 78. This switch to a simpler calculation at small distances was

21   consistent with balancing realism and the Apple II's limited processing power. *Id*. Despite its far

22   greater processing power, the Sega game also switched from leading the ball carrier to heading

23   straight for the ball carrier at small distances. *Id.* at 79. Moreover, both games restricted pursuers to

24   lateral movements when the ball carrier was behind the line of scrimmage even though in a real

25   NFL game a player may or may not run parallel to the line of scrimmage in such situations. *Id.* at

26   77-79. In Barr's opinion, the evidence "strongly indicates" that Antonick's approach was used in

27   EA's later games. Ex. 7, Barr Rep. at 77. EA's argument that this methodology is not copyrightable

28   is simply irrelevant to breach of the 1986 Contract's confidentiality provisions. Similarly, EA's

31

1   assertion that "tackling ball carriers when they are within reach is behavior that is necessary to

2   model a realistic football simulation" ignores that Barr deliberately focused on analyzing the

3   elements of Antonick's methodology that (i) were adaptations to his slower machine and (ii) cannot

4   be explained by NFL rules. *See id.* at 74-79.

5   **D.   EA's Attacks On Plaintiff's Non-Royalty Contract Claims Fail.**

6         Although EA assured this Court that this motion would "not include arguments addressed

7   in earlier summary judgment motions," *see* Dkt. 279, its assurances have proven false. EA argues

8   that Plaintiff's other contract claims should be dismissed because he has "no evidence of damages

9   separate and apart from those stemming from his contract claim for allegedly unpaid royalties." Br.

10  at 2. EA made this ***exact same*** argument in its last summary judgment motion, *see* Dkt. 232 at 14,

11  and this Court rejected it, *see* Dkt. 288. In reasserting the same arguments, EA is, in effect, making

12  a request for reconsideration, *see, e.g., Castro v. Terhune*, 2010 WL 724683, at *2 (N.D. Cal. Mar.

13  1, 2010), which fails to comply with Local Rule 7-9(a). In any case, it is meritless because Lloyd's

14  report provides the jury with a basis for calculating damages based on disgorgement[40] and, in the

15  alternative, the royalty rates already agreed to by the parties would also be a reasonable measure of

16  damages for EA's breaches of the other contractual provisions. *See* Cal. Civ. Code § 3300.

17        EA's remaining objections to Plaintiff's other contract claims are meritless. *First*, as

18  discussed *supra* Part III.A & B, there are multiple material fact issues preventing summary

19  judgment that subsequent *Madden* games are not Derivative Works. Thus, Plaintiff's breach of

20  contract claims stemming from EA's failure to (1) place Antonick's name on copyright notices and

21  (2) offer Antonick a right of first refusal to develop Derivative Works, cannot be defeated on that

22  basis. *Second*, as discussed *supra* Part III.C, EA breached the confidentiality provisions of the 1986

23  Contract by using Antonick's Development Aids and other IP to develop subsequent *Madden*

24  games. *Third*, the 1986 Contract requires EA to "use reasonable efforts to obtain and maintain

25  proprietary protection" (defined to include protection under "patent, trademark, trade secrecy or

26

27        [40] *See* Ex. 68, Lloyd Rep. ¶¶ 6-7 & Table Six (listing total net revenues for each game on each
    platform); *see also* Ex. 69, Lloyd Dep. at 25-27. Moreover, Plaintiff's interrogatory responses
28  clearly reference injuries based on these breaches. *See, e.g.,* Exs. 62, 70.

OPPOSITION TO EA'S THIRD MOTION FOR SUMMARY JUDGMENT                    3:11-CV-01543-CRB

copyright" laws). Ex. 6 § 8.01. Contrary to EA's contention, the requirement to seek protection

under copyright law plainly includes the requirement to register copyrights in Antonick's games.

The contract specifically mentions "copyright registration" in the following section. *Id.* § 8.02. [41]

**E.      Material Issues Of Fact Prevent Dismissal Of Antonick's Fraud Claim.**

EA again raises arguments previously rejected by this Court. All are still without merit.

*First*, EA claims the fraud claim is duplicative of the contract claim. *See* Br. at 25-26. This Court

rejected this ***exact same*** argument at the motion to dismiss stage, holding that Hilleman's August

28, 1990 assurances to Antonick that the Sega version was being developed independently

"describes with particularity misconduct that is independent of Defendant's alleged breaches of the

1986 Contract." Dkt. 47 at 14. In an effort to wriggle out from this ruling, EA now contends that

the evidence is lacking because Antonick's notes of that conversation (Ex. 41) do not track word-

for-word his testimony. Nonsense. Antonick's notes are just that—notes. They do not purport to be

a transcript of the conversation with Hilleman. Nor is Antonick's deposition testimony somehow

irrelevant as a "*post hoc* recollection," Br. at 26, (whatever that means).[42] It is detailed and

consistent with the narratives of other witnesses. For example, Antonick remembered Hilleman

telling him that the Sega game would be more arcade-like. Ex. 1, Antonick Dep. at 19. Brook also

testified that EA first pitched the Sega game as an "arcade" game. Ex. 46, Brook Dep. at 13.

Antonick could not have tailored his recollection to Brook's because he was deposed before Brook.

There is additional evidence of fraud independent of the contract. In late summer/early fall

1990, after asking Antonick about the user interface for passing in his games, Gordon assured

Antonick that the Sega team was independently developing a different interface and was not

duplicating Antonick's work. Ex. 71 at 4. Gordon's affirmative oral misrepresentation that EA was

independently developing the Sega version did not itself violate the 1986 Contract, but was a

---

[41] Plaintiff incorporates by reference his arguments regarding these non-royalty breaches made in opposition to EA's second motion for summary judgment. *See* Dkt. 224 at 23-25.

[42] Antonick's deposition testimony has not been "proven false" because he testified that Hilleman told him "he won't be needed on Sega" even though he had already declined to code the Sega game himself. *See* Br. at 26. In the Decline Letter (Ex. 40), Antonick committed to give "aid" to EA as a condition to receiving Derivative Work royalties—royalties which, until that August 1990 call with Hilleman, Antonick believed he would receive. Ex. 1, Antonick Dep. at 18, 125.

33

gratuitous statement designed to gain control over Antonick's IP. Dkt. 47 at 14; *see also Portney v. CIBA Vision Corp.*, 2008 WL 5505517, at *6 (C.D. Cal. July 17, 2008) (allegations that defendant's employee represented to plaintiff that his technology was not being used state a claim for fraud independent from breach of royalties contract).[43] Furthermore, EA fraudulently induced Antonick to sign the 1991 Nintendo Termination Amendment by falsely promising that it would continue to protect his IP and not use it in subsequent games. *Supra* Part II.I. "One circumstance in which courts have routinely recognized the availability of both a fraud and a contract action is a case in which a party contends that it was fraudulently induced to enter into a contract." *Streamcast Networks, Inc. v. Ibis LLC*, 2006 WL 5720345, at *10 (C.D. Cal. May 2, 2006).[44]

*Second*, Antonick justifiably relied on EA's misrepresentations. It is not necessary that his "reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct" as long as it "played a substantial part." *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 976-77 (Cal. 1997). A presumption of reliance arises where, as here, the misrepresentation was material. *Id.* at 977. Antonick would never have continued to provide deliverables and technical documents to EA, nor spent considerable time explaining his IP to EA employees, if he had known that EA was secretly scheming to use his IP to develop other games without paying him. Ex. 12 at 4. Contrary to EA's claims, the 1986 Contract did not require Antonick to perform these tasks. It only required him to develop three games: the Apple II, Commodore 64 and IBM versions. Ex. 6 § IV. Only later, after EA's fraud had already

---

[43] Neither Hilleman nor Gordon can contradict Antonick's recollection because both testified that they had no recollection of any conversations with Antonick. *See* Ex. 20, Gordon Dep. at 14-15; Ex. 13, Hilleman Dep. at 61.

[44] EA's eleventh-hour affirmative defense of California Uniform Trade Secrets Act ("CUTSA") preemption, Br. at 26-27, is waived for failure to raise it in its Answer (Ex. 72). Fed. R. Civ. P. 8(c); *see, e.g., Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). Nor should the Court allow EA to amend its Answer. Plaintiff had no notice of this defense and, with only six weeks until trial, cannot amend his complaint to add a CUTSA claim. In any event, fraud claims are not preempted by CUTSA where, as here, the claim is based on the defendant's false promise to protect trade secrets and its fraudulent inducement to contract. *Martone v. Burgess*, 2008 WL 3916022, at *4 (N.D. Cal. Aug. 25, 2008); *Gabriel Technologies Corp. v. Qualcomm Inc.*, 2009 WL 3326631, at *13 (S.D. Cal. Sep. 3, 2009).

1    begun (unbeknownst to Antonick), did he agree to additional work.[45] During this time, Antonick

2    discussed the technical details of his games with EA employees who were simultaneously

3    developing the Sega version. *Supra* Part III.A. Antonick would never have undertaken new

4    contractual commitments to develop additional games if he had known EA was using his work

5    without his permission and without compensation. Likewise, Antonick would not have signed the

6    1991 Termination Amendment had he known that its assurances that his IP would be protected

7    were false. *Supra* Part II.I. Nothing in the 1986 Contract required him sign the Termination

8    Amendment. Given that EA's misrepresentations influenced Antonick to enter into these additional

9    contracts and to contribute additional IP, summary judgment is inappropriate. *Engalla*, 15 Cal. 4th

10   at 977; *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1169 (C.D. Cal. 2011).

11           *Third*, EA's argument that Antonick suffered no fraud damages is—like its argument that

12   Antonick suffered no damage as a result of its non-royalty breaches of contract—improper

13   reargument that fails to comply with Local Rule 7-9(a). *See supra* Part III.D. As discussed above,

14   Antonick suffered injury beyond that caused by EA's breach of its contractual obligations.

**IV.    CONCLUSION**

15

16           For the foregoing reasons, EA's third motion for summary judgment should be denied.

17

18    DATED: February 19, 2012                          HAGENS BERMAN SOBOL SHAPIRO LLP

19

20                                                      By    /s/ Leonard W. Aragon
                                                              LEONARD W. ARAGON

21                                                      Robert B. Carey (*Pro Hac Vice*)
22                                                      11 West Jefferson Street, Suite 1000
                                                        Phoenix, Arizona 85003
23                                                      Telephone: (602) 840-5900
                                                        Facsimile: (602) 840-3012
                                                        Email: rob@hbsslaw.com
24                                                             leonard@hbsslaw.com

25

26

27    ────────────────

28           [45] In July 1990, Antonick agreed to develop a second IBM version of *Madden*. Ex. 73. Then, in
      February 1991, he signed a new contract to develop the game. Ex. 74.

35

1   |   Stuart M. Paynter (226147)
2   |   Jennifer L. Murray (*Pro Hac Vice*)
    |   Sara Willingham (*Pro Hac Vice*)
3   |   THE PAYNTER LAW FIRM PLLC
    |   1200 G Street N.W., Suite 800
4   |   Washington, D.C. 20005
    |   Telephone: (202) 626-4486
5   |   Facsimile: (866) 734-0622
    |   Email: stuart@smplegal.com
6   |           jmurray@smplegal.com
    |           swillingham@smplegal.com

7   |   Shana E. Scarlett (217895)
8   |   HAGENS BERMAN SOBOL SHAPIRO LLP
    |   715 Hearst Avenue, Suite 202
9   |   Berkeley, California 94710
    |   Telephone: (510) 725-3000
10  |   Facsimile: (510) 725-3001
    |   Email: shanas@hbsslaw.com

11  |   Steve W. Berman (*Pro Hac Vice pending*)
    |   HAGENS BERMAN SOBOL SHAPIRO LLP
12  |   1918 Eighth Avenue, Suite 3300
    |   Seattle, Washington 98101
13  |   Telephone: (206) 623-7292
    |   Facsimile: (206) 623-0594
14  |   Email: steve@hbsslaw.com

15  |   Attorneys for Plaintiff Robin Antonick

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO EA'S THIRD MOTION FOR SUMMARY JUDGMENT                                    3:11-CV-01543-CRB