THE PAYNTER LAW FIRM PLLC
Stuart M. Paynter (226147)
Jennifer L. Murray (*Pro Hac Vice*)
Sara Willingham (*Pro Hac Vice*)
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
          jmurray@smplegal.com
          swillingham@smplegal.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
          leonard@hbsslaw.com

Attorneys for Plaintiff Robin Antonick

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBIN ANTONICK, an Illinois Citizen,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS INC., a California corporation,<br><br>Defendant. | Case No. 3:11-CV-01543-CRB<br><br>**PLAINTIFF'S OPPOSITION TO ELECTRONIC ARTS INC.'S MOTION TO STRIKE PORTIONS OF EXPERT REPORT BY GARRY KITCHEN**<br><br>Date:  March 22, 2013<br>Time:  10:00 a.m.<br>Judge:  Hon. Charles R. Breyer<br>Ctrm:   6, 17th floor<br><br>Date Complaint Filed: March 30, 2011<br>Trial Date:  April 1, 2013 |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. KITCHEN'S QUALIFICATIONS ..........................................................................................1

III. ARGUMENT ...........................................................................................................................2

    A. EA Fails To Specify What It Seeks To Strike Or Exclude............................................2

    B. Kitchen's Testimony Is Relevant And Reliable. ...........................................................3

        1. Kitchen Reliably Bases His Opinion That SNES 65C816 And Apple II 6502 Microprocessors Are In The Same Microprocessor Family On The Contract Definition. ...........................................................................................................4

            (a) Kitchen Bases His Opinion On The Contractual Definition. ................5

            (b) Kitchen Correctly Ignored The Unrelated Definition Of "Apple II Family Of Computers." .......................................................................5

            (c) Kitchen's Opinion Regarding Data Word Size Is Reliable. ..................6

        2. Kitchen's Opinion That EA Should Have But Did Not Institute A Clean Room Is Relevant And Reliable. ........................................................................7

        3. Kitchen's Opinion Regarding The Sega Development Schedule Is Reliable, Relevant And Confirmed By Percipient Witness Testimony. ..........................10

        4. Kitchen's Explanation Of Industry Dynamics In 1990 Is Relevant And Reliable. ............................................................................................................12

        5. Kitchen's Opinion That The 3% Royalty Rate Is Reasonable Is Relevant And Reliable. ....................................................................................................13

        6. Kitchen' Offers No Legal Conclusions On Trade Secret Or Copyright Law. 14

IV. CONCLUSION ......................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Davison v. Eldorado Resorts LLC*, 2006 Wl 585585 (D. Nev. March 10, 2006) ........................... 9

*Fahmy v. Jay-Z*, 835 F.Supp.2d 783 (C.D. Cal. 2011) .................................................................. 13

*Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) .................... 3, 13, 14

*Lego v. Stratos Intern., Inc.*, 2004 WL 5518162 (N.D. Cal. Nov. 4, 2004) ..................................... 2

*Morey v. Vannucci*, 64 Cal.App.4th 904 (Cal. Ct. App. 1998) ........................................................ 6

*Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216 (N.D. Cal. 2003) ..................................... 13

*U.S. v. Mendoza-Paz*, 286 F.3d 1104 (9th Cir. 2002) ..................................................................... 3

*Valladon v. City of Oakland*, 2009 WL 585804 ........................................................................... 14

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397 (S.D.N.Y 2003) .... 2, 3

*Wolf v. Superior Court*, 114 Cal. App. 4th 1343 (2004) ................................................................ 7

**STATUTES**

Cal. Civ. Code § 1641 ...................................................................................................................... 6

Cal Civ.Code § 2224 ...................................................................................................................... 13

**OTHER AUTHORITIES**

Wright, Miller & Kane, 10B Federal Practice and Procedure § 2738 ............................................ 2

## I. INTRODUCTION

The deposition of EA's industry expert Edward Lerner revealed that he reviewed neither deposition transcripts, nor development materials, nor the contracts between EA, Park Place and Simmons, but instead based his opinions largely on watching "minute or two" YouTube clips from which he concluded that EA's 1990 Sega Genesis game incorporated "no innovations" from Antonick's version. 10/15 Lerner Rep. at 36.[1] Counting on the best defense being a good offense, EA then hastily filed this motion to "strike" the report by Plaintiff's industry expert Garry Kitchen as "irrelevant, unreliable and inadmissible." In its haste, EA failed to specify what it seeks to "strike." Instead, the motion quotes purportedly objectionable snippets from Kitchen's report and deposition leaving both Plaintiff and the Court to guess what exactly EA wants excluded. This lack of clarity alone provides ground for denying EA's motion. Even had its objections been more specific, EA's motion is meritless, given Kitchen's 30+ years of experience in the videogame industry, as well as his careful review of relevant testimony, development materials and contracts.

## II. KITCHEN'S QUALIFICATIONS

Educated as an electrical engineer, Garry Kitchen has spent over 30 years in the videogame industry. 10/15 Kitchen Rep. ("10/15 Rep.") ¶¶ 2-3. Most recently, he served as VP of Game Publishing for Viacom Media Networks. 10/15 Rep. ¶ 10. He has "hands on technical and creative experience" in virtually all game genres, having been "directly involved in the design of hundreds of commercially released game products" across a "breadth" of platforms. 10/15 Rep. ¶ 3.[2] In addition, he has run game development companies, founding Absolute Entertainment, Inc., a console publisher that published over 100 titles. 10/15 Rep. ¶ 8. As its head, he had significant experience developing titles for both "the NES and Super NES" Nintendo platforms. Ex. 1, 12/14 Kitchen Rep. ("12/14 Rep.") ¶ 27.[3] In fact, his company "engineered the first English-language development system for the NES," which he licensed to other videogame companies. 12/14 Rep. ¶

---

[1] Attached as Ex. 63 to Dkt. 325, the 2/19/13 Declaration of Jennifer L. Murray in support of Pls. Opp'n to EA's Third MSJ ("Murray Decl.").

[2] Attached as Ex. 166 to Dkt. 301 , the 1/29/13 Decl. of Tia A. Sherringham in support of EA's Motion ("Sherringham Decl.").

[3] Exhibits attached to accompanying Declaration of Stuart M. Paynter unless otherwise noted.

1

27. He also was personally involved in porting games from the NES to the SNES platform. 12/14 Rep. ¶ 31. He also has significant experience developing or supervising the development of numerous games for the Sega Genesis platform, including the football videogame *ESPN Sunday Night Football*. 2/25/13 Declaration of Garry Kitchen ("Kitchen Decl.") ¶ 4.

### III.   ARGUMENT

**A.   EA Fails To Specify What It Seeks To Strike Or Exclude.**

A party seeking to strike or exclude evidence must show with "sufficient specificity" the "evidence to be excluded." *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397 (S.D.N.Y 2003).[4] Generally, this requires pointing to "particular" testimony or document. *Id.* Where the "requested relief is too vague," the motion should be denied. *Lego v. Stratos Intern., Inc.*, 2004 WL 5518162, at *1 (N.D. Cal. Nov. 4, 2004).

EA's slapdash motion fails to meet this standard. It quotes variously from Kitchen's three reports and deposition. Then, it requests the exclusion of the "opinions and testimony" discussed therein. Br. at 15. It nowhere specifies by paragraph or other means exactly what it seeks to "strike" or "exclude." It is unfair to require Plaintiff to guess. For example, EA devotes a section to arguing that Kitchen "impermissibly opines on copyright and trade secret law" but the only reference to a specific portion of Kitchen's report is an uncited quotation on page 14 of EA's brief. Plaintiff must therefore guess whether EA seeks to strike that entire section of Kitchen's report, or merely quibbles with the phrasing of the quoted sentence. EA's Proposed Order provides no more clarity. It requests that the Court "strike" the "following opinions from Mr. Kitchen's report" and then lists six bullet points that describe at a high level of generality the "opinions." Dkt. 300-1. Again, Plaintiff must guess what exactly EA wants stricken. For example, EA's Proposed Order seeks to "strike" Kitchen's "opinion" that "EA's failure to institute a clean room would have made it almost impossible for EA to develop Sega Madden without using Antonick's intellectual property." Dkt 300-1, at 2. This sentence, however, condenses numerous separate opinions including: (i) that clean rooms are used for software development; (ii) that EA should have used a

---

[4] *cf*, Wright, Miller & Kane, 10B Federal Practice and Procedure § 2738 ("a motion to strike should specify the objectionable portions" of a document.)

1  clean room because a failure to do so can result in a transfer of IP; (iii) that EA did not use one; (iv)
2  that the involvement of EA employees in the development of both games would make it "almost
3  impossible" to avoid using Antonick's IP; and (v) that this transfer of IP could have been
4  inadvertent. Without reference to paragraphs or lines of Kitchen's report, Plaintiff does not know
5  whether EA is objecting to all Kitchen's testimony regarding clean rooms or only his specific
6  conclusion that under the circumstances of the case, the failure to use a clean room makes it likely
7  that EA used Antonick's IP.[5]

8  **B.    Kitchen's Testimony Is Relevant And Reliable.**

9  An expert may testify "in the form of an opinion or otherwise" if his or her "specialized
10 knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."
11 F.R.E. 702. An expert may be qualified by "knowledge, skill, experience, training or education."
12 *Id.* Nothing in Rule 702 limits expert testimony to application of a "scientific" methodology. The
13 advisory committee's note expressly states that "experience alone" may provide "sufficient
14 foundation" and that "[i]n certain fields experience is the predominant, if not sole, basis for a great
15 deal of reliable expert testimony. Fed. R. Evid. 702. The Ninth Circuit has repeatedly emphasized
16 that when "non-scientific testimony" is offered "the *Daubert* factors . . . simply are not applicable"
17 since its "reliability depends heavily on the ***knowledge and experience*** of the expert, rather than
18 the methodology or theory behind it." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998,
19 1017-1018 (9th Cir. 2004); *see also U.S. v. Mendoza-Paz*, 286 F.3d 1104, 1112 (9th Cir. 2002)
20 (rejecting request to exclude non-scientific expert testimony on the ground it was "not subject to
21 empirical testing"). A party seeking to exclude expert testimony before trial must demonstrate that
22 the "evidence is clearly inadmissible on *all possible grounds*." *Weiss v. La Suisse, Societe*
23 *D'Assurances Sur La Vie*, 293 F.Supp.2d 397, 408 (S.D.N.Y. 2003) (emphasis added).

24 Here, as discussed in more detail below, EA cannot meet its burden of demonstrating
25 inadmissibility because Kitchen's testimony easily qualifies as both relevant and reliable.

---

[5] EA devotes much of its brief to citing purportedly objectionable deposition answers. *E.g.,* EA Br. § III.B (citing one sentence of Kitchen report and over 20 deposition pages). Objections to specific deposition answers should be addressed at trial if Kitchen similarly testifies. EA cannot bootstrap a deposition objection into a basis for "striking" entire portions of Kitchen's report.

1. **Kitchen Reliably Bases His Opinion That SNES 65C816 And Apple II 6502 Microprocessors Are In The Same Microprocessor Family On The Contract Definition.**

Last October, EA moved for summary judgment based on the assertion that "none" of its subsequent games were in the "same microprocessor family" as Antonick's games. EA's Second MSJ, Dkt. 194 at 1 n.1. To support this assertion, EA cited only its own interrogatory response, a remarkable failure since applying the contractual definition of "Microprocessor Family" to specific platforms clearly requires expert guidance. That definition reads in full:

> "Microprocessor Family" means a single microprocessor and all related microprocessors that utilize the same instruction set and have the same instruction and word data size. Examples of Microprocessor Families include the Motorola 68000, the Intel 8086 and the 6502.

1986 Contract, §1.04.[6] Relying on Kitchen, Plaintiff responded by pointing out that the 65816 (also called 65C816) processor used in the SNES console was in the same "Microprocessor Family" as the 6502 chip used in the Apple II computer, for which Antonick developed the original game. Pl's Opp. to EA's Second MSJ, Dkt. 224 at 14-15. Moreover, Kitchen noted, Antonick also developed a game for the Apple IIGS computer, which, as EA concedes, Br. at 4, used the *same* chip as the SNES.[7] Since EA released multiple games for the SNES, EA's statement that "none" of Antonick's games were in the "same Microprocessor Family" as its subsequent games was incorrect.

In reply, EA argued that Kitchen's opinion was unreliable because it "ignored" another defined contractual term, "Apple II Family of Computer," and also because Kitchen was mistaken about the "data word size." EA's Reply ISO Second MSJ, Dkt. 232 at 13-14. The Court rejected these arguments, holding that there were "genuine issues of material fact" as to "whether the [SNES] and TurboGrafx games are in the same microprocessor family as the Apple II." 1/28/13 Order, Dkt. 288. Rather than accept this considered judgment, however "misguided" EA felt it to be,[8] EA now resuscitates these rejected arguments. Nothing has changed in the last month, and the Court should reject them again.

---

[6] Sherringham Decl., Dkt. 301, Ex. 15.

[7] Even if the SNES chip were not in the 6502 family, under Amendment 1, Antonick's development of the Apple IIGS game would have revived his first refusal rights for the 65816 microprocessor. Murray Decl., Dkt. 325, Ex. 57.

[8] 1/25/13 Summary Judgment Hearing Tr. at 19:2

4

### (a) Kitchen Bases His Opinion On The Contractual Definition.

Accordingly to EA, Kitchen "readily admitted that his opinion is not based on the language of the Contract." Br. at 4. Not true. Kitchen reviewed EA's interrogatory response listing subsequent games and associated platforms and "[u]sing the contractual definition of 'microprocessor family,'" he "identified five microprocessor families". 10/15 Rep. ¶ 23. He specifically opined that "the microprocessors within each group" met "the contractual requirement of using the 'same instruction set' and the 'same instruction and data word size.'" *Id.* ¶ 24. Nor did Kitchen "admit" anything different in his deposition:

> Q: And ***based on your review of all of those amendments and the contract***, it's your opinion that the microprocessor within the Super Nintendo falls within the same microprocessor family as the microprocessor within the Apple II; is that correct?
> A: **Yes**.

Ex. 2, Dep. at 203 (emphasis added). EA's assertion that Kitchen's report does anything other than apply the definition of "Microprocessor Family" contained in the contract is baseless.

### (b) Kitchen Correctly Ignored The Unrelated Definition Of "Apple II Family Of Computers."

In late 1987, the parties executed Amendment III modifying the delivery schedule for the original Apple II game and adding delivery schedules for Apple IIGS, IBM and Commodore 64 versions. 1986 Contract, Am. III. Because Amendment III distinguished between various Apple games, it contained a new definition of "Apple II Family of Computers":

> The Apple II Family of Computers shall mean all Apple II computers based on the 6502 8-bit microprocessor including the Apple II, Apple II+, Apple IIe and Apple IIc but excludes the Apple III and the Apple IIGS.

1986 Contract, Am. III, at 1. According to EA, this "clear" contractual language shows that the parties "excluded" the Apple IIGS from the Apple II 6502 Microprocessor Family and, by implication, excluded the SNES because it used the same microprocessor as the Apple IIGS. Br. at 5. There are two fatal flaws in this argument.

First, the definition cited by EA defines a family of "Computers," not a family of "Microprocessors." Therefore, it cannot logically modify the contractual definition of "Microprocessor Family." If anything, the fact that EA felt it necessary to expressly *exclude* the Apple IIGS from the phrase "Apple II computers based on the 6502 8-bit microprocessor" implies that, at the time, EA believed that the Apple IIGS would otherwise be encompassed within that

5

definition. Otherwise, the express exclusion of the Apple IIGS would be surplusage. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part.")

Second, the definition of "Apple II Family of Computers" also excludes the Apple III computer even though it had the *same* 6502 processor as the Apple II. Kitchen Decl. ¶ 2. Although Plaintiff's counsel pointed this out at the last oral argument in the presence of the EA attorney who signed this motion, EA not only ignores this fact but deliberately excises and replaces with ellipses the phrase "the Apple III" when quoting the definition of "Apple II Family of Computers."[9] EA has good reason for such evasion. The parties' exclusion of *both* the Apple III (6502 processor) *and* the Apple IIGS (65816 processor) cannot be reconciled with EA's current stance that the exclusion of the Apple IIGS implies that it is not in the 6502 "Microprocessor Family."

### (c) Kitchen's Opinion Regarding Data Word Size Is Reliable.

The 65816 microprocessor "powered up" in an 8-bit emulation mode that possessed the exact same "instruction and word data size" as the 6502 and had "full compatibility with the 6502 instruction set." 12/14 Rep. ¶ 35. Thus, in Kitchen's opinion, it meets the definition of "Microprocessor Family" in the contract. Bolstering that opinion, Western Design Center, Inc., the creator of the 65816 microprocessor "categorizes" it and the 6502 as "part of the 65xx" family and explicitly refers to the 65816 as possessing "***both*** 8-bit and 8/16-bit" instruction set architecture. 12/14 Rep. ¶¶ 19-22 (emphasis added).

EA seizes on the fact that the 65816 *also* had a 16-bit mode to argue that this means the instruction set is "different". At best, these dual modes make the contractual definition ambiguous as applied to the 65816. *Id.* ¶ 35. Given this potential ambiguity, the Court should look at the overall intent and purpose of the parties. *Morey v. Vannucci*, 64 Cal.App.4th 904, 912 (Cal. Ct. App. 1998). Since this is a software development contract, a logical assumption is that in grouping microprocessors into families, the parties focused on the degree to which code from one microprocessor could run on another. From that perspective, the 6502 and 65C816 microprocessors clearly belong in the same family since the "65C816 microprocessor . . . was completely backward compatible with the 6502." 12/14 Rep. ¶ 35. In fact, Kitchen has personal experience running

---

[9] 1/25/13 Summary Judgment Hearing Tr. at 47:23-48:16; Br. at 4.

1  "6502 code on the 65C816 processor powering the SNES platform." *Id.* ¶ 31.[10] EA's uncited

2  assertion that Kitchen testified that the difference in bit size "confirmed that the actual *JMF* game

3  designed and released for the SNES was ***different*** in every material way from the Apple II game"

4  is simply a wholesale fabrication. Br. at 6.

5        Finally, to the extent the contractual definition of "microprocessor family" as applied to the

6  65816 is ambiguous, the Court may look to industry practice. *Wolf v. Superior Court*, 114 Cal.

7  App. 4th 1343, 1355 (2004) (court should have admitted expert testimony on industry custom and

8  usage of the ambiguous term "gross receipts"). In Kitchen's opinion, this also supports Plaintiff's

9  interpretation. In fact, Mr. Kitchen testified that "[a]nyone who has worked in the gaming industry

10  would think it would be foolish to characterize" the 6502 and 65C816 "in separate microprocessor

11  families." Dep. at 216. This opinion is reliable given Mr. Kitchen's 30+ years in the gaming

12  industry, including specific contemporaneous experience designing games for both the 6502 and

13  65816 microprocessors. *See supra* Part II.

14        **2.**    **Kitchen's Opinion That EA Should Have But Did Not Institute A Clean Room Is Relevant And Reliable.**

15  EA told Artists that if it terminated its relationship with them but continued to market

16  software with similar functionality, it would develop those subsequent games in a clean room

17  development environment. Pl's Opp. to EA's Third MSJ, Dkt. 323 at 11. This statement is

18  consistent with the 1986 Contract's requirement that EA bear the burden of proving

19  "independent[]" development. 1986 Contract, § 9.03. In Kitchen's opinion, EA needed to institute

20  rigorous clean room development procedures to prevent the transfer of Antonick's IP to subsequent

21  games, but, by allowing Hilleman and Cronce, who had been intimately involved in the

22  development of Antonick's game, to also work on the 1990 Sega Genesis game, EA failed to do so.

23  10/15 Rep. at ¶ 39. As Kitchen explains, without a clean room, the improper use of prior IP "may

24  occur unintentionally." *Id.* ¶ 56.

25        Contrary to EA's arguments, Kitchen's report is not a "closing argument" but an expert

26  opinion that will help jurors understand the definition of a "clean room" and whether or not EA

27

28      [10] While EA's is right that the SNES game could not run NES games, this was "not due in any way to the design of the 65C816 microprocessor" but to the graphics and sound chips. *Id.* ¶¶ 31-32.

7

instituted one here. Moreover, jurors might incorrectly believe that Plaintiff's IP could not have been used unintentionally.[11] EA has already made clear that the thrust of its case will be reliance on "percipient witness[es]" who will say they don't "recall" using any of Antonick's IP. Dk. 291, Ex. F. Far from being "unduly prejudicial" to EA, Br. at 8, Kitchen's testimony will allow Plaintiff to counter EA's story, which otherwise may be given undue weight by the jury, by explaining how IP can be misappropriated unintentionally in the absence of rigorous clean room procedures.

Nor is it true that "EA has never claimed that it set up a formal cleanroom during the development of *Sega Madden*." Br. at 8. In fact, EA *did* claim at the time that it would use a "clean room," and later specifically told Antonick that it was developing the Sega version "independently" with a different "team" —clear invocations of clean room development procedures. Pl's Opp. to EA's Third MSJ, Dkt. 323 at 11. Regardless of EA's current defenses, Plaintiff's fraud claim entitles him to introduce expert testimony explaining what a "clean room" is and proving that EA's assurances in that regard were dishonest. Separate and apart from the fraud claim, Plaintiff is also entitled to use Kitchen's testimony to show that EA breached the 1986 Contract's requirement of "independent[]" development. Moreover, although EA now concedes that it never "set up a *formal* clean room," its careful phrasing leaves it plenty of wiggle room to continue to claim "independent" development, and in fact, its currently summary judgment motion attaches a Hilleman declaration stating that he never talked to Simmons about "any aspect" of Antonick's game—a clear reference to clean room principles. 12/8/11 Hilleman Decl., Dkt. 291, Ex. F. Kitchen's testimony is therefore indisputably relevant.

Excluding Kitchen's opinions regarding EA's lack of clean room procedures would be particularly unfair because EA's own industry expert Edward Lerner has an entire section of his initial (not rebuttal) report on this area, entitled:

> IT WOULD HAVE MADE NO TECHNICAL OR DEVELOPMENTAL SENSE
> TO BUILD A FOOTBALL VIDEO GAME FOR THE SEGA GENESIS FROM
> CODE WRITTEN FOR THE APPLE II, COMMODORE 64 AND IBM PC.

10/15 Lerner Rep. § VIII. Unlike Kitchen, Lerner reviewed no evidence before coming to this conclusion. Ex. 3, Lerner Dep. at 25-29, 44-46. His report cites nothing except a Google translation

---

[11] Unlike Plaintiff's fraud claim, the contract claim does not require that EA acted intentionally.

8

1  of "Mary had a little lamb" from "English to Korean, then from Korean back to English." 10/15
2  Lerner Rep. at 42. EA cannot credibly claim that Kitchen's opinions regarding the lack of a clean
3  room represent impermissible "closing argument" style expert testimony while simultaneously
4  proffering the Lerner testimony in Section VIII of his report. If the Court grants EA's motion, in
5  whole or in part, Plaintiff requests that the Court strike Section VIII of the Lerner report.

6      EA's other attacks on Kitchen's clean room testimony are meritless. *First,* citing a single
7  deposition answer, EA misleadingly suggests that Kitchen's opinion that it would have been
8  "almost impossible" to develop the Sega game without using "Antonick's IP" is based "solely" on
9  the lack of a clean room. Br. at 6 (citing Kitchen Dep. 112:25-113:15). In fact, that opinion is based
10 not only on the lack of a clean room, but also documents indicating a flow of IP from EA to Park
11 Place, Simmons' lack of experience programming football simulations, and the development
12 schedule (discussed *infra* B. 3.). *See* 10/15 Rep. ¶¶ 39-57. To the extent that EA contests the
13 answer Kitchen gave when deposed, that can be addressed at trial if and when the need arises.

14     *Second,* citing Kitchen's failure to list "clean rooms" on his resume as an area of expertise,
15 EA argues that he has "admitted that he is not an expert in clean room procedures." Br. at 7. In fact,
16 contradicting EA's assertion that he has "never . . . implemented a clean room," Br. at 7, Kitchen
17 testified that he "personally" implemented a clean room at least once. Dep. at 228. Kitchen
18 testified that he "understand[s] what a clean room is" and "understand[s] how to implement it."
19 Dep. at 16. Kitchen is clearly qualified to testify about clean room development procedures.[12]

20     *Finally*, EA claims that Kitchen's "clean room" testimony is "predicated on a fundamental
21 misreading of the 1986 Contract regarding what constitutes "Antonick's IP." Br. at 7. EA nowhere
22 explains the connection between Kitchen's clean room testimony and his alleged "misreading of
23 the 1986 Contract." In any case, EA's argument is spurious. Kitchen did not assume that "any
24 knowledge or insight acquired" during game development would be "proprietary." Br. at 7-8.
25 Instead, in the passage quoted by EA, he limited his definition of "proprietary" to information that,
26 based on his years of experience, would typically have been covered by "confidentiality

27
28     [12] *See Davison v. Eldorado Resorts LLC*, 2006 Wl 585585 (D. Nev. March 10, 2006) (witness qualified as forensic expert even though he did not refer to himself as "an expert in forensics")

9

agreements." Dep. at 88. That definition is consistent with the contractual definition of "proprietary," which expressly references "trade secrets," and with the 1986 Contract's broad definition of Antonick's "Confidential Information" to include "source code" and "Development Aids." 1986 Contract, § 8.04. Nor did Kitchen incorrectly "assume[]" that Antonick, not EA, "owns all 'proprietary rights in the game' (including trade secrets)." Kitchen explicitly stated that he expressed no opinion on that issue. *See* Dep. at 258 ("Where the line is drawn between what he owns and what EA owns, I can let the lawyers figure that out.").[13]

### 3. Kitchen's Opinion Regarding The Sega Development Schedule Is Reliable, Relevant And Confirmed By Percipient Witness Testimony.

Simmons originally declared that he coded 1990 Sega Genesis game in "six months" and the "only input or direction" that he received from EA was "high level design and features." 11/11/09 Simmons Decl., Dkt. 178, Ex. 15 ¶ 2. The documentary evidence demonstrates—and he subsequently admitted—that EA provided detailed design documents, play diagrams, play calling tables, and player ratings. Pl's Opp. to EA's Third MSJ, Dkt. 323 at 7-9. Lengthy in-person meetings and weekly calls between Hilleman and Simmons also took place. *Id*. Although Simmons has essentially conceded that his original statement was false, EA has not, and continues to contend that "Simmons had his own vision for the football game and built the game from the ground up" and that "no one from EA ever spoke to Simmons about any aspect of Antonick-coded games."[14] To bolster its story, EA's industry expert opines that it "is not at all surprising that *Madden* Genesis was completed in under a year." 10/15 Lerner Rep. at 5.[15]

In Kitchen's opinion, it would have been "almost impossible" for Simmons to have developed the Sega Genesis game without "substantial assistance" from EA—assistance which the factual record demonstrates came largely from Hilleman, who had intimate knowledge of Antonick's game. 11/30 Rep. ¶¶ 12-13. Kitchen found particularly unbelievable the idea that

---

[13] Antonick always retained "ownership" of his source code and Development Aids and if EA committed a material breach all "proprietary" rights reverted to him. *See generally,* 1986 Contract, §§ 8.04, 9.02, 12.02, 12.04; Pl's Opp. to EA's Third MSJ, Dkt. 323 at 10-11, n.12.

[14] EA's Fifth Am Resp to Plaintiff's Interrogatory No. 3, Murray Decl., Dkt. 325, Ex. 28.

[15] Lerner bases his opinion largely on his experience developing a flight simulator with "an exceptionally talented and fast programmer" in 9 months – a 50% more time than it took Simmons to design and develop *Madden* alone. *Id.* at 5.

10

1  Simmons could take a game, which in July 1990 consisted of 22 avatars running aimlessly around
2  the field, and convert it to 11x11 players on a fully realized field of play with outcomes calculated
3  in real time based on individual player ratings. 10/15 Kitchen ¶ 49. Since the average juror has no
4  way of evaluating the credibility of EA's claim that Simmons developed the Sega Genesis version
5  of *Madden* from scratch essentially unassisted in 6 months, Kitchen's testimony clearly qualifies as
6  "scientific, technical, or other specialized knowledge" that will assist the jury. F.R.E. 702. Thus,
7  EA's arguments for excluding Kitchen's testimony are meritless.
8  *First*, EA claims that Kitchen's opinion is unreliable because he did not "look[] at any
9  source code, talk[] to a single witness" or "play[] the games in question." Br. at 9. While Kitchen
10 did not interview witnesses, he reviewed relevant deposition transcripts of witnesses involved in
11 the development of the Apple II and Sega Genesis games. 10/15 Rep. ¶ 12; 11/30 Rep. ¶ 2; Dep. at
12 107, 200. Like EA's own industry expert, he did not review source code because he was not
13 offering an opinion on substantial similarity of the code, but he did review the Barr and Zeidman
14 reports. Dep. at 41; 12/14 Rep. ¶ 1. Kitchen also reviewed hundreds of pages of development
15 materials related to Antonick's game and the 1990 Sega Genesis game. 10/15 Rep. ¶ 12. Finally,
16 Kitchen reviewed the original contract with Park Place, which was labeled a "consulting"
17 agreement and explicitly anticipated that EA would provide substantial "technical" assistance."
18 10/15 Rep. ¶¶ 12, 46-47. In addition, he reviewed the agreement between Park Place and Jim
19 Simmons, which anticipated a release date of March 31, 1990 for the game. 10/15 Rep. ¶¶ 12 & 61.
20 Kitchen also based his opinion on his experience developing or supervising the
21 development of "hundreds" of videogames, including numerous games for the Sega Genesis. 10/15
22 Rep. ¶¶ 3, 8; Kitchen Decl. ¶¶ 3-7. He also testified he had the expertise to personally code a
23 football game himself if hired to do so. Dep. at 33. In fact, while Kitchen was President, CEO and
24 head of development, Absolute Entertainment developed the football simulation videogame, *ESPN*
25 *Sunday Night Football,* for the Sega Genesis. Kitchen Decl. ¶ 4. As for playing Antonick's game,
26 EA does not explain how or why that is relevant. In any case, Kitchen played "a lot" of Genesis
27 games during his career and certainly may have played Simmons' 1990 game. Dep. at 46. Given
28 that EA's own expert reviewed no testimony or development documents, yet still opines on the

11

plausibility of the development schedule, EA cannot credibly claim that the opinion of Kitchen, who did actually review the evidence, is unreliable.

*Second*, Kitchen's opinion is not unreliable because he should have and failed to "control for" Simmons' supposedly preternatural programming ability—an assertion at odds with the evidence that in July 1990, months after his contract was signed, the game consisted of 22 avatars running aimlessly around the field. Br. at 9; Pl's Opp. To EA's Third MSJ, Dkt. 323 at 8; Simmons Contract, Murray Decl., Dkt. 325, Ex. 52. Given this, Kitchen rightly disregarded Lerner's assertion that Simmons "earned a reputation for speediness." 11/30 Lerner Rep. at 5. In any case, as Kitchen made clear, his opinion, based on his extensive experience, was that no solitary programmer, regardless of their talents, could have independently developed the *Madden* game in six months without "substantial" assistance. Dep. 281-282.

### 4. Kitchen's Explanation Of Industry Dynamics In 1990 Is Relevant And Reliable.

Videogame sales are seasonal with the holiday months comprising a crucial season. 10/15 Rep. ¶ 59. 1990 was a particularly dynamic year as the Sega Genesis rapidly gained consumer acceptance, surpassing 1 million in sales by mid-year. *Id*.¶ 58. In Kitchen's opinion, these trends made it "highly desirable" for EA to accelerate the 1990 Sega Genesis version's release from March 1991 to December 1990. *Id.* ¶ 61. Indeed, the 1990 holiday season gave EA a "unique window" to "establish the game as the pre-eminent sports title on the Sega platform" because Sega had run into development delays with its own game *Joe Montana Football* and contracted with EA to finish it. *Id.* ¶ 63. In Kitchen's opinion, EA's ability to "release in 1990 prior to the holiday season while simultaneously gutting its own competitors' game contributed substantially to its later dominance of the Sega platform." *Id.* ¶ 64. Kitchen's opinion is supported by the Hawkins' testimony that EA designed the *Joe Montana* game to be "notably inferior to *Madden*." Hawkins Depo., Murray Decl., Dkt. 325, Ex. 2 at 67-68.

According to EA, Kitchen's opinion is inadmissible because he did not "conduct" any "econometric, regression or comparative analysis," but instead relied on his experience. Br. at 11. As discussed, *supra* Part III. B., nothing in Rule 702 requires that Kitchen conduct a regression analysis or analyze "sales data," Br. at 11, before opining on industry conditions. Rather, as an

OPPOSITION TO MOTION TO STRIKE PORTIONS OF EXPERT REPORT BY GARRY KITCHEN 3:11-CV-01543-CRB

1 industry expert, he is entitled to rely on his substantial experience—experience which spans the
2 relevant time period and includes the Sega Genesis platform. Kitchen Decl. ¶ 3-7; *see Hangarter*,
3 373 F.3d at 1017-1018. Nothing in the *Robinson* case cited by EA compels a different conclusion.
4 That case involved *scientific* testimony regarding the link between a particular drug and the
5 plaintiffs' injuries and is therefore irrelevant to the admissibility of Kitchen's testimony here. *See*
6 *Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216, 1221 (N.D. Cal. 2003).

7 Finally, EA claims that Kitchen's opinion regarding industry dynamics in 1990 should be
8 excluded as "not relevant to any issue in this case." Br. at 12. In fact, these opinions are relevant to
9 at least two issues. Most obviously, they are relevant to explaining EA's motivations for copying
10 Antonick's IP. Without an understanding of industry dynamics in 1990, the jury will lack context
11 for understanding the pressure on EA to release *Madden* in the 1990 holiday season. Kitchen's
12 testimony is also relevant to Plaintiff's request that EA disgorge the profits of its fraud. *See, e.g.,*
13 *Fahmy v. Jay-Z*, 835 F.Supp.2d 783 (C.D. Cal. 2011); Cal Civ.Code § 2224. That Plaintiff's
14 damages expert did not "rely" on Kitchen's testimony does not bar its admission because it will not
15 be introduced to calculate damages, but to meet Plaintiff's minimal burden of showing a "nexus"
16 between the wrongful conduct and EA's profits. *See id.* For the same reason, the fact that Kitchen
17 was not "trying to quantify any economic benefit to EA" does not bar the testimony's admission.

18     **5.    Kitchen's Opinion That The 3% Royalty Rate Is Reasonable Is Relevant And Reliable.**
19 Amendment VIII lists a series of deliverables related to Nintendo and Sega "Derivative
20 Works" and provides for a 3% royalty rate. 1986 Contract, Am. VIII. Plaintiff will testify that he
21 provided the listed deliverables. Since the Sega versions at issue constitute Derivative Works,
22 Plaintiff will argue at trial that EA cheated him out of his royalties. EA devoted nearly half of its
23 second summary judgment motion to arguing that Plaintiff's commonsense reading of Amendment
24 VIII was "unreasonable" because he did not actually "code" that game. EA's Second MSJ, Dkt.
25 194 at 8 n. 4, 9-10 & 15. Going beyond four corners of the contract, EA's expert Lerner opines that
26 "in his experience, artists like Mr. Antonick receive dramatically different royalty rates for
27 'Derivative Works by Artist' than 'Derivative Works by Publisher.'" 11/30 Lerner Rep. ¶ 9. EA
28 additionally relies on a declaration from its ex-CFO William Kaiser that he couldn't "recall any

13

1 instance in which the artist received the same royalty rate for derivative works by artist and
2 derivative works by publisher." 10/4/12 Kaiser Decl., Dkt 196 ¶ 8. EA relied on Kaiser even
3 though at his deposition he admitted that he played no part in negotiating Antonick's contract. Ex.
4 4, Kasier Dep. at 22-25. Finally, EA instructed its damages expert to "assume" that Antonick wrote
5 no Sega Genesis code and "[w]ith that assumption" she is apparently comfortable opining that the
6 1990 Sega Genesis version "is not a Derivative Work." Ex.5, Nettesheim Rep. ¶ 13.

7 Kitchen's report responds directly to EA's attempt to introduce ambiguity into Amendment
8 VIII where none exists. Kitchen reviewed the deliverables required by Amendment VIII and
9 considered the IP that Antonick contributed from his versions. 10/15 Rep. ¶¶ 12, 65-66. With his
10 30+ years of experience, he concluded that a 3% royalty specified in Amendment VIII for the use
11 of Antonick's IP was reasonable even "if he did not do all the underlying development work."
12 10/15 Rep. ¶ 65. By definition, Kitchen did not "ignore[] the explicit terms" of the contract, as EA
13 argues, since he took the 3% rate directly from Amendment VIII, stating that he "express[es] no
14 opinion on what the parties actually intended." Br. at 12-13; 10/15 Rep. ¶ 65.

15 **6. Kitchen' Offers No Legal Conclusions On Trade Secret Or Copyright Law.**

16 "[A] witness may properly be called upon to aid the jury in understanding the facts in
17 evidence even though reference to those facts is couched in legal terms." *Hangarter*, 373 F.3d at
18 1017 (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)); *see also Valladon v. City of*
19 *Oakland*, 2009 WL 585804, at *3 (expert opinion not inadmissible merely because it "included
20 reference to legal terms or regulations."). Here, Kitchen's testimony is clearly admissible.

21 As regards copyright, Kitchen opines only that the elements of Antonick's IP discussed in
22 the Barr report would have been "generally recognized in the industry at the time of being of a
23 character which would be protectable" under copyright." 10/15 Rep. at ¶ 67. He nowhere opines
24 that these elements *are* copyrightable, or that EA breached the 1986 Contract—the ultimate "legal"
25 issue in this case. Since numerous changes in copyright law have taken place since the Contract's
26 execution, *see* Pl's Opp. To EA's Third MSJ, Dkt 323 at 13 n. 18. (noting that the abstract-
27 filtration test urged by EA did not exist in 1986), an understanding of what people in the industry at
28 the time viewed as copyrightable would help the jury to determine whether EA's games are

1 derivative works of Antonick's if, as EA urges, that term is strictly limited to works that use
2 copyrightable elements from Antonick's game.
3       In regard to potential trade secrets, Kitchen does not offer a legal opinion that any of
4 Antonick's IP was a trade secret or that EA breached the confidentiality provisions of the 1986
5 Contract. To the extent his report has any ambiguity, Kitchen clarified when deposed that he
6 considered identifying a trade secret to be "a legal question." Dep. at 143. Instead, his report is
7 limited to his opinion that the "design elements, methods and processes" in the Barr report would
8 be "generally recognized in the industry at the time as being proprietary and confidential
9 information that would not have been shared with third parties absent the execution of non-
10 disclosure agreements or other assurances of confidentiality." 10/15 Rep. at ¶ 67. Kitchen is clearly
11 qualified to render this opinion based on his "30+ years" in the industry, during which he
12 developed numerous games, ran game development, and negotiated or entered into numerous non-
13 disclosure agreements. Dep. at 141-46.
14       The testimony is also relevant and will aid the jury. It relates to Plaintiff's claim that EA
15 breached the confidentiality provisions of the 1986 Contract that required EA to "obtain and
16 maintain proprietary protection" for Antonick's work, including "trade secret" protection. 1986
17 Contract, § 8.01. EA was also required to safeguard all Antonick's "Confidential Information,"
18 defined to include Antonick's "source code" and "Development Aids" unless the information was
19 (i) "known to the general public"; (ii) "customarily disclosed" to others, (iii) obtained from a "third
20 party"; (iv) "independently derived from other sources" or (v) "required to be disclosed" in
21 litigation. *Id*. §§ 9.02-9.04. Without expert guidance, a jury will be unable to determine, for
22 example, what types of information were "customarily disclosed" to third parties in the videogame
23 industry at the time. Similarly, determining whether EA "maintain[ed]" proprietary protection for
24 trade secrets embodied in the work requires the jury to make a factual determination whether the
25 information contained in the Barr report is a method or process that videogame developers at the
26 time would not have shared with third parties absent assurances of confidentiality.

### IV. CONCLUSION

28 Electronic Arts' motion to strike should be denied.

15

| | | |
|---|---|---|
| 1 | DATED: February 26, 2012 | HAGENS BERMAN SOBOL SHAPIRO LLP |
| 2 | | |
| 3 | | By   /s/ Leonard W. Aragon<br>      LEONARD W. ARAGON |

Robert B. Carey (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
      leonard@hbsslaw.com

Stuart M. Paynter (226147)
Jennifer L. Murray (*Pro Hac Vice*)
Sara Willingham (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
      jmurray@smplegal.com
      swillingham@smplegal.com

Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Attorneys for Plaintiff Robin Antonick