KEKER & VAN NEST LLP
SUSAN J. HARRIMAN - #111703
sharriman@kvn.com
ERIC H. MACMICHAEL - # 231697
emacmichael@kvn.com
R. ADAM LAURIDSEN - #243780
alauridsen@kvn.com
TIA A. SHERRINGHAM - #258507
tsherringham@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188

Attorneys for Defendant
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ANTONICK, an Illinois citizen,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS INC., a California corporation,<br><br>Defendants. | Case No. 3:11-CV-01543-CRB (EDL)<br><br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PORTIONS OF EXPERT REPORT BY GARRY KITCHEN**<br><br>Date:       April 19, 2013<br>Time:       10:00 a.m.<br>Dept:       6, 17th Floor<br>Judge:     Charles R. Breyer<br><br>Date Filed: March 30, 2011<br><br>Trial Date: June 10, 2013 |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    ARGUMENT .......................................................................................................2

       A.   EA's Motion Specifies the Opinions to be Excluded. ...........................2

       B.   Kitchen's Opinions Regarding a "Clean Room" are Irrelevant and
            Unreliable................................................................................................3

       C.   Kitchen's Opinion That the Development Schedule for *Sega Madden*
            Makes it "Very Likely" That EA Used "Antonick's IP" is Unreliable and
            Improper...................................................................................................7

       D.   Kitchen's Opinion That EA's Release of *Sega Madden* in December of
            1990 Was A "Substantial Contributor" to its Success is Admittedly
            Unsupported..............................................................................................8

       E.   Kitchen's Opinion About a "Reasonable Royalty Rate" for Derivative
            Works is Irrelevant and Lacks Foundation. ...........................................9

       F.   Kitchen Impermissibly Opines on Copyright and Trade Secret Law. ...................10

       G.   Kitchen's Opinion that the SNES is in the Same "Microprocessor Family"
            as the Apple II is Irrelevant and Unreliable. ........................................12

III.   CONCLUSION..................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

# **FEDERAL CASES**

*Bourjaily v. United States*
483 U.S. 171 (1987)................................................................................................. 2

*Daubert v. Merrell Dow Pharm.*
43 F.3d 1311 (9th Cir. 1995) ........................................................................... 1, 2, 8

*GE v. Joiner*
522 U.S. 136 (1997)................................................................................................. 8

*GPF Waikiki Galleria, LLC v. DFS Grp., L.P*
2007 WL 3195089 (D. Haw. Oct. 30, 2007) .......................................................... 9

*iGames Entm't, Inc. v. Chex Servs., Inc.*
2005 WL 3657156 (D. Del. June 9, 2005)............................................................ 14

*In re Rezulin Prods. Liab. Litig.*
309 F. Supp. 2d 531 (S.D.N.Y. 2004)..................................................................... 9

*Lego v. Stratos Int'l., Inc.*
2004 WL 5518162 (N.D. Cal. Nov. 4, 2004) ......................................................... 3

*Lust by & Through Lust v. Merrell Dow Pharms*
89 F.3d 594 (9th Cir. 1996) .................................................................................... 2

*Mukhtar v. Cal. State Univ.*
299 F.3d 1053 (9th Cir. 2002) .............................................................................. 10

*Nationwide Transp. Finance v. Cass Information Systems, Inc.*
523 F.3d 1051 (9th Cir. 2008) ................................................................................ 6

*Primavera Familienstifung v. Askin*
130 F.Supp.2d 450 (S.D.N.Y. 2001).......................................................................7

*Salas v. Carpenter*
980 F.2d 299 (5th Cir. 1992) .................................................................................. 8

*Travelers Indem. Co. v. Scor Reinsurance Co.*
62 F.3d 74 (2d Cir. 1995)...................................................................................... 13

*United States v. Hermanek*
289 F.3d 1076 (9th Cir. 2002) ......................................................................... 2, 4, 9

*Wallach v. Longevity Network, Ltd.*
2006 WL 5106206 (C.D. Cal. Apr. 26, 2006) ........................................................ 3

ii

732723.01

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*
  395 F.3d 416 (7th Cir. 2005) .......................................................................... 1, 8

### STATE CASES

*Wolf v. Superior Court*
  114 Cal. App. 4th 1343 (2004) ........................................................................ 15

*Wolf v. Walt Disney Pictures & Television*
  162 Cal. App. 4th 1107 (2008) ........................................................................ 10

### FEDERAL RULES

Fed. R. Evid. 403 ...................................................................................................... 6

Fed. R. Evid. 702 ...................................................................................... 1, 2, 4, 12

iii

DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

732723.01

# I.     INTRODUCTION

The crux of Plaintiff Robin Antonick's opposition is that experts who testify based on their "experience" are not required to employ a reliable methodology, but instead may rely solely on their "background" and "intuition" as a basis for telling the jury what conclusions to draw from the evidence. This premise is wrong as a matter of law. In *Kumho Tire Co. v. Carmichael*, the Supreme Court directed that all experts, including those testifying on the basis of experience alone, must comply with *Daubert* by utilizing reliable methods and demonstrating how their methodology leads to their conclusions. 526 U.S. 137, 149 (1999). Antonick's opposition confirms that Kitchen's opinions are not based on any "principles" or "methods"—other than simply reciting record evidence selected by Antonick's lawyers and then using his "experience" to interpret that evidence for the jury. Reviewing evidence isn't a "methodology," and a "witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

With the exception of his opinion about "Microprocessor Family" (which must be excluded for several other reasons), the opposition confirms that Kitchen's opinions rest solely on the single, amorphous fact that he has worked in the video game industry for "30+ years." Opp. (Dkt. 237) at 1:15; 11:20-27; 12:8-9; 13:1-2; 14:9-10; 15:10-12. That's it. But no amount of "experience" can cure the factual shortcomings in Kitchen's opinions, or excuse him from explaining *how* he reaches his conclusions. That reasoning is entirely absent from his report, from his deposition and from the opposition. Antonick fails completely to explain how any facet of Kitchen's "experience" actually leads to or supports his opinions, or is even relevant to the issues in this case. Because Antonick cannot justify, let alone explain, how Kitchen's "experience" lends any support to his opinions, Kitchen's opinions must be excluded as unreliable.

The fundamental problems with Kitchen's testimony affect its admissibility, and not merely its weight, as Antonick claims. Antonick bears the burden of establishing the

1

732723.01

1   appropriateness of Kitchen's qualifications and experience, the sufficiency of his factual support,

2   and the reliability of the "principles and methods" used for arriving at his opinions. *Bourjaily v.*

3   *United States*, 483 U.S. 171, 175-76 (1987).[1]  Antonick has failed to carry this burden in every

4   respect.  Kitchen's opinions rely on nothing more than his resume and a smattering of record

5   evidence selected by Antonick's counsel.  Because of the powerful and potentially misleading

6   effect of expert testimony, Rule 702 and *Daubert* demand the exclusion of Kitchen's blatant

7   speculation masquerading as "expert testimony."[2]

## II.    ARGUMENT

### A.    EA's Motion Specifies the Opinions to be Excluded.

10          Antonick begins by claiming that EA's motion should be denied because the requested

11   relief is "too vague."  Opp. at 2:10-12.  Nonsense.  Each section in EA's motion begins with a

12   quote from and citation to Kitchen's report, identifying the opinion EA seeks to exclude.  *See,*

13   *e.g.,* Mot. (Dkt. 300) at 6:13-18; 9:3-6; 10:26-11:2; 12:11-14.  EA's Proposed Order also lists the

14   opinions that should be excluded, and does so by lifting the opinions directly out of the section of

15   Kitchen's report entitled "Summary of Opinions."  *Compare* Proposed Order (Dkt. 300-1) *with*

16   Ex. 166 (Report at 27).[3]  Antonick pretends not to understand what is encompassed within these

17   opinions by questioning whether EA is also seeking to exclude the necessary components of those

18   opinions.  Opp. at 2:25-3:7.  In seeking to exclude Kitchen's ultimate opinions on various

---

[1] Antonick's statement that EA bears the "burden of demonstrating inadmissibility"—which he claims without citing any legal authority—is simply wrong.  Opp. at 3:24-25; *see, e.g., Lust by & Through Lust v. Merrell Dow Pharms*, 89 F.3d 594, 598 (9th Cir. 1996) ("proponent of the expert who has the burden of proving admissibility").

[2] Antonick takes inappropriate potshots at one of EA's experts, Edward Lerner.  Lerner's opinions are irrelevant to this motion, and EA will respond to Antonick's misleading characterizations if and when Antonick brings his own *Daubert* motion.  But any suggestion that the Court should lower the standard for admissibility as some sort of trade off for allowing an opinion from another expert is false.  In its role as a gatekeeper, the Court is required to verify the reliability and relevance of ***each*** expert's testimony individually.  *See United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (expert testifying on the basis of experience "must establish the reliability of the principles and methods employed 'to draw a conclusion regarding the *particular matter to which the expert testimony was directly relevant.*'") (emphasis in original) (citations omitted).

[3] All exhibits referenced herein are attached to the Sherringham Decl. (Dkt. 301) or the Supplemental Sherringham Decl. (Exs. AA, BB, CC, and 191), filed herewith.

732723.01

1   subjects, EA also seeks to prevent Kitchen from testifying about each element of those opinions,

2   all of which are plagued by the same reliability and relevance problems identified in EA's

3   motion.[4]

4       **B.      Kitchen's Opinions Regarding a "Clean Room" are Irrelevant and
                 Unreliable.**

5       Antonick's defense of Kitchen's "clean room" opinions goes beyond the pale in every

6   respect. *First*, Antonick states that Kitchen is "clearly qualified to testify about clean room

7   development procedures," and that EA's attack on Kitchen's qualifications is based solely on a

8   technicality—Kitchen's failure to list clean rooms on his resume as an area of expertise.  Opp. at

9   9:14-19.  As EA explained in its opening memorandum, EA's challenge has nothing to do with

10  Kitchen's resume, and everything to do with his admitted lack of relevant experience.  Mot. at 7.

11  Kitchen admitted, under oath, that he is "not an expert" in clean room development procedures;

12  that he has never been qualified as an expert in clean room procedures; that he has "never" been

13  hired to do any work regarding clean rooms; and that he has "never" implemented a clean room

14  as described in his report.  Ex. AA (Kitchen Depo., 226:3-5; 15:15-18; 226:20-227:7; 238:3-6).

15  That lack of experience is dispositive.  *See, e.g., Wallach v. Longevity Network, Ltd.*, 2006 WL

16  5106206, at *2 (C.D. Cal. Apr. 26, 2006) (finding expert unqualified to testify given his "lack of

17  experience in the relevant field").  Kitchen further admitted he has no other relevant experience,

18  stating he could not recall a single situation in his career "where a member of [his] development

19  team had previously been exposed to confidential information of someone else as related to the

20  product that was being developed."  Ex. AA (Kitchen Depo., 232:15-23).  On this record, there is

21  no basis for allowing Kitchen to testify as an expert on the subject of clean rooms.

22      Ignoring Kitchen's own admissions of his lack of relevant experience, Antonick claims

23  that "Kitchen testified that he 'personally' implemented a clean room at least once."  Opp. at

24

---

25  [4] Antonick fares no better on the law.  In the lone case he cites (Opp. at 2:10), the court was
    confronted with a motion in limine to "preclude opinion testimony by any individual who is not
26  disclosed as an expert," with no reference to any particular witness or subject matter.  *Lego v.
    Stratos Int'l., Inc.*, 2004 WL 5518162, at *1 (N.D. Cal. Nov. 4, 2004).  Neither the facts nor the
27  holding of *Lego* bear on this case.

                                                    3
28  DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
                                    KITCHEN
                       Case No. 3:11-CV-01543-CRB (EDL)

732723.01

9:16-17.  That statement is terribly misleading.  The only experience in Kitchen's career that involves a "clean room" occurred 33 years ago, when Kitchen says he and two other engineers tried to reverse-engineer the Atari 2600.  Ex. AA (Kitchen Depo., 26:9-11; 227:8-16).  But this single project had nothing to do with a clean room.  Kitchen admitted that neither he nor anyone else had access to any to any confidential information, and that they never set up a "dirty room" or a "clean room."  *Id.* at 227:24-229:8.  The project involved three people working without any concern over misuse of confidential information.  Indeed, Kitchen even conceded that this situation would not fall within the description of "clean room engineering" set forth in his report.  *Id.* at 236:11-25. This single, inapposite experience does not qualify Kitchen to testify as an expert about clean room development procedures.

Another fundamental problem raised by EA, and unaddressed by Antonick, is that Kitchen never explains *how* the absence of a clean room leads him to conclude that it would have been "almost impossible" to develop the Sega game without utilizing "Antonick's IP," (Mot. at 6-7), rendering this opinion speculative and unreliable.  *See United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (upholding exclusion of government expert qualified on the basis of experience, finding that expert cannot rely on "general qualifications" without explaining the methods used to arrive at his opinions).  This opinion is not based on Kitchen's experience in similar situations, because he admitted he has none.  Ex. AA (Kitchen Depo., 226:3-5; 15:15-18; 226:20-227:7; 238:3-6).  And Kitchen admitted that his opinion was not based on evidence of any particular discussions between EA and the developers of *Sega Madden*, stating "I was not involved in their discussions.  I don't know what was discussed."  *Id.* at 111:20-21; 251:6-25.  Consequently, because this opinion is not based on experience or specialized knowledge, and is not based on sufficient facts or data from the case, it is pure speculation and should be excluded.  An expert who asserts his opinions without explanation or analysis does not satisfy Rule 702's requirement that a witness "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

*Second*, backpedaling from the opinions in Kitchen's report,  Antonick now claims that

732723.01

Kitchen never intended to suggest that the absence of a clean room, by itself, means that it would have been "almost impossible" to develop the Sega game without using "Antonick's IP." Opp. at 9:6-13. That's not what Kitchen wrote in his report:

> As a result of Electronic Arts' failure to institute clean room development procedures, it is my opinion that it would have been almost impossible to develop the Sega Genesis version without incorporating and benefitting from Mr. Antonick's intellectual property, whether intentionally or not.

Ex. 166 (Report at 27) ("Summary of Opinions").

Kitchen makes a similar statement in the introduction to his report, explaining that he was asked to opine whether EA's failure to implement a clean room "meant that it was more likely than not that EA used Mr. Antonick's intellectual property in subsequent games." *Id.* at ¶ 14(2). And, when asked about the basis for this opinion at his deposition, Kitchen confirmed that it was based on the fact that one of the producers of the Antonick-coded games (Richard Hilleman) was also a producer on *Sega Madden*, stating "[i]f you're credited as a producer on a game, I can pretty accurately ***guess*** what you do...***So that's what my opinion is based on.***" Ex. AA (Kitchen Depo., 251:14-25) (emphasis added). In deposition, Kitchen further affirmed his opinion that the *Sega Madden* game would likely constitute "a derivative work of Mr. Antonick's game ***simply by virtue of the fact that Mr. Hilleman was the producer on the Antonick game.***" *Id.* at 256:14-257:1 (emphasis added).[5] Kitchen's report and deposition testimony do not permit Antonick to now recast Kitchen's speculative opinion into something it is not.

*Third*, Antonick's proffered theories of relevance do not withstand scrutiny. Antonick claims that Kitchen's testimony is relevant to rebut percipient witness testimony from EA's

---

[5] In addition to being speculative and unreliable, Kitchen's opinion directly contradicts the argument Antonick's counsel made during the hearing on EA's motion for summary judgment on the statute of limitations. Ex. CC (Transcript of Hearing on July 20, 2012; at 18:12-19). During the hearing, Antonick's counsel argued that Mr. Hilleman's involvement on the *Sega Madden* game – which counsel conceded was known to Mr. Antonick at the time – would not have alerted Antonick to the basis for his claim. *Id.* Kitchen, on the other hand, contends that Mr. Hilleman's involvement, by itself, creates a "substantial risk" that EA's later Madden games would derive from the game Mr. Antonick programmed. Ex. AA (Kitchen Depo., 256:14-257:1). Antonick's expert should not be permitted to make an argument to the jury that directly contradicts an argument his counsel made to the Court to avoid summary judgment.

732723.01

1    witnesses who will testify that they never used "Antonick's IP" in the development of *Sega*

2    *Madden.* Opp. at 8:1-6. According to Antonick, Kitchen can rebut such testimony by

3    "explaining how IP can be misappropriated unintentionally in the absence of rigorous clean room

4    procedures." *Id.* Kitchen's unfounded speculation about what "could" have happened is simply

5    not relevant to the factual determination the jury will be asked to decide. The jury will decide

6    whether *Sega Madden* is a derivative work of Antonick's code based on evidence of similarities

7    and the legal instructions from the Court. Kitchen's musings about what might have happened—

8    based solely on other situations which he has not identified—falls beyond the boundaries of

9    relevant information.

10        Antonick also claims that Kitchen's testimony is relevant because the Contract contains a

11   requirement that EA prove "independent development" for future Madden games. Opp. at 8:13-

12   15. This is a novel and inventive reading of the Contract. Nowhere does the Contract say

13   anything about EA having to show independent development for its games. Tellingly, the

14   provision Antonick cited and quoted in the opposition comes from a section listing boilerplate

15   exceptions to the Contract's definition of "Confidential Information," which includes information

16   that is independently derived by either party. Ex. 15 (Contract, Section 9.03). Antonick cannot

17   credibly argue now that this language has anything to do with Kitchen's discussion about clean

18   rooms, particularly given that Kitchen never mentioned it in any of his reports, and never cited it

19   as a basis for his opinions.

20        *Finally,* Antonick does not even respond to the argument that Kitchen's opinions should

21   be excluded under Rule 403 because they are far more prejudicial than probative. At bottom,

22   whether EA's later Madden games are derivative works of Antonick's code is for the jury to

23   decide based on the evidence. Kitchen should not be permitted to put his thumb on the scale by

24   telling the jury that EA must have utilized "Antonick's IP," regardless of whether he has any

25   basis for saying so. *See Nationwide Transp. Finance v. Cass Information Systems, Inc.,* 523 F.3d

26   1051, 1060 (9th Cir. 2008) ("evidence that merely tells the jury what result to reach is not

27   sufficiently helpful to the trier of fact to be admissible") (citations omitted).

28

C.   **Kitchen's Opinion That the Development Schedule for *Sega Madden* Makes it "Very Likely" That EA Used "Antonick's IP" is Unreliable and Improper.**

Similar to his discussion about clean rooms, Kitchen seeks to testify beyond his qualifications in opining that the development schedule for *Sega Madden* "makes it very likely that [EA] utilized and benefited from Mr. Antonick's intellectual property." Ex. 166 (Report, ¶ 57). EA explained why this isn't proper. Mot. at 9-10. In response, Antonick again claims that Kitchen's "experience" allows him to draw an inference of copying from the fact that *Sega Madden* was programmed in six months. Opp. at 11:20-12:2. But neither Antonick nor Kitchen ever identifies the experience to which Antonick refers. Antonick claims in his opposition that Kitchen worked at a company that once developed a football game (Opp. 11:23-25), but Antonick neglects to inform the Court that when Kitchen was asked under oath whether he personally had any involvement or experience with such games, he said no.[6] Ex. AA (Kitchen Depo, 31:5-15; 274:17-24). Kitchen admitted that not only does he have zero experience in developing football simulation games, he made no effort to analyze the development schedule for *any* other football games for a comparative sense of how long they take to develop. *Id.* at 281:9-19. And when asked to identify what intellectual property EA supposedly would have "utilized and benefited from" in order to finish the game in six months, Kitchen stated that he has no opinion about what EA used, only that it likely used something. *Id.* at 45:21-46:3; 110:2-23; 112:25-113:15; 275:20-276:3. It remains undisputed that Kitchen's opinion is speculative and lacking a proper foundation. *See Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 530 (S.D.N.Y. 2001) (while an expert may "base his opinion on his own experience, he must do more than aver conclusorily that his experience led to his opinion").

As EA explained in its opening memorandum, relying on "intuition" is not a methodology, and "is neither normal among social scientists nor testable—and conclusions that

---

[6] Mr. Kitchen never mentioned this game in his report. It is mentioned for the first time in Antonick's opposition. But Antonick never explains how it supports Kitchen's opinion. For example, there is not a single detail about its development schedule, information that assumedly Kitchen would need to know in order to opine about the development of *Sega Madden*.

732723.01

1   are not falsifiable aren't worth much to either science or the judiciary." *Zenith Elecs. Corp.*, 395

2   F.3d at 419 (quotation marks omitted).  Antonick has the burden to show more than that his

3   witness has special expertise;  he must also demonstrate that, in forming the proffered opinions,

4   the witness has actually applied that expertise properly to the facts of the case, and in a manner

5   that would be helpful to the finder of fact.  *See Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311,

6   1315-16 (9th Cir. 1995) (remand decision).  Because Kitchen's opinion is based solely on his say-

7   so, rather than a single piece of objectively verifiable data, it must be excluded.

8   **D.      Kitchen's Opinion That EA's Release of *Sega Madden* in December of 1990**
         **Was A "Substantial Contributor" to its Success is Admittedly Unsupported.**

9

10      Antonick's opposition confirms that Kitchen conducted ***no*** analysis to support his

11  remarkable opinion that EA's ability to release *Sega Madden* in December of 1990 (three months

12  ahead of an initial schedule) is "substantially" responsible for the commercial success of ***all*** of the

13  subsequent games that EA has developed over the past 20 years, across all subject matters.  Opp.

14  at 12:27-28.  Kitchen's failure to review a single piece of data—or perform *any* type of analysis—

15  in connection with an opinion that tries to explain two decades worth of economic behavior is

16  undisputed.  Antonick's only response is that Kitchen should be permitted to rely solely on his

17  "experience" when opining about anything related to the video game industry.  Opp. at 13:1-2.

18  That is decidedly not the law.  "[N]othing in either *Daubert* or the Federal Rules of Evidence

19  requires a district court to admit opinion evidence that is connected to existing data only by the

20  *ipse dixit* of the expert." *GE v. Joiner,* 522 U.S. 136, 146 (1997).  Instead, district courts are

21  required to exclude opinions where "there is simply too great an analytical gap between the data

22  and the opinion proffered." *Id.*  The analytical gap in Kitchen's analysis is mammoth; this Court

23  must reject his opinion.

24      Separately, Kitchen's opinion should be excluded because EA's overall success on the

25  Sega platform is not relevant to any issue in this case.  Antonick contends this opinion is relevant

26  to "explaining EA's motivations for copying Antonick's IP" (Opp. at 13:9-10), but the law is

27  clear that expert testimony about a defendant's "motivations" is inadmissible.  *See, e.g., Salas v.*

28

DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

732723.01

*Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). Antonick responds that this opinion is relevant to his attempt to recover disgorgement damages. Opp. at 13:11-17. But Antonick does not and cannot explain how EA's success with *other* games on the Sega platform is relevant to a disgorgement analysis. Equally important, this argument has a more fundamental problem: Antonick has not pursued the remedy of disgorgement in this case, as evidenced by the fact that his damages expert made no attempt to calculate disgorgement damages. *See* Ex. 191 (Lloyd Am. Report; 2, 17-19). Antonick cannot assert an entirely new damages theory months after discovery has closed. Kitchen's opinion about EA's "overall success" on the Sega platform remains irrelevant to any issue in this case.

      **E.**    **Kitchen's Opinion About a "Reasonable Royalty Rate" for Derivative Works is Irrelevant and Lacks Foundation.**

      Antonick's opposition concedes that Kitchen did not review a single contract from any source to base his opinion that a 3% royalty rate for Antonick for *both* Derivative Works by Artist and Derivative Works by Publisher would be "reasonable" and within industry norms. Opp. at 14:8-11; Ex. AA (Kitchen Depo., 67:11-69:8; 99:7-100:11). That admission alone compels the exclusion of this opinion.[7] But the foundational problems run much deeper. Antonick argues that Kitchen's "experience" suffices to express this opinion, but Antonick forgets that Kitchen was asked directly at his deposition whether his "experience" supports his contention that "artists receive the same royalty rates for derivative works that they develop as compared to derivative works that are developed by the publisher." Ex. AA (Kitchen Depo., 67:19-68:1). Kitchen's response was: "I can't recall contracts that I've seen that have that specific language one way or the other." *Id.* Accordingly, Kitchen's own testimony establishes that his "experience" provides no foundation or support for this opinion, and it should be excluded. *See Hermanek*, 289 F.3d at

---

[7] *See, e.g., GPF Waikiki Galleria, LLC v. DFS Grp., L.P*, 2007 WL 3195089, at *6 (D. Haw. Oct. 30, 2007) (excluding expert because his "conclusions are not based on his assessment of other similar agreements to clarify or to define terms of art").

732723.01

1    1094 (excluding expert testimony based on experience where the expert "failed to explain in any

2    detail the knowledge, investigatory facts and evidence he was drawing from").

3         Similarly, Antonick does not dispute that the Contract and its amendments specify the

4    applicable rates, which the Court must interpret as a matter of law. *Wolf v. Walt Disney Pictures*

5    *& Television*, 162 Cal. App. 4th 1107, 1125 (2008) ("The interpretation of a contract is a judicial

6    function"). Kitchen's opinion about what would have been "fair compensation" for Antonick—

7    which he admittedly "rendered ***regardless of what [Antonick] agreed to*** … and what was

8    *actually* in the contracts"[8]—is therefore irrelevant, and would only mislead the jury.

9    **F.    Kitchen Impermissibly Opines on Copyright and Trade Secret Law.**

10        Antonick contends that Kitchen's testimony about copyright and trade secret is "clearly

11   admissible" because Kitchen's opinions are limited to facts and offer "no legal conclusions."

12   Opp. at 14:15-20. That claim is flatly contradicted by Kitchen's report, in which he states that the

13   elements identified in Mr. Barr's report were understood to be "of a character which would be

14   protectable under trade secret and copyright." Ex. 166 (Report at 28). That is a legal conclusion.

15   Even if that wasn't Kitchen's intent, no jury could separate some minor factual component from

16   that predominantly legal conclusion. Consequently, this opinion, as set forth in Kitchen's report,

17   violates the Ninth Circuit's rule that expert testimony as to a matter of law is always improper.

18   *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002) ("an expert witness cannot

19   give an opinion as to her legal conclusion").

20        Equally misplaced is Antonick's claim that "an understanding of what people in the

21   industry at the time viewed as copyrightable would help the jury determine whether EA's games

22   are derivative works of Antonick's." Opp. at 14:27-15:1. Simply articulating that argument

23   highlights its inadmissibility. The jury will decide whether EA's games are derivative works of

24   Antonick's based on evidence of similarities between the games, and the Court's legal

25   instructions. Testimony about what lay people in the video game industry viewed as

26

27   [8] Ex. AA (Kitchen Depo., 62:2-3; 62:13-15).

10

28

732723.01

1   copyrightable back in the 1980s is completely irrelevant to that inquiry.  Antonick cites no

2   authority, and EA is not aware of any, which supports the claim that third parties' understanding

3   of copyright law (30 years ago) is relevant to an infringement analysis.

4          Antonick also claims that Kitchen should be allowed to tell the jury whether certain

5   information was generally known to individuals in the industry at the time without access to Mr.

6   Antonick's intellectual property.  Ex. 166 (Report at ¶ 67) ("In my opinion, these elements would

7   not have been generally known to individuals in the industry at the time without access to Mr.

8   Antonick's intellectual property").  Again, Antonick does not cite any authority for this

9   proposition, as the law does not support it.  In *Atmel Corp. v. Information Storage Devices, Inc.*,

10  the court excluded the testimony of an expert opining on what information was "generally

11  known" to individuals in the industry where the expert did not do any research or otherwise seek

12  additional information beyond his unrefreshed recollections.  189 F.R.D. 410, 416 (N.D. Cal.

13  1999).  Likewise, here, Kitchen admitted that he did no research or analysis in connection with

14  forming this opinion:

15          Q.   And my question to you is did you undertake any analysis in this
                 case to ascertain whether or not any of these elements in paragraph
16               67 had been disclosed in a publication as of 1990?

17          A.   No.  Beyond relying on my experience, no.

18          Q.   And did you undertake any analysis in this case to determine whether
                 or not any of these elements were known to other programmers in
19               the video game industry as of 1990?  Other than yourself.

20          A.   I wouldn't even know how to go about that.

21          Q.   Is the answer then no?

22          A.   The answer is no.[9]

23          Kitchen's admission that he did no analysis to reach this opinion means that it must be

24  excluded, as his unrefreshed recollections do not qualify him to testify about what the video game

25  industry as a whole knew or didn't know as of 1990.  Indeed, Kitchen could not even say whether

26

27  [9] Ex. AA (Kitchen Depo., 150:9-23.)

                                               11

732723.01

1    these elements were unique to Antonick's game, or had been used previously in other games that

2    third parties developed. Ex. AA (Kitchen Depo., 146:10-13; 151:21-24).

3           Finally, recognizing that Kitchen's definition of a trade secret is hopelessly overbroad

4    (Mot. at 15), Antonick shifts gears and states that "Kitchen does not offer a legal opinion that any

5    of Antonick's IP was a trade secret or that EA breached the confidentiality provisions of the 1986

6    Contract." Opp. at 15:3-6. Instead, Antonick now claims that Kitchen's opinion is limited to

7    whether or not the elements in the Barr report would be "generally recognized in the industry at

8    the time as being proprietary and confidential information." Opp. at 15:8-9. Regardless of what

9    terminology Antonick settles on, the fact remains that Kitchen is not qualified to tell the jury what

10   the entire video game industry considered proprietary in 1990, given his admission that he did

11   zero analysis or research in connection with forming that opinion:

12          Q.    My question was did you undertake any analysis to determine to what
                  extent these elements were known to other programmers in the video
13                game industry as of 1990?

14          A.    No, I—I answered. My opinion is that they were not known and that's
                  based on my 30-plus years in the industry.
15
            Q.    So what analysis, if any, did you undertake to reach that opinion?
16
            A.    I didn't....[10]
17
     Kitchen's admission that he did not apply any "reliable principles [or] methods" means
18
     that his opinion must be excluded. *See* Fed. R. Evid. 702.
19
            **G.    Kitchen's Opinion that the SNES is in the Same "Microprocessor Family" as
20                  the Apple II is Irrelevant and Unreliable.**

21          Antonick offers four unpersuasive arguments for admitting Kitchen's testimony that the

22   Super Nintendo Entertainment System ("SNES") is part of the same "Microprocessor Family" as

23   the Apple II. Each should be rejected, and the testimony should be excluded.

24          *First*, Antonick claims that the Court already deemed Kitchen's testimony reliable and

25   admissible when it denied EA's Motion for Summary Judgment. Opp. at 4:22-24. Not true. EA

26

27   [10] Ex. AA (Kitchen Depo., 145:16-24).

28   DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
     KITCHEN
     Case No. 3:11-CV-01543-CRB (EDL)

732723.01

1   never attempted to strike or exclude Kitchen's opinion in connection with its summary judgment

2   motion. Instead, EA argued that Kitchen's opinions, to the extent they were relevant, actually

3   supported EA's interpretation of the contract. The Court never addressed, let alone endorsed, the

4   reliability of Kitchen's opinion.

5        *Second,* Antonick contends that Kitchen never suggested that his opinion was based on

6   "anything other than" the language in the Contract. Opp. at 5:2-12. That position is impossible

7   to reconcile with Kitchen's deposition, where Kitchen made clear that his opinion gives zero

8   weight to the terms of the parties' agreement:

> Q.     If the parties had specifically agreed to exclude the Super Nintendo
>             microprocessor family from the Apple II, would you still contend that it
>             falls within the same microprocessor family as the Apple II?
>
>   . . . .
>
> A.     Yes, I believe the 65816 belongs in the 6502 family....
>
> Q.     Even if the parties in this agreement specifically stated that the 65816
>             did not fall within the 6502 family, you would still contend that it does?
>
>   . . .
>
> A.     Yes, because of the emulation mode in the 65816.[11]

     A party cannot use expert testimony in "an effort to persuade the jury to ignore the

contract." *Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 78 (2d Cir. 1995).

Kitchen's testimony cannot help the Court or the jury interpret the Contract, because he admitted

(twice) that no matter what the Contract states, he believes these chips belong in the same family.

Similarly, when presented with Amendment III's definition of the "Apple II Family of

Computers," Kitchen unabashedly "disagree(d)" with the language in the parties agreement,

stating "I'm not saying it's not in the contract; I'm saying I disagree with their characterization."

Ex. AA (Kitchen Depo., 223:22-225:2).[12] Antonick does not dispute that, as a matter of law,

---

[11] Ex. AA (Kitchen Depo., 225:4-25).

[12] Antonick argues that it was permissible for Kitchen to disagree with the language of
Amendment III because its definition of Apple II "Family of Computers" has no bearing on the
meaning of Apple II "Microprocessor Family." Opp. at 5:24-26. Setting aside Antonick's
credibility-straining reading of Amendment III, this argument does not make Kitchen's opinion
reliable because Kitchen does not rely on Antonick's interpretation of Amendment III. Kitchen
said flat out that he "disagree[d]" with the language in Amendment III— not that he shared
Antonick's creative interpretation.

DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

732723.01

1    "[a]n expert giving his view of what contract language means, without linking it to what the

2    parties understood, is not giving relevant evidence." *iGames Entm't, Inc. v. Chex Servs., Inc.*,

3    2005 WL 3657156, at *3 (D. Del. June 9, 2005).  Because Kitchen's opinion is untethered to the

4    language in the Contract and how the parties would have understood it, he cannot assist the Court

5    or the jury in interpreting the meaning of the parties' agreement.

6         *Third*, Antonick accuses EA of constructing a "wholesale fabrication" in claiming that

7    Kitchen admitted that the actual *John Madden Football* ("*JMF*") game released for the SNES

8    utilized the 16-bit mode and was therefore different from the Apple II game in every way material

9    to the Contract (*i.e.*, it utilized different data word sizes, different instructions, and different

10   instruction lengths).  Opp. at 7:1-4.  Again, Antonick's over-heated rhetoric, never supported by

11   actual testimony or evidence, cannot be reconciled with Kitchen's actual testimony:

> Q.    Do you have **any doubt** that the Super Nintendo John Madden Football
>        game was programmed and designed to run on a 16-bit platform?
>
> A.    No.
>        . . .
> Q.    And so accordingly it **utilized data words of 16 bits in length**, correct?
>
> A.    Yes.
>        . . .
> Q.    And you would assume that it **utilizes the longer instructions** found
>        in the 65816 manual?
>
> A.    I'm sure it does to some extent, sure.
>
> Q.    And you would assume that it **utilizes instructions that are new to
>        the 65816 and that are not supported by the 6502**, correct?
>
> A.    Yes.[13]

21        Thus, Kitchen admitted that the *JMF* game designed for the SNES utilized longer word

22   sizes than, longer instructions than, and different instructions from the Apple II game.  Because

23   the Contract states that microprocessors in the same family must actually "***utilize*** the ***same***

24   instruction set and have the ***same*** instruction and data word size,"[14] EA correctly cited Kitchen's

---

[13] Ex. AA (Kitchen Depo., 221:23-222:6; 222:20-223:1) (emphasis added).

[14] *See* Ex. 15 (1986 Contract, Section 1.04) (emphasis added).

DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
KITCHEN
Case No. 3:11-CV-01543-CRB (EDL)

732723.01

1   testimony as confirmation that the actual *JMF* game designed and released for the *SNES* was

2   *different* in every material way from the Apple II game.  In case the testimony cited above was at

3   all unclear, Kitchen went on to say that he "agree[d]" that the *JMF* game released for the SNES

4   was "***written predominantly***" for the 16-bit mode, and not for the reverse compatibility

5   "emulation mode" upon which he based his entire opinion.  *Id.* at 222:17-18 (emphasis added).

6   Antonick cannot walk away from Kitchen's testimony because it doesn't fit with the language in

7   the Contract.

8        *Finally,* Antonick argues that the Court should admit Kitchen's testimony because it is

9   relevant to understanding how people in the "industry" would understand this term.  Opp. at 7:5-

10  13.  Here, though, the parties defined "Microprocessor Family" in their Contract, making what

11  people in the industry think about its meaning irrelevant.  *See Wolf v. Superior Court*, 114 Cal.

12  App. 4th 1343, 1354 (2004) (expert testimony on industry custom and usage of a term admitted

13  because the term was "***not otherwise specifically defined***" in the contract) (emphasis added).  As

14  the parties "specifically defined" "Microprocessor Family" here, the Court and the jury need look

15  no further than the Contract for its meaning.

16              **III.    CONCLUSION**

17       The Court should exclude those opinions and testimony of Antonick's expert Garry

18  Kitchen discussed herein.

19

20  Dated:  March 11, 2013                         KEKER & VAN NEST LLP

21                                      By:   */s/ Eric H. MacMichael*
22                                            SUSAN J. HARRIMAN
                                              ERIC H. MACMICHAEL
23                                            R. ADAM LAURIDSEN
                                              TIA A. SHERRINGHAM
24
                                              Attorneys for Defendant
25                                            ELECTRONIC ARTS INC.

26

27
                              15
28  DEFENDANT'S REPLY MEMORANDUM ISO MOTION TO STRIKE OPINIONS OF GARRY
                                    KITCHEN
                          Case No. 3:11-CV-01543-CRB (EDL)