# KEKER & VAN NEST LLP

633 Battery Street
San Francisco, CA 94111-1809
415 391 5400
kvn.com

**Susan J. Harriman**
(415) 676-2213
sharriman@kvn.com

June 4, 2013

Honorable Charles R. Breyer
United States District Court
Northern District of California
450 Golden Gate Ave.,
San Francisco, CA 94102

Re:   *Robin Antonick v. Electronic Arts Inc.*, Case No. 3:11-cv-01543-CRB

Dear Judge Breyer:

After the Court bifurcated the upcoming trial and ordered that EA's statute of limitations defense be tried first, Antonick's counsel represented that he wanted to call his source code expert, Michael Barr, to testify during phase one. Ex. A (5/23/13 Hearing Tr., 46:25-47:13). EA disputed the relevance and admissibility of Barr's testimony in phase one. *Id.* at 48:7-49:2. The Court asked Antonick's counsel to identify the portions of Barr's report relevant to phase one, and invited the parties to submit five-page letter briefs addressing the scope of Barr's anticipated testimony, so that the Court could determine whether the testimony was appropriate for phase one and decide EA's pending motion in limine to strike portions of Barr's testimony. *Id.* at 49:3-24. The Court reminded the parties that phase one is "not a free-for-all," and that witnesses will not be allowed to "get up and talk" about "all kinds of things." *Id.* at 42:18-21.

Thereafter, Antonick provided EA with a list of six "subjects" on which Antonick anticipated that Barr would testify in phase one. *See* Ex. B. Antonick also stated that he might call another expert during phase one, Garry Kitchen, even though Antonick never mentioned Kitchen during the Pretrial Conference, and EA has a pending *Daubert* motion to strike much of Kitchen's testimony. *Id.* Antonick has refused to identify the portions of Kitchen's report that he believes are relevant to phase one.

EA objects to Antonick's proposed phase one expert testimony for three reasons. **First,** EA objects to the proposed testimony that was not disclosed in the experts' Rule 26 reports. This precludes most of the proposed testimony, as Antonick tacitly concedes that many of the subjects are not contained in the Rule 26 reports. **Second,** most of Barr's proposed testimony centers on what he believes could not be observed from playing EA's subsequent *Madden* games. This testimony becomes relevant only if EA opens the door by suggesting that Antonick could have known about the specific elements that remain at issue by playing subsequent *Madden* games. Unless EA opens that door, Barr's testimony would only confuse the jury

758752.04

June 4, 2013
Page 2

because it is counterfactual to what Antonick alleges actually put him on notice of his claims. ***Third,*** Antonick's proposed testimony would turn phase one into an unduly prejudicial circus—the very "free-for-all" that the Court has cautioned against. Antonick seeks to inject testimony about the merits of his claims. In addition to Barr's substantive opinions, Antonick has identified broad "background" topics for Barr (and possibly Kitchen) to testify about that pertain to the copying of source code, which is irrelevant to phase one. Moreover, Antonick intends to instruct his expert to "assume" that EA copied his source code in a transparent attempt to prejudice the jury.

The Court should preclude Antonick from introducing irrelevant and undisclosed expert testimony during phase one.

**I.    Background**

In the following verified interrogatory response, Antonick explained when he first suspected the basis for his claims:

> In the spring of 2009, Plaintiff heard media reports that Electronic Arts had rented out the Rose Bowl stadium for a celebration of Madden's "20[th] Anniversary." Curious, he went to Electronic Arts' website which had publicity materials again confirming that 2009 marked the 20th Anniversary of Madden. Because Plaintiff's version of Madden was the first and only version released and available in 1989, Electronic Arts seemed to be connecting its current game to his game. This was the first time Plaintiff had ever seen any connection between the current Madden and his work. By this point, however, Plaintiff no longer had complete copies of his original contracts with Electronic Arts. Plaintiff decided to contact Richard Hilleman to see if he could locate copies of Plaintiff's contracts. Plaintiff had not communicated with Richard Hilleman in many years.
>
> Despite Plaintiff's repeated requests, Electronic Arts did not deliver his contract file until July 2009. At approximately the same time, Plaintiff was contacted by an acquaintance named Jack Lindsey who informed Plaintiff about an interview that Electronic Arts' founder Trip Hawkins gave on CNBC, presumably as part of Electronic Arts' publicity efforts surrounding the 20th Anniversary. During this interview, Hawkins acknowledged that having 11 players on each team like a real game had been thought to be a technical impossibility prior to the release of Madden. Hawkins also told the reporter that it took "four years" to solve the problem. Only Plaintiff's version of Madden took four years to develop. Plaintiff was surprised that Mr. Hawkins seemed to be tracing the evolution of the current Madden videogame directly to the version he developed.
>
> Plaintiff then did some web searches for additional information and discovered the website of Park Place co-founder Troy Lyndon. On this webpage, Troy Lyndon credited Richard Hilleman with helping him develop the 1990 Sega Genesis version of Madden and explicitly referred to the "countless hours" Hilleman spent assisting Jim Simmons, Troy Lyndon's only programmer on the

title. Plaintiff knew that Richard Hilleman had also spent "countless hours" working with Plaintiff on Plaintiff's 1989 version. At this point, Plaintiff was stunned because these facts contradicted Electronic Arts' assurances that his intellectual property had not been used and that it had independently developed subsequent versions of Madden.

On July 30, 2009, Plaintiff purchased, and shortly thereafter received, a copy of Madden's 20th Anniversary Collector's Edition. Plaintiff was shocked to see that it contained a timeline that seemed to unambiguously trace every version of Madden released back to the version he developed in 1989. A copy of that timeline is attached hereto as Exhibit B.

All these facts combined to cause Plaintiff to suspect for the first time in July 2009 that perhaps Electronic Arts had not been completely forthright with him in the past about its royalty obligations.

Plaintiff contacted counsel on August 1, 2009.

Ex. C (Antonick's Response to Interrogatory No. 13). Notably, Antonick's interrogatory response makes no mention of source code; to the contrary, he states that it was EA marketing materials that put him on notice. At deposition, he testified that he first suspected his claims *without* reviewing any source code for the allegedly infringing EA games. Ex. D (Antonick Dep. at 218:18-20). Antonick has never said that playing any later *Madden* game put him on notice; he even testified that he has no recollection of playing the first *Sega Madden* game, which was released in 1990. *Id.* at 25:25-26:2.

The issue in phase one, then, is not what Antonick could have learned from reviewing EA's source code or by playing EA's games, because Antonick has already stated under oath that such information played no role in placing him on notice of his claims. Rather, the only issue in phase one is whether Antonick learned any *new* information in 2009, or whether he knew the relevant facts that put him on notice on or before November 21, 2005. Neither Barr's nor Kitchen's testimony sheds any light on that question, and therefore would only confuse the jury about the issue it must decide.

## II.   Legal Argument

### A.   Most of the Proposed Testimony Was Not Disclosed in a Rule 26 Report.

Consistent with Rules 26(a)(2) and 37(c) of the Federal Rules of Civil Procedure, the Court limits direct testimony from experts to matters disclosed in their reports. Dkt. 166 (Pretrial Guidelines at 7). Despite the Court's admonition during the Pretrial Conference that it would "faithful[ly]" enforce this rule during phase one, most of Antonick's proposed subject matters are not contained in Barr's or Kitchen's Rule 26 reports:

- With respect to Proposed Topic 1—background—Antonick specifies five topics, but the *only* topic that is disclosed in Barr's Rule 26 report is an explanation of what is

  meant by source code (ii). Ex. B. For the remaining background topics, Antonick cites only extraneous documents—not Barr's Rule 26 report— thereby conceding that those are not proper trial testimony subjects. *Id.*

- In support of Proposed Topic 2—testimony about the field width—Antonick does not cite anything from Barr's Rule 26 report. Instead, he only cites a declaration that Barr submitted in July 2012, several months *before* Barr's Rule 26 report was served. Ex. B. Barr did not address this issue in his report, which precludes him from opining on it in direct examination.

- In support of Proposed Topic 5—testimony about instant replay—Antonick again cites only to a prior declaration from Barr, but to nothing in Barr's Rule 26 report. Ex B.[1] Antonick cannot bootstrap an old declaration from Barr to attempt to broaden the scope of his testimony.

- Proposed Topic 6 is rebuttal testimony that admittedly was never disclosed in Barr's expert report. Ex. B.

- With respect to Kitchen, Antonick has only stated that Kitchen may offer some "background testimony" in phase one. The only background subject that is arguably within the scope of Kitchen's Rule 26 report is a brief discussion of the platforms at issue (i). The rest are not discussed anywhere in Kitchen's report.

  **B. The Proposed Testimony Is Not Relevant to Issues the Jury Must Decide in Phase One.**

  Barr's proposed testimony about what can and cannot be observed from playing later *Madden* games reflects a misunderstanding of what is at issue in phase one. The issue is not whether Antonick knew or suspected the specific factual bases for his claims that he uncovered in discovery. "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 807 (2005). The plaintiff need not have notice of the specific facts that support each legal element of a cause of action, but rather only "the 'generic' elements of wrongdoing, causation, and harm." *Id.*

  Antonick admits under oath that he was put on notice in 2009 without reviewing any source code. That is, Antonick *affirmatively claims* that he was put on notice before he knew about any of the elements on which Barr intends to testify, i.e., the alleged copying of his field width, the alleged similarities in how the field-flip is implemented in the source code, or the alleged similarity in the play formations. The question the jury will need to resolve is this: given the factual basis that Antonick affirmatively claims put him on notice in 2009, did Antonick

---

[1] Antonick also includes an *incomplete* citation to Barr's expert report, without any pin citation. The Barr Report does not have any disclosure that would support this citation.

*already* have notice of his claims before November 21, 2005, in which case his claims are time barred. Barr's testimony does not assist the jury to answer that question.

At most, testimony about what can and cannot be observed by playing another videogame, including source code within the game, may become relevant only if EA offers testimony suggesting that Antonick would have been put on notice by playing other EA games. But unless EA opens that door, the testimony is irrelevant and would only confuse the jury.

### C. The Proposed Testimony Is Unduly Prejudicial.

Through proposed expert testimony, Antonick seeks to inject the substantive merits of his claims into phase one. Specifically, for topics 2 through 5, Antonick states that Barr "will be instructed to assume that EA used Antonick's source code." Ex. B. There is no reason for Barr to make this assumption, as his testimony in no way depends on code having been copied. This ploy prejudices EA by suggesting to the jury that the merits of Antonick's claims are undisputed. Even if EA were permitted to rebut these assumptions with its own expert testimony, it would expand phase one into the very "free-for-all" the Court seeks to avoid.

Similarly, Antonick seeks to introduce irrelevant subject matters into phase one through Barr's (and possibly Kitchen's) purported "background" testimony. It is undisputed that Antonick suspected he had a claim against EA before reviewing any source code or hiring a source code expert. The jury does not need extensive expert testimony on source code analysis—with topics such as "the difference between source code and compiled code" or the "platforms at issue, including their user interfaces and graphical capabilities"—to determine whether Antonick's claims are timely. Ex. B. The only reason for Antonick to elicit this testimony during phase one is to suggest to the jury that some of Antonick's source code must have been copied. EA will be unduly prejudiced by Antonick's attempt to circumvent the Court's bifurcation order by blurring the line between statute of limitations and merits issues.

Finally, Antonick seeks to offer testimony from Kitchen, even though Antonick never mentioned him during the Pretrial Conference and EA has a pending *Daubert* motion to strike much of his testimony. EA would have requested a hearing on its *Daubert* motion at the Pretrial Conference had Antonick disclosed his intent to call Kitchen during phase one. Regardless, Kitchen has no opinions relevant to phase one—as evidenced by Antonick's refusal to identify portions of Kitchen's report that he believes are relevant. Ex. B at n.2. The Court should not allow Antonick to repackage the opinions of his merits experts as unspecified "background" testimony for the statute of limitations phase.

Respectfully submitted,

*/s/ Susan J. Harriman*
SUSAN J. HARRIMAN